IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| STATE FARM FIRE & CASUALTY<br>INS. CO. a/s/o CIARA TARONJI,<br><br>    Plaintiff,<br><br>v.<br><br>TECHTRONIC INDUSTRIES NORTH<br>AMERICA, INC.,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)   Civil Action No. 1:22-cv-01753<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT TECHTRONIC INDUSTRIES NORTH AMERICA, INC.'S, MOTION TO EXCLUDE OPINIONS OF PLAINTIFF'S EXPERT, JIM SOBOTA

Defendant Techtronic Industries North America, Inc. ("TTI-NA"), respectfully moves this Honorable Court for entry of an order excluding certain opinions offered by Plaintiff's designated expert witness, Jim Sobota, pursuant to Rules 104, 402, 403, and 702 of the Federal Rules of Evidence.

Sobota is a fire investigator who was retained to opine on the fire origin and cause in this case. However, he offered certain opinions as to alleged failure modes and defects associated with the subject Ryobi-brand lithium-ion battery pack. Sobota is not an engineer and, thus, is not qualified to render those opinions. Regardless, those opinions are nothing more than untested, unreliable speculation. Further, Sobota offered certain opinions regarding other potential ignition sources of the subject fire. Those opinions rest on unreliable methodology. When analyzed against the standards for expert testimony established by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), some of Sobota's opinions, as specified below, are inadmissible and should be excluded accordingly.

1

## **TABLE OF CONTENTS**

| | |
|---|---:|
| **BACKGROUND** | Pg. 3 |
|     A. Subject Fire | Pg. 3 |
|     B. Jim Sobota | Pg. 4 |
| **ARGUMENT** | Pg. 5 |
|     A. Sobota is not qualified to testify competently regarding potential failure modes or defects associated with lithium-ion batteries. | Pg. 7 |
|     B. Sobota's defect opinions rest on unreliable methodology. | Pg. 8 |
|     C. Sobota's defect opinions – which are nothing more than an impermissible *ipse dixit* opinion – will not assist the trier of fact. | Pg. 13 |
|     D. Sobota's defect opinions are inadmissible under Rule 403. | Pg. 14 |
|     E. Sobota used unreliable methodology to "rule out" other possible sources of ignition. | Pg. 14 |
|     F. Sobota's opinions related to ruling out alternative ignition sources will not assist the trier of fact. | Pg. 17 |
|     G. Sobota's opinions on ruling out alternative ignition sources are inadmissible under Rule 403. | Pg. 18 |
| **CONCLUSION** | Pg. 18 |

## BACKGROUND

**A.      Subject Fire.**

On May 19, 2020, a residential fire occurred in the basement utility room at Ciara Taronji's house in Hagerstown, Maryland. State Farm Insurance Company held a homeowners insurance policy for Taronji's home. (Compl. ¶ 7). Plaintiff asserts that "[t]he fire and Plaintiff's insured's damages were proximately caused by the aforementioned defective and unreasonably dangerous conditions" associated with the subject battery. (*Id.* at ¶ 21).  The area of origin of the subject fire was within the utility room in the basement of the residence. (Report of Jim Sobota ("Sobota Report"), p. 6, attached as Exhibit A). Specifically, the area of origin was on a metal shelving unit located within the basement utility room. *Id.* According to Sobota, the area of origin was located on the bottom-left shelf when facing the unit, also referred to as "Shelf 1," as indicated below. (Deposition of Jim Sobota ("Sobota Dep.") at 70:3-19, attached as Exhibit B).



At the time the subject fire started, a Ryobi-brand lithium-ion battery (the "subject battery pack") was located on Shelf 4. (Sobota Dep. at 75:16 - 77:10). The subject battery pack was not

3

plugged into, or energized by, a battery charger. The subject battery pack had been on Shelf 4, unplugged, for approximately eight hours before the fire occurred.

Mr. Juan Fernandez, one of the tenants at the subject house, utilized the subject battery pack with his Ryobi-brand chainsaw on the morning of May 19, 2020. (Sobota Dep. at 115:13 – 116:6). Following that use, Mr. Fernandez charged the subject battery pack. *Id.* Once fully charged, Mr. Fernandez placed the subject battery pack on Shelf 4 at approximately 9:30 AM. *Id.*; (Sobota Dep. at 75:16 - 77:10). At approximately 4:15 PM, Mr. Fernandez smoked cigarettes in the basement. (Sobota Dep. at p. 116:8-10). Mr. Fernandez left the house at approximately 4:20 PM. (*See id.* at p. 116:12-14). Around two hours later, the subject fire occurred at approximately 6:18 PM. (Sobota Dep. at 116:15-20).

**B.      Jim Sobota.**

Following the fire, Plaintiff filed this lawsuit in subrogation. Plaintiff alleges that the subject battery was defective and caused the subject fire. (*See generally* Compl.) Plaintiff retained Jim Sobota to testify in support of its claims. Sobota is a certified fire and explosion investigator ("CFEI"). He held several positions with various fire departments prior to entering a consulting role in 2016. (Sobota Report at pp. 185-190).

Sobota was retained to provide opinions as a fire origin and cause expert in this case. (Sobota Dep. at 11:9-12). As listed in his report (Sobota Report at 6-7), Sobota's conclusions are as follows:

1. *The area of fire origin was located within the basement level utility room, more specifically on metal shelfing located to the left as one would enter the room. (See Appendix C – Drawings).*

2. *The cause of the fire resulted from the ignition of combustible materials, as a result of a failure of a lithium-Ion battery cell(s).*

3. *The material(s) first ignited were the batteries combustible liquid electrolyte.*

4. *The act or omissions that brought the ignition source and the material first ignited together resulted from a catastrophic failure of lithium-Ion battery cell(s).*

5. *All other possible sources of ignition were considered and ruled out during the course of our investigation.*

TTI-NA does not dispute Sobota's qualifications to opine as to the subject fire's area of origin, nor does TTI-NA dispute the relevance of that opinion. However, Sobota cannot offer opinions related to any alleged failure mode or defect of the subject battery pack. Sobota is not qualified to render those opinions, and even if he were qualified to do so, his methodology used to form those opinions is entirely unreliable. Sobota's second, third, and fourth opinions, which pertain to alleged failure modes and defects, are inadmissible because of this. Further, Sobota's fifth opinion, relating to other potential ignition sources, is inadmissible, as the methodology used to reach that opinion was unreliable.

## ARGUMENT

Testimony by expert witnesses has the potential to "be both powerful and quite misleading." *Daubert*, 509 U.S. at 595 (quotation omitted). Federal Rule of Evidence 702, therefore, "imposes a special obligation upon a trial judge to 'ensure that any and all [expert] testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589). Under *Daubert*'s "exacting standards of reliability," *Weisgram v. Marley*, 528 U.S. 440, 455 (2000), an expert's bald assurance of validity is not enough. Rather, the party presenting the expert must show that the expert's findings are based on sound science, "which requires an "objective, independent validation of the expert's methodology." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) (emphasis added).

So, under Rule 702, this Court must determine whether an expert is qualified, and if so, whether the opinions they render are reliable. *Shreve v. Sears, Roebuck & Co.*, 166 F.Supp.2d 378, 391 (D. Md. 2001). When evaluating the reliability of expert testimony, Rule 702 only "permits expert testimony 'if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the jury or other trier of fact to understand or resolve a fact at issue.'" *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F.Supp.2d 334, 340 (D. Md. 2011) (citations omitted). And "'[t]he party seeking admission of the expert testimony bears the burden of establishing admissibility by a preponderance of the evidence.'" *Id.* (citing *Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F.Supp.2d 549, 553 (D. Md. 2011)).

Speculation is inadmissible. *See Nease v. Ford Motor Company*, 848 F.3d 219, 231 (4th Cir. 2017) (citing *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)). This Court, not the jury, "must ensure that the proffered expert opinion is 'based on scientific, technical, or other specialized knowledge and not on belief or speculation …'" *Nease*, 848 F.3d at 229 (citing *Oglesby*, 190 F.3d at 250). For product liability claims specifically, speculation is fatal. "[A] plaintiff may not prevail in a products liability case by relying on the opinion of an expert unsupported by any evidence such as test data or relevant literature in the field." *Id.* at 231. When an expert's opinions are unsupported by evidence, this Court must reject them. "The Fourth Circuit does not accept opinions from experts simply because the 'expert says its so.'" *Shreve*, 166 F. Supp. 2d at 400 (citing *Alevromagiros v. Hechinger Co.*, 93 F.2d 417, 421 (4th Cir. 1993)); *see also General Electric v. Joiner*, 522 U.S. 136, 146 (1997) (holding "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected only by the *ipse dixit* of the expert.").

A. **<u>Sobota is not qualified to testify competently regarding potential failure modes or defects associated with lithium-ion batteries.</u>**

The first determination of whether expert testimony is admissible is whether the expert is qualified to render their opinions. *Shreve*, 166 F. Supp. 2d at 391. "[A]n expert's opinion is helpful to the trier of fact, and therefore relevant under Rule 702, 'only to the extent the expert draws on some special skill, knowledge or experience to formulate that opinion; the opinion must be an expert opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert.'" *Id.* at 393 (citing *Ancho v. Pentek Corp.*, 157 F.3d 512, 518 (7th Cir. 1998)).

Sobota's opinions related to alleged failure modes or defects associated with the subject battery pack are inadmissible, because they are outside the scope of his expertise. Presumably this is why Sobota explicitly agreed that he would defer to Plaintiff's engineering expert, C.J. Flaherty, on opinions related to the failure mode and any alleged defect in the subject battery pack.

> Q. Am I fair to assume that you're going to be deferring to Mr. Flaherty for – as to his opinions on the failure mode and any alleged defect in the subject battery pack?
>
> A. Yes.

(Sobota Dep. at 29:17-22).

That admission alone should be the end of this inquiry. But to be sure, Sobota is not an engineer, and he confirmed that he would not provide engineering opinions, design opinions, or manufacturing opinions. (Sobota Dep. at 11:21 – 12:22). Despite admitting that he would defer to Flaherty on opinions related to alleged failure modes or defects, Sobota nonetheless ventured "out of his lane" and offered opinions related to alleged failure modes and defects. Even Plaintiff's engineering expert acknowledged this:

7

> Q. Tell me about that. What did y'all talk about specifically with respect to Mr. Sobota?
>
> A. The – what did we talk about specifically? So Mr. Fratus said that he thought Jim in his deposition, Jim Sobota, allowed himself to get led a little bit too far into the electrical land of opinion-making as opposed to carefully staying in his lane, so to speak, with respect to fire origin.

(Deposition of C.J. Flaherty ("Flaherty Dep.") at 34:20 – 35:6, attached as Exhibit C).

Sobota possesses no specialized skills, knowledge, or experience that qualify him to render engineering opinions as to failure modes or defects associated with lithium-ion batteries. Because he is not qualified to do so, Sobota's opinions related to alleged failure modes and defects of the subject battery pack are inadmissible and due to be excluded.

**B.    Sobota's defect opinions rest on unreliable methodology.**

Even if Sobota were qualified to offer defect opinions, his opinions are inadmissible because they are based on unreliable methodology. For reliability, the main inquiry under *Daubert* is whether proffered testimony "can be (and has been) tested." *Daubert*, 509 U.S. at 593. This consideration is described as a "key component" or "the most significant factor" of a *Daubert* analysis, especially in products-liability cases. *Fireman's Fund Ins. Co. v. Tecumseh Products Co.*, 767 F. Supp. 2d 549, 554 (4th Cir. 2011); *Cummins v. Lyle Industries*, 93 F.3d 362, 362-68 (7th Cir. 1996); *Watkins v. Telsmith, Indus.*, 121 F.3d 984, 992 (11th Cir. 1997); *Pestel v. Vermeer Mfg., Inc.*, 64 F.3d 382, 383–84 (8th Cir. 1995). Courts routinely exclude expert opinions grounded on insufficient testing. *See, e.g.*, *Fireman's Fund Ins. Co.*, 767 F. Supp. 2d at 556 (expert opinion was "plainly insufficient" because his hypothesis was derived from only observations, with no testing); *Jaurequi v. Carter Mfg. Co., Inc.*, 173 F.3d 1076, 1084 (8th Cir. 1999) (expert opinions unsupported by testing excluded as "unabashed speculation"); *Peitzmeier v. Hennessy Indus., Inc.*, 97 F.3d 293, 297 (8th Cir. 1996).

For fire investigations specifically, the Fourth Circuit has recognized and applied the standards set forth in NFPA 921 to evaluate the reliability of an expert's principles and methodology. *Fireman's Fund Ins. Co.*, 767 F. Supp. 2d at 554. Reliable fire investigations require the investigator "to collect data about the fire 'by observation, experiment, or other direct . . . means,' to analyze the data objectively and without speculation, to develop a hypothesis based solely on the data collected, to test the hypothesis by comparing it to all known facts, and to repeat the process until all feasible hypotheses have been tested." *Id.* (citing NFPA 921 4.3.3 – 4.3.6). "Until all these steps are completed, NFPA 921 unambiguously requires an investigator to list the cause of the fire as undetermined." *Id.* (citing NFPA 921 4.3.6). In *Fireman's Fund Ins. Co.,* the court excluded expert testimony because the expert failed to properly collect data per NFPA 921, formed his hypothesis through speculation, and failed to test that hypothesis. *Id.* at 554-555. That was "plainly insufficient" and did not meet "'the same level of intellectual rigor that characterizes the practice of an expert' in the field of fire investigations." *Id.* at 555-556 (citing *Kumho Tire v. Carmichael*, 526 U.S. 137, 152 (1999)).

Sobota agreed that NFPA 921 is the "standard of care" for fire investigations (Sobota Dep. at 24:3-4), and that rigorous testing is required to form a valid hypothesis under NFPA 921. (Sobota Dep. at 124:19 – 125:1). Despite this, Sobota's defect opinions are based not only on insufficient testing, they are based on <u>no testing</u> at all.

> Q. . . . Do you have specialized experience in determining the origin, cause, and circumstances of residential fires allegedly caused by lithium-ion batteries?
> 
> A. Not specifically.
> 
> Q. All right. Thank you. Have you done any FEMA analysis in this case?
> 
> A. No.
> 
> Q. **. . . Did you, Mr. Sobota, do any physical testing of the subject battery pack?**
> 
> A. **No.**

9

> **Q.     Did you do any testing of any exemplar battery pack?**
>
> **A.     No.**

(Sobota Dep. at 22:2 – 23:11) (emphasis added).

Even though he performed no testing related to any defect theory, Sobota still opined that the subject battery failed, causing it to expel materials that were the first fuels ignited. His basis for that opinion is equally consistent with material expulsion from the subject battery pack due to an external fire attack.

> Q.     What is your opinion in this case as to the first fuel ignited?
>
> A.     The gasses from the batteries.
>
> Q.     What is that based on?
>
> A.     Based on my research that when batteries fail, they – there's reaction within the battery and they fail.
>
> Q.     What research?
>
> A.     The research that we talked about earlier. Quintiere's articles, CFI trainer net class I took.
>
> Q.     And in those same training materials, you know and you would agree with me or would you agree with me that those same gases can be admitted from a lithium-ion battery pack that's attacked externally by a fire, right?
>
> A.     Yes.

(Sobota Dep. at 95:10 – 96:4).

Sobota clarified his opinion in that the battery's combustible liquid electrolyte was the first fuel ignited. However, Sobota cannot even state whether the subject battery contained liquid electrolyte, nor did he perform any testing or analysis to determine this. (Sobota Dep. at 96:8 – 97:20).

Sobota digs deeper. He opined that the initial ignition resulted from a failure of cells within the subject battery. Once again, the only evidence that supports this contention is equally consistent with a battery attacked by an external fire. (Sobota Dep. at 97:21 – 99:16). Sobota made this clear:

> Q. And so you would agree with me, sir, that every basis that supports your opinion four are things that can occur when a lithium-ion battery pack is subject to an external fire attack; true?
>
> A. Yes. As well as other things.

(Sobota Dep. at 100:12 – 101:22).

Incredibly, in Sobota's decades of fire investigations, he has <u>never</u> opined that an unplugged lithium-ion battery caused a fire, outside of this case.

> Q. . . . My question is, other than this case, in the thousands of fires that you had previously investigated, you cannot specifically recall under oath another case that you investigated in which you have opined that an unplugged lithium-ion battery caused a fire; true?
>
> A. True.

(Sobota Dep. at 48:12-21).

In his notes from an early scene inspection, Sobota referred to a piece of evidence as a "failed cell." He backtracked and acknowledged that this terminology was incorrect in his deposition. Regardless, he performed no testing to confirm this, nor can he distinguish between what caused the "failed cell."

> Q. So you put that pink tape on there in May or June of 2020 because you made the determination that that was a failed cell?
>
> A. One of them.
>
> Q. Okay. Was that simply based on your gross observations at the scene?
>
> A. Yes.
>
> Q. Without X-Ray, right?
>
> A. Without X-Ray, correct.
>
> Q. Without CT, right?
>
> A. Yes.
>
> Q. Without any testing or analysis, right?
>
> A. Yes.

(Sobota Dep. at 109:3 – 110:1).

> Q. Based upon your training, education, and experience, why did you put the pink tape on there and what, if anything, did you do to determine whether that was a cell that expelled its contents because it was attacked by a fire

11

> versus your belief in May or June of 2020 that it was a failed internal cell failure?
>
> **A.     The reason I can think I put the tape on was to note that that was one of the cells that were damaged. I didn't – I wasn't trying to infer that that one failed by internal damage. It was just a marker to aide in my photography.**

(Sobota Dep. at 110:20 – 111:10) (emphasis added).

> Q.     What, if anything, did you do to distinguish this cell as being externally attacked by fire versus "being a failed cell"?
>
> **A.     I guess I used the term failed generically. Damaged cell may have been a better term.**
>
> Q.     Yeah. So would it be fair and consistent with the scientific method NFPA 921 for us to add a note here that says, either by external fire attack or internal failure? Would that be fair?
>
> A.     That would be fair.

(Sobota Dep. at 111:22 – 112:11)

Sobota performed no testing, much less rigorous testing, to evaluate his defect hypotheses. This is in stark contrast with a reliable investigation performed in accordance with NFPA 921. *See e.g., Fireman's Fund Ins. Co.*, 767 F. Supp. 2d 549. It is the exact essence of *ipse dixit* testimony that is explicitly prohibited. *Gen Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Sobota's defect opinions are nothing more than untested, hypothetical speculation. He based these opinions on evidence that is equally consistent with a non-defective battery subjected to an external fire attack. (Sobota Dep. at 100:12 – 101:22). Despite relying on this non-determinate evidence, Sobota performed <u>no</u> testing whatsoever to evaluate his posed hypotheses. (Sobota Dep. at 22:2 – 23:11). His methodology directly contradicts the requirements of *Daubert* and NFPA 921, and Sobota's defect opinions are due to be excluded accordingly.

As this Court has explained, for testimony to be "relevant under *Daubert*, the proposed expert testimony must have 'a valid scientific connection to the pertinent inquiry as a

precondition to admissibility.'" *Nease*, 848 F.3d at 229 (citing *Daubert*, 509 U.S. at 597). Untested theories are unreliable. *See Id.* at 232 (the expert's "failure to test his hypothesis renders his opinions on the cause of [the] accident unreliable."). Even though an untested theory could be "plausible and 'may even be right[,] … it is no more than a hypothesis, and thus it is not knowledge, nor is it based upon sufficient facts or data or the product of reliable principles and methods applied reliably to the facts of the case.'" *Id.* (citing *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010)). Sobota's defect opinions are nothing more than untested hypotheses that should be inadmissible.

C. **Sobota's defect opinions – which are nothing more than an impermissible *ipse dixit* opinions – will not assist the trier of fact.**

Relevant evidence helps the trier of fact understand evidence or determine a factual issue. *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (citing *Daubert*, 509 U.S. at 591). As the Fourth Circuit has explained, "[t]o be relevant under *Daubert*, the proposed expert testimony must have a 'valid scientific connection to the pertinent inquiry as a precondition to admissibility.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (citing *Daubert*, 509 U.S. at 592). And to determine reliability, "the district court must ensure that the proffered expert opinion is 'based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (citing *Oglesby*, 190 F.3d at 250).

To determine relevance, the Court should consider the underlying substantive claims. *See, e.g.*, *Daubert*, 43 F.3d at 1320 ("In assessing whether the proffered expert testimony 'will assist the trier of fact' in resolving this issue, we must look to the governing substantive standard, which in this case is supplied by [state] tort law."). To succeed on any product liability theory, the "[p]laintiff must establish the existence of a defect." *Hartford Cas. Ins. Co. v. Marpac Corp.*,

193 F.Supp.2d 859, 862 (D. Md. 2002) (citing *Watson v. Sunbeam Corp.*, 816 F. Supp. 384, 387 n. 3 (D. Md. 1993)). "Proof of defect must arise above surmise, conjecture or speculation; and one's right to recovery may not rest on any presumption from the happening of an accident." *Id.* at 862-63 (citing *Virgil v. "Kash N' Karry" Serv. Corp.*, 484 A.2d 652, 657 (Md. App. 1984)). As explained above, Sobota's bare-boned defect hypotheses do not rise above surmise, conjecture, or speculation, and will not assist the trier of fact here.

D. **Sobota's defect opinions are inadmissible under Rule 403.**

Sobota's defect-related opinions, for the reasons outlined above, will confuse the jury. The Court should exclude Sobota's opinions under Rule 403 because the prejudicial effect of the opinions overwhelms their minimal probative value. FED. R. EVID. 403; *Daubert*, 509 U.S. at 595 ("'Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge is weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.'") (internal citations omitted); *see also Higginbotham v. KCS Int'l, Inc.*, 85 Fed. App'x 911, 014 (4th Cir. 2004) ("[W]here the expert proffer has a greater potential to mislead than to enlighten, that evidence may be properly excluded").

E. **Sobota used unreliable methodology to "rule out" other possible sources of ignition.**

Sobota's fifth opinion – that he considered and ruled out all other possible sources of ignition – is based on unreliable methodology. Sobota acknowledged that the scientific method and NFPA 921 required him to consider potential ignition sources other than the subject battery. He claimed to have considered smoking activity, other electrical causes, and incendiary (arson), as alternative ignition sources.

> Q.  So that necessarily means that the scientific method requires you to consider alternative sources of a first fuel ignited other than the subject battery pack; true?

14

> A.	Yes.
>
> Q.	So when you did your thorough examination of the property and used the levels of scientific certainty as discussed in the 2017 edition of NFPA 921, what were your hypotheses as to the cause of this fire?
>
> A.	Smoking, electrical, incendiary.

(Sobota Dep. at 51:15 – 52:4).

However, Sobota's "ruling out" of alternative ignition sources did not comport with the scientific method or NFPA 921. There are two salient examples of this – (1) improperly discarded smoking materials and (2) the soldering iron.

### *Improperly Discarded Smoking Materials.*

Sobota claimed to have considered and ruled out, pursuant to the scientific theory and NFPA 921, improperly discarded smoking materials as a potential ignition source of this fire. He acknowledged that improperly discarded cigarettes cause hundreds of residential fires every year in this country.

> Q.	Would you agree that lighted cigarettes can cause hundreds of residential fires a year in the United States?
>
> A.	Yes.

(Sobota Dep. at 36:17 – 37:6).

While investigating this fire, Sobota found and documented evidence of discarded cigarette butts in make-shift ashtrays in the basement. (Sobota Dep. at 122:14-20). Further, Mr. Fernandez (one of the tenants) reported to Sobota that he was smoking cigarettes in the basement just two hours before the fire. Sobota confirmed that this is within the window of time in which an improperly discarded cigarette can cause a fire. (Sobota Dep. at 116:8 – 117:14).

In ruling out whether an improperly discarded cigarette caused this fire, Sobota relied on two pieces of "evidence" – (1) Mr. Fernandez's statement that he was last in the utility room of the basement at approximately 10:00 AM, and (2) the fact that Sobota did not find any cigarettes in the area of origin. (Sobota Dep. at 117:15-22, 122:21-23 – 123:1-6). But Sobota

15

acknowledged that witness statements about smoking activity pertaining to a fire are often unreliable. In fact, in his own experience, witnesses often misremember, misstate, or even misrepresent their smoking activity – in both time and location – on the day of a fire. (Sobota Dep. at 58:13 – 58:19). Further, Sobota acknowledged that cigarettes can be consumed by the fires they create, leaving no evidence of them behind. Again, he has experienced this first-hand in his career. (Sobota Dep. at 91:10-19). And critically, Sobota admitted that, although he did not find any cigarettes in the area of origin, *that does not mean that there were not cigarettes in the area of origin that were consumed by the fire.* (Sobota Dep. at 122:21-23 – 123:1-6).

Sobota's "methodology" used to rule out an improperly discarded cigarette as the cause of this fire is unreliable. It rests on the statement of a witness – the exact type of statement that he admitted is often unreliable in his own experience – and inconclusive evidence. Sobota acknowledged that cigarettes can be consumed by the fires they create, which he has seen before, leaving behind no evidence of their presence in the area of origin. Sobota performed no testing to rule out this ignition source hypothesis. He performed no other objective evaluation to rule out this hypothesis. Instead, Sobota simply took Mr. Fernandez's word for it, and now he wants the jury to take his word for it. This is the essence of an *ipse dixit* opinion. Sobota admits that the basis for this opinion is often unreliable and performed no independent, objective testing or analysis to evaluate this hypothesis.

### *The Soldering Iron.*

Sobota identified the area of origin of this fire as a specific shelf in the basement utility room, which is referred to as "shelf one." (Sobota Dep. at 70:3-19). He acknowledged that, among other items, a soldering iron was present on shelf one. Sobota also acknowledged that energized soldering irons can cause fires. Critically, Sobota cannot state if the soldering iron present at the area of origin was energized at the time of the fire. Further, he never confirmed

16

whether x-ray imaging or any testing was performed on the soldering iron to answer that question.

> A. I think there was a soldering iron maybe.
>
> Q. Soldering irons can cause fires, can't they?
>
> A. Yes. If on or energized.
>
> Q. Do you know whether the soldering iron that was on shelf one was on or energized at the time of the fire?
>
> A. No, I don't. And I had notes in – from the lab inspection that the soldering iron was supposed to be X-rayed. I believe C.J. was going to take care of that. I haven't gotten the results of that.
>
> Q. So as we sit here today, with you being prepared to offer your full final complete opinions, do you know one way or the other whether that soldering iron was on and energized on shelf one at the time of the fire?
>
> A. No. But I think if it was and there was anything, I'm sure I would have noted that.
>
> **Q. Okay. So the answer to my question is no, I do not know whether the soldering iron was on or energized on shelf one at the time of the fire; is that correct?**
>
> **A. No, I do not know. Not right now.**

(Sobota Dep. at 87:17 – 88:22)

Sobota claimed to have considered and ruled out all potential ignition sources, other than the subject battery. But, the above testimony calls into question whether he even considered the soldering iron. Sobota agreed that energized soldering irons can cause fires. He agreed that a soldering iron was present at the area of origin. He cannot tell a jury whether that soldering iron was energized at the time of the fire. He performed no testing or other independent analysis to determine this. Despite this, Sobota somehow ruled out the soldering iron as the ignition source of this fire without any objective evidence or testing to confirm it.

**F.** **Sobota's opinions related to ruling out alternative ignition sources will not assist the trier of fact.**

To determine reliability, "the district court must ensure that the proffered expert opinion is 'based on scientific, technical, or other specialized knowledge and not on belief or speculation,

17

and inferences must be derived using scientific or other valid methods.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (citing *Oglesby*, 190 F.3d at 250). Sobota's "ruling out" alternative ignition sources here, specifically the soldering iron and discarded cigarettes, are based on speculation. His ruling out the soldering iron as the cause of this fire is based solely on his own conjecture, which he cannot even confirm is accurate. His ruling out of smoking materials as the cause of this fire relies on a witness statement, which he admits is often unreliable in his experience, and inconclusive evidence. He performed no independent testing or analysis to further evaluate either of these opinions. Because of this, Sobota's opinions related to ruling out alternative ignition sources will not assist the trier of fact and should be excluded.

**G.** **Sobota's opinions on ruling out alternative ignition sources are inadmissible under Rule 403.**

Sobota's opinions related to him ruling out alternative ignition sources, for the reasons outlined above, will confuse the jury. The Court should exclude Sobota's opinions under Rule 403 because the prejudicial effect of the opinions overwhelms their minimal probative value. FED. R. EVID. 403; *Daubert*, 509 U.S. at 595.

## CONCLUSION

TTI-NA respectfully requests that the Court exclude Sobota's opinions as outlined above.

Respectfully submitted this 5th day of December 2023,

                */s/ H. Ben Brown III*
                J. Chandler Bailey (admitted *pro hac vice*)
                cbailey@lightfootlaw.com
                Christopher C. Yearout (admitted *pro hac vice*)
                cyearout@lightfootlaw.com
                H. Ben Brown III (admitted *pro hac vice*)
                bbrown@lightfootlaw.com
                LIGHTFOOT, FRANKLIN & WHITE, LLC

The Clark Building
400 North 20th Street
Birmingham, Alabama 35203
(205) 581-0700
(205) 581-0799 (fax)

Jeffrey J. Hines (Bar No. 03803)
GOODELL, DEVRIES, LEECH AND DANN LLP
One South Street, 20th Floor
Baltimore, MD 21202
(410) 783-4000
(410) 783-4040 Facsimile
jjh@gdldlaw.com

***Attorneys for Defendant Techtronic Industries North America, Inc.***

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of December 2023, the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which sends electronic notification of such filing to all CM/ECF participants.

*/s/ H. Ben Brown III*
OF COUNSEL