# EXHIBIT B

## Page 1

IN THE UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF MARYLAND

NORTHERN DIVISION

CIVIL ACTION NUMBER

1:22-CV-01753

STATE FARM FIRE & CASUALTY INSURANCE

COMPANY, a/s/o, CIARA TARONJI

        Plaintiff(s),

vs.

TECHTRONIC INDUSTRIES NORTH AMERICA, INC.,

        Defendant(s).

DEPOSITION TESTIMONY OF:

JAMES A. SOBOTA

June 28, 2023

9:00 a.m.

COURT REPORTER:

DANIELLE BOWMAN, CCR

## Page 2

1    The reading and signing of this deposition
2    has been waived
3        S T I P U L A T I O N S
4        IT IS STIPULATED AND AGREED
5    by and between the parties through their
6    respective counsel that the deposition of
7    JAMES A. SOBOTA may be taken before
8    Danielle Bowman, Certified Shorthand
9    Reporter and Notary Public, State at
10   Large, at the offices of Birmingham
11   Reporting, via Zoom, BIRMINGHAM, ALABAMA,
12   on June 28, 2023, commencing at
13   approximately 9:00 a.m.
14       IT IS FURTHER STIPULATED AND
15   AGREED that the signature to and the
16   reading of the deposition by the witness
17   is waived, the deposition to have the same
18   force and effect as if full compliance had
19   been had with all laws and rules of Court
20   relating to the taking of depositions.
21       IT IS FURTHER STIPULATED AND
22   AGREED that it shall not be necessary for
23   any objections to be made by counsel to

## Page 3

1    any questions, except as to form or
2    leading questions, and that counsel for
3    the parties may make objections and assign
4    grounds at the time of trial or at the
5    time said deposition is offered in
6    evidence, or prior thereto.
7       In accordance with Rule 5(d)
8    of the Alabama Rules of Civil Procedure,
9    as amended, effective May 15, 1988, I,
10   Danielle Bowman, am hereby delivering to
11   Mr. Yearout the original transcript of the
12   oral testimony taken June 28, 2023, along
13   with exhibits.
14       Please be advised that this
15   is the same and not retained by the Court
16   Reporter, nor filed with the Court.

## Page 4

        I N D E X

WITNESS:

James A, Sobota

EXAMINATION BY        PAGE

Mr. Yearout.................... 7

    PLAINTIFF'S EXHIBITS

There were no Plaintiff's Exhibits marked
to this deposition.

    Defendant's EXHIBITS

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 1 | Notice | 45 |
| 2 | Report | 65 |
| 3 | Notes | 65 |
| 4 | Scene Photos | 76 |
| 5 | Lab Exam Photos | 114 |

Page 5

APPEARANCES

FOR THE PLAINTIFF(S):
Charles J. Fratus
FRATUS LAW GROUP, LLC
566 Baltimore Annapolis Blvd.
Severna Park, MD 21146

FOR THE DEFENDANT(S):
Christopher C. Yearout
H. Ben Brown III
LIGHTFOOT, FRANKLIN & WHITE, LLC
The Clark Building
400 North 20th Street
Birmingham, Alabama 35203

Page 6

          I, Danielle Bowman, a
Certified Shorthand Reporter of
Birmingham, Alabama, and a Notary Public
for the State of Alabama at Large, acting
as Commissioner, certify that on this
date, pursuant to the Alabama Rules of
Civil Procedure and the foregoing
stipulation of counsel, there came before
me at the offices of Birmingham Reporting,
via Zoom, BIRMINGHAM, ALABAMA, commencing
at approximately 9:00 a.m. on
June 28, 2023, JAMES A. SOBOTA, witness in
the above cause, for oral examination,
whereupon the following proceedings were
had:

          JAMES A. SOBOTA,
having been first duly sworn, was examined
and testified as follows:
          COURT REPORTER:  Usual
stipulations?
          MR. YEAROUT:  Yes.
          MR. FRATUS:  Yes.

Page 7

EXAMINATION BY MR. YEAROUT:
     Q.   Good morning, Mr. Sobota.
     A.   Good morning.
     Q.   Would you state your name for us,
please?
     A.   James Allen Sobota.
     Q.   How do you spell Sobota?
     A.   S-O-B-O-T-A.
     Q.   Thank you, sir.  And you and I
just met on -- and we're doing this via
Zoom.  You and I just met a few minutes
ago, but have not met before; is that
right?
     A.   That's correct.
     Q.   I understand you've been deposed
before; is that true?
     A.   Yes.
     Q.   All right.  So you know the
ground rules generally, but let me go
through them just out of habit.  Madam
Court Reporter is taking down everything we
say, so let me get my question, put a
question mark on it, and you give your

Page 8

answer that way we have a good clean
transcript.  You know that you can't --
uh-huhs and huh-uhs don't go down on paper
correct or they don't read right, so if you
could answer with a yes or no.  If we need
to take a break, let me know.  We will take
a break.  Just we can't leave a question on
the table and take a break.  You understand
you're under oath, right?
     A.   Yes.
     Q.   What's that mean to you?
     A.   Tell the truth, the whole truth,
and nothing but the truth.
     Q.   All right.  If I ask a direct
question, can we have a deal that you'll
give me a direct answer to the best of your
ability?
     A.   Yes.
     Q.   All right.  And now I see you've
got sort of a shaded, or I don't know what
to call it, background.  Where are you
currently located?
     A.   I'm in my office in my house.

Page 9

1    Q.    Okay.  And where is that located?
2    A.    Purcellville, Virginia.  Do you
3    want an address?
4    Q.    Yes, sir.
5    A.    37096 Longmoor Farm Lane,
6    L-O-N-G-M-O-O-R, Farm Lane, Purcellville,
7    Virginia 20132.
8    Q.    Okay.  And can you hear me okay?
9    A.    Yes.
10   Q.    Okay.  Is there anyone else in
11   the room with you right now?
12   A.    No.
13   Q.    Do you have any documents with
14   you, pieces of paper on your desk or
15   anywhere related to this case?
16   A.    I've got NFPA 921.  I've got my
17   iPad here with some documents that I
18   researched.
19   Q.    921 being NFP -- I didn't mean to
20   interrupt you.  Go ahead.
21   A.    The documents are on my iPad.
22   And yes, NFPA 921.
23   Q.    So the reference to 921 is NFPA

Page 10

1    921, right?
2    A.    Yes.
3    Q.    Have you done all the work that
4    you need to do to render your opinions in
5    this case?
6    A.    Yes.
7    Q.    Have you reviewed all the
8    information and materials that you think
9    you need to review in order to give your
10   opinions today?
11   A.    Yes.
12   Q.    So if this case were set for
13   trial tomorrow, would you be prepared to
14   come in the courthouse and give your
15   opinions based on the work you've done so
16   far?
17   A.    Yes.
18   Q.    Have you reviewed the depositions
19   of Ciara Taronji?
20   A.    Yes.
21   Q.    How about Theresa Taronji?
22   A.    Yes.
23   Q.    How about the deposition of Juan

Page 11

1    Fernandez?
2    A.    Yes.
3    Q.    And those depositions were taken
4    after you generated your December 2022
5    report, and so is any aspect of their
6    testimony have any affect on the opinions
7    that are reflected in your report?
8    A.    No.
9    Q.    And you understand that you're
10   here today as a hired expert by State Farm
11   to give opinions as a fire origin and cause
12   expert; is that right?
13   A.    Yes.
14   Q.    And are your opinions, let's see,
15   five of them, reflected on pages six and
16   seven of your report?
17   A.    Are you asking me are those my
18   opinions?
19   Q.    Yes, sir.
20   A.    Yes.
21   Q.    All right.  You're not an
22   engineer, are you, sir?
23   A.    No.

Page 12

1    Q.    You're not a PE, a Professional
2    Engineer?
3    A.    No.
4    Q.    Are you an electrical engineer?
5    A.    No.
6    Q.    Are you a chemical engineer?
7    A.    No.
8    Q.    Are you a mechanical engineer?
9    A.    No.
10   Q.    And so then, is it fair for me to
11   assume -- strike that.  You're not going to
12   be giving any engineering opinions, are
13   you?
14   A.    No.
15   Q.    And you're not going to be
16   opining on the design of the battery pack
17   at issue in this case, are you?
18   A.    No.
19   Q.    You're not going to be opining on
20   the manufacturer of the battery pack at
21   issue, are you?
22   A.    No.
23   Q.    And you're not going to be

James Sobota                                                    6/28/2023

Page 13

1  opining on any damages in this case, are
2  you?
3      A.    What do you mean by damages?
4      Q.    Damages being the real and
5  personal property damages in terms of State
6  Farm's payments, the amounts of damages
7  paid in this case?
8      A.    No.
9      Q.    All right.  Have you ever
10 designed a battery pack, lithium-ion
11 battery pack?
12     A.    No.
13     Q.    On page three of your report, do
14 you have that in front of you or I can pull
15 it up?
16     A.    If you can pull it up.  I don't
17 have it in front of me.
18     Q.    Okay.  While I'm doing that, let
19 me back up a little bit.  When were you
20 retained in this case?
21     A.    I believe was May 19.
22     Q.    Of what year?
23     A.    2020.

Page 14

1      Q.    What was the date of the fire?
2      A.    May 19, 2020.
3      Q.    You were retained the day of the
4  fire?
5      A.    Yes, I believe so if you want me
6  to check.  I'm looking at my case file that
7  you have or should have a copy of.  I'm
8  sorry.  I was retained on May 20, 2020.
9      Q.    So you were retained the day
10 after the fire?
11     A.    Yes.
12     Q.    By whom?
13     A.    By State Farm, Gwen Edwards.
14     Q.    Before this case, the Taronji
15 case, how many times have you been hired as
16 an expert or to investigate a fire by State
17 Farm?
18     A.    I don't keep track of those
19 numbers, but quite a few.
20     Q.    Quite a few.  Let's try to drill
21 down.  Is that more or less than ten?
22     A.    More than ten.
23     Q.    Is that more or less than a

Page 15

1  hundred?
2      A.    More than a hundred.
3      Q.    More or less than 500?
4      A.    Less than 500.
5      Q.    How about more or less than 250?
6      A.    Like I say, I don't keep track
7  of --
8      Q.    I understand.
9      A.    -- how many numbers.  I would say
10 around 250 and that's overdoing -- I've
11 been doing this for insurance companies for
12 about five or six years now.
13     Q.    Did you say doing this for the
14 insurance company or for insurance
15 companies?
16     A.    Companies.
17     Q.    Other than State Farm, what
18 insurance companies do you do hired expert
19 work for?
20     A.    Erie --
21     Q.    I'm sorry, you broke up.  What
22 did you say?
23     A.    Erie is one of them.  Allstate.

Page 16

1      Q.    Have you ever been hired by an
2  attorney named Sharon Horner?
3      A.    No.
4      Q.    Go ahead.  Erie.  Allstate.  Who
5  else?
6      A.    Erie.  Allstate.  If you name
7  some of the names I will know.  There's a
8  bunch of them.  I just can't think of them
9  right off the top of my head.
10     Q.    And you said you've been doing
11 expert work for the last five to six years?
12     A.    Yes.  I believe seven years.
13 Started in 2015.
14     Q.    So around 250 cases over the last
15 seven years.  Does that give us
16 approximately 35 cases a year?
17     A.    Yes.
18     Q.    And what is your rate as a hired
19 expert for insurance companies?
20     A.    Right now I get paid $70 an hour.
21     Q.    I'm sorry?
22     A.    Right now I get paid $70 an hour.
23     Q.    Well, you need to tell Chuck to

                                4  (Pages 13 to 16)

James Sobota                                                      6/28/2023

---

Page 17

1    up the rate.
2         A.   I've been asking him.
3         Q.   So can you give me an estimate --
4    well, what were you doing before 2015?
5         A.   I worked for Fairfax County Fire
6    & Rescue Department.
7         Q.   Why did you leave Fairfax County?
8         A.   I retired after 32 years.
9         Q.   I'm not asking you to give me a
10   specific number, but in your 32 years at
11   Fairfax, what's your best judgment as to
12   how many fires you investigated?  In the
13   order of thousands?
14        A.   Thousands.
15        Q.   And in the 250 cases that you
16   have served as a hired expert fire
17   investigator for various insurance
18   companies, have those all been in the
19   context of subrogation, for a subrogation
20   matter such as what we're here for today?
21        A.   Are you asking strictly about
22   State Farm fires?
23        Q.   I'm asking about all of the

---

Page 18

1    insurance companies for whom you've done
2    expert work?
3         A.   Yeah.  Being asked this question
4    before, you're asking the difference
5    between subrogation and defense?
6         Q.   Sure.
7         A.   And I would say 99 percent
8    subrogation and 1 percent defense.
9         Q.   And what would the -- for the 1
10   percent defense, what types of cases are
11   those?
12        A.   Recently I had one where an
13   insulation installer installed insulation
14   apparently too close to a flute for a
15   chimney.  Fire chimney.  I had just another
16   one where there was fatality where the
17   electric company was blamed for lack of
18   maintenance on the poles where the wire
19   came down and started the fire.
20        Q.   So after Fairfax County -- after
21   you left Fairfax County, was that in 2015
22   or when?
23        A.   Yes, 2015.

---

Page 19

1         Q.   So starting in 2015, have you
2    exclusively done expert work, fire
3    investigation expert work?
4         A.   Yes.
5         Q.   And 99 percent of which had been
6    in subrogation for what we will call the
7    plaintiff, right?
8         A.   Yes.
9         Q.   So 99 percent of your income has
10   been in connection with being a hired
11   expert by insurance companies, right?
12        A.   Yes.
13        Q.   All right.  Have you ever been
14   hired before -- other than this case, have
15   you ever been hired or worked with
16   Mr. Fratus?
17        A.   Yes.
18        Q.   How many cases?
19        A.   I've got to start keeping track
20   of this.  I don't know.
21        Q.   All right.  More or less than
22   five?
23        A.   More.

---

Page 20

1         Q.   Give me your best judgment.  20,
2    30, 50, a thousand?  What's your best
3    judgment?
4         A.   Over the last seven years, I
5    would say maybe 150.
6         Q.   150 cases with Mr. Fratus?
7         A.   Yes.
8         Q.   And what percentage of those
9    cases have you ever said, you know, Chuck,
10   I've looked in to this, I don't think
11   there's any basis to pursue subrogation?
12        A.   Quite a few.
13        Q.   Okay.  Is that more than
14   50 percent?
15        A.   Yes.
16        Q.   How many cases have you been a
17   hired expert for State Farm working for
18   Mr. Fratus saying let's go, we have a basis
19   to sue for subrogation, out of the 150?
20        A.   10 to 20.
21        Q.   Sir?
22        A.   10 to 20.
23        Q.   In your report on page three, you

---

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

James Sobota                                                6/28/2023

Page 21

1  say you have specialized experience in
2  determining the origin, cause, and
3  circumstances of structural, vehicle, and
4  marine fires; is that true?
5      A.   Yes.
6      Q.   You have specialized experience
7  in determining the origin, cause, and
8  circumstances of residential fires
9  allegedly caused by lithium-ion batteries?
10     A.   I would say my knowledge,
11 training, and experience covers that.
12     Q.   My question was a hair different.
13 Do you have specialized experience in
14 determining the origin, cause, and
15 circumstances of residential fires
16 allegedly caused by lithium-ion batteries,
17 the same way you say you have specialized
18 experience in determining the origin,
19 cause, and circumstances of structural,
20 vehicle, and marine fires?
21     A.   Well, I would say I've had
22 specialized training in structure fires.
23 I've had specialized training in

Page 22

1  lithium-ion batteries.
2      Q.   Okay.  We're getting there, but
3  my question was a hair different still.  Do
4  you have specialized experience in
5  determining the origin, cause, and
6  circumstances of residential fires
7  allegedly caused by lithium-ion batteries?
8      A.   Not specifically.
9      Q.   All right.  Thank you.  Have you
10 done any FMEA analysis in this case?
11     A.   No.
12     Q.   Have you done any physical
13 testing of the subject battery pack?  I
14 know you haven't seen inspection.  I know
15 there were lab exams.  I'm asking about
16 testing of the subject battery pack.
17     A.   I believe the electrical engineer
18 expert, Flaherty submitted the cells for a
19 CAT scan.
20     Q.   Okay.  I'm going to be talking
21 with him later.  Did you, Mr. Sobota, do
22 any physical testing of the subject battery
23 pack?

Page 23

1      A.   No.
2      Q.   Did you do any testing of any
3  exemplar battery pack?
4      A.   No.
5      Q.   Do you know the model of this
6  battery pack?
7      A.   No.
8      Q.   Do you know the manufacturer of
9  the cells contained in the subject battery
10 pack?
11     A.   No.
12     Q.   Is any of that important to you?
13 Would it be important for you to know the
14 model of the battery pack we're talking
15 about or who made the cells?  Sir?
16     A.   Yes, I'm thinking.
17     Q.   Okay.  I'm not trying to push
18 you.  I just didn't know if I wasn't
19 hearing you or if you had already answered.
20     A.   I know.  I would say yes, that
21 would be important.
22     Q.   Okay.  What texts or treatises do
23 you consider authoritative in the field of

Page 24

1  -- as an investigator in a fire origin and
2  cause expert?
3      A.   921 as a standard of care,
4  current fire and investigations manual.
5      Q.   Any others?
6      A.   I can't think of any right now.
7      Q.   So we have got NFPA 921.  That's
8  the fire Bible, right?
9      A.   Standard of care.
10     Q.   And then we've got Kirk's?  Is
11 that K-I-R-K-'-S?
12     A.   Yes.
13     Q.   And what was the full title of
14 that again?  I'm sorry.
15     A.   I have to look it up.  I believe
16 it's Kirk's Fire & Investigation Manual.
17     Q.   And I notice in your report you
18 referenced relying on the 2018 edition of
19 NFPA 921 and there's a couple of references
20 to it.  Is that a typo?  Are you referring
21 to 2017?
22     A.   Yeah, 2017.  I think there's
23 2017.  There's 2021 that's out now.  So

James Sobota                                                    6/28/2023

Page 25

1    yeah, 2017.
2        Q.   All right.  And so 2021 had some
3    updates, revisions, and changes from 2018
4    edition, right?
5        A.   They always do.
6        Q.   So is my question correct?
7        A.   Yes.
8        Q.   And so when you generated your
9    report in December of 2022, did you
10   reference or rely upon the 2021 edition of
11   NFPA 2021?
12       A.   Probably relied on 2021.
13       Q.   Okay.  But your report references
14   2018 and you just told me it was 2017.
15   This is not a gotcha.  I'm not trying to
16   beat you up on the editions.  I'm just
17   wondering to what extent, if any, your
18   opinions are based upon the 2021 edition of
19   NFPA 921?
20       A.   I would say both.
21       Q.   Both the 2017 and 2021 additions?
22       A.   Yes.
23       Q.   All right.  I'm going to show you

Page 26

1    -- and we're going to talk about your
2    report and I've got your notes and we're
3    going to talk more about your file
4    materials, but I want to show you something
5    if I can properly share.  Can you see my
6    screen?
7        A.   Yes.
8        Q.   All right.  And this is a copy of
9    your -- this is Appendix B to your report,
10   which is your CV, right?
11       A.   Yes.
12       Q.   Is this a current CV?
13       A.   You would have to go all the way
14   to the end of it so I can see the date.  Go
15   back down.  In addition to that, I sent an
16   updated one, which has two more depositions
17   on it.  I think that's about the only
18   changes.
19       Q.   When were those two depositions
20   and the names of the cases, if you
21   remember?
22       A.   I'm going to have to pull that up
23   and take a look.

Page 27

1        Q.   Okay.  We will pull that up in a
2    minute.  This is dated December 15, 2022.
3    Since then, you've got two additional cases
4    in which you have provided deposition
5    testimony.  Other than that, are there any
6    changes?
7        A.   No.
8        Q.   You see I've highlighted here --
9    and this is under the section of
10   professional related training.  In March of
11   2019 -- well, what are these professional
12   related changes?  Are these classes,
13   courses, continuing education?  What are
14   they?
15       A.   Yes.  Classes, courses, and
16   continuing education.
17       Q.   Okay.  In March of 2019, you see
18   this says giving stronger depositions and
19   testimony.  Did I read that right?
20       A.   Yes.
21       Q.   What was that?  Is that a class?
22   A presentation?  What was it?
23       A.   Yeah.  It was class given by a

Page 28

1    White & Williams attorney.  I can't think
2    of his name off the top of my head.
3        Q.   A what attorney?
4        A.   An attorney from White &
5    Williams.  I can't think of the name.
6        Q.   What kind of firm?
7        A.   They're a law firm in
8    Philadelphia.
9        Q.   Sure.  Do they do plaintiff
10   subrogation work?
11       A.   Yes.
12       Q.   All right.  So giving stronger
13   depositions and testimony.  Tell me what
14   you've learned in that eight-hour class or
15   presentation?
16       A.   Well, one of the things is being
17   prepared for your case.
18       Q.   How do you do that?
19       A.   Well, research the subject
20   matter, review your case file, review your
21   case notes, look at any other kind of
22   documentation there's out there.
23       Q.   So what did you do to prepare for

7 (Pages 25 to 28)

James Sobota                                          6/28/2023

Page 29

1  your deposition today?
2       A.   All above what I just said.
3       Q.   When did you read the depositions
4  of Theresa Taronji, Ciara Taronji, and Juan
5  Fernandez?
6       A.   Last night.
7       Q.   How long did it take you to do
8  that?
9       A.   About three hours total.
10      Q.   What else did you review?
11      A.   I reviewed an article by
12  Dr. Quintiere.  He wrote a paper on
13  lithium-ion batteries, safety, and scores I
14  believe it is.  I reviewed a CFI trainer
15  podcast about lithium-ion batteries.
16  Amongst other things.
17      Q.   Am I fair to assume that you're
18  going to be deferring to Mr. Flaherty for
19  -- as to his opinions as to the failure
20  mode and any alleged defect in the subject
21  battery pack?
22      A.   Yes.
23      Q.   So then why were you listening to

Page 30

1  a lithium-ion podcast and reading an
2  article about lithium-ion batteries?
3       A.   Well, it's all on the subject
4  matter of this case.  I want to learn more
5  about it.
6       Q.   How do you spell Quintiere.  I've
7  got it as Q-U-I-N-T-E-R-I, but I bet that's
8  wrong.
9       A.   Q-U-I-N-T-I-E-R-E.
10      Q.   I got the first five letters
11  right.  What is the name of that article?
12      A.   Packaging technique to defeat
13  fires and explosions due to lithium-ion and
14  related high energy density batteries.
15  Pipeline hazards materials safety
16  administration of transportation
17  March 2020.
18      Q.   Okay.  And what was the name of
19  the -- you said CFI trainer podcast.
20  What's the name of the podcast?
21      A.   CFI Trainer Net Lithium-Ion
22  Battery Fires.
23      Q.   Okay.  What else, if anything,

Page 31

1  did you review, watch, listen to, observe
2  in preparation for your deposition other
3  than what we've discussed?
4       A.   I can't think of anything else
5  right now.
6       Q.   Did you review your report?
7       A.   Yes.
8       Q.   Your notes?
9       A.   Yes.
10      Q.   File materials?
11      A.   Yes.
12      Q.   All right.  How much time have
13  you spent on this case?
14      A.   Since the beginning?
15      Q.   Yes, sir.
16      A.   Maybe 40 hours.  I would have to
17  go back and count if you would like.
18      Q.   So 40 hours, and that's charged
19  at a rate of $70 an hour?
20      A.   I don't know what it -- well, I
21  do know because I looked at some of the
22  files.  I think he charged -- he is Michael
23  Schaal.  He's the owner of FAIC and I

Page 32

1  believe he charged me $150 an hour.
2       Q.   Okay.  So what the insurance
3  companies pay for your time is $150 an
4  hour; fair?
5       A.   That's my understanding, but I'm
6  not involved in the billing process.
7       Q.   Okay.  So if we take 40 -- I'm
8  not holding you to exactly the number 40,
9  but approximately 40 times 150, that gives
10  us $6,000, right?
11      A.   I guess.  You did the math.
12      Q.   Have you submitted an invoice or
13  has FAIC submitted an invoice to State Farm
14  in this case?
15      A.   I believe they submitted it to
16  Mr. Fratus.
17      Q.   I haven't seen any invoices?
18          MR. YEAROUT:  Chuck, were they in
19  the file materials?  If not, can we maybe
20  get one on the break?
21          MR. FRATUS:  I can ask.  It would
22  be through the -- like you said, Michael
23  Schaal, S-C-H-A-A-L, of Fire Arson

8  (Pages 29 to 32)

James Sobota                                          6/28/2023

---

Page 33

1  Investigation Consultants, which is the
2  FAIC.  But some of these go directly
3  through State Farm rather than myself, so I
4  will check with State Farm and Mike Schaal
5  to see if I can get a list of invoices or
6  bills.
7      MR. YEAROUT:  Not the biggest
8  deal.  I haven't seen one and just wanted
9  to check.
10     MR. FRATUS:  Okay.
11     Q.   Okay.  Back to giving stronger
12  depositions and testimony.  You told me
13  that one of the things you learned from the
14  White & Williams plaintiff subro lawyer is
15  to be prepared for your case, right?
16     A.   Yes.
17     Q.   What else did you learn?  I mean,
18  how do you give a stronger deposition and
19  testimony?
20     A.   Well, one of the tips that I've
21  learned is when you listen to a question,
22  you evaluate the question, you formulate a
23  response, and then you articulate the

---

Page 34

1  response.
2      Q.   Did you need an eight hour class
3  to understand that?
4      A.   I'm sure that was just one of the
5  topics.
6      Q.   Okay.  What are the other topics?
7      A.   I can't remember offhand.
8      Q.   Did you learn -- in that eight
9  hour class given by the White & Williams
10  plaintiff's subro lawyer, did he teach you
11  or give you tips on how to give the best
12  possible deposition testimony to advance in
13  insurance company cases in a subrogation
14  matter?
15     A.   I don't believe there was ever
16  that pointed approach.  In other words,
17  there was no subject line saying, hey, if
18  you really want to win your case for the
19  subject -- for the testimony, this is what
20  you do.  Nothing like that.
21     Q.   Well, then what's the point?
22  What's the point of giving stronger
23  depositions?

---

Page 35

1      A.   Be more professional.
2      Q.   Okay.  Did you get materials of,
3  I don't know, handouts, slides, any reading
4  materials from your giving stronger
5  depositions and testimony eight hour class
6  from the plaintiff's subro lawyer?
7      A.   I may have, but I would have to
8  put on a heck of a search for that.
9      Q.   What would you search?
10     A.   My training files.
11     Q.   So you have a file that's for
12  training materials?
13     A.   Yes.
14     Q.   Could I ask you -- it doesn't
15  have to be today.  Could I ask you to check
16  your files to see if you've got stronger
17  depositions and testimony?
18     A.   Sure.  And what may make it
19  easier for you, I believe that same course
20  of instruction is on CFI Trainer Net.
21     Q.   The podcast?
22     A.   Yes.  It's a podcast.
23     Q.   Okay.  All right.  Let's move on

---

Page 36

1  to another class or presentation.  This is
2  six hours in July of 2022, so less than a
3  year ago.  Smoking materials as ignition
4  source, tell me about that.
5      A.   We talk about all the different
6  ways cigarettes can be an ignition source.
7  Gave examples of fires actually started by
8  smoking materials.
9      Q.   Anything else?
10     A.   Talked about there's a certain
11  percentage of cigarettes that are supposed
12  to be fire safe, but it's really not --
13  really not that many are fire safe.
14     Q.   Really aren't that many
15  cigarettes that are fire safe?
16     A.   Correct.
17     Q.   So I guess basic premise,
18  cigarettes -- lighted cigarettes can cause
19  fires, right?
20     A.   Yes.
21     Q.   And they cause -- lighted
22  cigarettes cause hundreds of residential
23  fires a year; true?

9  (Pages 33 to 36)

James Sobota                                                6/28/2023

Page 37

1      A.    I don't know what the number is,
2   but I'm sure it's a high number.
3      Q.    Would you agree that lighted
4   cigarettes cause hundreds of residential
5   fires a year in the United States?
6      A.    Yes.
7      Q.    All right.  Do you have any
8   materials -- and I was looking at this
9   earlier.  I believe the presenter of
10  smoking materials as ignition source was a
11  member of the -- a gentleman that was a
12  member of the ATF, right?
13     A.    I believe so.  Do you want me to
14  look in my notes here?  Let me see.
15  Jonathan Butta.
16     Q.    That's B-U-T-T-A?
17     A.    B-U-T-T-A, correct.
18     Q.    Do you have the course materials
19  from the Smoking Materials As Ignition
20  Source class?
21     A.    No, I don't.
22     Q.    Is what you learned in that
23  class, does that have any relevance or

Page 38

1   applicability to this case?
2      A.    Yes.
3      Q.    In your opinion?
4      A.    Yes.
5      Q.    How so?
6      A.    For this particular case, the
7   ruling out cigarettes.
8      Q.    Okay.  We're going to come back
9   to that, but I want to finish up on some of
10  this teaching materials or learning
11  materials.  This is a December 2022, six
12  hour class or presentation, Expert
13  Testimony and Lithium Batteries.  Tell me
14  what that one was about.
15     A.    Let's see, David Bridges is an
16  attorney.  Talked about expert testimony.
17  Talked about qualifications, methodology,
18  opinions, the scientific method, the
19  process of putting people on notice,
20  moralization.
21     Q.    You already knew all of those
22  things before December 2022, didn't you?
23     A.    I've taken courses on them before

Page 39

1   and was familiar with them, yes.
2      Q.    Okay.  What else was this class
3   about?
4      A.    This other part was on
5   lithium-ion batteries and that was given by
6   Michael Abraham of ATF.
7      Q.    And you said -- before I went
8   further back, you said some part of this
9   class was taught or presented by David
10  Bridges who is an attorney?
11     A.    Yes.
12     Q.    Is he another plaintiff
13  subrogation lawyer?
14     A.    I don't believe so.  I don't
15  believe so.  I don't know.
16     Q.    And what was the name of the
17  gentleman that talked about the lithium-ion
18  batteries?
19     A.    Michael Abraham from the ATF.
20     Q.    What did he talk about in terms
21  of lithium-ion batteries?
22     A.    He talked about the different
23  charge in corruption.  Something called

Page 40

1   CID, Charge in Corruption device.  The
2   different sizes of the batteries like
3   18650s.  Basically the construction of the
4   batteries, contents, how they work.  The
5   different types of lithium-ion batteries.
6   How they're safely transported.  Stuff like
7   that.
8      Q.    CID, you said charge, I'm not
9   picking on you.  Is it Current Interrupter
10  Device?
11     A.    It could be.  I've heard Charge
12  Interrupted Device.
13     Q.    Okay.  Do you have the course
14  materials from that presentation?
15     A.    No.  They don't give out course
16  materials.  Just taking notes.
17     Q.    All right.  So I've got your file
18  materials or the file materials that
19  Mr. Fratus sent to me.  We are going to
20  mark them at some point, although I don't
21  want to mark however many hundreds of
22  photos necessarily.
23     Other than -- and let me just take

10  (Pages 37 to 40)

James Sobota                                        6/28/2023

Page 41

1    a quick look at what your file is.  So I've
2    got -- are you able to cross reference this
3    with me either from your iPad or your
4    notes?
5        A.    Cross reference what?
6        Q.    Your file materials.
7        A.    I should be able to.
8        Q.    Okay.  The first document I've
9    got is joint scene attendance roster,
10   right?
11       A.    6220?
12       Q.    Correct.
13       A.    I got that.
14       Q.    All right.  I've got your 412
15   Vermont Avenue pictures.  I've got Federal
16   Rule 26 letter, lab exam pictures, 412
17   Vermont Avenue evidence log, 412 street
18   e-mail from insured, and I've got a
19   document called FAIC 20-10622-089.
20       A.    Yes.
21       Q.    Then I have a document called
22   FAIC subro, right?
23       A.    Yes.

Page 42

1        Q.    And then I have forward -- it
2    looks like an e-mail.  Forward State Farm
3    file claim and that's an e-mail between
4    Drew Hornick from TTI and you, May 22 of
5    2020, right?
6        A.    Yes.
7        Q.    And then within that chain is an
8    e-mail between you and Mr. Fratus on
9    May 22, 2020, right?
10       A.    I see reason State Farm fire
11   claim Taronji/Fernandez.  I'm not sure
12   without me opening them all up.
13       Q.    Okay.  And then I've got the
14   document called invoice Larry & Sons,
15   right?
16       A.    Yes.
17       Q.    And then another e-mail, it's re,
18   R-E, CO inspection and this is e-mails
19   between you and Mylika Scatliffe?
20       A.    Yes.  I see the title that you're
21   talking about.  I haven't opened it up.
22       Q.    I don't know if I'm saying that
23   right but it's M-Y-L-I-K-A,

Page 43

1    S-C-A-T-L-I-F-F-E, and then within that
2    chain is an e-mail between Michael Schaal,
3    that's your boss or your partner at AFIC?
4        A.    Not partner.  I don't know what
5    the correct term is.  Part of his company.
6    Senior investigator with his company.
7        Q.    Okay.  And then I also have, it
8    says UV light receipt and this is a receipt
9    for Larry & Sons, right?
10       A.    Yes.
11       Q.    And I have another document, your
12   electronic receipt, which is appears to be
13   a -- I don't know what this is.  A latching
14   box.  What is that?
15       A.    I have that file.  Do you want me
16   to open it up?
17       Q.    Yes.
18       A.    I believe that's a receipt for
19   when I went to Home Depot to get bins for
20   evidence collection.
21       Q.    Okay.  And that's all I've got as
22   part of the file materials that I received.
23   Is there anything else in your file

Page 44

1    materials that pertain in this case?
2        A.    I don't see anything.
3        Q.    Okay.  Other than photos -- and I
4    know you have annotations on some of your
5    photos and there's a scene sketch.  Other
6    than the file materials we just went over
7    and the annotated photos and your notes and
8    your report, have you created any videos,
9    animations, diagrams, any other
10   demonstrative materials pertaining to this
11   case?
12       A.    No.
13       Q.    So what I have that was sent to
14   me is the entirety of your file materials
15   in this case?
16       A.    Yes.
17       Q.    All right.  Let me do a little --
18   I skipped a step.  Let me do a little
19   housekeeping and I'm going to mark as
20   Exhibit 1 and I'm going to share my screen.
21   Can you see my screen?
22       A.    Yes.
23       Q.    Do you recognize this?

                            11  (Pages 41 to 44)

James Sobota                                                      6/28/2023

Page 45

1     A.    Yes.
2           (Defendant's Exhibit No. 1 was
3           marked for identification.)
4     Q.    This is your notice of
5     deposition.  Back up.  When did you get
6     this document?
7     A.    Maybe a week or two weeks ago.
8     Q.    Did you review the document
9     request?
10    A.    Yes.
11    Q.    I'm not going to go through every
12    one of them because there are 26 of them,
13    but you've reviewed all 26 of these
14    document requests.  Did you endeavor to
15    search for and provide materials in
16    response for each of these document
17    requests?
18    A.    Yes.
19    Q.    Outside of your file materials,
20    were there any materials responsive to
21    these document requests that you searched
22    for and found but have not yet provided to
23    me or that I do not yet have?

Page 46

1     A.    I would say the biggest one is
2     the Quintiere document.
3     Q.    Okay.  Do you have that
4     electronically available and can e-mail it
5     to Mr. Fratus?
6     A.    I don't know if I can or not.
7     I'll try.  It's all paid through my IAAI
8     subscription, annual dues.  And all that
9     sort of stuff.  I'm not sure if it's
10    something I can e-mail.  I'll certainly
11    take a look and see if I can.
12    Q.    Okay.  Thank you.  All right.
13    Would you agree with me that a lithium-ion
14    battery can be a victim of an external fire
15    and have one or more of its cells with
16    expelled contents?
17    A.    Yes.
18    Q.    And have you ever, either in your
19    capacity with -- what was the name of the
20    fire department, I'm sorry?
21    A.    Fairfax County Fire & Rescue
22    Department.
23    Q.    Either when you were working with

Page 47

1     Fairfax County or in your time as doing
2     expert work for the past seven years, have
3     you ever investigated a case where you said
4     that there was a fire caused by a battery
5     that was unplugged?
6     A.    No.  I would have to go back in
7     my cases and look, but I can't remember one
8     that was unplugged.  Like I said, I would
9     have to go back and look at the notes of
10    that case I had on fires that had involved
11    lithium-ion batteries.
12    Q.    As we sit here today.  You cannot
13    recall under oath in the thousands of fires
14    that you investigated, investigating a case
15    in which you said an unplugged lithium-ion
16    battery was the cause of the fire; true?
17         MR. FRATUS:  Other than this
18    case?
19    A.    I'm sorry?
20    Q.    Yeah, so let me get it clean.
21    Other than this case, in the thousands of
22    fires that you previously investigated,
23    this is the only one that you can recall

Page 48

1     under oath that you investigated and in
2     which you have opined an unplugged
3     lithium-ion battery was the cause of the
4     fire; true?
5     A.    The reason why I'm hesitating is
6     because there have been lithium battery
7     fires that have been before that were in
8     devices like a scooter or something like
9     that, and right now I can't recall if they
10    were being charged or not being charged.
11    Does that make sense?
12    Q.    It does make sense.  It doesn't
13    quite answer my question though.  My
14    question is, other than this case, in the
15    thousands of fires that you had previously
16    investigated, you cannot specifically
17    recall under oath another case that you
18    investigated in which you have opined that
19    an unplugged lithium-ion battery caused a
20    fire; true?
21    A.    True.
22    Q.    I'm sorry?
23    A.    True.

12  (Pages 45 to 48)

James Sobota                                              6/28/2023

Page 49

1    Q.   Okay.
2         MR. FRATUS:  Should we qualify
3    that to say were there lithium-ion
4    batteries back 35 years ago when you first
5    started investigating fires?  I'm kidding.
6    We can strike that.
7    Q.   Okay.  So Mr. Sobota, you are of
8    course familiar with NFPA 921, right?
9    A.   Yes.
10   Q.   What does it stand for?
11   A.   National Fire Protection
12   Association.
13   Q.   All right.  And your report at
14   page 26, when you lead in to your opinions,
15   you say that you generated your opinions
16   "after a thorough examination of the
17   property and using the levels of scientific
18   certainty as discussed in the 2018 -- and
19   we actually know that to mean 2017 edition
20   to NFPA 921."  Right?
21   A.   Yes.
22   Q.   In order to that, you have to
23   follow the scientific method, right?

Page 50

1    A.   Yes.
2    Q.   And the scientific method under
3    NFPA 921, it starts with recognizing the
4    need, that is identify the problem, right?
5    A.   Yes.
6    Q.   Then you go on to define the
7    problem, right?
8    A.   Yes.
9    Q.   And the next step is to collect
10   data, right?
11   A.   Yes.
12   Q.   And then you analyze the data;
13   true?
14   A.   Yes.
15   Q.   And then you develop hypotheses,
16   right?
17   A.   Yes.
18   Q.   And that's in the category of
19   inductive reasoning, right?
20   A.   Yes.
21   Q.   And then you go on to test the
22   hypotheses, right?
23   A.   Yes.

Page 51

1    Q.   And that's part of deductive
2    reasoning; true?
3    A.   True.
4    Q.   Then you go on to select your
5    final hypothesis, right?
6    A.   Yes.
7    Q.   So the scientific method requires
8    you to develop hypotheses as to what
9    potentially caused a fire, true?
10   A.   Yes.
11   Q.   And then what it requires you to
12   do is to test and analyze and try to
13   disprove your hypotheses, right?
14   A.   That's correct.
15   Q.   So that necessarily means that
16   the scientific method require you to
17   consider alternative sources of a first
18   fuel ignited other than the subject battery
19   pack; true?
20   A.   Yes.
21   Q.   So when you did your thorough
22   examination of the property and used the
23   levels of scientific certainty as discussed

Page 52

1    in the 2017 edition of NFTA921, what were
2    your hypotheses as to the cause of this
3    fire?
4    A.   Smoking, electrical, incendiary.
5    Q.   Incendiary?
6    A.   Yes.
7    Q.   What do you mean by that?  I know
8    what the word means.
9    A.   Fire intentionally set for the
10   wrong reasons.
11   Q.   I gotcha.  Okay.  I've got
12   smoking, electrical, incendiary, and what
13   else, if anything?
14   A.   Right now that's all I had from
15   the information that I observed.
16   Q.   Do you remember this being
17   reported as Theresa Taronji calling in and
18   saying she smelled natural gas?
19   A.   Yes.
20   Q.   Did that have any impact on the
21   hypotheses that you developed?
22   A.   No.
23   Q.   Why not?

13  (Pages 49 to 52)

Page 53

1    A.    Basically I didn't see any signs
2  of a gas fire, if you will.  There was no
3  type of order of explosion or anything like
4  that.  No signs of that.  I know she did --
5  she said both in her deposition and in my
6  note -- I believe in your deposition she
7  heard a shush type of sound and she smelled
8  gas.  And the thing about that, I kind of
9  attributed that odor of gas may have been
10  some of the gases from the batteries.
11    Q.    What's the basis of that opinion?
12    A.    Knowing that there's a light that
13  contains gases or when they heat they form
14  gases and they're expelled.
15    Q.    Okay.  Have you ever done any
16  testing or analysis or otherwise been a
17  part of any circumstance in which a
18  lithium-ion battery was on fire and you
19  smelled its gases?
20    A.    No.
21    Q.    Okay.  So you don't know what
22  lithium-ion battery gas smells like, do
23  you?

Page 54

1    A.    No.
2    Q.    And you mentioned Theresa Taronji
3  deposition and your notes.  Your notes
4  include references to her hearing banging,
5  popping, and hissing, right?
6    A.    Yes.
7    Q.    But as you read last night in her
8  deposition, she recalled simply a constant
9  hissing or shushing sound and did not
10  testify as to any banging or popping; do
11  you remember that?
12    A.    Yes, I do.
13    Q.    What significance of that, if
14  any, does that mean to you?
15    A.    Either she doesn't remember or
16  for some reason she forgot what she heard
17  or heard or saw.
18    Q.    Well, when she spoke with me, she
19  was under oath, right?
20    A.    Yes.
21    Q.    When she spoke to you, she was
22  not under oath, true?
23    A.    Yes.

Page 55

1    Q.    How did you conduct your --
2    A.    I'm sorry, I did not interview
3  her.
4    Q.    You didn't?
5    A.    I did not, no.  I talked to Juan
6  Fernandez and Ciara.
7    Q.    So let's go back to -- you
8  interviewed Mr. Fernandez and Ciara
9  Taronji, right?
10    A.    Yes.
11    Q.    And neither Juan Fernandez or
12  Ciara Taronji were at the residence at the
13  time of the fire; true?
14    A.    Yes.
15    Q.    But Theresa Taronji was present
16  at the time of the fire; true?
17    A.    Yes.
18    Q.    So as part of the scientific
19  method in collecting data -- strike that.
20         NFPA talks about interviewing
21  witnesses as an important part of your
22  investigation, right?
23    A.    Yes.

Page 56

1    Q.    That would be particularly true
2  for witnesses that were present at the
3  scene of the fire, correct?
4    A.    Yes.
5    Q.    Why didn't you interview Theresa
6  Taronji?
7    A.    I can't remember if she was
8  unavailable at that time, but Mr. Fernandez
9  gave me the information or told me what she
10  told him.
11    Q.    Okay.  Did you try to interview
12  Theresa and it went to voicemail or she
13  wasn't home or you were told she's not
14  available?
15    A.    I can't remember.
16    Q.    If you did attempt to interview
17  her and were unable to do so, would that be
18  reflected in your notes?
19    A.    Yes.  Well, I didn't write that
20  down when I reviewed my notes.
21    Q.    How did you conduct your
22  interviews with Mr. Fernandez and Ciara
23  Taronji?  Were they in person or over the

James Sobota                                              6/28/2023

Page 57

1    phone?
2        A.    I would believe mostly in person.
3        Q.    Help me understand mostly.
4        A.    Okay.  I would say a hundred
5    percent -- I mean, I would call them up and
6    say, hey, I'm going to -- what's a good
7    time to meet at your property and then I
8    would interview them in person.
9        Q.    How long was your interview with
10   Mr. Fernandez?
11       A.    I'm estimating maybe a half hour.
12       Q.    Same question for Ciara Taronji
13   -- and that's C-I-A-R-A.  How long was your
14   interview with her?
15       A.    Maybe 15 minutes.
16       Q.    In your experience as a fire
17   investigator -- strike that.
18          How long were you with the fire
19   department?
20       A.    32 years.
21       Q.    32 years.  So 32 years and then
22   seven as an expert.  So in 39 years
23   investigating fires, either the fire

Page 58

1    department or as an expert, in your
2    experience, have you had insurers or
3    homeowners who had misstated or
4    misrepresented or misremembered things
5    about what they were doing, let's say, in a
6    kitchen stove fire for example?  They were
7    actually cooking or left the stove on, but
8    they told you that they didn't have the
9    stove on; did that ever happen?
10       A.    Yes.
11       Q.    All right.  In your 39 years of
12   experience as a fire investigator, have you
13   ever had anyone misrepresent, misstate, or
14   misremember smoking activity that occurred
15   on the day or at a place of a fire?
16       A.    Yes.
17       Q.    That happens relatively often,
18   doesn't it?
19       A.    Yes.
20       Q.    All right.  We've been going a
21   little over an hour.  Can we take just a
22   five minute comfort break?
23       A.    Yes.

Page 59

1        (A recess was taken.)
2        Q.    Let's go back on.  Mr. Sobota,
3    back from a brief break.  In NFPA 921 or
4    generally, are you familiar with the
5    concept of negative corpus?
6        A.    Yes.
7        Q.    What's that mean?
8        A.    It means if you can't find --
9    none of the other evidences is around and
10   that it could be something like incendiary
11   or --
12       Q.    Right.  And more specifically, I
13   want to see if you will agree with me on
14   this.  The process of elimination can be
15   used inappropriately, identifying the
16   ignition source for a fire by believing to
17   have eliminated all ignition sources found,
18   known, or suspected to be present in the
19   area or origin and for which no supporting
20   evidence exists is referred to by some
21   investigators as negative corpus.  Do you
22   agree with that?
23       A.    Yes.

Page 60

1        Q.    And do you agree that the
2    termination of the ignition source must be
3    based on data or logical inferences drawn
4    from that data?
5        A.    Yes.
6        Q.    So what this is basically saying
7    is, the fact that you didn't find some
8    piece of evidence or something that might
9    be a plausible ignition source, doesn't
10   necessarily mean that that wasn't the cause
11   of the fire, right?  Isn't that the gist of
12   negative corpus?
13       A.    It's also in the process of
14   developing a hypothesis, testing them, and
15   choosing the final hypothesis.  That's all
16   within that process.
17       Q.    All right.  And I appreciate
18   that.  To summarize what we just read and
19   what you agreed with me on, negative corpus
20   essentially is the fact that you as a fire
21   investigator didn't find a piece of
22   evidence at a fire scene that's a plausible
23   ignition source doesn't necessarily mean

                        15  (Pages 57 to 60)

Page 61

1    that that was not the cause of the fire,
2    right?
3        A.    I'm formulating.
4        Q.    I'm sorry?
5        A.    Remember I said evaluate,
6    formulate, and articulate in the expert
7    witness and testimony class.  So I'm
8    formulating.
9        Q.    Okay.
10       A.    I would say that you have to take
11   everything into account with those type of
12   things.  So like I guess -- you left me.
13       Q.    I'm listening.
14       A.    Okay.  I mean, there's a whole
15   bunch of things that were there that could
16   have been an ignition source.  Okay.
17   Lightning.  Did lightning occur somewhere.
18   Didn't see any signs of it.  The weather
19   didn't indicate it or anything like that.
20   Is that a possibility or a probability.  So
21   the fact that I didn't find something --
22   you know, all things are possible, but
23   whether or not they're probable are two

Page 62

1    different things.
2        Q.    Okay.  I appreciate all of that
3    and I want to move on.  I just want to make
4    sure I have an answer to the question I'm
5    not sure I have yet.  The concept of
6    negative corpus, which is inappropriate
7    under NFPA 921, is that basically the idea
8    that there can be a plausible ignition
9    source, evidence of which, you as a fire
10   investigator do not find and yet that could
11   actually be the cause of the fire, right?
12       A.    That's what the guide says, yes.
13       Q.    And that's the guide that you
14   follow and that you followed in this case;
15   true?
16       A.    As a guide.
17       Q.    Does that mean you can follow it
18   sometimes but not follow it others?
19       A.    Well, there's -- you know,
20   there's different parts in that I don't
21   agree.  You've got to remember that it's a
22   consensus document.
23       Q.    Well, do you -- in your

Page 63

1    investigation in this case, did you
2    disregard the NFPA 921's guide with respect
3    to negative corpus?
4        A.    Sure.
5        Q.    You disregarded that concept?
6        A.    No.
7        Q.    Okay.  Okay.  So your
8    investigation and your complying with the
9    scientific method, you recognized the
10   concept of negative corpus; fair?
11       A.    Fair.
12       Q.    All right.  How do you define the
13   area of origin in a fire?
14       A.    Defined by basically fire
15   patterns.
16       Q.    Okay.  Anything else?
17       A.    What is there at the scene, what
18   is the ignition source, or the possible
19   ignition sources.
20       Q.    Anything else?
21       A.    Witness statements, arc mapping.
22       Q.    Did you say arc mapping?
23       A.    Yes.

Page 64

1        Q.    Anything else?
2        A.    None that I can think of right
3    now.
4        Q.    Witness statements, including but
5    not limited to those witnesses who were
6    present at the scene of the fire?
7        A.    Yes.
8        Q.    Which you didn't do in this case,
9    right?
10       A.    Yes.
11       Q.    Have you told me everything that
12   you consider in defining the area of
13   origin?
14       A.    That's all I can think of right
15   now.
16       Q.    Okay.  In this case and in your
17   opinion --
18       A.    Can I back up?
19       Q.    Go ahead.
20       A.    Yeah.  Basically, you know, I use
21   systematic approach to investigate all
22   fires.  You know, you go from the least
23   damaged to the worst damaged.  Then you go

16  (Pages 61 to 64)

Page 65

1  down there and evaluate the fire patterns,
2  what the ignition sources are, and you get
3  witness information and evidence collect
4  data and develop hypothesis.  All of that
5  sort of stuff.
6      Q.    In this case, where is the area
7  of origin in your opinion?
8      A.    I believe you have it marked as
9  shelf number two in the photos.
10     Q.    Which photos?
11     A.    I think there were photos in the
12  Juan Fernandez deposition.  Shelf one, two,
13  three, and four.
14         (Defendant's Exhibit Nos. 2-3 were
15         marked for identification.)
16     Q.    Okay.  I'm going to show you and
17  I'm going to mark as Defendant's Exhibit 2
18  your report and I'm going to mark as
19  Defendant's Exhibit 3 what I'm going to
20  call your notes.  Okay.
21     A.    Yes.
22     Q.    And I'm going to show these to
23  you.  Can you see my screen?

Page 66

1      A.    Yes.
2      Q.    Let me scroll to the top.  This
3  is a 54 page document that I'm calling your
4  notes; is that fair?
5      A.    Yes.
6      Q.    At the top this says no report.
7  What does that mean?
8      A.    That means to -- one, no report
9  was requested; two, it's a note to the
10  people that process the information that I
11  did not write a report for this case.
12     Q.    And this says -- go ahead, I'm
13  sorry.
14     A.    I said at that time I did not
15  write a report at the time that this was
16  uploaded.
17     Q.    So what is date in mean?
18     A.    That was when I was notified of
19  the case.
20     Q.    That's when you were hired,
21  right?
22     A.    Yes.
23     Q.    And the date of loss was the day

Page 67

1  before, right, May 19, 2020?
2      A.    Yes.
3      Q.    And this says -- this is a little
4  squiggly line that means approximately,
5  right?
6      A.    Yes.
7      Q.    Is that 17:30?
8      A.    Yes.
9      Q.    So that means -- what does that
10  mean?  That the fire occurred at
11  approximately 5:30 p.m.?
12     A.    That was some of the information
13  I got, yes.
14     Q.    And date of inspection, May 21,
15  2020, is that the date that you conducted
16  an inspection of the residence?
17     A.    Yes.
18     Q.    How long were you there on May 21
19  of 2020?
20     A.    If you scroll back up -- can you
21  scroll up?
22     Q.    I can.  Well, I do mine inverse.
23     A.    Yeah.  I'm going to say two to

Page 68

1  three hours maybe.
2      Q.    Before I get to this, do you know
3  Mr. John Crist, C-R-I-S-T?
4      A.    I met him before.
5      Q.    When did you meet him?
6      A.    Training classes.
7      Q.    Did you talk with him in
8  connection with this case?
9      A.    Yes.
10     Q.    What did y'all discuss?
11     A.    I think it's on my notes there if
12  you scroll up.
13     Q.    We will get to it.  I'm just
14  asking if you remember.
15     A.    Yeah.  I remember talking to him.
16  We talked about what he thought the origin
17  of fire was, where it was, what the
18  witnesses told him.
19     Q.    Okay.  You got a page here, page
20  seven of your notes.  I'm going to get you
21  to translate some of them.  I think I can
22  read most of this.  I need translation and
23  help on some of them.  This highlighted

James Sobota                                                    6/28/2023

Page 69

1   area here says, "Larry & Sons contractor,
2   new AC and this Christie," C-H-R-I-S-T-I-E.
3   Does that indicate that you called her on
4   May 21, 2020?
5       A.   Yes.
6       Q.   And then you have a note that
7   says, "Will get back to me"?
8       A.   Yes.
9       Q.   Did you ever speak with or
10  interview Christie with Larry & Sons?
11      A.   Not other than that phone call,
12  they didn't get back to me.
13      Q.   Why did you reach out to Christie
14  at Larry & Sons?
15      A.   Just to see what their activities
16  were.
17      Q.   Okay.  All right.  Now, I want to
18  skip forward to -- we were talking about
19  the area of origin.  Bear with me.  I
20  apologize.  Do you see this photograph?
21      A.   Yes.
22      Q.   This is on page 18 of your notes
23  and I want to make sure we're on the same

Page 70

1   page.  Can you see my cursor?
2       A.   Yes.
3       Q.   So we're looking at the shelving
4   in the basement of the Taronji residence,
5   right?
6       A.   Yes.
7       Q.   And I believe you just told me
8   that you defined the area of origin as
9   being at shelf two?
10      A.   Yes.
11      Q.   And the way we numbered them in
12  the deposition and the way I believe
13  Mr. Flaherty designated them, this bottom
14  left shelf is one; is that right?
15      A.   I stand corrected then.  Shelf
16  one.
17      Q.   So you're defining the area of
18  origin as being shelf one?
19      A.   Yes.
20      Q.   We go clockwise, right?  Bottom
21  left shelf is one, top left shelf is two,
22  top right shelf is three, and then I've
23  called the bottom right shelf four?

Page 71

1       A.   Yes.
2       Q.   Are we on the same page?
3       A.   Yes.
4       Q.   And you made a note in your
5   report about when you were there conducting
6   your investigation at the residence, that
7   the fire department had overhauled the
8   scene.  Do you remember that?
9       A.   Yes.
10      Q.   What does that mean?
11      A.   Making sure everything is
12  extinguished.
13      Q.   I'm sorry?
14      A.   Make sure the fire is
15  extinguished.
16      Q.   Of course.  Is there anything
17  else about overhauling the scene other than
18  putting the fire out?
19      A.   It's different for each fire.
20      Q.   How about this one?
21      A.   Well, this one, I believe John
22  Crist's report was that they used a
23  relatively low amount of water and very low

Page 72

1   disturbance.
2       Q.   On shelf four, see these stacks
3   of tiles?
4       A.   Yes.
5       Q.   And you have -- we see here on
6   this right stack of tiles a battery
7   charger, right?
8       A.   Yes.
9       Q.   And you understand that that
10  battery charger was actually on the floor
11  farther to the right of the basement,
12  right?
13      A.   Yes.
14      Q.   Who put that battery charger
15  there?
16      A.   Me.
17      Q.   So you put it there where it is
18  depicted in this picture, but then you have
19  a note, you have an arrow over to this left
20  stack of tiles that says most probable
21  location of charger, right?
22      A.   Yes.
23      Q.   What's the basis of that

Page 73

1  statement?
2      A.   Well, I believe there were
3  protected patterns of that piece of tile
4  that match the charger I believe at that
5  time.
6      Q.   Okay.  Is that the protected area
7  or is that --
8      A.   No.  At the time I took the
9  picture, I think what I was trying to
10  document was what Mr. Fernandez says where
11  he put the charger.
12      Q.   Okay.  And your notes indicate --
13  and I'm not quoting them verbatim, but your
14  notes indicate that basically Mr. Fernandez
15  had put the battery pack on top of the
16  charger but not connected into the charger.
17  Do you remember that?
18      A.   Yes.
19      Q.   And then last night when you read
20  his deposition, you remember reading his
21  testimony that he testified that he put the
22  battery pack to the left of the charger
23  approximately six inches apart.  Do you

Page 74

1  remember that?
2      A.   I remember that, but I remember
3  you making notations on the photograph but
4  I could not find those notations on the
5  photograph that was in the deposition.
6      Q.   But I'm talking about his
7  testimony.
8      A.   Yes.  I remember that testimony.
9      Q.   So you understand he testified
10  that he placed the unplugged battery
11  approximately six inches to the left of the
12  unplugged charger on the shelf, right?
13      A.   Yes.  Can I elaborate on that as
14  well?
15      Q.   Sure.  Go ahead.
16      A.   Fire Marshal Crist was told that
17  the battery and/or the charger were placed
18  on shelf one.
19      Q.   And that would be incorrect,
20  right?
21      A.   I don't know.
22      Q.   Well, you say here in page 18 of
23  your notes, most probable location of

Page 75

1  charger is on top of a tile that's on shelf
2  four, right?
3      A.   I did say that at that time based
4  on what Mr. Fernandez was saying.
5      Q.   Okay.  Is your opinion now
6  different?
7      A.   Yeah.  Taking in to account what
8  the fire marshal said and even listening
9  and even reading Mr. Fernandez' testimony,
10  he was back and forth on exactly where he
11  put anything in there.  I think one of the
12  words he said was, okay, let's just go with
13  that.  So he wasn't too -- he wasn't too
14  convincing on where he actually put the
15  charger and the battery.
16      Q.   All right.  Well, where does
17  Mr. Sobota place the charger and the
18  battery on the date of the fire?
19      A.   I think the charger was over on
20  tiles and I think that the battery was
21  probably located closer to shelf number
22  one.
23      Q.   You see this photograph I'm

Page 76

1  showing you?
2      A.   Yeah.
3      Q.   I'll represent to you this was
4  one of your photographs as jpeg210068 and
5  I'm going to annotate this.  I want to see
6  where -- and I know we're doing this via
7  Zoom, which makes it a little bit more
8  difficult.  How about this.  See my cursor?
9      A.   Yes.
10      Q.   Stop me where I'm at the point
11  where you think the battery pack was.
12      A.   Right in there.
13      Q.   All right.
14      A.   And I base that on right below it
15  are a good amount of the cell cases.
16      Q.   Okay.  And so you see my blue
17  box?
18      A.   Yes.
19          (Defendant's Exhibit No. 4 was
20          marked for identification.)
21      Q.   And so let's -- we're going to
22  call that blue box that I've put on -- I'm
23  going to mark this as Defendant's 4.  It's

James Sobota                                                          6/28/2023

Page 77

1    going to be a collection of -- there are 32
2    photographs within a PowerPoint and these
3    photographs consist of a combination of
4    your scene photographs as well as Mr. Drew
5    Hornick's photographs. And on slide 11,
6    which is your photograph 210068, is this a
7    fair representation with this blue box
8    where you say the battery pack was located
9    at the time of the fire?
10        A.  It's fair.
11        Q.  Okay. And you see how these --
12   so the right -- the right stack of tiles
13   are stacked relatively straight, right?
14        A.  The right stacks of the tile?
15        Q.  Yes, sir. Over here.
16        A.  Yes.
17        Q.  And you then see next to my blue
18   box how four or five -- I don't know how
19   many. Several of the tiles are sort of
20   spread out to the right?
21        A.  Yes, I see that.
22        Q.  You attribute that to fire
23   suppression efforts?

Page 78

1        A.  Possible.
2        Q.  Well, is it probable?
3        A.  Yeah, I would say it's probable.
4        Q.  All right. So more likely than
5    not, the arrangement -- the way we see this
6    left stack of tiles arranged and the three
7    or four on top, more likely than not, that
8    arrangement is attributable to fire
9    suppression efforts, fair? That's what you
10   just told me. I'm just trying to get you
11   to --
12        A.  Yeah, I know. I know. I'm
13   thinking based on one, the lack of water
14   that was in the room. And I know I was
15   there the day after the fire or two days
16   after the fire. My other thought about
17   displaced tiles could be from the failure
18   of the lithium-ion batteries as well.
19        Q.  Okay. So you're saying one
20   possibility for the displacement of several
21   tiles is the failure of a lithium-ion
22   battery pack?
23        A.  Yes.

Page 79

1        Q.  Do you hold that opinion within a
2    reasonable degree of fire science
3    certainty?
4        A.  Based on my training, yes.
5        Q.  You just 35 seconds ago told me
6    that more likely than not, the displaced
7    tiles was from fire suppression efforts.
8    Is that still your testimony or not?
9        A.  I think -- actually I think it's
10   less likely than fire suppression efforts.
11        Q.  What is less likely?
12        A.  That the tiles are from fire
13   suppression efforts.
14        Q.  Okay. What just changed in the
15   last 35 seconds? I thought you said it was
16   probable and thus more likely than not that
17   the fire suppression efforts moved those
18   tiles that we see in this picture on
19   Defendant's 4 at slide 11. What changed?
20        A.  Basically my mind. After
21   considering looking at the pictures and
22   remembering the scene and the fact that the
23   fire department said that they used very

Page 80

1    little water.
2        Q.  Okay. They used a dadgum fire
3    department fire hose, right?
4        A.  Yes.
5        Q.  And so when you say using very
6    little water, you're talking about the
7    amount of time that they had the suppress
8    the fire, not the pressure at which the
9    water is coming out of the hose, right?
10        A.  It depends on what they flowed
11   the nozzle at. You don't have to open it
12   up full blast.
13        Q.  Well, do you know how open the
14   nozzle was when they put out this fire?
15        A.  No.
16        Q.  Did you ask Mr. Crist?
17        A.  No.
18        Q.  Did you ask anybody?
19        A.  No.
20        Q.  So then what is the basis of your
21   opinion that it is the battery as opposed
22   to a fire department's fire hose that
23   displaced these tiles?

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

James Sobota                                                6/28/2023

Page 81

1      A.    Just now looking at the picture
2   and the way that the tiles are displaced,
3   it could have been from part of the --
4   there's a whole bunch of possibilities.  It
5   could have been from the fire department
6   moving things to check to see if the fire
7   was out.  It could have been partially from
8   the fire stream and could partially be also
9   from the reaction of the batteries.
10     Q.    Okay.  Did you do any testing --
11  as part of the scientific method, did you
12  do any testing to develop any sort of
13  hypothesis or opinion as to the battery --
14  lithium-ion battery pack displacing these
15  tiles?
16     A.    No.
17     Q.    How many times do you say you've
18  used a fire hose in your career?
19     A.    Many, many, many times.  If I
20  could back up to one of your questions
21  about if I did any testing.  I have
22  observed videos of how lithium-ion
23  batteries fail.

Page 82

1      Q.    Tell me about those videos.
2      A.    Well, basically when the cells
3   fail, they do so in a catastrophic means.
4   They shoot out flames like a Roman candle.
5   They are propelled from their pack.
6      Q.    What is propelled from their
7   pack?  What is propelled from their pack?
8      A.    What is propelled from their
9   pack?
10     Q.    That's what you just said.  I'm
11  trying to understand what's propelled.
12     A.    They move away from their pack at
13  a very, very high rate of speed.
14     Q.    Whose videos were these?
15     A.    I think that was some of the
16  videos I saw in one class that I just
17  talked about.
18     Q.    I'm sorry, Mr. Sobota, I don't
19  know if it's on my end or not.  I think
20  we're having connection issues.  Can you
21  still hear me?
22     A.    Yes.
23     Q.    You said --

Page 83

1      A.    I think the videos that I last
2   remember were those -- we talked about
3   earlier about that lithium-ion battery
4   class that was taught.  I believe Butta
5   from the ATF.
6      Q.    Butta videos?
7      A.    Butta.  Just other still pictures
8   and documentations that I've read.
9      Q.    Okay.  Let's focus on the videos.
10  How many videos were there?
11     A.    I do not remember.
12     Q.    Were Mr. Butta's videos, were
13  they depicting some sort of test that he
14  set up or was it videos of an actual say
15  security footage or whatever showing an
16  actual event that happened with a
17  lithium-ion battery pack?
18     A.    It could have been with a
19  security video and I don't remember if
20  there were tests or specifically if they
21  were video camera security.
22     Q.    Where were those batteries?  Were
23  there multiple battery packs in the videos?

Page 84

1      A.    I don't remember.
2      Q.    What were the batteries placed
3   upon or where were they located?
4      A.    I don't remember.
5      Q.    What do you remember about the
6   videos other than Roman candle stuff?
7      A.    Mainly observing the type of
8   reaction.
9      Q.    Okay.  Do you know whether those
10  videos were from showing the lithium-ion
11  battery's reaction when they were subject
12  to external fire or whether it was showing
13  the reaction of a lithium-ion battery pack
14  that experienced an internal cell failure?
15     A.    I don't know.
16     Q.    You don't know either way?
17     A.    No.
18     Q.    It could be that the videos you
19  saw were showing the reaction of a battery
20  pack that had been attacked by fire, true?
21     A.    It could have been.
22     Q.    So after all of that, do we still
23  agree -- do you still agree with what's in

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

James Sobota                                                    6/28/2023

Page 85

```
1    slide 11 of Defendant's 4 in this blue box
2    as to where the battery pack was located?
3        A.    Yes.
4        Q.    All right.  And I'm going to do
5    -- just so we're not getting confused on
6    our shapes, I'm going to do a circle for
7    the charger and I want you to tell me -- I
8    want you to stop my cursor when I'm where
9    you believe the charger was located at the
10   time of the fire?
11       A.    Right there.
12       Q.    Right here?
13       A.    Yeah.  But actually maybe back up
14   just a little bit to the right.
15       Q.    Is that fair?
16       A.    That's fair.  Maybe on the tile
17   that I had in the picture.  I really don't
18   know.
19       Q.    All right.  So is it your opinion
20   that this is a fair and accurate depiction
21   of -- this blue circle is a fair and
22   accurate depiction of where you believe, in
23   your opinion, the battery charger was
```

Page 86

```
1    located?
2        A.    Yes.
3        Q.    I want to talk about shelf one.
4    What all was located on shelf one at the
5    time of the fire?
6        A.    The information I had, there was
7    a plastic bin full of regular alkaline type
8    of batteries.  There was a cup of what I
9    believe Mr. Hernandez described as a
10   purplish liquid, which I interpreted it to
11   be fuel from a recent furnace change-out.
12   There was also a report that there was --
13   that was from John Crist that there was the
14   little girl's craft supplies there.  There
15   were aerosol cans and paint containers.
16       Q.    Are all of those items that you
17   just listed to me combustible?
18       A.    To a varying degree, yes.
19   There's drywall compound on there as well.
20       Q.    Did Mr. Crist describe any detail
21   that you recall of the craft supplies?
22       A.    No.
23       Q.    Do you have any other information
```

Page 87

```
1    about the craft supplies?
2        A.    No.
3        Q.    Do you know if they included
4    let's say pens, paint, paper, anything like
5    that?
6        A.    No.  I don't know the makeup of
7    what the craft supplies were.
8        Q.    But nevertheless, all the items
9    you just listed for me are in your opinion
10   combustible items?
11       A.    Yes.
12       Q.    Anything else on shelf one?
13       A.    There was a modem that they said
14   they didn't use.  It was left there by the
15   previous owner.
16       Q.    Anything else?
17       A.    I think there was a soldering
18   iron maybe.
19       Q.    Soldering irons can cause fires,
20   cant' they?
21       A.    Yes.  If on or energized.
22       Q.    Do you know whether the soldering
23   iron that was on shelf one was on or
```

Page 88

```
1    energized at the time of the fire?
2        A.    No, I don't.  And I had notes in
3    my -- from the lab inspection that the
4    solder iron was supposed to be X-rays.  I
5    believe C.J. was going to take care of
6    that.  I haven't got the results of that.
7        Q.    So as we sit here today, with you
8    being prepared to offer your full final
9    complete opinions, do you know one way or
10   the other whether that soldering iron was
11   on and energized on shelf one at the time
12   of the fire?
13       A.    No.  But I think if it was and
14   there was anything, I'm sure I would have
15   noted that.
16       Q.    Okay.  So the answer to my
17   question is no, I do not know whether the
18   soldering iron was on or energized on shelf
19   one at the time of the fire; is that
20   correct?
21       A.    No, I do not know.  Not right
22   now.
23       Q.    Okay.  You mentioned a cup of
```

                                    22  (Pages 85 to 88)

James Sobota                                                    6/28/2023

---

Page 89

1  purplish liquid that you referred to as
2  fuel oil; is that right?
3      A.   Yes.
4      Q.   I'm going to go back to your
5  notes here.  This is page 17 of your notes.
6  It has a photograph of the shelf, right?
7      A.   Yes.
8      Q.   And you have annotations with
9  yellow ink, blue ink, red ink, right?
10     A.   Yes.
11     Q.   You say here -- do I read
12 correctly in yellow, "Plastic container
13 with batteries."  It points down and it's
14 got a little blue box, right?
15     A.   Yes.
16     Q.   What kind of batteries?
17     A.   Alkaline batteries.
18     Q.   All right.  And then you have a
19 yellow bucket looking thing that says
20 "Tupperware container w/," which means
21 with, right?
22     A.   Yes.
23     Q.   "With fuel oil open container."

---

Page 90

1  Did I read that right?
2      A.   Yes.
3      Q.   What was the size of the
4  Tupperware container?
5      A.   Roughly about the way it was
6  described to me.  About the size that you
7  see in comparison to the paint cans.
8      Q.   I'm sorry?
9      A.   I said roughly the size that was
10 conveyed to me by Mr. Fernandez.  Maybe a
11 little even smaller than in comparison to
12 the size of the paint cans in the back.
13     Q.   So we're not talking about like a
14 solo cup.  It's a Tupperware container
15 that's not quite as big as a paint can
16 similar to the paint cans we see above your
17 yellow drawing of the Tupperware, right?
18     A.   Yes.
19     Q.   And in your notes, you said that
20 Tupperware container was filled with liquid
21 from oil furnace (removed) near point of
22 origin (fuel oil reddish color).  Do you
23 know the volume of the fuel oil that was in

---

Page 91

1  the Tupperware container that was nearly
2  the size of the paint can?
3      A.   I'm not saying that it was the
4  size of the paint can.  I would say
5  probably a quarter of a size of a paint
6  can.  I didn't see that container.
7      Q.   Because the container was
8  consumed by the fire; true?
9      A.   Yes.
10     Q.   Can cigarettes be consumed by a
11 fire?
12     A.   Yes.
13     Q.   And you've experienced this
14 before, haven't you?  There's been a
15 cigarette-induced fire and you investigated
16 it and couldn't find any evidence of
17 cigarettes in the area or point of origin,
18 right?
19     A.   Yes.
20     Q.   All right.  So what was the
21 volume of the fuel oil in the Tupperware
22 container, if you know?
23     A.   I do not know.

---

Page 92

1      Q.   Did you ask anybody?
2      A.   Mr. Fernandez kind of held his
3  hand in a small circular pattern saying how
4  big the Tupperware container was.  I
5  imagine that's how I got that size.
6      Q.   And when I read your notes and
7  they say filled with liquid from oil
8  furnace, I interpret that as being pretty
9  well full.  Are you saying that it was full
10 or did it simply contain -- the Tupperware
11 container contained the fuel oil?
12     A.   I'm thinking it just contained
13 the fuel oil.
14     Q.   Okay.  Do you have any estimate
15 as to the volume?
16     A.   No.  Estimate?
17     Q.   Yes, sir.
18     A.   Ounces.
19     Q.   Yes, sir.
20     A.   Several ounces.
21     Q.   Okay.  Is that between three and
22 five?
23     A.   Yes.

23 (Pages 89 to 92)

Page 93

1    Q.    And fuel -- well, let me ask you
2   this:  What was the chemical composition of
3   the fuel, if you know?
4    A.    No.  I don't know the chemical
5   composition.
6    Q.    Was it diesel?
7    A.    Similar to diesel.  I guess it's
8   a different breed of diesel.
9    Q.    Would you agree with me that the
10  flash point of liquid diesel is
11  approximately 105 degrees Fahrenheit at
12  minimum?
13   A.    Yes.
14   Q.    Would you also agree with me --
15  let me back up.  In general, a liquid with
16  a lower flash point is easier to ignite,
17  right?
18   A.    Yes.  Lower the flash.
19   Q.    And you agree with me that liquid
20  diesel, it's flash point is as minimum
21  approximately 105 degrees Fahrenheit,
22  right?
23   A.    Yes.

Page 94

1    Q.    And would you also agree with me
2   that the flash point of liquid gasoline is
3   negative 45 degrees Fahrenheit?
4    A.    Yes.
5    Q.    Would you agree that cigarettes
6   have a burning temperature of 930 and
7   1300 degrees when free burning?
8    A.    Yes.
9    Q.    All right.  I want you to assume
10  for me hypothetically that a battery pack
11  fails and shoots out that -- does the Roman
12  candle thing, shoots out flames, can a jet
13  of flames come out of a battery pack ignite
14  a container containing three to five ounces
15  of fuel?
16   A.    I think eventually -- and what I
17  mean by that is that the plastic container
18  that it was in, another surrounding
19  combustible was burning, would have to melt
20  that container and release the liquid.  In
21  other words, that container initially is
22  protecting that fluid.
23   Q.    Right.  So to be direct -- well,

Page 95

1   let me ask it this way:  If I took a match
2   and threw it in a Tupperware container of
3   three to five ounces of fuel, it would not
4   light the thing on fire, would it?
5    A.    No, it would not.
6    Q.    Because that fuel would quench
7   it, wouldn't it?
8    A.    Yes.  And the temperature of that
9   time wouldn't be producing a flash point.
10   Q.    What is your opinion in this case
11  as to the first fuel ignited?
12   A.    The gases from the batteries.
13   Q.    What is that based on?
14   A.    Based on my research that when
15  batteries fail, they -- there's reaction
16  within the battery and they fail.
17   Q.    What research?
18   A.    The research that we talked about
19  earlier.  Quintiere's articles, CFI trainer
20  net class I took.
21   Q.    And in those same training
22  materials, you know and you would agree
23  with me or would you agree with me that

Page 96

1   those same gases can be admitted from a
2   lithium-ion battery pack that's attacked
3   externally by a fire, right?
4    A.    Yes.
5    Q.    Okay.  So then what -- is there
6   any other basis for your opinion that --
7   strike that.
8          So based on Dr. Quintiere's
9   articles, some podcast, and your class on
10  lithium-ion battery packs, is it your
11  testimony under oath today that you hold --
12  that you have an opinion within a
13  reasonable degree of fire science certainty
14  the first fuel ignited was the lithium-ion
15  battery cell based on the gases that were
16  admitted?
17   A.    Yes.
18   Q.    Okay.  And is that really
19  reflected in opinion three of your report
20  which says the materials first ignited were
21  the batteries -- I guess that should say
22  battery's combustible liquid electrolyte?
23   A.    Yes.

James Sobota                                                        6/28/2023

Page 97

1      Q.   Do you know if the battery cells
2   contained liquid electrolyte?
3      A.   From my research, yes.
4      Q.   Is that what Dr. Quintiere told
5   you in his paper?
6      A.   Yes.
7      Q.   Do you know if there's a liquid
8   electrolyte in Ryobi 40 volt cells?
9      A.   Not specifically, no.
10      Q.   Okay.  So if there's not liquid
11   electrolyte in this -- you already told us
12   you don't know the model of this battery
13   pack.  If the subject Ryobi 40 volt battery
14   pack at issue in this case does not in fact
15   contain liquid electrolyte, can we take a
16   red pen and mark through opinion three?
17      A.   Yes.
18      Q.   You would be dead wrong, wouldn't
19   you?
20      A.   Yes.
21      Q.   All right.  Number four opinion,
22   "The act or omissions that brought the
23   ignition source and the material first

Page 98

1   ignited together resulted from a
2   catastrophic failure of lithium-ion battery
3   cells."  Did I read that right?
4      A.   Yes.
5      Q.   What is the basis of that
6   opinion?
7      A.   The basis of that opinion is the
8   degree of damage of the cells that we
9   found.  One cell was expelled all the way
10   across the room on the opposite side.
11   That's it.
12      Q.   And cells -- would you agree with
13   me that based on your podcast, looking up
14   Dr. Quintiere's article, and your
15   lithium-ion training class that you took in
16   2022, that lithium-ion cells can be cast
17   across a room, they can expel their
18   contents, one or more can expel their
19   contents, and that can be caused by
20   external fire?
21      A.   It's possible, yes.
22      Q.   So you would agree with me?
23      A.   I would agree what?

Page 99

1      Q.   You would agree with me that
2   lithium-ion battery packs, that one or more
3   of their cells can expel their contents
4   and/or one or more cells can be cast, you
5   know, lengths across a room as a result of
6   an external fire attack?
7      A.   Yes, and it could also be caused
8   by other things.
9      Q.   Sure.  Sure.  I'm not fussing
10   with you.  I just trying to get a clean
11   answer.  You would agree with me, sir, that
12   cells can be thrown across a room and one
13   or more of them can expel their contents
14   when they are subject to external fire
15   attack?
16      A.   Yes.
17      Q.   All right.  What part of my
18   screen do you see, Mr. Sobota, if any?
19      A.   I see the picture that we're
20   looking at with the Tupperware container
21   and the battery container and the paint
22   cans on shelf one.
23      Q.   While I'm thinking about it, you

Page 100

1   mentioned C.J. Flaherty a couple of times.
2   What is his role in this case?
3      A.   He was the electrical engineer
4   brought out to assist.
5      Q.   Did you and C.J. talk about this
6   case?
7      A.   Yes.
8      Q.   What did y'all discuss?
9      A.   Discussed our findings.
10   Basically discussing when we're at the
11   scene, at the lab exams.
12      Q.   Going back to opinion four --
13   before I leave this, opinion four, "The act
14   or omissions that brought the ignition
15   source and the material first ignited
16   together resulted from a catastrophic
17   failure of lithium-ion battery cells."  Do
18   you hold that opinion within a reasonable
19   degree of fire science certainty?
20      A.   I hold that opinion.
21      Q.   And that is based upon -- I
22   believe you told me the fact that there
23   were one or more cells that expel their

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

James Sobota                                              6/28/2023

Page 101

1  contents and at least one cell had been --
2  that was found in another area of the
3  basement?
4      A.    Yes.  And other parts of the
5  battery were displaced about the room as
6  well.
7      Q.    Which can also occur when a
8  lithium-ion battery pack is subject to
9  external fire attack; true?
10     A.    True.
11     Q.    All right.  Is there any other
12 basis that support -- or any other reason,
13 observation, podcast, anything that serves
14 as the basis of opinion four?
15     A.    None that I can think of right
16 now.
17     Q.    And so you would agree with me,
18 sir, that every basis that supports your
19 opinion four are things that can occur when
20 a lithium-ion battery pack is subject to
21 external fire attack; true?
22     A.    Yes.  As well as other things.
23         MR. YEAROUT:  Can we go off the

Page 102

1  record real quick?
2         (Discussion off the record.)
3      Q.    Mr. Sobota, back from a brief
4  break.  I apologize for the interruption.
5  When you read Ms. Taronji's deposition last
6  night, do you remember her talking about
7  she heard the hissing noises, she smelled
8  what she thought was natural gas, went to
9  the kitchen, heard the smoke detector going
10 off, calls 911, and shortly thereafter
11 observes thick black smoke coming up from
12 the basement?  Do you remember that?
13     A.    I believe the way I read it was
14 she was outside of the house and saw smoke
15 coming out.
16     Q.    Okay.  What is the fact that
17 thick, black smoke -- strike that.  What's
18 your understanding of the amount of time
19 between Ms. Taronji hearing the hissing
20 noises, calling 911, and observing thick
21 black smoke?
22     A.    Can you ask the question one more
23 time?  I'm sorry.

Page 103

1      Q.    I would be happy to.  Do you have
2  an understanding of the amount of time that
3  elapsed between Ms. Taronji hearing the
4  hissing noises and the smoke detectors
5  going off and observing the thick black
6  smoke?
7      A.    No.
8      Q.    Do you know if it's a minute,
9  five minutes, ten minutes?  Do you have a
10 judgment?
11     A.    A judgment would be a couple of
12 minutes.
13     Q.    Okay.  Couple minutes between
14 hearing the hissing, smoke detectors going
15 off, and seeing thick black smoke coming
16 out of the basement and out of the house.
17 What does that tell you about how far this
18 fire had progressed when the smoke was
19 observed?
20     A.    It doesn't tell me anything.
21     Q.    It doesn't?  Does it tell you --
22 what I'm driving at is, she hears the
23 hissing noises, hears the smoke detector go

Page 104

1  off, and give or take two minutes later,
2  there's thick black smoke emanating from
3  the basement and the house.  Does that tell
4  you that this fire had just started or that
5  it was a longer progressing fire?
6      A.    Well, my judgment is a couple of
7  minutes, so I think it's a relatively quick
8  fire.
9      Q.    What's that based on?  Just the
10 smoke?
11     A.    Well, she -- no, not just the
12 smoke.  I mean, the sequence of events that
13 she describes that -- I can't remember if
14 she heard the hissing noises first, then
15 the smoke detector, goes outside and sees
16 the black smoke, so that's relatively
17 quick.
18     Q.    Okay.  Do you understand the
19 phrase ignition scenario?
20     A.    Ignition sequence?
21     Q.    Ignition sequence.  Scenario.
22 Let's use ignition sequence.  Are you
23 familiar with that?

26  (Pages 101 to 104)

Page 105

1    A.    Yes.
2    Q.    What is your ignition sequence in
3  this case?
4    A.    The battery fails, the gases
5  expel, it's ignited most likely by the hot
6  casing of the battery.
7    Q.    Did you say hot casing of the
8  battery?
9    A.    Yes.
10   Q.    What is the basis for your
11 opinion that the battery had a hot casing?
12   A.    There's a -- when the battery
13 fails, there's an exothermic reaction that
14 heats up the battery.  As the gas expels,
15 it's ignited by the hot gas or it could
16 also be -- from the research again it could
17 be where it doesn't need oxygen.  It
18 actually produces oxygen and can fail
19 internally.
20   Q.    The same exothermic reaction that
21 can occur from an external fire attack,
22 right?
23   A.    Yes.

Page 106

1    Q.    So then what happens next in
2  Mr. Sobota's ignition sequence?
3    A.    The nearby combustibles are
4  ignited and goes from a fuel package to
5  fuel package.
6    Q.    And are those fuel packages the
7  items that we discussed earlier as what you
8  believe were contained on shelf one?
9    A.    Yes.
10   Q.    All right.  I apologize, I'm
11 trying to share my screen here.  Do you see
12 my screen?
13   A.    Yes.
14   Q.    This is slide two of Defendant's
15 4 and this is your photograph 210050.  Do
16 you see this big black container,
17 Mr. Sobota?
18   A.    Yes.
19   Q.    What's that?
20   A.    Fuel tank.
21   Q.    Do you see this shelf next to it?
22   A.    Yes.
23   Q.    Do you believe that shelf number

Page 107

1  one could contain contents similar to what
2  we see in this shelf in slide two of
3  Defendant's 4?
4    A.    What are you referring to as
5  shelf number one?
6    Q.    I'm talking about the subject
7  shelf number -- and that's a good
8  clarification.  I'm talking about for the
9  contents on subject shelf number one, could
10 that have contained items similar to what
11 we see in the shelving in this picture that
12 is slide number two of Defendant's 4?
13   A.    Possible.
14   Q.    Okay.  Let's go to page 20 of
15 your notes.  See that?
16   A.    Yes.
17   Q.    Here we are the subject shelving.
18 We've got the two tape measurers.  We see
19 battery cells on the floor nearby the
20 shelving.  Right?
21   A.    Yes.
22   Q.    Who put that pink or what is that
23 pink -- what is that pink stuff?

Page 108

1    A.    It's a surveyor tape.  I put it
2  on there.
3    Q.    What did you put that pink
4  surveyors tape on?
5    A.    I think it was on one of the
6  failed cells.
7    Q.    Why did you pick that one?
8    A.    I'm not sure exactly why.  I just
9  kind of make it recognizable in the
10 picture.
11   Q.    And this photograph was taken
12 when, May 21st of 2020?
13   A.    I believe so.  I take that back.
14 I don't know.  There were three separate
15 inspections on that and I can't remember
16 exactly when I took that picture.
17   Q.    All of the inspection photographs
18 occurred in what, June or July of 2020?
19   A.    I think the last inspection was
20 on June 2, 2020.
21   Q.    And I said June or July.  Your
22 scene inspection photographs and the
23 others, all of those were taken either May

Page 109

1    or June of 2020, right?
2        A.    Yes.
3        Q.    And so you put this pink tape on
4    this cell because you had already
5    determined that it was a failed cell?
6        A.    It was deformed cell.
7        Q.    Well, you just told me it was a
8    failed cell.
9        A.    Okay.
10       Q.    So you put that pink tape on
11   there in May or June of 2020 because you
12   made the determination that that was a
13   failed cell?
14       A.    One of them.
15       Q.    Okay.  Was that simply based on
16   your gross observations at the scene?
17       A.    Yes.
18       Q.    Without X-ray, right?
19       A.    Without X-ray, correct.
20       Q.    Without CT, right?
21       A.    Yes.
22       Q.    Without any testing or analysis,
23   right?

Page 110

1        A.    Yes.
2        Q.    What, if anything, did you do to
3    determine, you know what, I've seen
4    these -- well, I don't know if you had seen
5    the podcast at this point.  Based on your
6    training, education, and experience, what
7    did you do to determine I'm not sure if
8    this cell right here expelled its contents
9    because it had been attacked by fire versus
10   internally failed?
11       A.    Brought on by the electrical
12   engineer.
13       Q.    Did he tell you to put the pink
14   tape on there?
15       A.    No.
16       Q.    So C.J. has nothing to do with
17   your decision to put pink tape on that
18   cell, does he?
19       A.    No.
20       Q.    Based upon your training,
21   education, and experience, why did you put
22   the pink tape on there and what, if
23   anything, did you do to determine whether

Page 111

1    that was a cell that expelled its contents
2    because it was attacked by a fire versus
3    your belief in May or June of 2020 that it
4    was a failed internal cell failure?
5        A.    The reason I can think I put the
6    tape on was to note that that was one of
7    the cells that were damaged.  I didn't -- I
8    wasn't trying to infer that that one failed
9    by internal damage.  It was just a marker
10   to aide in my photography.
11       Q.    Here we are, page 19, what do
12   those words in red ink say?
13       A.    Failed cell.
14       Q.    When was that photograph taken
15   and when did you write that?
16       A.    Some time in June and probably
17   right after I took the picture.
18       Q.    This doesn't say damaged cell, it
19   doesn't say deformed cell, it says failed
20   cell; true?
21       A.    True.
22       Q.    What, if anything, did you do to
23   distinguish this cell as being externally

Page 112

1    attacked by fire versus "being a failed
2    cell"?
3        A.    I guess I used the term failed
4    generically.  Damaged cell may have been a
5    better term.
6        Q.    Yeah.  So would it be fair and
7    consistent with the scientific method NFPA
8    921 for us to add a note here that says,
9    either by external fire attack or internal
10   failure?  Would that be fair?
11       A.    That would be fair.
12       Q.    All right.  Let's write it.
13   Let's do it.  All right.  We're going to
14   put a note.  So I'm going to write failed
15   cell--either by external fire attack or
16   internal failure.
17       A.    Can you put another or in there?
18       Q.    Sure.
19       A.    Or cell affected by other cells
20   next to a failed cell.
21       Q.    So I've got failed cell--either
22   by external fire attack or internal failure
23   or cell affected by other cells.  Is that

James Sobota                                                    6/28/2023

---

Page 113

1    Mr. Sobota's opinion as we're sitting here
2    today?
3       A.   Yes.
4       Q.   All right.  See here on page 22
5    of your notes?
6       A.   Yes.
7       Q.   You've got -- you write here in
8    yellow "battery pack."  Do you see that?
9       A.   Yes.
10      Q.   Then you write "copper foil
11   electrodes," right?
12      A.   Yes.
13      Q.   How did that battery pack get on
14   the ground, if you know?
15      A.   I don't know.
16      Q.   I mean, do you think it exploded
17   and just blew itself off of the shelf?
18   Could it have gotten there from fire
19   suppression efforts?  Mr. Fernandez threw
20   it on the ground?  Do you have any idea?
21      A.   Other than Mr. Fernandez throwing
22   it on the ground, I think all apply that
23   you mentioned.

---

Page 114

1       Q.   Okay.  So could have been fire
2    suppression.  Could have just blown itself
3    off of the shelf.  Those are the
4    possibilities?
5       A.   Yes.
6       Q.   All right.  Bear with me, please.
7    I'm sorry.  And I'm going to find this
8    picture and mark it as an exhibit, but I
9    don't have it handy.  I will represent to
10   you that this was a photograph taken during
11   the lab exam.  Does that appear to be
12   correct?
13      A.   Yes.
14          (Defendant's Exhibit No. 5 was
15           marked for identification.)
16      Q.   You see the paint cans, right?
17      A.   Yes.
18      Q.   And I'll further represent to you
19   that this is shelf one; is that fair to be
20   correct?
21      A.   Yes.
22      Q.   Do you know or have an opinion as
23   to what this white cakey stuff is in the

---

Page 115

1    center of -- kind of in the center area of
2    shelf one?
3       A.   My best guess is drywall
4    compound.
5       Q.   Is that combustible?
6       A.   I'm sure certain components of it
7    is, which is designed to be a endothermic
8    chemical.  Like I said, I would have to
9    look at the MSDS for that product.
10      Q.   Do you know what the flash point
11   for drywall compound is?
12      A.   No.
13      Q.   All right.  You read
14   Mr. Fernandez' deposition and you recall
15   that he said he used the chain saw with his
16   lithium-ion 40 volt battery pack and then
17   went inside the basement, put the battery
18   on the charger in his basement office desk,
19   correct?
20      A.   Yes.
21      Q.   And about 30 minutes later, the
22   charge is complete and he then takes the
23   battery pack, according to his testimony,

---

Page 116

1    and the charger, unplugs them, takes them
2    into the utility room, and puts them on the
3    shelf, right?
4       A.   Yes.
5       Q.   And that's at approximately
6    9:30 a.m., right?
7       A.   Yes.
8       Q.   And your notes indicate that at
9    approximately 4:15 p.m., Mr. Fernandez is
10   smoking cigarettes in the basement, right?
11      A.   Yes.
12      Q.   And then he leaves the house at
13   approximately 4:20, correct?
14      A.   Yes.
15      Q.   And the fire is reported at what
16   time?
17      A.   I think it was dispatched at
18   1818 hours, 6:18 p.m.
19      Q.   I'm sorry?
20      A.   At 6:18 p.m.
21      Q.   6:18 p.m.  So what is that,
22   approximately two hours after Mr. Fernandez
23   left the house?

---

29  (Pages 113 to 116)

James Sobota                                                          6/28/2023

---

Page 117

1    A.   Yes.
2    Q.   All right.  And you remember
3  seeing the photographs.  In fact, you
4  photographed the cigarette butts that were
5  in the containers, ashtrays, whatever,
6  cans, whatever you want to call them;
7  there's two of them on your desk, right?
8    A.   Yes.
9    Q.   Two hours is within the window --
10  according to peer review published
11  literature, two hours is within the window
12  of time in which a cigarette can cause a
13  fire; true?
14    A.   True.
15    Q.   All right.  How, sir, were you
16  able, in your opinion, to rule out an
17  inadvertent discarded cigarette in the
18  utility room that caused the fire?
19    A.   I believe my notes there it says
20  the last time he was in that utility room
21  was around 10:00 in the morning after he
22  put the battery charger in there.
23    Q.   Okay.  Of course we talked about

---

Page 118

1  people's -- whether it's a memory fading or
2  whether it's a misremembering or
3  misstatement or misrepresentation about
4  activities that are reported on the date
5  and time of the fires, right?
6    A.   We talked about that, yes.
7    Q.   Right.  And you agreed with me
8  that that happens and has happened to you
9  relatively often in your career, right?
10    A.   Yes.
11    Q.   We also talked about the fact
12  that cigarettes can be consumed by fire and
13  as such cannot be found as evidence, right?
14    A.   Yes.
15    Q.   All right.  I'll represent to you
16  that you took seven photographs of the
17  aerosol cans that were on shelf one.  Why?
18    A.   Why?  I don't know.  I mean,
19  sometimes I just take pictures of things
20  that I'm seeing.  No particular reason.
21    Q.   No particular reason.  You just
22  took seven photographs of aerosol cans?
23    A.   To see if there's any burn

---

Page 119

1  patterns on them.  What they look like.
2    Q.   Okay.  You observed the arcing on
3  the -- strike that.
4       What, if anything, of significance
5  did you observe on the extension cord that
6  was draped across and above the shelving?
7    A.   There was an arc site that we
8  noticed on lab exam.
9    Q.   Arcing indicates what?
10  Electrical activity, right?
11    A.   Electrical activity, correct.
12    Q.   What, if anything, did you do to
13  rule out the electrical cord that shows
14  evidence of arcing and thus electrical
15  activity as the cause of this virus?
16    A.   Ruled it out because it was above
17  the area of origin and it appeared to be
18  more thermal damage than anything else.
19    Q.   Well, if an arced electrical cord
20  causes a fire that then drops down, can it
21  also then get burnt by the fire that it
22  caused?
23    A.   I would suspect to see different

---

Page 120

1  burn patterns.  If that was the case, I
2  would see more heavily damaged burn
3  patterns above that extension cord rather
4  than below it.
5    Q.   Okay.  I'm going to share again.
6  This is slide 23 of Defendant's 4.  I'm
7  going to come back.  I want to focus on
8  shelf four, okay?
9    A.   Yes.
10    Q.   Is this just a big giant random
11  piece of wood?
12    A.   Yes.
13    Q.   Do you know how it got there?
14    A.   No.
15    Q.   Do you see where my cursor is?
16    A.   Yes.
17    Q.   That black sooty area, what does
18  that indicate to you?
19    A.   That something burned there and
20  I'm not sure what.
21    Q.   You don't know what caused that
22  black sooty area on that tile which is on
23  shelf four?

---

30  (Pages 117 to 120)

James Sobota                                      6/28/2023

---

Page 121

1    A.   No.
2    Q.   And do you see where my cursor is
3  now?
4    A.   Yes.
5    Q.   This tile does not have the same
6  extent for degree of soot or burned char,
7  right?
8    A.   Yes.
9    Q.   Same with the tile below it,
10  right?
11    A.   Yes.
12    Q.   Same with the tile below it,
13  right?
14    A.   Yes.
15    Q.   Same with the tile below it,
16  right?
17    A.   Yes.
18    Q.   What does that indicate to you
19  relative to this top tile with all the
20  black sooty char on it?
21    A.   That they were protected at the
22  time of fire.
23    Q.   Right.  And does that also

---

Page 122

1  indicate to you that they were stacked on
2  top of each other, thus protecting the
3  tiles beneath this top one with the black
4  sooty char on it?
5    A.   Yes.
6    Q.   Okay.  This is a little bit of a
7  random -- what is this -- I'll represent
8  this is slide 32 of Defendant's 4, this is
9  your photograph 210117.  What is this brown
10  stake thing?
11    A.   I don't know.
12    Q.   And this is one of those -- what
13  is that?  Some sort of candle?
14    A.   No.  It's a shot glass.
15    Q.   It's got cigarettes in it, right?
16    A.   It's got I think one cigarette in
17  it.
18    Q.   And then there was the other can
19  thing containing cigarette butts, right?
20    A.   Yes.
21    Q.   Did you find any evidence of
22  cigarette butts in the utility room in or
23  near the area origin of the shelving?

---

Page 123

1    A.   No.
2    Q.   And that, of course, did not mean
3  that there weren't cigarette butts that
4  were in the area of origin that were
5  consumed by the fire, right?
6    A.   Sure.
7    Q.   And thus, cigarette smoking
8  cannot be ruled out as a cause of this
9  fire; true?
10    A.   I ruled it out.
11    Q.   Consistent with the scientific
12  method?
13    A.   Yes.
14    Q.   I'm almost done, Mr. Sobota.  I'm
15  going to consult with a couple of people
16  who are smarter than me and I'm going to
17  look at my notes and I might be done.  Can
18  we take a five minute break?
19    A.   Sure.
20    (A recess was taken.)
21    Q.   Back on the record after a break.
22  Mr. Sobota, are you familiar with NFPA 921
23  and its discussion of expectation bias?

---

Page 124

1    A.   Yes.
2    Q.   What is expectation bias?
3    A.   Trying to prove a hypothesis
4  instead of disprove it.
5    Q.   Is that a good or bad thing under
6  the NFPA 921?
7    A.   That's a bad thing.
8    Q.   In fact, investigators are
9  strongly cautioned to avoid expectation
10  bias in proper use of the scientific
11  method, right?
12    A.   Yes.
13    Q.   What's confirmation bias?
14    A.   I'm sorry.  The expectation bias
15  is trying to prove a case without all the
16  facts and data.  Confirmation bias is
17  trying to confirm a hypothesis rather than
18  disprove it.
19    Q.   And we're talking about
20  confirmation bias.  Would you agree with me
21  that a hypothesis can be said to be valid
22  only when rigorous testing has failed to
23  disprove the hypothesis?

---

31  (Pages 121 to 124)

James Sobota                                                    6/28/2023

Page 125

1    A.   Yes.
2    Q.   Is there anything -- I know we've
3  been going a while and I meant to apologize
4  earlier, but I was not -- I had forgotten
5  y'all were on eastern and I know it's
6  lunchtime.  Everybody is probably getting
7  hungry.  Forgive me for that.
8       Is there anything, any aspect of
9  your testimony that you need to change,
10  clarify, elaborate upon, anything like
11  that?
12    A.   No.
13    Q.   All right.  Have you understood
14  my questions today?
15    A.   Yes.
16    Q.   Have I been courteous and
17  respectful to you in my questioning?
18    A.   Yes, and I hope I have been too.
19    Q.   You have, Mr, Sobota, and I
20  appreciate your time.  If you could send
21  Mr. Fratus a copy of that Dr. Quintiere
22  thing, I would appreciate it.  And for now
23  I will pass the witness.  I have no further

Page 126

1  questions.
2    A.   Okay.  Is that the only thing
3  that you wanted?
4    Q.   Well, I do want -- if you've got
5  materials from that smoking class and the
6  lithium-ion class.
7    A.   Yeah.  Like I said, the only
8  thing I have are my notes.  They don't
9  provide handouts or things like that.
10    Q.   Okay.  I would be interested in
11  those, your notes.
12       MR. BROWN:  And the CV with the
13  two updated depositions.
14       MR. YEAROUT:  Yeah.  I don't see
15  that in my file, Chuck.  It's not a big
16  deal for purposes of today, but if I could
17  get an updated CV, that would be great.
18       And before I pass, I've got
19  Defendant's 1 as the depo notice.
20  Defendant's 2 as Mr. Sobota's report.
21  Defendant's 3 as Mr. Sobota's notes.
22  Defendant's 4 as the PowerPoint collection
23  of scene photographs.  Then I have

Page 127

1  Defendant's 5 as that lab exam photograph
2  that we discussed with the drywall
3  compound.  Is that correct, Madam Court
4  Reporter?
5       COURT REPORTER:  Yes.
6       MR. YEAROUT:  I have no further
7  questions right now.  Thank you for your
8  time, Mr. Sobota.
9       MR. FRATUS:  I do not have any
10  questions.  And Mr. Sobota, as you probably
11  remember, you have the right to read and
12  review or you can waive that right assuming
13  that the court reporter is taking
14  everything down.  Typically experts read
15  and review and then are provided with an
16  errata sheet to make any necessary changes,
17  spelling and such.
18       THE WITNESS:  I waive.
19       MR. FRATUS:  Okay.
20    Q.   (BY MR. YEAROUT) And I'm sorry, I
21  have one more.  Famous last words.  Have
22  you told me today the full extent and the
23  entirety of your opinions in this case that

Page 128

1  you intend to offer at trial in this case?
2    A.   Yes.
3    Q.   All right.  No further questions.
4
5       (The deposition of James A. Sobota
6       was concluded at 11:46 a.m. on
7       July 28, 2023.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

32 (Pages 125 to 128)

James Sobota                                                    6/28/2023

Page 129

1              C E R T I F I C A T E
2    State of Alabama
3    St. Clair County
4      I hereby certify that the above and
5    foregoing deposition was taken down by me
6    in stenotype and the questions and answers
7    thereto were transcribed by means of
8    computer-aided transcription, and that the
9    foregoing represents a true and correct
10   transcript of the testimony given by said
11   witness upon said hearing.
12     I further certify that I am neither of
13   counsel, nor of kin to the parties to the
14   action, nor am I in any way interested in
15   the result of said cause named in said
16   caption.
17
18        /s/Danielle Leigh Bowman
19        DANIELLE LEIGH BOWMAN, CCR
20        CCR#651, Expires 9/30/23
21        Commissioner for the State
22        Of Alabama at Large
23        My Commission Expires 1/22/2024

33 (Page 129)

**A**

**a.m** 1:20 2:13
6:11 116:6
128:6
**a/s/o** 1:10
**ability** 8:17
**able** 41:2,7
117:16
**Abraham** 39:6
39:19
**AC** 69:2
**account** 61:11
75:7
**accurate** 85:20
85:22
**act** 97:22 100:13
**acting** 6:4
**action** 1:5
129:14
**activities** 69:15
118:4
**activity** 58:14
119:10,11,15
**actual** 83:14,16
**add** 112:8
**addition** 26:15
**additional** 27:3
**additions** 25:21
**address** 9:3
**administration**
30:16
**admitted** 96:1
96:16
**advance** 34:12
**advised** 3:14
**aerosol** 86:15
118:17,22
**affect** 11:6
**AFIC** 43:3
**ago** 7:12 36:3
45:7 49:4 79:5
**agree** 37:3 46:13
59:13,22 60:1
62:21 84:23,23
93:9,14,19

94:1,5 95:22
95:23 98:12,22
98:23 99:1,11
101:17 124:20
**agreed** 2:4,15,22
60:19 118:7
**ahead** 9:20 16:4
64:19 66:12
74:15
**aide** 111:10
**Alabama** 2:11
3:8 5:15 6:3,4
6:6,10 129:2
129:22
**alkaline** 86:7
89:17
**alleged** 29:20
**allegedly** 21:9
21:16 22:7
**Allen** 7:6
**Allstate** 15:23
16:4,6
**alternative**
51:17
**amended** 3:9
**AMERICA** 1:13
**amount** 71:23
76:15 80:7
102:18 103:2
**amounts** 13:6
**analysis** 22:10
53:16 109:22
**analyze** 50:12
51:12
**and/or** 74:17
99:4
**animations** 44:9
**Annapolis** 5:6
**annotate** 76:5
**annotated** 44:7
**annotations**
44:4 89:8
**annual** 46:8
**answer** 8:1,5,16
48:13 62:4
88:16 99:11

**answered** 23:19
**answers** 129:6
**anybody** 80:18
92:1
**apart** 73:23
**apologize** 69:20
102:4 106:10
125:3
**apparently**
18:14
**appear** 114:11
**appeared**
119:17
**appears** 43:12
**Appendix** 26:9
**applicability**
38:1
**apply** 113:22
**appreciate**
60:17 62:2
125:20,22
**approach** 34:16
64:21
**approximately**
2:13 6:11
16:16 32:9
67:4,11 73:23
74:11 93:11,21
116:5,9,13,22
**arc** 63:21,22
119:7
**arced** 119:19
**arcing** 119:2,9
119:14
**area** 59:19 63:13
64:12 65:6
69:1,19 70:8
70:17 73:6
91:17 101:2
115:1 119:17
120:17,22
122:23 123:4
**arranged** 78:6
**arrangement**
78:5,8
**arrow** 72:19

**Arson** 32:23
**article** 29:11
30:2,11 98:14
**articles** 95:19
96:9
**articulate** 33:23
61:6
**ashtrays** 117:5
**asked** 18:3
**asking** 11:17
17:2,9,21,23
18:4 22:15
68:14
**aspect** 11:5
125:8
**assign** 3:3
**assist** 100:4
**Association**
49:12
**assume** 12:11
29:17 94:9
**assuming**
127:12
**ATF** 37:12 39:6
39:19 83:5
**attack** 99:6,15
101:9,21
105:21 112:9
112:15,22
**attacked** 84:20
96:2 110:9
111:2 112:1
**attempt** 56:16
**attendance** 41:9
**attorney** 16:2
28:1,3,4 38:16
39:10
**attributable**
78:8
**attribute** 77:22
**attributed** 53:9
**authoritative**
23:23
**available** 46:4
56:14
**Avenue** 41:15

41:17
**avoid** 124:9

**B**

**B** 26:9
**B-U-T-T-A**
37:16,17
**back** 13:19
26:15 31:17
33:11 38:8
39:8 45:5 47:6
47:9 49:4 55:7
59:2,3 64:18
67:20 69:7,12
75:10 81:20
85:13 89:4
90:12 93:15
100:12 102:3
108:13 120:7
123:21
**background**
8:21
**bad** 124:5,7
**Baltimore** 5:6
**banging** 54:4,10
**base** 76:14
**based** 10:15
25:18 60:3
75:3 78:13
79:4 95:13,14
96:8,15 98:13
100:21 104:9
109:15 110:5
110:20
**basement** 70:4
72:11 101:3
102:12 103:16
104:3 115:17
115:18 116:10
**basic** 36:17
**basically** 40:3
53:1 60:6 62:7
63:14 64:20
73:14 79:20
82:2 100:10
**basis** 20:11,18

53:11 72:23
80:20 96:6
98:5,7 101:12
101:14,18
105:10
**batteries** 21:9
21:16 22:1,7
29:13,15 30:2
30:14 38:13
39:5,18,21
40:2,4,5 47:11
49:4 53:10
78:18 81:9,23
83:22 84:2
86:8 89:13,16
89:17 95:12,15
96:21
**battery** 12:16,20
13:10,11 22:13
22:16,22 23:3
23:6,9,14
29:21 30:22
46:14 47:4,16
48:3,6,19
51:18 53:18,22
72:6,10,14
73:15,22 74:10
74:17 75:15,18
75:20 76:11
77:8 78:22
80:21 81:13,14
83:3,17,23
84:13,19 85:2
85:23 94:10,13
95:16 96:2,10
96:15 97:1,12
97:13 98:2
99:2,21 100:17
101:5,8,20
105:4,6,8,11
105:12,14
107:19 113:8
113:13 115:16
115:17,23
117:22
**battery's** 84:11

96:22
**Bear** 69:19
114:6
**beat** 25:16
**beginning** 31:14
**belief** 111:3
**believe** 13:21
14:5 16:12
22:17 24:15
29:14 32:1,15
34:15 35:19
37:9,13 39:14
39:15 43:18
53:6 57:2 65:8
70:7,12 71:21
73:2,4 83:4
85:9,22 86:9
88:5 100:22
102:13 106:8
106:23 108:13
117:19
**believing** 59:16
**Ben** 5:11
**beneath** 122:3
**best** 8:16 17:11
20:1,2 34:11
115:3
**bet** 30:7
**better** 112:5
**bias** 123:23
124:2,10,13,14
124:16,20
**Bible** 24:8
**big** 90:15 92:4
106:16 120:10
126:15
**biggest** 33:7
46:1
**billing** 32:6
**bills** 33:6
**bin** 86:7
**bins** 43:19
**Birmingham**
2:10,11 5:15
6:3,9,10
**bit** 13:19 76:7

85:14 122:6
**black** 102:11,17
102:21 103:5
103:15 104:2
104:16 106:16
120:17,22
121:20 122:3
**blamed** 18:17
**blast** 80:12
**blew** 113:17
**blown** 114:2
**blue** 76:16,22
77:7,17 85:1
85:21 89:9,14
**Blvd** 5:6
**boss** 43:3
**bottom** 70:13,20
70:23
**Bowman** 1:23
2:8 3:10 6:1
129:18,19
**box** 43:14 76:17
76:22 77:7,18
85:1 89:14
**break** 8:6,7,8
32:20 58:22
59:3 102:4
123:18,21
**breed** 93:8
**Bridges** 38:15
39:10
**brief** 59:3 102:3
**broke** 15:21
**brought** 97:22
100:4,14
110:11
**brown** 5:11
122:9 126:12
**bucket** 89:19
**Building** 5:13
**bunch** 16:8
61:15 81:4
**burn** 118:23
120:1,2
**burned** 120:19
121:6

**burning** 94:6,7
94:19
**burnt** 119:21
**Butta** 37:15 83:4
83:6,7
**Butta's** 83:12
**butts** 117:4
122:19,22
123:3

———————
**C**
**C** 5:1,10 129:1,1
**C-H-R-I-S-T-...**
69:2
**C-I-A-R-A**
57:13
**C-R-I-S-T** 68:3
**C.J** 88:5 100:1,5
110:16
**cakey** 114:23
**call** 8:21 19:6
57:5 65:20
69:11 76:22
117:6
**called** 39:23
41:19,21 42:14
69:3 70:23
**calling** 52:17
66:3 102:20
**calls** 102:10
**camera** 83:21
**candle** 82:4 84:6
94:12 122:13
**cans** 86:15 90:7
90:12,16 99:22
114:16 117:6
118:17,22
**cant'** 87:20
**capacity** 46:19
**caption** 129:16
**care** 24:3,9 88:5
**career** 81:18
118:9
**case** 9:15 10:5
10:12 12:17
13:1,7,20 14:6

14:14,15 19:14
22:10 28:17,20
28:21 30:4
31:13 32:14
33:15 34:18
38:1,6 44:1,11
44:15 47:3,10
47:14,18,21
48:14,17 62:14
63:1 64:8,16
65:6 66:11,19
68:8 95:10
97:14 100:2,6
105:3 120:1
124:15 127:23
128:1
128:1
**cases** 16:14,16
17:15 18:10
19:18 20:6,9
20:16 26:20
27:3 34:13
47:7 76:15
**casing** 105:6,7
105:11
**cast** 98:16 99:4
**CASUALTY**
1:9
**CAT** 22:19
**catastrophic**
82:3 98:2
100:16
**category** 50:18
**cause** 6:13 11:11
21:2,7,14,19
22:5 24:2
36:18,21,22
37:4 47:16
48:3 52:2
60:10 61:1
62:11 87:19
117:12 119:15
123:8 129:15
**caused** 21:9,16
22:7 47:4
48:19 51:9
98:19 99:7

117:18 119:22
120:21
**causes** 119:20
**cautioned** 124:9
**CCR** 1:23
129:19
**CCR#651**
129:20
**cell** 76:15 84:14
96:15 98:9
101:1 109:4,5
109:6,8,13
110:8,18 111:1
111:4,13,18,19
111:20,23
112:2,4,19,20
112:23
**cell--either**
112:15,21
**cells** 22:18 23:9
23:15 46:15
82:2 97:1,8
98:3,8,12,16
99:3,4,12
100:17,23
107:19 108:6
111:7 112:19
112:23
**center** 115:1,1
**certain** 36:10
115:6
**certainly** 46:10
**certainty** 49:18
51:23 79:3
96:13 100:19
**Certified** 2:8 6:2
**certify** 6:5 129:4
129:12
**CFI** 29:14 30:19
30:21 35:20
95:19
**chain** 42:7 43:2
115:15
**change** 125:9
**change-out**
86:11

**changed** 79:14
79:19
**changes** 25:3
26:18 27:6,12
127:16
**char** 121:6,20
122:4
**charge** 39:23
40:1,8,11
115:22
**charged** 31:18
31:22 32:1
48:10,10
**charger** 72:7,10
72:14,21 73:4
73:11,16,16,22
74:12,17 75:1
75:15,17,19
85:7,9,23
115:18 116:1
117:22
**Charles** 5:4
**check** 14:6 33:4
33:9 35:15
81:6
**chemical** 12:6
93:2,4 115:8
**chimney** 18:15
18:15
**choosing** 60:15
**Christie** 69:2,10
69:13
**Christopher**
5:10
**Chuck** 16:23
20:9 32:18
126:15
**Ciara** 1:10
10:19 29:4
55:6,8,12
56:22 57:12
**CID** 40:1,8
**cigarette** 117:4
117:12,17
122:16,19,22
123:3,7

**cigarette-indu...**
91:15
**cigarettes** 36:6
36:11,15,18,18
36:22 37:4
38:7 91:10,17
94:5 116:10
118:12 122:15
**circle** 85:6,21
**circular** 92:3
**circumstance**
53:17
**circumstances**
21:3,8,15,19
22:6
**Civil** 1:5 3:8 6:7
**claim** 42:3,11
**Clair** 129:3
**clarification**
107:8
**clarify** 125:10
**Clark** 5:13
**class** 27:21,23
28:14 34:2,9
35:5 36:1
37:20,23 38:12
39:2,9 61:7
82:16 83:4
95:20 96:9
98:15 126:5,6
**classes** 27:12,15
68:6
**clean** 8:1 47:20
99:10
**clockwise** 70:20
**close** 18:14
**closer** 75:21
**collect** 50:9 65:3
**collecting** 55:19
**collection** 43:20
77:1 126:22
**color** 90:22
**combination**
77:3
**combustible**
86:17 87:10

94:19 96:22
115:5
**combustibles**
106:3
**come** 10:14 38:8
94:13 120:7
**comfort** 58:22
**coming** 80:9
102:11,15
103:15
**commencing**
2:12 6:10
**Commission**
129:23
**Commissioner**
6:5 129:21
**companies**
15:11,15,16,18
16:19 17:18
18:1 19:11
32:3
**company** 1:10
15:14 18:17
34:13 43:5,6
**comparison**
90:7,11
**complete** 88:9
115:22
**compliance** 2:18
**complying** 63:8
**components**
115:6
**composition**
93:2,5
**compound**
86:19 115:4,11
127:3
**computer-aided**
129:8
**concept** 59:5
62:5 63:5,10
**concluded** 128:6
**conduct** 55:1
56:21
**conducted** 67:15
**conducting** 71:5

**confirm** 124:17
**confirmation**
124:13,16,20
**confused** 85:5
**connected** 73:16
**connection**
19:10 68:8
82:20
**consensus** 62:22
**consider** 23:23
51:17 64:12
**considering**
79:21
**consist** 77:3
**consistent** 112:7
123:11
**constant** 54:8
**construction**
40:3
**consult** 123:15
**Consultants**
33:1
**consumed** 91:8
91:10 118:12
123:5
**contain** 92:10
97:15 107:1
**contained** 23:9
92:11,12 97:2
106:8 107:10
**container** 89:12
89:20,23 90:4
90:14,20 91:1
91:6,7,22 92:4
92:11 94:14,17
94:20,21 95:2
99:20,21
106:16
**containers**
86:15 117:5
**containing**
94:14 122:19
**contains** 53:13
**contents** 40:4
46:16 98:18,19
99:3,13 101:1

107:1,9 110:8
111:1
**context** 17:19
**continuing**
  27:13,16
**contractor** 69:1
**conveyed** 90:10
**convincing**
  75:14
**cooking** 58:7
**copper** 113:10
**copy** 14:7 26:8
  125:21
**cord** 119:5,13
  119:19 120:3
**corpus** 59:5,21
  60:12,19 62:6
  63:3,10
**correct** 7:14 8:4
  25:6 36:16
  37:17 41:12
  43:5 51:14
  56:3 88:20
  109:19 114:12
  114:20 115:19
  116:13 119:11
  127:3 129:9
**corrected** 70:15
**correctly** 89:12
**corruption**
  39:23 40:1
**counsel** 2:6,23
  3:2 6:8 129:13
**count** 31:17
**County** 17:5,7
  18:20,21 46:21
  47:1 129:3
**couple** 24:19
  100:1 103:11
  103:13 104:6
  123:15
**course** 35:19
  37:18 40:13,15
  49:8 71:16
  117:23 123:2
**courses** 27:13,15

38:23
**court** 1:1,22
  2:19 3:15,16
  6:20 7:21
  127:3,5,13
**courteous**
  125:16
**courthouse**
  10:14
**covers** 21:11
**craft** 86:14,21
  87:1,7
**created** 44:8
**Crist** 68:3 74:16
  80:16 86:13,20
**Crist's** 71:22
**cross** 41:2,5
**CT** 109:20
**cup** 86:8 88:23
  90:14
**current** 24:4
  26:12 40:9
**currently** 8:22
**cursor** 70:1 76:8
  85:8 120:15
  121:2
**CV** 26:10,12
  126:12,17

---

**D**

**D** 4:1
**dadgum** 80:2
**damage** 98:8
  111:9 119:18
**damaged** 64:23
  64:23 111:7,18
  112:4 120:2
**damages** 13:1,3
  13:4,5,6
**Danielle** 1:23
  2:8 3:10 6:1
  129:19
**data** 50:10,12
  55:19 60:3,4
  65:4 124:16
**date** 6:6 14:1

26:14 66:17,23
  67:14,15 75:18
  118:4
**dated** 27:2
**David** 38:15
  39:9
**day** 14:3,9 58:15
  66:23 78:15
**days** 78:15
**dead** 97:18
**deal** 8:15 33:8
  126:16
**December** 11:4
  25:9 27:2
  38:11,22
**decision** 110:17
**deductive** 51:1
**defeat** 30:12
**defect** 29:20
**Defendant's**
  4:14 45:2
  65:14,17,19
  76:19,23 79:19
  85:1 106:14
  107:3,12
  114:14 120:6
  122:8 126:19
  126:20,21,22
  127:1
**Defendant(s)**
  1:14 5:9
**defense** 18:5,8
  18:10
**deferring** 29:18
**define** 50:6
  63:12
**defined** 63:14
  70:8
**defining** 64:12
  70:17
**deformed** 109:6
  111:19
**degree** 79:2
  86:18 96:13
  98:8 100:19
  121:6

**degrees** 93:11
  93:21 94:3,7
**delivering** 3:10
**demonstrative**
  44:10
**density** 30:14
**department**
  17:6 46:20,22
  57:19 58:1
  71:7 79:23
  80:3 81:5
**department's**
  80:22
**depends** 80:10
**depicted** 72:18
**depicting** 83:13
**depiction** 85:20
  85:22
**depo** 126:19
**deposed** 7:15
**deposition** 1:16
  2:1,6,16,17 3:5
  4:11 10:23
  27:4 29:1 31:2
  33:18 34:12
  45:5 53:5,6
  54:3,8 65:12
  70:12 73:20
  74:5 102:5
  115:14 128:5
  129:5
**depositions** 2:20
  10:18 11:3
  26:16,19 27:18
  28:13 29:3
  33:12 34:23
  35:5,17 126:13
**Depot** 43:19
**describe** 86:20
**described** 86:9
  90:6
**describes**
  104:13
**DESCRIPTI...**
  4:15
**design** 12:16

**designated**
  70:13
**designed** 13:10
  115:7
**desk** 9:14
  115:18 117:7
**detail** 86:20
**detector** 102:9
  103:23 104:15
**detectors** 103:4
  103:14
**determination**
  109:12
**determine** 110:3
  110:7,23
**determined**
  109:5
**determining**
  21:2,7,14,18
  22:5
**develop** 50:15
  51:8 65:3,4
  81:12
**developed** 52:21
**developing**
  60:14
**device** 40:1,10
  40:12
**devices** 48:8
**diagrams** 44:9
**diesel** 93:6,7,8
  93:10,20
**difference** 18:4
**different** 21:12
  22:3 36:5
  39:22 40:2,5
  62:1,20 71:19
  75:6 93:8
  119:23
**difficult** 76:8
**direct** 8:14,16
  94:23
**directly** 33:2
**discarded**
  117:17
**discuss** 68:10

100:8
**discussed** 31:3
  49:18 51:23
  100:9 106:7
  127:2
**discussing**
  100:10
**discussion** 102:2
  123:23
**dispatched**
  116:17
**displaced** 78:17
  79:6 80:23
  81:2 101:5
**displacement**
  78:20
**displacing** 81:14
**disprove** 51:13
  124:4,18,23
**disregard** 63:2
**disregarded**
  63:5
**distinguish**
  111:23
**DISTRICT** 1:1
  1:2
**disturbance**
  72:1
**DIVISION** 1:3
**document** 41:8
  41:19,21 42:14
  43:11 45:6,8
  45:14,16,21
  46:2 62:22
  66:3 73:10
**documentation**
  28:22
**documentations**
  83:8
**documents** 9:13
  9:17,21
**doing** 7:10 13:18
  15:11,13 16:10
  17:4 47:1 58:5
  76:6
**Dr** 29:12 96:8

97:4 98:14
  125:21
**draped** 119:6
**drawing** 90:17
**drawn** 60:3
**Drew** 42:4 77:4
**drill** 14:20
**driving** 103:22
**drops** 119:20
**drywall** 86:19
  115:3,11 127:2
**due** 30:13
**dues** 46:8
**duly** 6:18

_____
            **E**
**E** 4:1 5:1,1
  129:1,1
**e-mail** 41:18
  42:2,3,8,17
  43:2 46:4,10
**e-mails** 42:18
**earlier** 37:9 83:3
  95:19 106:7
  125:4
**easier** 35:19
  93:16
**eastern** 125:5
**edition** 24:18
  25:4,10,18
  49:19 52:1
**editions** 25:16
**education** 27:13
  27:16 110:6,21
**Edwards** 14:13
**effect** 2:18
**effective** 3:9
**efforts** 77:23
  78:9 79:7,10
  79:13,17
  113:19
**eight** 34:2,8 35:5
**eight-hour**
  28:14
**either** 41:3
  46:18,23 54:15

57:23 84:16
  108:23 112:9
**elaborate** 74:13
  125:10
**elapsed** 103:3
**electric** 18:17
**electrical** 12:4
  22:17 52:4,12
  100:3 110:11
  119:10,11,13
  119:14,19
**electrodes**
  113:11
**electrolyte**
  96:22 97:2,8
  97:11,15
**electronic** 43:12
**electronically**
  46:4
**eliminated**
  59:17
**elimination**
  59:14
**emanating**
  104:2
**endeavor** 45:14
**endothermic**
  115:7
**energized** 87:21
  88:1,11,18
**energy** 30:14
**engineer** 11:22
  12:2,4,6,8
  22:17 100:3
  110:12
**engineering**
  12:12
**entirety** 44:14
  127:23
**Erie** 15:20,23
  16:4,6
**errata** 127:16
**essentially** 60:20
**estimate** 17:3
  92:14,16
**estimating**

57:11
**evaluate** 33:22
  61:5 65:1
**event** 83:16
**events** 104:12
**eventually** 94:16
**Everybody**
  125:6
**evidence** 3:6
  41:17 43:20
  59:20 60:8,22
  62:9 91:16
  118:13 119:14
  122:21
**evidences** 59:9
**exactly** 32:8
  75:10 108:8,16
**exam** 4:20 41:16
  114:11 119:8
  127:1
**examination** 4:6
  6:13 7:1 49:16
  51:22
**examined** 6:18
**example** 58:6
**examples** 36:7
**exams** 22:15
  100:11
**exclusively** 19:2
**exemplar** 23:3
**exhibit** 44:20
  45:2 65:14,17
  65:19 76:19
  114:8,14
**exhibits** 3:13 4:9
  4:10,14
**exists** 59:20
**exothermic**
  105:13,20
**expectation**
  123:23 124:2,9
  124:14
**expel** 98:17,18
  99:3,13 100:23
  105:5
**expelled** 46:16

53:14 98:9
  110:8 111:1
**expels** 105:14
**experience** 21:1
  21:6,11,13,18
  22:4 57:16
  58:2,12 110:6
  110:21
**experienced**
  84:14 91:13
**expert** 11:10,12
  14:16 15:18
  16:11,19 17:16
  18:2 19:2,3,11
  20:17 22:18
  24:2 38:12,16
  47:2 57:22
  58:1 61:6
**experts** 127:14
**Expires** 129:20
  129:23
**exploded** 113:16
**explosion** 53:3
**explosions** 30:13
**extension** 119:5
  120:3
**extent** 25:17
  121:6 127:22
**external** 46:14
  84:12 98:20
  99:6,14 101:9
  101:21 105:21
  112:9,15,22
**externally** 96:3
  111:23
**extinguished**
  71:12,15

_____
            **F**
**F** 129:1
**fact** 60:7,20
  61:21 79:22
  97:14 100:22
  102:16 117:3
  118:11 124:8
**facts** 124:16

James Sobota                                                    6/28/2023

**fading** 118:1
**Fahrenheit**
   93:11,21 94:3
**FAIC** 31:23
   32:13 33:2
   41:19,22
**fail** 81:23 82:3
   95:15,16
   105:18
**failed** 108:6
   109:5,8,13
   110:10 111:4,8
   111:13,19
   112:1,3,14,20
   112:21 124:22
**fails** 94:11 105:4
   105:13
**failure** 29:19
   78:17,21 84:14
   98:2 100:17
   111:4 112:10
   112:16,22
**fair** 12:10 29:17
   32:4 63:10,11
   66:4 77:7,10
   78:9 85:15,16
   85:20,21 112:6
   112:10,11
   114:19
**Fairfax** 17:5,7
   17:11 18:20,21
   46:21 47:1
**familiar** 39:1
   49:8 59:4
   104:23 123:22
**Famous** 127:21
**far** 10:16 103:17
**Farm** 1:9 9:5,6
   11:10 14:13,17
   15:17 17:22
   20:17 32:13
   33:3,4 42:2,10
**Farm's** 13:6
**farther** 72:11
**fatality** 18:16
**Federal** 41:15

**Fernandez** 11:1
   29:5 55:6,8,11
   56:8,22 57:10
   65:12 73:10,14
   75:4 90:10
   92:2 113:19,21
   116:9,22
**Fernandez'** 75:9
   115:14
**field** 23:23
**file** 14:6 26:3
   28:20 31:10
   32:19 35:11
   40:17,18 41:1
   41:6 42:3
   43:15,22,23
   44:6,14 45:19
   126:15
**filed** 3:16
**files** 31:22 35:10
   35:16
**filled** 90:20 92:7
**final** 51:5 60:15
   88:8
**find** 59:8 60:7
   60:21 61:21
   62:10 74:4
   91:16 114:7
   122:21
**findings** 100:9
**finish** 38:9
**fire** 1:9 11:11
   14:1,4,10,16
   17:5,16 18:15
   18:19 19:2
   24:1,4,8,16
   32:23 36:12,13
   36:15 42:10
   46:14,20,21
   47:4,16 48:4
   48:20 49:11
   51:9 52:3,9
   53:2,18 55:13
   55:16 56:3
   57:16,18,23
   58:6,12,15

59:16 60:11,20
60:22 61:1
62:9,11 63:13
63:14 64:6
65:1 67:10
68:17 71:7,14
71:18,19 74:16
75:8,18 77:9
77:22 78:8,15
78:16 79:2,7
79:10,12,17,23
80:2,3,8,14,22
80:22 81:5,6,8
81:18 84:12,20
85:10 86:5
88:1,12,19
91:8,11,15
95:4 96:3,13
98:20 99:6,14
100:19 101:9
101:21 103:18
104:4,5,8
105:21 110:9
111:2 112:1,9
112:15,22
113:18 114:1
116:15 117:13
117:18 118:12
119:20,21
121:22 123:5,9
**fires** 17:12,22
   21:4,8,15,20
   21:22 22:6
   30:13,22 36:7
   36:19,23 37:5
   47:10,13,22
   48:7,15 49:5
   57:23 64:22
   87:19 118:5
**firm** 28:6,7
**first** 6:18 30:10
   41:8 49:4
   51:17 95:11
   96:14,20 97:23
   100:15 104:14
**five** 11:15 15:12

16:11 19:22
30:10 58:22
77:18 92:22
94:14 95:3
103:9 123:18
**Flaherty** 22:18
   29:18 70:13
   100:1
**flames** 82:4
   94:12,13
**flash** 93:10,16
   93:18,20 94:2
   95:9 115:10
**floor** 72:10
   107:19
**flowed** 80:10
**fluid** 94:22
**flute** 18:14
**FMEA** 22:10
**focus** 83:9 120:7
**foil** 113:10
**follow** 49:23
   62:14,17,18
**followed** 62:14
**following** 6:14
**follows** 6:19
**footage** 83:15
**force** 2:18
**foregoing** 6:7
   129:5,9
**Forgive** 125:7
**forgot** 54:16
**forgotten** 125:4
**form** 3:1 53:13
**formulate** 33:22
   61:6
**formulating**
   61:3,8
**forth** 75:10
**forward** 42:1,2
   69:18
**found** 45:22
   59:17 98:9
   101:2 118:13
**four** 65:13 70:23
   72:2 75:2

77:18 78:7
97:21 100:12
100:13 101:14
101:19 120:8
120:23
**FRANKLIN**
   5:12
**Fratus** 5:4,5
   6:23 19:16
   20:6,18 32:16
   32:21 33:10
   40:19 42:8
   46:5 47:17
   49:2 125:21
   127:9,19
**free** 94:7
**front** 13:14,17
**fuel** 51:18 86:11
   89:2,23 90:22
   90:23 91:21
   92:11,13 93:1
   93:3 94:15
   95:3,6,11
   96:14 106:4,5
   106:6,20
**full** 2:18 24:13
   80:12 86:7
   88:8 92:9,9
   127:22
**furnace** 86:11
   90:21 92:8
**further** 2:14,21
   39:8 114:18
   125:23 127:6
   128:3 129:12
**fussing** 99:9

___

**G**

**gas** 52:18 53:2,8
   53:9,22 102:8
   105:14,15
**gases** 53:10,13
   53:14,19 95:12
   96:1,15 105:4
**gasoline** 94:2
**general** 93:15

generally 7:19
  59:4
generated 11:4
  25:8 49:15
generically
  112:4
gentleman
  37:11 39:17
getting 22:2
  85:5 125:6
giant 120:10
girl's 86:14
gist 60:11
give 7:23 8:16
  10:9,14 11:11
  16:15 17:3,9
  20:1 33:18
  34:11,11 40:15
  104:1
given 27:23 34:9
  39:5 129:10
gives 32:9
giving 12:12
  27:18 28:12
  33:11 34:22
  35:4
glass 122:14
go 7:19 8:3 9:20
  16:4 20:18
  26:13,14 31:17
  33:2 45:11
  47:6,9 50:6,21
  51:4 55:7 59:2
  64:19,22,23
  66:12 70:20
  74:15 75:12
  89:4 101:23
  103:23 107:14
goes 104:15
  106:4
going 12:11,15
  12:19,23 22:20
  25:23 26:1,3
  26:22 29:18
  38:8 40:19
  44:19,20 45:11

57:6 58:20
  65:16,17,18,19
  65:22 67:23
  68:20 76:5,21
  76:23 77:1
  85:4,6 88:5
  89:4 100:12
  102:9 103:5,14
  112:13,14
  114:7 120:5,7
  123:15,16
  125:3
good 7:2,3 8:1
  57:6 76:15
  107:7 124:5
gotcha 25:15
  52:11
gotten 113:18
great 126:17
gross 109:16
ground 7:19
  113:14,20,22
grounds 3:4
GROUP 5:5
guess 32:11
  36:17 61:12
  93:7 96:21
  112:3 115:3
guide 62:12,13
  62:16 63:2
Gwen 14:13

———————
H
———————
H 5:11
habit 7:20
hair 21:12 22:3
half 57:11
hand 92:3
handouts 35:3
  126:9
handy 114:9
happen 58:9
happened 83:16
  118:8
happens 58:17
  106:1 118:8

happy 103:1
hazards 30:15
head 16:9 28:2
hear 9:8 82:21
heard 40:11
  53:7 54:16,17
  102:7,9 104:14
hearing 23:19
  54:4 102:19
  103:3,14
  129:11
hears 103:22,23
heat 53:13
heats 105:14
heavily 120:2
heck 35:8
held 92:2
help 57:3 68:23
Hernandez 86:9
hesitating 48:5
hey 34:17 57:6
high 30:14 37:2
  82:13
highlighted 27:8
  68:23
hired 11:10
  14:15 15:18
  16:1,18 17:16
  19:10,14,15
  20:17 66:20
hissing 54:5,9
  102:7,19 103:4
  103:14,23
  104:14
hold 79:1 96:11
  100:18,20
holding 32:8
home 43:19
  56:13
homeowners
  58:3
hope 125:18
Horner 16:2
Hornick 42:4
Hornick's 77:5
hose 80:3,9,22

81:18
hot 105:5,7,11
  105:15
hour 16:20,22
  31:19 32:1,4
  34:2,9 35:5
  38:12 57:11
  58:21
hours 29:9
  31:16,18 36:2
  68:1 116:18,22
  117:9,11
house 8:23
  102:14 103:16
  104:3 116:12
  116:23
housekeeping
  44:19
huh-uhs 8:3
hundred 15:1,2
  57:4
hundreds 36:22
  37:4 40:21
hungry 125:7
hypotheses
  50:15,22 51:8
  51:13 52:2,21
hypothesis 51:5
  60:14,15 65:4
  81:13 124:3,17
  124:21,23
hypothetically
  94:10

———————
I
———————
IAAI 46:7
idea 62:7 113:20
identification
  45:3 65:15
  76:20 114:15
identify 50:4
identifying
  59:15
ignite 93:16
  94:13
ignited 51:18

95:11 96:14,20
  98:1 100:15
  105:5,15 106:4
ignition 36:3,6
  37:10,19 59:16
  59:17 60:2,9
  60:23 61:16
  62:8 63:18,19
  65:2 97:23
  100:14 104:19
  104:20,21,22
  105:2 106:2
III 5:11
imagine 92:5
impact 52:20
important 23:12
  23:13,21 55:21
inadvertent
  117:17
inappropriate
  62:6
inappropriately
  59:15
incendiary 52:4
  52:5,12 59:10
inches 73:23
  74:11
include 54:4
included 87:3
including 64:4
income 19:9
incorrect 74:19
indicate 61:19
  69:3 73:12,14
  116:8 120:18
  121:18 122:1
indicates 119:9
inductive 50:19
INDUSTRIES
  1:13
infer 111:8
inferences 60:3
information
  10:8 52:15
  56:9 65:3
  66:10 67:12

86:6,23
**initially** 94:21
**ink** 89:9,9,9
  111:12
**inside** 115:17
**inspection** 22:14
  42:18 67:14,16
  88:3 108:17,19
  108:22
**inspections**
  108:15
**installed** 18:13
**installer** 18:13
**instruction**
  35:20
**insulation** 18:13
  18:13
**insurance** 1:9
  15:11,14,14,18
  16:19 17:17
  18:1 19:11
  32:2 34:13
**insured** 41:18
**insurers** 58:2
**intend** 128:1
**intentionally**
  52:9
**interested**
  126:10 129:14
**internal** 84:14
  111:4,9 112:9
  112:16,22
**internally**
  105:19 110:10
**interpret** 92:8
**interpreted**
  86:10
**interrupt** 9:20
**Interrupted**
  40:12
**Interrupter**
  40:9
**interruption**
  102:4
**interview** 55:2
  56:5,11,16

57:8,9,14
  69:10
**interviewed**
  55:8
**interviewing**
  55:20
**interviews** 56:22
**inverse** 67:22
**investigate**
  14:16 64:21
**investigated**
  17:12 47:3,14
  47:22 48:1,16
  48:18 91:15
**investigating**
  47:14 49:5
  57:23
**investigation**
  19:3 24:16
  33:1 55:22
  63:1,8 71:6
**investigations**
  24:4
**investigator**
  17:17 24:1
  43:6 57:17
  58:12 60:21
  62:10
**investigators**
  59:21 124:8
**invoice** 32:12,13
  42:14
**invoices** 32:17
  33:5
**involved** 32:6
  47:10
**iPad** 9:17,21
  41:3
**iron** 87:18,23
  88:4,10,18
**irons** 87:19
**issue** 12:17,21
  97:14
**issues** 82:20
**items** 86:16 87:8
  87:10 106:7

107:10
_____
**J**
**J** 5:4
**James** 1:17 2:7
  4:4 6:12,17 7:6
  128:5
**jet** 94:12
**John** 68:3 71:21
  86:13
**joint** 41:9
**Jonathan** 37:15
**jpeg210068** 76:4
**Juan** 10:23 29:4
  55:5,11 65:12
**judgment** 17:11
  20:1,3 103:10
  103:11 104:6
**July** 36:2 108:18
  108:21 128:7
**June** 1:19 2:12
  3:12 6:12
  108:18,20,21
  109:1,11 111:3
  111:16
_____
**K**
**K-I-R-K-'-S**
  24:11
**keep** 14:18 15:6
**keeping** 19:19
**kidding** 49:5
**kin** 129:13
**kind** 28:6,21
  53:8 89:16
  92:2 108:9
  115:1
**Kirk's** 24:10,16
**kitchen** 58:6
  102:9
**knew** 38:21
**know** 7:18 8:2,6
  8:20 16:7
  19:20 20:9
  22:14,14 23:5
  23:8,13,18,20

31:20,21 35:3
  37:1 39:15
  42:22 43:4,13
  44:4 46:6
  49:19 52:7
  53:4,21 61:22
  62:19 64:20,22
  68:2 74:21
  76:6 77:18
  78:12,12,14
  80:13 82:19
  84:9,15,16
  85:18 87:3,6
  87:22 88:9,17
  88:21 90:23
  91:22,23 93:3
  93:4 95:22
  97:1,7,12 99:5
  103:8 108:14
  110:3,4 113:14
  113:15 114:22
  115:10 118:18
  120:13,21
  122:11 125:2,5
**Knowing** 53:12
**knowledge**
  21:10
**known** 59:18
_____
**L**
**L** 2:3
**L-O-N-G-M-...**
  9:6
**lab** 4:20 22:15
  41:16 88:3
  100:11 114:11
  119:8 127:1
**lack** 18:17 78:13
**Lane** 9:5,6
**Large** 2:10 6:4
  129:22
**Larry** 42:14
  43:9 69:1,10
  69:14
**latching** 43:13
**law** 5:5 28:7

**laws** 2:19
**lawyer** 33:14
  34:10 35:6
  39:13
**lead** 49:14
**leading** 3:2
**learn** 30:4 33:17
  34:8
**learned** 28:14
  33:13,21 37:22
**learning** 38:10
**leave** 8:7 17:7
  100:13
**leaves** 116:12
**left** 18:21 58:7
  61:12 70:14,21
  70:21 72:19
  73:22 74:11
  78:6 87:14
  116:23
**Leigh** 129:18,19
**lengths** 99:5
**let's** 11:14 14:20
  20:18 35:23
  38:15 55:7
  58:5 59:2
  75:12 76:21
  83:9 87:4
  104:22 107:14
  112:12,13
**letter** 41:16
**letters** 30:10
**levels** 49:17
  51:23
**light** 43:8 53:12
  95:4
**lighted** 36:18,21
  37:3
**LIGHTFOOT**
  5:12
**lightning** 61:17
  61:17
**limited** 64:5
**line** 34:17 67:4
**liquid** 86:10
  89:1 90:20

92:7 93:10,15
93:19 94:2,20
96:22 97:2,7
97:10,15
**list** 33:5
**listed** 86:17 87:9
**listen** 31:1 33:21
**listening** 29:23
61:13 75:8
**literature**
117:11
**lithium** 38:13
48:6
**lithium-ion**
13:10 21:9,16
22:1,7 29:13
29:15 30:1,2
30:13,21 39:5
39:17,21 40:5
46:13 47:11,15
48:3,19 49:3
53:18,22 78:18
78:21 81:14,22
83:3,17 84:10
84:13 96:2,10
96:14 98:2,15
98:16 99:2
100:17 101:8
101:20 115:16
126:6
**little** 13:19
44:17,18 58:21
67:3 76:7 80:1
80:6 85:14
86:14 89:14
90:11 122:6
**LLC** 5:5,12
**located** 8:22 9:1
75:21 77:8
84:3 85:2,9
86:1,4
**location** 72:21
74:23
**log** 41:17
**logical** 60:3
**long** 29:7 57:9

57:13,18 67:18
**longer** 104:5
**Longmoor** 9:5
**look** 24:15 26:23
28:21 37:14
41:1 46:11
47:7,9 115:9
119:1 123:17
**looked** 20:10
31:21
**looking** 14:6
37:8 70:3
79:21 81:1
89:19 98:13
99:20
**looks** 42:2
**loss** 66:23
**low** 71:23,23
**lower** 93:16,18
**lunchtime** 125:6

──────────

**M**

**M-Y-L-I-K-A**
42:23
**Madam** 7:20
127:3
**maintenance**
18:18
**makeup** 87:6
**making** 71:11
74:3
**manual** 24:4,16
**manufacturer**
12:20 23:8
**mapping** 63:21
63:22
**March** 27:10,17
30:17
**marine** 21:4,20
**mark** 7:23 40:20
40:21 44:19
65:17,18 76:23
97:16 114:8
**marked** 4:10
45:3 65:8,15
76:20 114:15

**marker** 111:9
**marshal** 74:16
75:8
**MARYLAND**
1:2
**match** 73:4 95:1
**material** 97:23
100:15
**materials** 10:8
26:4 30:15
31:10 32:19
35:2,4,12 36:3
36:8 37:8,10
37:18,19 38:10
38:11 40:14,16
40:18,18 41:6
43:22 44:1,6
44:10,14 45:15
45:19,20 95:22
96:20 126:5
**math** 32:11
**matter** 17:20
28:20 30:4
34:14
**MD** 5:7
**mean** 8:11 9:19
13:3 33:17
49:19 52:7
54:14 57:5
59:7 60:10,23
61:14 62:17
66:7,17 67:10
71:10 94:17
104:12 113:16
118:18 123:2
**means** 51:15
52:8 59:8 66:8
67:4,9 82:3
89:20 129:7
**meant** 125:3
**measurers**
107:18
**mechanical** 12:8
**meet** 57:7 68:5
**melt** 94:19
**member** 37:11

37:12
**memory** 118:1
**mentioned** 54:2
88:23 100:1
113:23
**met** 7:10,11,12
68:4
**method** 38:18
49:23 50:2
51:7,16 55:19
63:9 81:11
112:7 123:12
124:11
**methodology**
38:17
**Michael** 31:22
32:22 39:6,19
43:2
**Mike** 33:4
**mind** 79:20
**mine** 67:22
**minimum** 93:12
93:20
**minute** 27:2
58:22 103:8
123:18
**minutes** 7:11
57:15 103:9,9
103:12,13
104:1,7 115:21
**misremember**
58:14
**misremember...**
58:4
**misremember...**
118:2
**misrepresent**
58:13
**misrepresenta...**
118:3
**misrepresented**
58:4
**misstate** 58:13
**misstated** 58:3
**misstatement**
118:3

**mode** 29:20
**model** 23:5,14
97:12
**modem** 87:13
**moralization**
38:20
**morning** 7:2,3
117:21
**move** 35:23 62:3
82:12
**moved** 79:17
**moving** 81:6
**MSDS** 115:9
**multiple** 83:23
**Mylika** 42:19

──────────

**N**

**N** 2:3 4:1 5:1
**name** 7:4 16:6
28:2,5 30:11
30:18,20 39:16
46:19
**named** 16:2
129:15
**names** 16:7
26:20
**National** 49:11
**natural** 52:18
102:8
**near** 90:21
122:23
**nearby** 106:3
107:19
**nearly** 91:1
**necessarily**
40:22 51:15
60:10,23
**necessary** 2:22
127:16
**need** 8:5 10:4,9
16:23 34:2
50:4 68:22
105:17 125:9
**negative** 59:5,21
60:12,19 62:6
63:3,10 94:3

neither 55:11
129:12
net 30:21 35:20
95:20
nevertheless
87:8
new 69:2
NFP 9:19
NFPA 9:16,22
9:23 24:7,19
25:11,19 49:8
49:20 50:3
55:20 59:3
62:7 63:2
112:7 123:22
124:6
NFTA921 52:1
night 29:6 54:7
73:19 102:6
noises 102:7,20
103:4,23
104:14
North 1:13 5:14
NORTHERN
1:3
Nos 65:14
Notary 2:9 6:3
notations 74:3,4
note 53:6 66:9
69:6 71:4
72:19 111:6
112:8,14
noted 88:15
notes 4:18 26:2
28:21 31:8
37:14 40:16
41:4 44:7 47:9
54:3,3 56:18
56:20 65:20
66:4 68:11,20
69:22 73:12,14
74:23 88:2
89:5,5 90:19
92:6 107:15
113:5 116:8
117:19 123:17

126:8,11,21
notice 4:16
24:17 38:19
45:4 126:19
noticed 119:8
notified 66:18
nozzle 80:11,14
number 1:5
17:10 32:8
37:1,2 65:9
75:21 97:21
106:23 107:5,7
107:9,12
numbered 70:11
numbers 14:19
15:9

**O**

O 2:3
oath 8:9 47:13
48:1,17 54:19
54:22 96:11
objections 2:23
3:3
observation
101:13
observations
109:16
observe 31:1
119:5
observed 52:15
81:22 103:19
119:2
observes 102:11
observing 84:7
102:20 103:5
occur 61:17
101:7,19
105:21
occurred 58:14
67:10 108:18
odor 53:9
offer 88:8 128:1
offered 3:5
offhand 34:7
office 8:23

115:18
offices 2:10 6:9
oil 89:2,23 90:21
90:22,23 91:21
92:7,11,13
okay 9:1,8,8,10
13:18 20:13
22:2,20 23:17
23:22 25:13
27:1,17 30:18
30:23 32:2,7
33:10,11 34:6
35:2,23 38:8
39:2 40:13
41:8 42:13
43:7,21 44:3
46:3,12 49:1,7
52:11 53:15,21
56:11 57:4
61:9,14,16
62:2 63:7,7,16
64:16 65:16,20
68:19 69:17
73:6,12 75:5
75:12 76:16
77:11 78:19
79:14 80:2
81:10 83:9
84:9 88:16,23
92:14,21 96:5
96:18 97:10
102:16 103:13
104:18 107:14
109:9,15 114:1
117:23 119:2
120:5,8 122:6
126:2,10
127:19
omissions 97:22
100:14
open 43:16
80:11,13 89:23
opened 42:21
opening 42:12
opined 48:2,18
opining 12:16

12:19 13:1
opinion 38:3
53:11 64:17
65:7 75:5 79:1
80:21 81:13
85:19,23 87:9
95:10 96:6,12
96:19 97:16,21
98:6,7 100:12
100:13,18,20
101:14,19
105:11 113:1
114:22 117:16
opinions 10:4,10
10:15 11:6,11
11:14,18 12:12
25:18 29:19
38:18 49:14,15
88:9 127:23
opposed 80:21
opposite 98:10
oral 3:12 6:13
order 10:9 17:13
49:22 53:3
origin 11:11
21:2,7,14,18
22:5 24:1
59:19 63:13
64:13 65:7
68:16 69:19
70:8,18 90:22
91:17 119:17
122:23 123:4
original 3:11
ounces 92:18,20
94:14 95:3
outside 45:19
102:14 104:15
overdoing 15:10
overhauled 71:7
overhauling
71:17
owner 31:23
87:15
oxygen 105:17
105:18

**P**

P 2:3 5:1,1
p.m 67:11 116:9
116:18,20,21
pack 12:16,20
13:10,11 22:13
22:16,23 23:3
23:6,10,14
29:21 51:19
73:15,22 76:11
77:8 78:22
81:14 82:5,7,7
82:9,12 83:17
84:13,20 85:2
94:10,13 96:2
97:13,14 101:8
101:20 113:8
113:13 115:16
115:23
package 106:4,5
packages 106:6
Packaging
30:12
packs 83:23
96:10 99:2
page 4:6,15
13:13 20:23
49:14 66:3
68:19,19 69:22
70:1 71:2
74:22 89:5
107:14 111:11
113:4
pages 11:15
paid 13:7 16:20
16:22 46:7
paint 86:15 87:4
90:7,12,15,16
91:2,4,5 99:21
114:16
paper 8:3 9:14
29:12 87:4
97:5
Park 5:7
part 39:4,8 43:5

43:22 51:1
53:17 55:18,21
81:3,11 99:17
**partially** 81:7,8
**particular** 38:6
118:20,21
**particularly**
56:1
**parties** 2:5 3:3
129:13
**partner** 43:3,4
**parts** 62:20
101:4
**pass** 125:23
126:18
**pattern** 92:3
**patterns** 63:15
65:1 73:3
119:1 120:1,3
**pay** 32:3
**payments** 13:6
**PE** 12:1
**peer** 117:10
**pen** 97:16
**pens** 87:4
**people** 38:19
66:10 123:15
**people's** 118:1
**percent** 18:7,8
18:10 19:5,9
20:14 57:5
**percentage** 20:8
36:11
**person** 56:23
57:2,8
**personal** 13:5
**pertain** 44:1
**pertaining**
44:10
**Philadelphia**
28:8
**phone** 57:1
69:11
**photograph**
69:20 74:3,5
75:23 77:6

89:6 106:15
108:11 111:14
114:10 122:9
127:1
**photographed**
117:4
**photographs**
76:4 77:2,3,4,5
108:17,22
117:3 118:16
118:22 126:23
**photography**
111:10
**photos** 4:19,20
40:22 44:3,5,7
65:9,10,11
**phrase** 104:19
**physical** 22:12
22:22
**pick** 108:7
**picking** 40:9
**picture** 72:18
73:9 79:18
81:1 85:17
99:19 107:11
108:10,16
111:17 114:8
**pictures** 41:15
41:16 79:21
83:7 118:19
**piece** 60:8,21
73:3 120:11
**pieces** 9:14
**pink** 107:22,23
107:23 108:3
109:3,10
110:13,17,22
**Pipeline** 30:15
**place** 58:15
75:17
**placed** 74:10,17
84:2
**plaintiff** 19:7
28:9 33:14
39:12
**plaintiff's** 4:9,10

34:10 35:6
**Plaintiff(s)** 1:11
5:3
**plastic** 86:7
89:12 94:17
**plausible** 60:9
60:22 62:8
**please** 3:14 7:5
114:6
**podcast** 29:15
30:1,19,20
35:21,22 96:9
98:13 101:13
110:5
**point** 34:21,22
40:20 76:10
90:21 91:17
93:10,16,20
94:2 95:9
110:5 115:10
**pointed** 34:16
**points** 89:13
**poles** 18:18
**popping** 54:5,10
**possibilities**
81:4 114:4
**possibility** 61:20
78:20
**possible** 34:12
61:22 63:18
78:1 98:21
107:13
**potentially** 51:9
**PowerPoint**
77:2 126:22
**premise** 36:17
**preparation**
31:2
**prepare** 28:23
**prepared** 10:13
28:17 33:15
88:8
**present** 55:15
56:2 59:18
64:6
**presentation**

27:22 28:15
36:1 38:12
40:14
**presented** 39:9
**presenter** 37:9
**pressure** 80:8
**pretty** 92:8
**previous** 87:15
**previously**
47:22 48:15
**prior** 3:6
**probability**
61:20
**probable** 61:23
72:20 74:23
78:2,3 79:16
**probably** 25:12
75:21 91:5
111:16 125:6
127:10
**problem** 50:4,7
**Procedure** 3:8
6:7
**proceedings**
6:14
**process** 32:6
38:19 59:14
60:13,16 66:10
**produces** 105:18
**producing** 95:9
**product** 115:9
**professional**
12:1 27:10,11
35:1
**progressed**
103:18
**progressing**
104:5
**propelled** 82:5,6
82:7,8,11
**proper** 124:10
**properly** 26:5
**property** 13:5
49:17 51:22
57:7
**protected** 73:3,6

121:21
**protecting** 94:22
122:2
**Protection**
49:11
**prove** 124:3,15
**provide** 45:15
126:9
**provided** 27:4
45:22 127:15
**Public** 2:9 6:3
**published**
117:10
**pull** 13:14,16
26:22 27:1
**Purcellville** 9:2
9:6
**purplish** 86:10
89:1
**purposes** 126:16
**pursuant** 6:6
**pursue** 20:11
**push** 23:17
**put** 7:22 35:8
72:14,17 73:11
73:15,21 75:11
75:14 76:22
80:14 107:22
108:1,3 109:3
109:10 110:13
110:17,21
111:5 112:14
112:17 115:17
117:22
**puts** 116:2
**putting** 38:19
71:18

---

**Q**

**Q-U-I-N-T-E-...**
30:7
**Q-U-I-N-T-I-...**
30:9
**qualifications**
38:17
**qualify** 49:2

**quarter** 91:5
**quench** 95:6
**question** 7:22,23
8:7,15 18:3
21:12 22:3
25:6 33:21,22
48:13,14 57:12
62:4 88:17
102:22
**questioning**
125:17
**questions** 3:1,2
81:20 125:14
126:1 127:7,10
128:3 129:6
**quick** 41:1 102:1
104:7,17
**Quintiere** 29:12
30:6 46:2 97:4
125:21
**Quintiere's**
95:19 96:8
98:14
**quite** 14:19,20
20:12 48:13
90:15
**quoting** 73:13

**R**

**R** 5:1 129:1
**R-E** 42:18
**random** 120:10
122:7
**rate** 16:18 17:1
31:19 82:13
**reach** 69:13
**reaction** 81:9
84:8,11,13,19
95:15 105:13
105:20
**read** 8:4 27:19
29:3 54:7
60:18 68:22
73:19 83:8
89:11 90:1
92:6 98:3

102:5,13
115:13 127:11
127:14
**reading** 2:1,16
30:1 35:3
73:20 75:9
**real** 13:4 102:1
**really** 34:18
36:12,13,14
85:17 96:18
**reason** 42:10
48:5 54:16
101:12 111:5
118:20,21
**reasonable** 79:2
96:13 100:18
**reasoning** 50:19
51:2
**reasons** 52:10
**recall** 47:13,23
48:9,17 86:21
115:14
**recalled** 54:8
**receipt** 43:8,8
43:12,18
**received** 43:22
**recess** 59:1
123:20
**recognizable**
108:9
**recognize** 44:23
**recognized** 63:9
**recognizing**
50:3
**record** 102:1,2
123:21
**red** 89:9 97:16
111:12
**reddish** 90:22
**reference** 9:23
25:10 41:2,5
**referenced**
24:18
**references** 24:19
25:13 54:4
**referred** 59:20

89:1
**referring** 24:20
107:4
**reflected** 11:7
11:15 56:18
96:19
**regular** 86:7
**related** 9:15
27:10,12 30:14
**relating** 2:20
**relative** 121:19
**relatively** 58:17
71:23 77:13
104:7,16 118:9
**release** 94:20
**relevance** 37:23
**relied** 25:12
**rely** 25:10
**relying** 24:18
**remember**
26:21 34:7
47:7 52:16
54:11,15 56:7
56:15 61:5
62:21 68:14,15
71:8 73:17,20
74:1,2,2,8 83:2
83:11,19 84:1
84:4,5 102:6
102:12 104:13
108:15 117:2
127:11
**remembering**
79:22
**removed** 90:21
**render** 10:4
**report** 4:17 11:5
11:7,16 13:13
20:23 24:17
25:9,13 26:2,9
31:6 44:8
49:13 65:18
66:6,8,11,15
71:5,22 86:12
96:19 126:20
**reported** 52:17

116:15 118:4
**reporter** 1:22
2:9 3:16 6:2,20
7:21 127:4,5
127:13
**Reporting** 2:11
6:9
**represent** 76:3
114:9,18
118:15 122:7
**representation**
77:7
**represents**
129:9
**request** 45:9
**requested** 66:9
**requests** 45:14
45:17,21
**require** 51:16
**requires** 51:7,11
**Rescue** 17:6
46:21
**research** 28:19
95:14,17,18
97:3 105:16
**researched** 9:18
**residence** 55:12
67:16 70:4
71:6
**residential** 21:8
21:15 22:6
36:22 37:4
**respect** 63:2
**respectful**
125:17
**respective** 2:6
**response** 33:23
34:1 45:16
**responsive**
45:20
**result** 99:5
129:15
**resulted** 98:1
100:16
**results** 88:6
**retained** 3:15

13:20 14:3,8,9
**retired** 17:8
**review** 10:9
28:20,20 29:10
31:1,6 45:8
117:10 127:12
127:15
**reviewed** 10:7
10:18 29:11,14
45:13 56:20
**revisions** 25:3
**right** 7:13,18 8:4
8:9,14,19 9:11
10:1 11:12,21
13:9 16:9,20
16:22 19:7,11
19:13,21 22:9
24:6,8 25:2,4
25:23 26:8,10
27:19 28:12
30:11 31:5,12
32:10 33:15
35:23 36:19
37:7,12 40:17
41:10,14,22
42:5,9,15,23
43:9 44:17
46:12 48:9
49:8,13,20,23
50:4,7,10,16
50:19,22 51:5
51:13 52:14
54:5,19 55:9
55:22 58:11,20
59:12 60:11,17
61:2 62:11
63:12 64:2,9
64:14 66:21
67:1,5 69:17
70:5,14,20,22
70:23 72:6,7
72:11,12,21
74:12,20 75:2
75:16 76:12,13
76:14 77:12,12
77:13,14,20

78:4 80:3,9
85:4,11,12,14
85:19 88:21
89:2,6,9,14,18
89:21 90:1,17
91:18,20 93:17
93:22 94:9,23
96:3 97:21
98:3 99:17
101:11,15
105:22 106:10
107:20 109:1
109:18,20,23
110:8 111:17
112:12,13
113:4,11 114:6
114:16 115:13
116:3,6,10
117:2,7,15
118:5,7,9,13
118:15 119:10
121:7,10,13,16
121:23 122:15
122:19 123:5
124:11 125:13
127:7,11,12
128:3
**rigorous** 124:22
**role** 100:2
**Roman** 82:4
  84:6 94:11
**room** 9:11 78:14
  98:10,17 99:5
  99:12 101:5
  116:2 117:18
  117:20 122:22
**roster** 41:9
**roughly** 90:5,9
**rule** 3:7 41:16
  117:16 119:13
**ruled** 119:16
  123:8,10
**rules** 2:19 3:8
  6:6 7:19
**ruling** 38:7
**Ryobi** 97:8,13

**S**

**S** 2:3,3 5:1
**S-C-A-T-L-I-...**
  43:1
**S-C-H-A-A-L**
  32:23
**S-O-B-O-T-A**
  7:8
**s/Danielle**
  129:18
**safe** 36:12,13,15
**safely** 40:6
**safety** 29:13
  30:15
**saw** 54:17 82:16
  84:19 102:14
  115:15
**saying** 20:18
  34:17 42:22
  52:18 60:6
  75:4 78:19
  91:3 92:3,9
**says** 27:18 43:8
  62:12 66:6,12
  67:3 69:1,7
  72:20 73:10
  89:19 96:20
  111:19 112:8
  117:19
**scan** 22:19
**Scatliffe** 42:19
**scenario** 104:19
  104:21
**scene** 4:19 41:9
  44:5 56:3
  60:22 63:17
  64:6 71:8,17
  77:4 79:22
  100:11 108:22
  109:16 126:23
**Schaal** 31:23
  32:23 33:4
  43:2
**science** 79:2
  96:13 100:19

**scientific** 38:18
  49:17,23 50:2
  51:7,16,23
  55:18 63:9
  81:11 112:7
  123:11 124:10
**scooter** 48:8
**scores** 29:13
**screen** 26:6
  44:20,21 65:23
  99:18 106:11
  106:12
**scroll** 66:2 67:20
  67:21 68:12
**search** 35:8,9
  45:15
**searched** 45:21
**seconds** 79:5,15
**section** 27:9
**security** 83:15
  83:19,21
**see** 8:19 11:14
  26:5,14 27:8
  27:17 33:5
  35:16 37:14
  38:15 42:10,20
  44:2,21 46:11
  53:1 59:13
  61:18 65:23
  69:15,20 70:1
  72:2,5 75:23
  76:5,8,16
  77:11,17,21
  78:5 79:18
  81:6 90:7,16
  91:6 99:18,19
  106:11,16,21
  107:2,11,15,18
  113:4,8 114:16
  118:23 119:23
  120:2,15 121:2
  126:14
**seeing** 103:15
  117:3 118:20
**seen** 22:14 32:17
  33:8 110:3,4

**sees** 104:15
**select** 51:4
**send** 125:20
**Senior** 43:6
**sense** 48:11,12
**sent** 26:15 40:19
  44:13
**separate** 108:14
**sequence** 104:12
  104:20,21,22
  105:2 106:2
**served** 17:16
**serves** 101:13
**set** 10:12 52:9
  83:14
**seven** 11:16
  16:12,15 20:4
  47:2 57:22
  68:20 118:16
  118:22
**Severna** 5:7
**shaded** 8:20
**shapes** 85:6
**share** 26:5 44:20
  106:11 120:5
**Sharon** 16:2
**sheet** 127:16
**shelf** 65:9,12
  70:9,14,15,18
  70:21,21,22,23
  72:2 74:12,18
  75:1,21 86:3,4
  87:12,23 88:11
  88:18 89:6
  99:22 106:8,21
  106:23 107:2,5
  107:7,9 113:17
  114:3,19 115:2
  116:3 118:17
  120:8,23
**shelving** 70:3
  107:11,17,20
  119:6 122:23
**shoot** 82:4
**shoots** 94:11,12
**Shorthand** 2:8

6:2
**shortly** 102:10
**shot** 122:14
**show** 25:23 26:4
  65:16,22
**showing** 76:1
  83:15 84:10,12
  84:19
**shows** 119:13
**shush** 53:7
**shushing** 54:9
**side** 98:10
**signature** 2:15
**significance**
  54:13 119:4
**signing** 2:1
**signs** 53:1,4
  61:18
**similar** 90:16
  93:7 107:1,10
**simply** 54:8
  92:10 109:15
**sir** 7:9 9:4 11:19
  11:22 20:21
  23:15 31:15
  77:15 92:17,19
  99:11 101:18
  117:15
**sit** 47:12 88:7
**site** 119:7
**sitting** 113:1
**six** 11:15 15:12
  16:11 36:2
  38:11 73:23
  74:11
**size** 90:3,6,9,12
  91:2,4,5 92:5
**sizes** 40:2
**sketch** 44:5
**skip** 69:18
**skipped** 44:18
**slide** 77:5 79:19
  85:1 106:14
  107:2,12 120:6
  122:8
**slides** 35:3

| | | | | |
|---|---|---|---|---|
| small 92:3 | 114:7 116:19 | starting 19:1 | 101:8,20 107:6 | suspected 59:18 |
| smaller 90:11 | 124:14 127:20 | starts 50:3 | 107:9,17 | sworn 6:18 |
| smarter 123:16 | sort 8:20 46:9 | state 1:9 2:9 6:4 | submitted 22:18 | systematic |
| smelled 52:18 | 65:5 77:19 | 7:4 11:10 13:5 | 32:12,13,15 | 64:21 |
| 53:7,19 102:7 | 81:12 83:13 | 14:13,16 15:17 | subro 33:14 | |
| smells 53:22 | 122:13 | 17:22 20:17 | 34:10 35:6 | T |
| smoke 102:9,11 | sound 53:7 54:9 | 32:13 33:3,4 | 41:22 | T 2:3,3 129:1,1 |
| 102:14,17,21 | source 36:4,6 | 42:2,10 129:2 | subrogation | table 8:8 |
| 103:4,6,14,15 | 37:10,20 59:16 | 129:21 | 17:19,19 18:5 | take 8:6,6,8 |
| 103:18,23 | 60:2,9,23 | statement 73:1 | 18:8 19:6 | 26:23 29:7 |
| 104:2,10,12,15 | 61:16 62:9 | statements | 20:11,19 28:10 | 32:7 40:23 |
| 104:16 | 63:18 97:23 | 63:21 64:4 | 34:13 39:13 | 46:11 58:21 |
| smoking 36:3,8 | 100:15 | States 1:1 37:5 | subscription | 61:10 88:5 |
| 37:10,19 52:4 | sources 51:17 | stenotype 129:6 | 46:8 | 97:15 104:1 |
| 52:12 58:14 | 59:17 63:19 | step 44:18 50:9 | sue 20:19 | 108:13 118:19 |
| 116:10 123:7 | 65:2 | STIPULATED | summarize | 123:18 |
| 126:5 | speak 69:9 | 2:4,14,21 | 60:18 | taken 2:7 3:12 |
| Sobota 1:17 2:7 | specialized 21:1 | stipulation 6:8 | supplies 86:14 | 11:3 38:23 |
| 4:4 6:12,17 7:2 | 21:6,13,17,22 | stipulations | 86:21 87:1,7 | 59:1 108:11,23 |
| 7:6,7 22:21 | 21:23 22:4 | 6:21 | support 101:12 | 111:14 114:10 |
| 49:7 59:2 | specific 17:10 | stop 76:10 85:8 | supporting | 123:20 129:5 |
| 75:17 82:18 | specifically 22:8 | stove 58:6,7,9 | 59:19 | takes 115:22 |
| 99:18 102:3 | 48:16 59:12 | straight 77:13 | supports 101:18 | 116:1 |
| 106:17 123:14 | 83:20 97:9 | stream 81:8 | supposed 36:11 | talk 26:1,3 36:5 |
| 123:22 125:19 | speed 82:13 | street 5:14 41:17 | 88:4 | 39:20 68:7 |
| 127:8,10 128:5 | spell 7:7 30:6 | strictly 17:21 | suppress 80:7 | 86:3 100:5 |
| Sobota's 106:2 | spelling 127:17 | strike 12:11 | suppression | talked 36:10 |
| 113:1 126:20 | spent 31:13 | 49:6 55:19 | 77:23 78:9 | 38:16,17 39:17 |
| 126:21 | spoke 54:18,21 | 57:17 96:7 | 79:7,10,13,17 | 39:22 55:5 |
| solder 88:4 | spread 77:20 | 102:17 119:3 | 113:19 114:2 | 68:16 82:17 |
| soldering 87:17 | squiggly 67:4 | stronger 27:18 | sure 18:6 28:9 | 83:2 95:18 |
| 87:19,22 88:10 | St 129:3 | 28:12 33:11,18 | 34:4 35:18 | 117:23 118:6 |
| 88:18 | stack 72:6,20 | 34:22 35:4,16 | 37:2 42:11 | 118:11 |
| solo 90:14 | 77:12 78:6 | strongly 124:9 | 46:9 62:4,5 | talking 22:20 |
| Sons 42:14 43:9 | stacked 77:13 | structural 21:3 | 63:4 69:23 | 23:14 42:21 |
| 69:1,10,14 | 122:1 | 21:19 | 71:11,14 74:15 | 68:15 69:18 |
| soot 121:6 | stacks 72:2 | structure 21:22 | 88:14 99:9,9 | 74:6 80:6 |
| sooty 120:17,22 | 77:14 | stuff 40:6 46:9 | 108:8 110:7 | 90:13 102:6 |
| 121:20 122:4 | stake 122:10 | 65:5 84:6 | 112:18 115:6 | 107:6,8 124:19 |
| sorry 14:8 15:21 | stand 49:10 | 107:23 114:23 | 120:20 123:6 | talks 55:20 |
| 16:21 24:14 | 70:15 | subject 22:13,16 | 123:19 | tank 106:20 |
| 46:20 47:19 | standard 24:3,9 | 22:22 23:9 | surrounding | tape 107:18 |
| 48:22 55:2 | start 19:19 | 28:19 29:20 | 94:18 | 108:1,4 109:3 |
| 61:4 66:13 | started 16:13 | 30:3 34:17,19 | surveyor 108:1 | 109:10 110:14 |
| 71:13 82:18 | 18:19 36:7 | 51:18 84:11 | surveyors 108:4 | 110:17,22 |
| 90:8 102:23 | 49:5 104:4 | 97:13 99:14 | suspect 119:23 | 111:6 |

**Taronji** 1:10
  10:19,21 14:14
  29:4,4 52:17
  54:2 55:9,12
  55:15 56:6,23
  57:12 70:4
  102:19 103:3
**Taronji's** 102:5
**Taronji/Ferna...**
  42:11
**taught** 39:9 83:4
**teach** 34:10
**teaching** 38:10
**technique** 30:12
**TECHTRONIC**
  1:13
**tell** 8:12 16:23
  28:13 36:4
  38:13 82:1
  85:7 103:17,20
  103:21 104:3
  110:13
**temperature**
  94:6 95:8
**ten** 14:21,22
  103:9
**term** 43:5 112:3
  112:5
**termination**
  60:2
**terms** 13:5
  39:20
**test** 50:21 51:12
  83:13
**testified** 6:19
  73:21 74:9
**testify** 54:10
**testimony** 1:16
  3:12 11:6 27:5
  27:19 28:13
  33:12,19 34:12
  34:19 35:5,17
  38:13,16 61:7
  73:21 74:7,8
  75:9 79:8
  96:11 115:23

  125:9 129:10
**testing** 22:13,16
  22:22 23:2
  53:16 60:14
  81:10,12,21
  109:22 124:22
**tests** 83:20
**texts** 23:22
**Thank** 7:9 22:9
  46:12 127:7
**Theresa** 10:21
  29:4 52:17
  54:2 55:15
  56:5,12
**thereto** 3:6
  129:7
**thermal** 119:18
**thick** 102:11,17
  102:20 103:5
  103:15 104:2
**thing** 53:8 89:19
  94:12 95:4
  122:10,19
  124:5,7 125:22
  126:2,8
**things** 28:16
  29:16 33:13
  38:22 58:4
  61:12,15,22
  62:1 81:6 99:8
  101:19,22
  118:19 126:9
**think** 10:8 16:8
  20:10 24:6,22
  26:17 28:1,5
  31:4,22 64:2
  64:14 65:11
  68:11,21 73:9
  75:11,19,20
  76:11 79:9,9
  82:15,19 83:1
  87:17 88:13
  94:16 101:15
  104:7 108:5,19
  111:5 113:16
  113:22 116:17

  122:16
**thinking** 23:16
  78:13 92:12
  99:23
**thorough** 49:16
  51:21
**thought** 68:16
  78:16 79:15
  102:8
**thousand** 20:2
**thousands** 17:13
  17:14 47:13,21
  48:15
**three** 13:13
  20:23 29:9
  65:13 68:1
  70:22 78:6
  92:21 94:14
  95:3 96:19
  97:16 108:14
**threw** 95:2
  113:19
**throwing** 113:21
**thrown** 99:12
**tile** 73:3 75:1
  77:14 85:16
  120:22 121:5,9
  121:12,15,19
**tiles** 72:3,6,20
  75:20 77:12,19
  78:6,17,21
  79:7,12,18
  80:23 81:2,15
  122:3
**time** 3:4,5 31:12
  32:3 47:1
  55:13,16 56:8
  57:7 66:14,15
  73:5,8 75:3
  77:9 80:7
  85:10 86:5
  88:1,11,19
  95:9 102:18,23
  103:2 111:16
  116:16 117:12
  117:20 118:5

  121:22 125:20
  127:8
**times** 14:15 32:9
  81:17,19 100:1
**tips** 33:20 34:11
**title** 24:13 42:20
**today** 10:10
  11:10 17:20
  29:1 35:15
  47:12 88:7
  96:11 113:2
  125:14 126:16
  127:22
**told** 25:14 33:12
  56:9,10,13
  58:8 64:11
  68:18 70:7
  74:16 78:10
  79:5 97:4,11
  100:22 109:7
  127:22
**tomorrow** 10:13
**top** 16:9 28:2
  66:2,6 70:21
  70:22 73:15
  75:1 78:7
  121:19 122:2,3
**topics** 34:5,6
**total** 29:9
**track** 14:18 15:6
  19:19
**trainer** 29:14
  30:19,21 35:20
  95:19
**training** 21:11
  21:22,23 27:10
  35:10,12 68:6
  79:4 95:21
  98:15 110:6,20
**transcribed**
  129:7
**transcript** 3:11
  8:2 129:10
**transcription**
  129:8
**translate** 68:21

**translation**
  68:22
**transportation**
  30:16
**transported**
  40:6
**treatises** 23:22
**trial** 3:4 10:13
  128:1
**true** 7:16 21:4
  36:23 47:16
  48:4,20,21,23
  50:13 51:2,3,9
  51:19 54:22
  55:13,16 56:1
  62:15 84:20
  91:8 101:9,10
  101:21 111:20
  111:21 117:13
  117:14 123:9
  129:9
**truth** 8:12,12,13
**try** 14:20 46:7
  51:12 56:11
**trying** 23:17
  25:15 73:9
  78:10 82:11
  99:10 106:11
  111:8 124:3,15
  124:17
**TTI** 42:4
**Tupperware**
  89:20 90:4,14
  90:17,20 91:1
  91:21 92:4,10
  95:2 99:20
**two** 26:16,19
  27:3 45:7
  61:23 65:9,12
  66:9 67:23
  70:9,21 78:15
  104:1 106:14
  107:2,12,18
  116:22 117:7,9
  117:11 126:13
**type** 53:3,7

61:11 84:7
86:7
**types** 18:10 40:5
**Typically**
127:14
**typo** 24:20

---
**U**
---

**U** 2:3
**uh-huhs** 8:3
**unable** 56:17
**unavailable**
56:8
**understand** 7:15
8:8 11:9 15:8
34:3 57:3 72:9
74:9 82:11
104:18
**understanding**
32:5 102:18
103:2
**understood**
125:13
**United** 1:1 37:5
**unplugged** 47:5
47:8,15 48:2
48:19 74:10,12
**unplugs** 116:1
**updated** 26:16
126:13,17
**updates** 25:3
**uploaded** 66:16
**use** 64:20 87:14
104:22 124:10
**Usual** 6:20
**utility** 116:2
117:18,20
122:22
**UV** 43:8

---
**V**
---

**valid** 124:21
**various** 17:17
**varying** 86:18
**vehicle** 21:3,20
**verbatim** 73:13

**Vermont** 41:15
41:17
**versus** 110:9
111:2 112:1
**victim** 46:14
**video** 83:19,21
**videos** 44:8
81:22 82:1,14
82:16 83:1,6,9
83:10,12,14,23
84:6,10,18
**Virginia** 9:2,7
**virus** 119:15
**voicemail** 56:12
**volt** 97:8,13
115:16
**volume** 90:23
91:21 92:15
**vs** 1:12

---
**W**
---

**w/** 89:20
**waive** 127:12,18
**waived** 2:2,17
**want** 9:3 14:5
26:4 30:4
34:18 37:13
38:9 40:21
43:15 59:13
62:3,3 69:17
69:23 76:5
85:7,8 86:3
94:9 117:6
120:7 126:4
**wanted** 33:8
126:3
**wasn't** 23:18
56:13 60:10
75:13,13 111:8
**watch** 31:1
**water** 71:23
78:13 80:1,6,9
**way** 8:1 21:17
26:13 70:11,12
78:5 81:2
84:16 88:9

90:5 95:1 98:9
102:13 129:14
**ways** 36:6
**we're** 7:10 17:20
22:2 23:14
26:1,2 38:8
69:23 70:3
76:6,21 82:20
85:5 90:13
99:19 100:10
112:13 113:1
124:19
**we've** 24:10 31:3
58:20 107:18
125:2
**weather** 61:18
**week** 45:7
**weeks** 45:7
**went** 39:7 43:19
44:6 56:12
102:8 115:17
**weren't** 123:3
**white** 5:12 28:1
28:4 33:14
34:9 114:23
**Williams** 28:1,5
33:14 34:9
**win** 34:18
**window** 117:9
117:11
**wire** 18:18
**witness** 2:16 4:3
6:12 61:7
63:21 64:4
65:3 125:23
127:18 129:11
**witnesses** 55:21
56:2 64:5
68:18
**wondering**
25:17
**wood** 120:11
**word** 52:8
**words** 34:16
75:12 94:21
111:12 127:21

**work** 10:3,15
15:19 16:11
18:2 19:2,3
28:10 40:4
47:2
**worked** 17:5
19:15
**working** 20:17
46:23
**worst** 64:23
**wouldn't** 95:7,9
97:18
**write** 56:19
66:11,15
111:15 112:12
112:14 113:7
113:10
**wrong** 30:8
52:10 97:18
**wrote** 29:12

---
**X**
---

**X** 4:1
**X-ray** 109:18,19
**X-rays** 88:4

---
**Y**
---

**y'all** 68:10 100:8
125:5
**yeah** 18:3 24:22
25:1 27:23
47:20 64:20
67:23 68:15
75:7 76:2 78:3
78:12 85:13
112:6 126:7,14
**year** 13:22 16:16
36:3,23 37:5
**Yearout** 3:11
4:7 5:10 6:22
7:1 32:18 33:7
101:23 126:14
127:6,20
**years** 15:12
16:11,12,15
17:8,10 20:4

47:2 49:4
57:20,21,21,22
58:11
**yellow** 89:9,12
89:19 90:17
113:8

---
**Z**
---

**Zoom** 2:11 6:10
7:11 76:7

---
**0**
---

---
**1**
---

**1** 4:16 18:8,9
44:20 45:2
126:19
**1/22/2024**
129:23
**1:22-CV-01753**
1:6
**10** 20:20,22
**10:00** 117:21
**105** 93:11,21
**11** 77:5 79:19
85:1
**11:46** 128:6
**114** 4:20
**1300** 94:7
**15** 3:9 27:2
57:15
**150** 20:5,6,19
32:1,3,9
**17** 89:5
**17:30** 67:7
**18** 69:22 74:22
**1818** 116:18
**18650s** 40:3
**19** 13:21 14:2
67:1 111:11
**1988** 3:9

---
**2**
---

**2** 4:17 65:17
108:20 126:20
**2-3** 65:14

James Sobota                                                           6/28/2023

**20** 14:8 20:1,20
20:22 107:14
**20-10622-089**
41:19
**20132** 9:7
**2015** 16:13 17:4
18:21,23 19:1
**2017** 24:21,22
24:23 25:1,14
25:21 49:19
52:1
**2018** 24:18 25:3
25:14 49:18
**2019** 27:11,17
**2020** 13:23 14:2
14:8 30:17
42:5,9 67:1,15
67:19 69:4
108:12,18,20
109:1,11 111:3
**2021** 24:23 25:2
25:10,11,12,18
25:21
**2022** 11:4 25:9
27:2 36:2
38:11,22 98:16
**2023** 1:19 2:12
3:12 6:12
128:7
**20th** 5:14
**21** 67:14,18 69:4
**210050** 106:15
**210068** 77:6
**210117** 122:9
**21146** 5:7
**21st** 108:12
**22** 42:4,9 113:4
**23** 120:6
**250** 15:5,10
16:14 17:15
**26** 41:16 45:12
45:13 49:14
**28** 1:19 2:12
3:12 6:12
128:7

**3**

**3** 4:18 65:19
126:21
**30** 20:2 115:21
**32** 17:8,10 57:20
57:21,21 77:1
122:8
**35** 16:16 49:4
79:5,15
**35203** 5:15
**37096** 9:5
**39** 57:22 58:11

**4**

**4** 4:19 76:19,23
79:19 85:1
106:15 107:3
107:12 120:6
122:8 126:22
**4:15** 116:9
**4:20** 116:13
**40** 31:16,18 32:7
32:8,9 97:8,13
115:16
**400** 5:14
**412** 41:14,16,17
**45** 4:16 94:3

**5**

**5** 4:20 114:14
127:1
**5(d)** 3:7
**5:30** 67:11
**50** 20:2,14
**500** 15:3,4
**54** 66:3
**566** 5:6

**6**

**6,000** 32:10
**6:18** 116:18,20
116:21
**6220** 41:11
**65** 4:17,18

**7**

**7** 4:7
**70** 16:20,22
31:19
**76** 4:19

**8**

**9**

**9/30/23** 129:20
**9:00** 1:20 2:13
6:11
**9:30** 116:6
**911** 102:10,20
**921** 9:16,19,22
9:23 10:1 24:3
24:7,19 25:19
49:8,20 50:3
59:3 62:7
112:8 123:22
124:6
**921's** 63:2
**930** 94:6
**99** 18:7 19:5,9