Page 1

IN THE UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF MARYLAND

NORTHERN DIVISION


CIVIL ACTION NUMBER

1:22-CV-01753


STATE FARM FIRE & CASUALTY INSURANCE

COMPANY, a/s/o, CIARA TARONJI

Plaintiff(s),

vs.

TECHTRONIC INDUSTRIES NORTH AMERICA, INC.,

Defendant(s).


DEPOSITION TESTIMONY OF:

JAMES A. SOBOTA


June 28, 2023

9:00 a.m.


COURT REPORTER:

DANIELLE BOWMAN, CCR

James Sobota                                                    6/28/2023

Page 2

1    The reading and signing of this deposition

2    has been waived

3         S T I P U L A T I O N S

4              IT IS STIPULATED AND AGREED

5    by and between the parties through their

6    respective counsel that the deposition of

7    JAMES A. SOBOTA may be taken before

8    Danielle Bowman, Certified Shorthand

9    Reporter and Notary Public, State at

10   Large, at the offices of Birmingham

11   Reporting, via Zoom, BIRMINGHAM, ALABAMA,

12   on June 28, 2023, commencing at

13   approximately 9:00 a.m.

14              IT IS FURTHER STIPULATED AND

15   AGREED that the signature to and the

16   reading of the deposition by the witness

17   is waived, the deposition to have the same

18   force and effect as if full compliance had

19   been had with all laws and rules of Court

20   relating to the taking of depositions.

21              IT IS FURTHER STIPULATED AND

22   AGREED that it shall not be necessary for

23   any objections to be made by counsel to

James Sobota                                              6/28/2023

Page 3

1    any questions, except as to form or

2    leading questions, and that counsel for

3    the parties may make objections and assign

4    grounds at the time of trial or at the

5    time said deposition is offered in

6    evidence, or prior thereto.

7                    In accordance with Rule 5(d)

8    of the Alabama Rules of Civil Procedure,

9    as amended, effective May 15, 1988, I,

10   Danielle Bowman, am hereby delivering to

11   Mr. Yearout the original transcript of the

12   oral testimony taken June 28, 2023, along

13   with exhibits.

14                   Please be advised that this

15   is the same and not retained by the Court

16   Reporter, nor filed with the Court.

17

18

19

20

21

22

23

James Sobota                                                    6/28/2023

                                                                Page 4

 1                        I N D E X

 2

 3      WITNESS:

 4      James A, Sobota

 5

 6      EXAMINATION BY                     PAGE

 7      Mr. Yearout.....................  7

 8

 9              PLAINTIFF'S EXHIBITS

10      There were no Plaintiff's Exhibits marked

11      to this deposition.

12

13

14              Defendant's EXHIBITS

15      NO.     DESCRIPTION              PAGE

16      1       Notice                   45

17      2       Report                   65

18      3       Notes                    65

19      4       Scene Photos             76

20      5       Lab Exam Photos          114

21

22

23

```
 1                A P P E A R A N C E S

 2

 3      FOR THE PLAINTIFF(S):

 4            Charles J. Fratus

 5            FRATUS LAW GROUP, LLC

 6            566 Baltimore Annapolis Blvd.

 7            Severna Park, MD 21146

 8

 9      FOR THE DEFENDANT(S):

10            Christopher C. Yearout

11            H. Ben Brown III

12            LIGHTFOOT, FRANKLIN & WHITE, LLC

13            The Clark Building

14            400 North 20th Street

15            Birmingham, Alabama 35203

16

17

18

19

20

21

22

23
```

James Sobota                                          6/28/2023

                                                           Page 6

    1                    I, Danielle Bowman, a

    2      Certified Shorthand Reporter of

    3      Birmingham, Alabama, and a Notary Public

    4      for the State of Alabama at Large, acting

    5      as Commissioner, certify that on this

    6      date, pursuant to the Alabama Rules of

    7      Civil Procedure and the foregoing

    8      stipulation of counsel, there came before

    9      me at the offices of Birmingham Reporting,

   10      via Zoom, BIRMINGHAM, ALABAMA, commencing

   11      at approximately 9:00 a.m. on

   12      June 28, 2023, JAMES A. SOBOTA, witness in

   13      the above cause, for oral examination,

   14      whereupon the following proceedings were

   15      had:

   16

   17                    JAMES A. SOBOTA,

   18      having been first duly sworn, was examined

   19      and testified as follows:

   20             COURT REPORTER:  Usual

   21      stipulations?

   22             MR. YEAROUT:  Yes.

   23             MR. FRATUS:  Yes.

James Sobota                                              6/28/2023

Page 7

1    EXAMINATION BY MR. YEAROUT:

2        Q.     Good morning, Mr. Sobota.

3        A.     Good morning.

4        Q.     Would you state your name for us,

5    please?

6        A.     James Allen Sobota.

7        Q.     How do you spell Sobota?

8        A.     S-O-B-O-T-A.

9        Q.     Thank you, sir.  And you and I

10   just met on -- and we're doing this via

11   Zoom.  You and I just met a few minutes

12   ago, but have not met before; is that

13   right?

14       A.     That's correct.

15       Q.     I understand you've been deposed

16   before; is that true?

17       A.     Yes.

18       Q.     All right.  So you know the

19   ground rules generally, but let me go

20   through them just out of habit.  Madam

21   Court Reporter is taking down everything we

22   say, so let me get my question, put a

23   question mark on it, and you give your

James Sobota                                      6/28/2023

                                                    Page 8

1    answer that way we have a good clean

2    transcript.  You know that you can't --

3    uh-huhs and huh-uhs don't go down on paper

4    correct or they don't read right, so if you

5    could answer with a yes or no.  If we need

6    to take a break, let me know.  We will take

7    a break.  Just we can't leave a question on

8    the table and take a break.  You understand

9    you're under oath, right?

10        A.    Yes.

11        Q.    What's that mean to you?

12        A.    Tell the truth, the whole truth,

13   and nothing but the truth.

14        Q.    All right.  If I ask a direct

15   question, can we have a deal that you'll

16   give me a direct answer to the best of your

17   ability?

18        A.    Yes.

19        Q.    All right.  And now I see you've

20   got sort of a shaded, or I don't know what

21   to call it, background.  Where are you

22   currently located?

23        A.    I'm in my office in my house.

James Sobota                                    6/28/2023

                                                    Page 9

1        Q.     Okay.  And where is that located?

2        A.     Purcellville, Virginia.  Do you

3    want an address?

4        Q.     Yes, sir.

5        A.     37096 Longmoor Farm Lane,

6    L-O-N-G-M-O-O-R, Farm Lane, Purcellville,

7    Virginia 20132.

8        Q.     Okay.  And can you hear me okay?

9        A.     Yes.

10       Q.     Okay.  Is there anyone else in

11   the room with you right now?

12       A.     No.

13       Q.     Do you have any documents with

14   you, pieces of paper on your desk or

15   anywhere related to this case?

16       A.     I've got NFPA 921.  I've got my

17   iPad here with some documents that I

18   researched.

19       Q.     921 being NFP -- I didn't mean to

20   interrupt you.  Go ahead.

21       A.     The documents are on my iPad.

22   And yes, NFPA 921.

23       Q.     So the reference to 921 is NFPA

James Sobota                                      6/28/2023

Page 10

1    921, right?

2         A.    Yes.

3         Q.    Have you done all the work that

4    you need to do to render your opinions in

5    this case?

6         A.    Yes.

7         Q.    Have you reviewed all the

8    information and materials that you think

9    you need to review in order to give your

10   opinions today?

11        A.    Yes.

12        Q.    So if this case were set for

13   trial tomorrow, would you be prepared to

14   come in the courthouse and give your

15   opinions based on the work you've done so

16   far?

17        A.    Yes.

18        Q.    Have you reviewed the depositions

19   of Ciara Taronji?

20        A.    Yes.

21        Q.    How about Theresa Taronji?

22        A.    Yes.

23        Q.    How about the deposition of Juan

James Sobota                                          6/28/2023

Page 11

1    Fernandez?

2         A.    Yes.

3         Q.    And those depositions were taken

4    after you generated your December 2022

5    report, and so is any aspect of their

6    testimony have any affect on the opinions

7    that are reflected in your report?

8         A.    No.

9         Q.    And you understand that you're

10   here today as a hired expert by State Farm

11   to give opinions as a fire origin and cause

12   expert; is that right?

13        A.    Yes.

14        Q.    And are your opinions, let's see,

15   five of them, reflected on pages six and

16   seven of your report?

17        A.    Are you asking me are those my

18   opinions?

19        Q.    Yes, sir.

20        A.    Yes.

21        Q.    All right.  You're not an

22   engineer, are you, sir?

23        A.    No.

James Sobota                                              6/28/2023

Page 12

1       Q.     You're not a PE, a Professional

2    Engineer?

3       A.     No.

4       Q.     Are you an electrical engineer?

5       A.     No.

6       Q.     Are you a chemical engineer?

7       A.     No.

8       Q.     Are you a mechanical engineer?

9       A.     No.

10      Q.     And so then, is it fair for me to

11   assume -- strike that.  You're not going to

12   be giving any engineering opinions, are

13   you?

14      A.     No.

15      Q.     And you're not going to be

16   opining on the design of the battery pack

17   at issue in this case, are you?

18      A.     No.

19      Q.     You're not going to be opining on

20   the manufacturer of the battery pack at

21   issue, are you?

22      A.     No.

23      Q.     And you're not going to be

James Sobota                                        6/28/2023

Page 13

1    opining on any damages in this case, are

2    you?

3         A.      What do you mean by damages?

4         Q.      Damages being the real and

5    personal property damages in terms of State

6    Farm's payments, the amounts of damages

7    paid in this case?

8         A.      No.

9         Q.      All right.  Have you ever

10   designed a battery pack, lithium-ion

11   battery pack?

12        A.      No.

13        Q.      On page three of your report, do

14   you have that in front of you or I can pull

15   it up?

16        A.      If you can pull it up.  I don't

17   have it in front of me.

18        Q.      Okay.  While I'm doing that, let

19   me back up a little bit.  When were you

20   retained in this case?

21        A.      I believe was May 19.

22        Q.      Of what year?

23        A.      2020.

James Sobota                                              6/28/2023

                                                          Page 14

1      Q.      What was the date of the fire?

2      A.      May 19, 2020.

3      Q.      You were retained the day of the

4   fire?

5      A.      Yes, I believe so if you want me

6   to check.  I'm looking at my case file that

7   you have or should have a copy of.  I'm

8   sorry.  I was retained on May 20, 2020.

9      Q.      So you were retained the day

10  after the fire?

11     A.      Yes.

12     Q.      By whom?

13     A.      By State Farm, Gwen Edwards.

14     Q.      Before this case, the Taronji

15  case, how many times have you been hired as

16  an expert or to investigate a fire by State

17  Farm?

18     A.      I don't keep track of those

19  numbers, but quite a few.

20     Q.      Quite a few.  Let's try to drill

21  down.  Is that more or less than ten?

22     A.      More than ten.

23     Q.      Is that more or less than a

James Sobota                                              6/28/2023

Page 15

1    hundred?

2         A.      More than a hundred.

3         Q.      More or less than 500?

4         A.      Less than 500.

5         Q.      How about more or less than 250?

6         A.      Like I say, I don't keep track

7    of --

8         Q.      I understand.

9         A.      -- how many numbers.  I would say

10   around 250 and that's overdoing -- I've

11   been doing this for insurance companies for

12   about five or six years now.

13        Q.      Did you say doing this for the

14   insurance company or for insurance

15   companies?

16        A.      Companies.

17        Q.      Other than State Farm, what

18   insurance companies do you do hired expert

19   work for?

20        A.      Erie --

21        Q.      I'm sorry, you broke up.  What

22   did you say?

23        A.      Erie is one of them.  Allstate.

James Sobota                                                    6/28/2023

                                                            Page 16

 1      Q.      Have you ever been hired by an

 2   attorney named Sharon Horner?

 3      A.      No.

 4      Q.      Go ahead.  Erie.  Allstate.  Who

 5   else?

 6      A.      Erie.  Allstate.  If you name

 7   some of the names I will know.  There's a

 8   bunch of them.  I just can't think of them

 9   right off the top of my head.

10      Q.      And you said you've been doing

11   expert work for the last five to six years?

12      A.      Yes.  I believe seven years.

13   Started in 2015.

14      Q.      So around 250 cases over the last

15   seven years.  Does that give us

16   approximately 35 cases a year?

17      A.      Yes.

18      Q.      And what is your rate as a hired

19   expert for insurance companies?

20      A.      Right now I get paid $70 an hour.

21      Q.      I'm sorry?

22      A.      Right now I get paid $70 an hour.

23      Q.      Well, you need to tell Chuck to

James Sobota                                              6/28/2023

                                                        Page 17

1    up the rate.

2         A.     I've been asking him.

3         Q.     So can you give me an estimate --

4    well, what were you doing before 2015?

5         A.     I worked for Fairfax County Fire

6    & Rescue Department.

7         Q.     Why did you leave Fairfax County?

8         A.     I retired after 32 years.

9         Q.     I'm not asking you to give me a

10   specific number, but in your 32 years at

11   Fairfax, what's your best judgment as to

12   how many fires you investigated?  In the

13   order of thousands?

14        A.     Thousands.

15        Q.     And in the 250 cases that you

16   have served as a hired expert fire

17   investigator for various insurance

18   companies, have those all been in the

19   context of subrogation, for a subrogation

20   matter such as what we're here for today?

21        A.     Are you asking strictly about

22   State Farm fires?

23        Q.     I'm asking about all of the

James Sobota                                          6/28/2023

                                                     Page 18

1    insurance companies for whom you've done

2    expert work?

3         A.    Yeah.  Being asked this question

4    before, you're asking the difference

5    between subrogation and defense?

6         Q.    Sure.

7         A.    And I would say 99 percent

8    subrogation and 1 percent defense.

9         Q.    And what would the -- for the 1

10   percent defense, what types of cases are

11   those?

12        A.    Recently I had one where an

13   insulation installer installed insulation

14   apparently too close to a flute for a

15   chimney.  Fire chimney.  I had just another

16   one where there was fatality where the

17   electric company was blamed for lack of

18   maintenance on the poles where the wire

19   came down and started the fire.

20        Q.    So after Fairfax County -- after

21   you left Fairfax County, was that in 2015

22   or when?

23        A.    Yes, 2015.

James Sobota                                              6/28/2023

Page 19

1      Q.     So starting in 2015, have you

2    exclusively done expert work, fire

3    investigation expert work?

4      A.     Yes.

5      Q.     And 99 percent of which had been

6    in subrogation for what we will call the

7    plaintiff, right?

8      A.     Yes.

9      Q.     So 99 percent of your income has

10   been in connection with being a hired

11   expert by insurance companies, right?

12     A.     Yes.

13     Q.     All right.  Have you ever been

14   hired before -- other than this case, have

15   you ever been hired or worked with

16   Mr. Fratus?

17     A.     Yes.

18     Q.     How many cases?

19     A.     I've got to start keeping track

20   of this.  I don't know.

21     Q.     All right.  More or less than

22   five?

23     A.     More.

Page 20

1      Q.     Give me your best judgment.  20,

2   30, 50, a thousand?  What's your best

3   judgment?

4      A.     Over the last seven years, I

5   would say maybe 150.

6      Q.     150 cases with Mr. Fratus?

7      A.     Yes.

8      Q.     And what percentage of those

9   cases have you ever said, you know, Chuck,

10   I've looked in to this, I don't think

11   there's any basis to pursue subrogation?

12      A.     Quite a few.

13      Q.     Okay.  Is that more than

14   50 percent?

15      A.     Yes.

16      Q.     How many cases have you been a

17   hired expert for State Farm working for

18   Mr. Fratus saying let's go, we have a basis

19   to sue for subrogation, out of the 150?

20      A.     10 to 20.

21      Q.     Sir?

22      A.     10 to 20.

23      Q.     In your report on page three, you

James Sobota                                              6/28/2023

Page 21

1    say you have specialized experience in

2    determining the origin, cause, and

3    circumstances of structural, vehicle, and

4    marine fires; is that true?

5         A.      Yes.

6         Q.      You have specialized experience

7    in determining the origin, cause, and

8    circumstances of residential fires

9    allegedly caused by lithium-ion batteries?

10        A.      I would say my knowledge,

11   training, and experience covers that.

12        Q.      My question was a hair different.

13   Do you have specialized experience in

14   determining the origin, cause, and

15   circumstances of residential fires

16   allegedly caused by lithium-ion batteries,

17   the same way you say you have specialized

18   experience in determining the origin,

19   cause, and circumstances of structural,

20   vehicle, and marine fires?

21        A.      Well, I would say I've had

22   specialized training in structure fires.

23   I've had specialized training in

James Sobota                                          6/28/2023

Page 22

1    lithium-ion batteries.

2        Q.     Okay.  We're getting there, but

3    my question was a hair different still.  Do

4    you have specialized experience in

5    determining the origin, cause, and

6    circumstances of residential fires

7    allegedly caused by lithium-ion batteries?

8        A.     Not specifically.

9        Q.     All right.  Thank you.  Have you

10   done any FMEA analysis in this case?

11       A.     No.

12       Q.     Have you done any physical

13   testing of the subject battery pack?  I

14   know you haven't seen inspection.  I know

15   there were lab exams.  I'm asking about

16   testing of the subject battery pack.

17       A.     I believe the electrical engineer

18   expert, Flaherty submitted the cells for a

19   CAT scan.

20       Q.     Okay.  I'm going to be talking

21   with him later.  Did you, Mr. Sobota, do

22   any physical testing of the subject battery

23   pack?

James Sobota                                              6/28/2023

Page 23

1      A.      No.

2      Q.      Did you do any testing of any

3   exemplar battery pack?

4      A.      No.

5      Q.      Do you know the model of this

6   battery pack?

7      A.      No.

8      Q.      Do you know the manufacturer of

9   the cells contained in the subject battery

10  pack?

11     A.      No.

12     Q.      Is any of that important to you?

13  Would it be important for you to know the

14  model of the battery pack we're talking

15  about or who made the cells?  Sir?

16     A.      Yes, I'm thinking.

17     Q.      Okay.  I'm not trying to push

18  you.  I just didn't know if I wasn't

19  hearing you or if you had already answered.

20     A.      I know.  I would say yes, that

21  would be important.

22     Q.      Okay.  What texts or treatises do

23  you consider authoritative in the field of

James Sobota                                          6/28/2023

Page 24

1    -- as an investigator in a fire origin and

2    cause expert?

3        A.    921 as a standard of care,

4    current fire and investigations manual.

5        Q.    Any others?

6        A.    I can't think of any right now.

7        Q.    So we have got NFPA 921.  That's

8    the fire Bible, right?

9        A.    Standard of care.

10       Q.    And then we've got Kirk's?  Is

11   that K-I-R-K-'-S?

12       A.    Yes.

13       Q.    And what was the full title of

14   that again?  I'm sorry.

15       A.    I have to look it up.  I believe

16   it's Kirk's Fire & Investigation Manual.

17       Q.    And I notice in your report you

18   referenced relying on the 2018 edition of

19   NFPA 921 and there's a couple of references

20   to it.  Is that a typo?  Are you referring

21   to 2017?

22       A.    Yeah, 2017.  I think there's

23   2017.  There's 2021 that's out now.  So

Page 25

1    yeah, 2017.

2         Q.    All right.  And so 2021 had some

3    updates, revisions, and changes from 2018

4    edition, right?

5         A.    They always do.

6         Q.    So is my question correct?

7         A.    Yes.

8         Q.    And so when you generated your

9    report in December of 2022, did you

10   reference or rely upon the 2021 edition of

11   NFPA 2021?

12        A.    Probably relied on 2021.

13        Q.    Okay.  But your report references

14   2018 and you just told me it was 2017.

15   This is not a gotcha.  I'm not trying to

16   beat you up on the editions.  I'm just

17   wondering to what extent, if any, your

18   opinions are based upon the 2021 edition of

19   NFPA 921?

20        A.    I would say both.

21        Q.    Both the 2017 and 2021 additions?

22        A.    Yes.

23        Q.    All right.  I'm going to show you

James Sobota                                          6/28/2023

Page 26

1    -- and we're going to talk about your

2    report and I've got your notes and we're

3    going to talk more about your file

4    materials, but I want to show you something

5    if I can properly share.  Can you see my

6    screen?

7         A.     Yes.

8         Q.     All right.  And this is a copy of

9    your -- this is Appendix B to your report,

10   which is your CV, right?

11        A.     Yes.

12        Q.     Is this a current CV?

13        A.     You would have to go all the way

14   to the end of it so I can see the date.  Go

15   back down.  In addition to that, I sent an

16   updated one, which has two more depositions

17   on it.  I think that's about the only

18   changes.

19        Q.     When were those two depositions

20   and the names of the cases, if you

21   remember?

22        A.     I'm going to have to pull that up

23   and take a look.

James Sobota                                          6/28/2023

Page 27

1      Q.     Okay.  We will pull that up in a

2    minute.  This is dated December 15, 2022.

3    Since then, you've got two additional cases

4    in which you have provided deposition

5    testimony.  Other than that, are there any

6    changes?

7      A.     No.

8      Q.     You see I've highlighted here --

9    and this is under the section of

10   professional related training.  In March of

11   2019 -- well, what are these professional

12   related changes?  Are these classes,

13   courses, continuing education?  What are

14   they?

15     A.     Yes.  Classes, courses, and

16   continuing education.

17     Q.     Okay.  In March of 2019, you see

18   this says giving stronger depositions and

19   testimony.  Did I read that right?

20     A.     Yes.

21     Q.     What was that?  Is that a class?

22   A presentation?  What was it?

23     A.     Yeah.  It was class given by a

James Sobota                                            6/28/2023

                                                        Page 28

1    White & Williams attorney.  I can't think

2    of his name off the top of my head.

3         Q.    A what attorney?

4         A.    An attorney from White &

5    Williams.  I can't think of the name.

6         Q.    What kind of firm?

7         A.    They're a law firm in

8    Philadelphia.

9         Q.    Sure.  Do they do plaintiff

10   subrogation work?

11        A.    Yes.

12        Q.    All right.  So giving stronger

13   depositions and testimony.  Tell me what

14   you've learned in that eight-hour class or

15   presentation?

16        A.    Well, one of the things is being

17   prepared for your case.

18        Q.    How do you do that?

19        A.    Well, research the subject

20   matter, review your case file, review your

21   case notes, look at any other kind of

22   documentation there's out there.

23        Q.    So what did you do to prepare for

James Sobota                                            6/28/2023

Page 29

1    your deposition today?

2         A.     All above what I just said.

3         Q.     When did you read the depositions

4    of Theresa Taronji, Ciara Taronji, and Juan

5    Fernandez?

6         A.     Last night.

7         Q.     How long did it take you to do

8    that?

9         A.     About three hours total.

10        Q.     What else did you review?

11        A.     I reviewed an article by

12   Dr. Quintiere.  He wrote a paper on

13   lithium-ion batteries, safety, and scores I

14   believe it is.  I reviewed a CFI trainer

15   podcast about lithium-ion batteries.

16   Amongst other things.

17        Q.     Am I fair to assume that you're

18   going to be deferring to Mr. Flaherty for

19   -- as to his opinions as to the failure

20   mode and any alleged defect in the subject

21   battery pack?

22        A.     Yes.

23        Q.     So then why were you listening to

James Sobota                                                    6/28/2023

Page 30

1    a lithium-ion podcast and reading an

2    article about lithium-ion batteries?

3        A.    Well, it's all on the subject

4    matter of this case.  I want to learn more

5    about it.

6        Q.    How do you spell Quintiere.  I've

7    got it as Q-U-I-N-T-E-R-I, but I bet that's

8    wrong.

9        A.    Q-U-I-N-T-I-E-R-E.

10       Q.    I got the first five letters

11   right.  What is the name of that article?

12       A.    Packaging technique to defeat

13   fires and explosions due to lithium-ion and

14   related high energy density batteries.

15   Pipeline hazards materials safety

16   administration of transportation

17   March 2020.

18       Q.    Okay.  And what was the name of

19   the -- you said CFI trainer podcast.

20   What's the name of the podcast?

21       A.    CFI Trainer Net Lithium-Ion

22   Battery Fires.

23       Q.    Okay.  What else, if anything,

James Sobota                                              6/28/2023

Page 31

1    did you review, watch, listen to, observe

2    in preparation for your deposition other

3    than what we've discussed?

4        A.    I can't think of anything else

5    right now.

6        Q.    Did you review your report?

7        A.    Yes.

8        Q.    Your notes?

9        A.    Yes.

10       Q.    File materials?

11       A.    Yes.

12       Q.    All right.  How much time have

13   you spent on this case?

14       A.    Since the beginning?

15       Q.    Yes, sir.

16       A.    Maybe 40 hours.  I would have to

17   go back and count if you would like.

18       Q.    So 40 hours, and that's charged

19   at a rate of $70 an hour?

20       A.    I don't know what it -- well, I

21   do know because I looked at some of the

22   files.  I think he charged -- he is Michael

23   Schaal.  He's the owner of FAIC and I

James Sobota                                              6/28/2023

Page 32

1   believe he charged me $150 an hour.

2       Q.      Okay.  So what the insurance

3   companies pay for your time is $150 an

4   hour; fair?

5       A.      That's my understanding, but I'm

6   not involved in the billing process.

7       Q.      Okay.  So if we take 40 -- I'm

8   not holding you to exactly the number 40,

9   but approximately 40 times 150, that gives

10  us $6,000, right?

11      A.      I guess.  You did the math.

12      Q.      Have you submitted an invoice or

13  has FAIC submitted an invoice to State Farm

14  in this case?

15      A.      I believe they submitted it to

16  Mr. Fratus.

17      Q.      I haven't seen any invoices?

18              MR. YEAROUT:  Chuck, were they in

19  the file materials?  If not, can we maybe

20  get one on the break?

21              MR. FRATUS:  I can ask.  It would

22  be through the -- like you said, Michael

23  Schaal, S-C-H-A-A-L, of Fire Arson

James Sobota                                              6/28/2023

                                                         Page 33

1    Investigation Consultants, which is the

2    FAIC.  But some of these go directly

3    through State Farm rather than myself, so I

4    will check with State Farm and Mike Schaal

5    to see if I can get a list of invoices or

6    bills.

7              MR. YEAROUT:  Not the biggest

8    deal.  I haven't seen one and just wanted

9    to check.

10             MR. FRATUS:  Okay.

11       Q.    Okay.  Back to giving stronger

12   depositions and testimony.  You told me

13   that one of the things you learned from the

14   White & Williams plaintiff subro lawyer is

15   to be prepared for your case, right?

16       A.    Yes.

17       Q.    What else did you learn?  I mean,

18   how do you give a stronger deposition and

19   testimony?

20       A.    Well, one of the tips that I've

21   learned is when you listen to a question,

22   you evaluate the question, you formulate a

23   response, and then you articulate the

James Sobota                                          6/28/2023

Page 34

1    response.

2         Q.    Did you need an eight hour class

3    to understand that?

4         A.    I'm sure that was just one of the

5    topics.

6         Q.    Okay.  What are the other topics?

7         A.    I can't remember offhand.

8         Q.    Did you learn -- in that eight

9    hour class given by the White & Williams

10   plaintiff's subro lawyer, did he teach you

11   or give you tips on how to give the best

12   possible deposition testimony to advance in

13   insurance company cases in a subrogation

14   matter?

15        A.    I don't believe there was ever

16   that pointed approach.  In other words,

17   there was no subject line saying, hey, if

18   you really want to win your case for the

19   subject -- for the testimony, this is what

20   you do.  Nothing like that.

21        Q.    Well, then what's the point?

22   What's the point of giving stronger

23   depositions?

James Sobota                                    6/28/2023

Page 35

1      A.      Be more professional.

2      Q.      Okay.  Did you get materials of,

3   I don't know, handouts, slides, any reading

4   materials from your giving stronger

5   depositions and testimony eight hour class

6   from the plaintiff's subro lawyer?

7      A.      I may have, but I would have to

8   put on a heck of a search for that.

9      Q.      What would you search?

10     A.      My training files.

11     Q.      So you have a file that's for

12  training materials?

13     A.      Yes.

14     Q.      Could I ask you -- it doesn't

15  have to be today.  Could I ask you to check

16  your files to see if you've got stronger

17  depositions and testimony?

18     A.      Sure.  And what may make it

19  easier for you, I believe that same course

20  of instruction is on CFI Trainer Net.

21     Q.      The podcast?

22     A.      Yes.  It's a podcast.

23     Q.      Okay.  All right.  Let's move on

James Sobota                                        6/28/2023

Page 36

1    to another class or presentation.  This is

2    six hours in July of 2022, so less than a

3    year ago.  Smoking materials as ignition

4    source, tell me about that.

5         A.     We talk about all the different

6    ways cigarettes can be an ignition source.

7    Gave examples of fires actually started by

8    smoking materials.

9         Q.     Anything else?

10        A.     Talked about there's a certain

11   percentage of cigarettes that are supposed

12   to be fire safe, but it's really not --

13   really not that many are fire safe.

14        Q.     Really aren't that many

15   cigarettes that are fire safe?

16        A.     Correct.

17        Q.     So I guess basic premise,

18   cigarettes -- lighted cigarettes can cause

19   fires, right?

20        A.     Yes.

21        Q.     And they cause -- lighted

22   cigarettes cause hundreds of residential

23   fires a year; true?

James Sobota                                              6/28/2023

                                                         Page 37

 1      A.      I don't know what the number is,

 2   but I'm sure it's a high number.

 3      Q.      Would you agree that lighted

 4   cigarettes cause hundreds of residential

 5   fires a year in the United States?

 6      A.      Yes.

 7      Q.      All right.  Do you have any

 8   materials -- and I was looking at this

 9   earlier.  I believe the presenter of

10   smoking materials as ignition source was a

11   member of the -- a gentleman that was a

12   member of the ATF, right?

13      A.      I believe so.  Do you want me to

14   look in my notes here?  Let me see.

15   Jonathan Butta.

16      Q.      That's B-U-T-T-A?

17      A.      B-U-T-T-A, correct.

18      Q.      Do you have the course materials

19   from the Smoking Materials As Ignition

20   Source class?

21      A.      No, I don't.

22      Q.      Is what you learned in that

23   class, does that have any relevance or

James Sobota                                              6/28/2023

Page 38

1    applicability to this case?

2         A.    Yes.

3         Q.    In your opinion?

4         A.    Yes.

5         Q.    How so?

6         A.    For this particular case, the

7    ruling out cigarettes.

8         Q.    Okay.  We're going to come back

9    to that, but I want to finish up on some of

10   this teaching materials or learning

11   materials.  This is a December 2022, six

12   hour class or presentation, Expert

13   Testimony and Lithium Batteries.  Tell me

14   what that one was about.

15        A.    Let's see, David Bridges is an

16   attorney.  Talked about expert testimony.

17   Talked about qualifications, methodology,

18   opinions, the scientific method, the

19   process of putting people on notice,

20   moralization.

21        Q.    You already knew all of those

22   things before December 2022, didn't you?

23        A.    I've taken courses on them before

James Sobota                                              6/28/2023

Page 39

1   and was familiar with them, yes.

2        Q.      Okay.  What else was this class

3   about?

4        A.      This other part was on

5   lithium-ion batteries and that was given by

6   Michael Abraham of ATF.

7        Q.      And you said -- before I went

8   further back, you said some part of this

9   class was taught or presented by David

10  Bridges who is an attorney?

11       A.      Yes.

12       Q.      Is he another plaintiff

13  subrogation lawyer?

14       A.      I don't believe so.  I don't

15  believe so.  I don't know.

16       Q.      And what was the name of the

17  gentleman that talked about the lithium-ion

18  batteries?

19       A.      Michael Abraham from the ATF.

20       Q.      What did he talk about in terms

21  of lithium-ion batteries?

22       A.      He talked about the different

23  charge in corruption.  Something called

James Sobota                                          6/28/2023

Page 40

1    CID, Charge in Corruption device.  The

2    different sizes of the batteries like

3    18650s.  Basically the construction of the

4    batteries, contents, how they work.  The

5    different types of lithium-ion batteries.

6    How they're safely transported.  Stuff like

7    that.

8         Q.     CID, you said charge, I'm not

9    picking on you.  Is it Current Interrupter

10   Device?

11        A.     It could be.  I've heard Charge

12   Interrupted Device.

13        Q.     Okay.  Do you have the course

14   materials from that presentation?

15        A.     No.  They don't give out course

16   materials.  Just taking notes.

17        Q.     All right.  So I've got your file

18   materials or the file materials that

19   Mr. Fratus sent to me.  We are going to

20   mark them at some point, although I don't

21   want to mark however many hundreds of

22   photos necessarily.

23             Other than -- and let me just take

James Sobota                                          6/28/2023

                                                      Page 41

1    a quick look at what your file is.  So I've

2    got -- are you able to cross reference this

3    with me either from your iPad or your

4    notes?

5         A.    Cross reference what?

6         Q.    Your file materials.

7         A.    I should be able to.

8         Q.    Okay.  The first document I've

9    got is joint scene attendance roster,

10   right?

11        A.    6220?

12        Q.    Correct.

13        A.    I got that.

14        Q.    All right.  I've got your 412

15   Vermont Avenue pictures.  I've got Federal

16   Rule 26 letter, lab exam pictures, 412

17   Vermont Avenue evidence log, 412 street

18   e-mail from insured, and I've got a

19   document called FAIC 20-10622-089.

20        A.    Yes.

21        Q.    Then I have a document called

22   FAIC subro, right?

23        A.    Yes.

James Sobota                                          6/28/2023

Page 42

1      Q.      And then I have forward -- it
2    looks like an e-mail.  Forward State Farm
3    file claim and that's an e-mail between
4    Drew Hornick from TTI and you, May 22 of
5    2020, right?
6      A.      Yes.
7      Q.      And then within that chain is an
8    e-mail between you and Mr. Fratus on
9    May 22, 2020, right?
10      A.      I see reason State Farm fire
11    claim Taronji/Fernandez.  I'm not sure
12    without me opening them all up.
13      Q.      Okay.  And then I've got the
14    document called invoice Larry & Sons,
15    right?
16      A.      Yes.
17      Q.      And then another e-mail, it's re,
18    R-E, CO inspection and this is e-mails
19    between you and Mylika Scatliffe?
20      A.      Yes.  I see the title that you're
21    talking about.  I haven't opened it up.
22      Q.      I don't know if I'm saying that
23    right but it's M-Y-L-I-K-A,

James Sobota                                           6/28/2023

Page 43

1    S-C-A-T-L-I-F-F-E, and then within that

2    chain is an e-mail between Michael Schaal,

3    that's your boss or your partner at AFIC?

4        A.    Not partner.  I don't know what

5    the correct term is.  Part of his company.

6    Senior investigator with his company.

7        Q.    Okay.  And then I also have, it

8    says UV light receipt and this is a receipt

9    for Larry & Sons, right?

10       A.    Yes.

11       Q.    And I have another document, your

12   electronic receipt, which is appears to be

13   a -- I don't know what this is.  A latching

14   box.  What is that?

15       A.    I have that file.  Do you want me

16   to open it up?

17       Q.    Yes.

18       A.    I believe that's a receipt for

19   when I went to Home Depot to get bins for

20   evidence collection.

21       Q.    Okay.  And that's all I've got as

22   part of the file materials that I received.

23   Is there anything else in your file

James Sobota                                          6/28/2023

                                                      Page 44

1    materials that pertain in this case?

2         A.     I don't see anything.

3         Q.     Okay.  Other than photos -- and I

4    know you have annotations on some of your

5    photos and there's a scene sketch.  Other

6    than the file materials we just went over

7    and the annotated photos and your notes and

8    your report, have you created any videos,

9    animations, diagrams, any other

10   demonstrative materials pertaining to this

11   case?

12        A.     No.

13        Q.     So what I have that was sent to

14   me is the entirety of your file materials

15   in this case?

16        A.     Yes.

17        Q.     All right.  Let me do a little --

18   I skipped a step.  Let me do a little

19   housekeeping and I'm going to mark as

20   Exhibit 1 and I'm going to share my screen.

21   Can you see my screen?

22        A.     Yes.

23        Q.     Do you recognize this?

James Sobota                                          6/28/2023

                                                     Page 45

 1      A.      Yes.

 2              (Defendant's Exhibit No. 1 was

 3              marked for identification.)

 4      Q.      This is your notice of

 5   deposition.  Back up.  When did you get

 6   this document?

 7      A.      Maybe a week or two weeks ago.

 8      Q.      Did you review the document

 9   request?

10      A.      Yes.

11      Q.      I'm not going to go through every

12   one of them because there are 26 of them,

13   but you've reviewed all 26 of these

14   document requests.  Did you endeavor to

15   search for and provide materials in

16   response for each of these document

17   requests?

18      A.      Yes.

19      Q.      Outside of your file materials,

20   were there any materials responsive to

21   these document requests that you searched

22   for and found but have not yet provided to

23   me or that I do not yet have?

James Sobota                                      6/28/2023

                                                    Page 46

1      A.      I would say the biggest one is

2    the Quintiere document.

3      Q.      Okay.  Do you have that

4    electronically available and can e-mail it

5    to Mr. Fratus?

6      A.      I don't know if I can or not.

7    I'll try.  It's all paid through my IAAI

8    subscription, annual dues.  And all that

9    sort of stuff.  I'm not sure if it's

10   something I can e-mail.  I'll certainly

11   take a look and see if I can.

12     Q.      Okay.  Thank you.  All right.

13   Would you agree with me that a lithium-ion

14   battery can be a victim of an external fire

15   and have one or more of its cells with

16   expelled contents?

17     A.      Yes.

18     Q.      And have you ever, either in your

19   capacity with -- what was the name of the

20   fire department, I'm sorry?

21     A.      Fairfax County Fire & Rescue

22   Department.

23     Q.      Either when you were working with

James Sobota                                            6/28/2023

                                                        Page 47

1    Fairfax County or in your time as doing

2    expert work for the past seven years, have

3    you ever investigated a case where you said

4    that there was a fire caused by a battery

5    that was unplugged?

6        A.     No.  I would have to go back in

7    my cases and look, but I can't remember one

8    that was unplugged.  Like I said, I would

9    have to go back and look at the notes of

10   that case I had on fires that had involved

11   lithium-ion batteries.

12       Q.     As we sit here today.  You cannot

13   recall under oath in the thousands of fires

14   that you investigated, investigating a case

15   in which you said an unplugged lithium-ion

16   battery was the cause of the fire; true?

17              MR. FRATUS:  Other than this

18   case?

19       A.     I'm sorry?

20       Q.     Yeah, so let me get it clean.

21   Other than this case, in the thousands of

22   fires that you previously investigated,

23   this is the only one that you can recall

James Sobota                                            6/28/2023

Page 48

1   under oath that you investigated and in

2   which you have opined an unplugged

3   lithium-ion battery was the cause of the

4   fire; true?

5       A.      The reason why I'm hesitating is

6   because there have been lithium battery

7   fires that have been before that were in

8   devices like a scooter or something like

9   that, and right now I can't recall if they

10  were being charged or not being charged.

11  Does that make sense?

12      Q.      It does make sense.  It doesn't

13  quite answer my question though.  My

14  question is, other than this case, in the

15  thousands of fires that you had previously

16  investigated, you cannot specifically

17  recall under oath another case that you

18  investigated in which you have opined that

19  an unplugged lithium-ion battery caused a

20  fire; true?

21      A.      True.

22      Q.      I'm sorry?

23      A.      True.

James Sobota                                        6/28/2023

Page 49

1       Q.      Okay.

2               MR. FRATUS:  Should we qualify

3       that to say were there lithium-ion

4       batteries back 35 years ago when you first

5       started investigating fires?  I'm kidding.

6       We can strike that.

7       Q.      Okay.  So Mr. Sobota, you are of

8       course familiar with NFPA 921, right?

9       A.      Yes.

10      Q.      What does it stand for?

11      A.      National Fire Protection

12      Association.

13      Q.      All right.  And your report at

14      page 26, when you lead in to your opinions,

15      you say that you generated your opinions

16      "after a thorough examination of the

17      property and using the levels of scientific

18      certainty as discussed in the 2018 -- and

19      we actually know that to mean 2017 edition

20      to NFPA 921."  Right?

21      A.      Yes.

22      Q.      In order to that, you have to

23      follow the scientific method, right?

James Sobota                                              6/28/2023

Page 50

1       A.      Yes.

2       Q.      And the scientific method under

3    NFPA 921, it starts with recognizing the

4    need, that is identify the problem, right?

5       A.      Yes.

6       Q.      Then you go on to define the

7    problem, right?

8       A.      Yes.

9       Q.      And the next step is to collect

10   data, right?

11      A.      Yes.

12      Q.      And then you analyze the data;

13   true?

14      A.      Yes.

15      Q.      And then you develop hypotheses,

16   right?

17      A.      Yes.

18      Q.      And that's in the category of

19   inductive reasoning, right?

20      A.      Yes.

21      Q.      And then you go on to test the

22   hypotheses, right?

23      A.      Yes.

James Sobota                                      6/28/2023

                                                     Page 51

1       Q.      And that's part of deductive

2    reasoning; true?

3       A.      True.

4       Q.      Then you go on to select your

5    final hypothesis, right?

6       A.      Yes.

7       Q.      So the scientific method requires

8    you to develop hypotheses as to what

9    potentially caused a fire, true?

10      A.      Yes.

11      Q.      And then what it requires you to

12   do is to test and analyze and try to

13   disprove your hypotheses, right?

14      A.      That's correct.

15      Q.      So that necessarily means that

16   the scientific method require you to

17   consider alternative sources of a first

18   fuel ignited other than the subject battery

19   pack; true?

20      A.      Yes.

21      Q.      So when you did your thorough

22   examination of the property and used the

23   levels of scientific certainty as discussed

James Sobota                                          6/28/2023

                                                      Page 52

1    in the 2017 edition of NFTA921, what were

2    your hypotheses as to the cause of this

3    fire?

4         A.    Smoking, electrical, incendiary.

5         Q.    Incendiary?

6         A.    Yes.

7         Q.    What do you mean by that?  I know

8    what the word means.

9         A.    Fire intentionally set for the

10   wrong reasons.

11        Q.    I gotcha.  Okay.  I've got

12   smoking, electrical, incendiary, and what

13   else, if anything?

14        A.    Right now that's all I had from

15   the information that I observed.

16        Q.    Do you remember this being

17   reported as Theresa Taronji calling in and

18   saying she smelled natural gas?

19        A.    Yes.

20        Q.    Did that have any impact on the

21   hypotheses that you developed?

22        A.    No.

23        Q.    Why not?

James Sobota                                    6/28/2023

Page 53

1      A.      Basically I didn't see any signs

2   of a gas fire, if you will.  There was no

3   type of order of explosion or anything like

4   that.  No signs of that.  I know she did --

5   she said both in her deposition and in my

6   note -- I believe in your deposition she

7   heard a shush type of sound and she smelled

8   gas.  And the thing about that, I kind of

9   attributed that odor of gas may have been

10  some of the gases from the batteries.

11     Q.      What's the basis of that opinion?

12     A.      Knowing that there's a light that

13  contains gases or when they heat they form

14  gases and they're expelled.

15     Q.      Okay.  Have you ever done any

16  testing or analysis or otherwise been a

17  part of any circumstance in which a

18  lithium-ion battery was on fire and you

19  smelled its gases?

20     A.      No.

21     Q.      Okay.  So you don't know what

22  lithium-ion battery gas smells like, do

23  you?

James Sobota                                           6/28/2023

Page 54

1      A.      No.

2      Q.      And you mentioned Theresa Taronji

3   deposition and your notes.  Your notes

4   include references to her hearing banging,

5   popping, and hissing, right?

6      A.      Yes.

7      Q.      But as you read last night in her

8   deposition, she recalled simply a constant

9   hissing or shushing sound and did not

10  testify as to any banging or popping; do

11  you remember that?

12     A.      Yes, I do.

13     Q.      What significance of that, if

14  any, does that mean to you?

15     A.      Either she doesn't remember or

16  for some reason she forgot what she heard

17  or heard or saw.

18     Q.      Well, when she spoke with me, she

19  was under oath, right?

20     A.      Yes.

21     Q.      When she spoke to you, she was

22  not under oath, true?

23     A.      Yes.

James Sobota                                      6/28/2023

                                                      Page 55

1        Q.      How did you conduct your --

2        A.      I'm sorry, I did not interview

3   her.

4        Q.      You didn't?

5        A.      I did not, no.  I talked to Juan

6   Fernandez and Ciara.

7        Q.      So let's go back to -- you

8   interviewed Mr. Fernandez and Ciara

9   Taronji, right?

10        A.      Yes.

11        Q.      And neither Juan Fernandez or

12   Ciara Taronji were at the residence at the

13   time of the fire; true?

14        A.      Yes.

15        Q.      But Theresa Taronji was present

16   at the time of the fire; true?

17        A.      Yes.

18        Q.      So as part of the scientific

19   method in collecting data -- strike that.

20             NFPA talks about interviewing

21   witnesses as an important part of your

22   investigation, right?

23        A.      Yes.

James Sobota                                          6/28/2023

                                                      Page 56

1       Q.     That would be particularly true

2    for witnesses that were present at the

3    scene of the fire, correct?

4       A.     Yes.

5       Q.     Why didn't you interview Theresa

6    Taronji?

7       A.     I can't remember if she was

8    unavailable at that time, but Mr. Fernandez

9    gave me the information or told me what she

10   told him.

11      Q.     Okay.  Did you try to interview

12   Theresa and it went to voicemail or she

13   wasn't home or you were told she's not

14   available?

15      A.     I can't remember.

16      Q.     If you did attempt to interview

17   her and were unable to do so, would that be

18   reflected in your notes?

19      A.     Yes.  Well, I didn't write that

20   down when I reviewed my notes.

21      Q.     How did you conduct your

22   interviews with Mr. Fernandez and Ciara

23   Taronji?  Were they in person or over the

James Sobota                                    6/28/2023

Page 57

1    phone?

2         A.     I would believe mostly in person.

3         Q.     Help me understand mostly.

4         A.     Okay.  I would say a hundred

5    percent -- I mean, I would call them up and

6    say, hey, I'm going to -- what's a good

7    time to meet at your property and then I

8    would interview them in person.

9         Q.     How long was your interview with

10   Mr. Fernandez?

11        A.     I'm estimating maybe a half hour.

12        Q.     Same question for Ciara Taronji

13   -- and that's C-I-A-R-A.  How long was your

14   interview with her?

15        A.     Maybe 15 minutes.

16        Q.     In your experience as a fire

17   investigator -- strike that.

18              How long were you with the fire

19   department?

20        A.     32 years.

21        Q.     32 years.  So 32 years and then

22   seven as an expert.  So in 39 years

23   investigating fires, either the fire

James Sobota                                    6/28/2023

                                                    Page 58

 1    department or as an expert, in your

 2    experience, have you had insurers or

 3    homeowners who had misstated or

 4    misrepresented or misremembered things

 5    about what they were doing, let's say, in a

 6    kitchen stove fire for example?  They were

 7    actually cooking or left the stove on, but

 8    they told you that they didn't have the

 9    stove on; did that ever happen?

10        A.    Yes.

11        Q.    All right.  In your 39 years of

12    experience as a fire investigator, have you

13    ever had anyone misrepresent, misstate, or

14    misremember smoking activity that occurred

15    on the day or at a place of a fire?

16        A.    Yes.

17        Q.    That happens relatively often,

18    doesn't it?

19        A.    Yes.

20        Q.    All right.  We've been going a

21    little over an hour.  Can we take just a

22    five minute comfort break?

23        A.    Yes.

James Sobota                                          6/28/2023

                                                        Page 59

1              (A recess was taken.)

2         Q.    Let's go back on.  Mr. Sobota,

3    back from a brief break.  In NFPA 921 or

4    generally, are you familiar with the

5    concept of negative corpus?

6         A.    Yes.

7         Q.    What's that mean?

8         A.    It means if you can't find --

9    none of the other evidences is around and

10   that it could be something like incendiary

11   or --

12        Q.    Right.  And more specifically, I

13   want to see if you will agree with me on

14   this.  The process of elimination can be

15   used inappropriately, identifying the

16   ignition source for a fire by believing to

17   have eliminated all ignition sources found,

18   known, or suspected to be present in the

19   area or origin and for which no supporting

20   evidence exists is referred to by some

21   investigators as negative corpus.  Do you

22   agree with that?

23        A.    Yes.

James Sobota                                                    6/28/2023

Page 60

1      Q.      And do you agree that the

2    termination of the ignition source must be

3    based on data or logical inferences drawn

4    from that data?

5      A.      Yes.

6      Q.      So what this is basically saying

7    is, the fact that you didn't find some

8    piece of evidence or something that might

9    be a plausible ignition source, doesn't

10   necessarily mean that that wasn't the cause

11   of the fire, right?  Isn't that the gist of

12   negative corpus?

13     A.      It's also in the process of

14   developing a hypothesis, testing them, and

15   choosing the final hypothesis.  That's all

16   within that process.

17     Q.      All right.  And I appreciate

18   that.  To summarize what we just read and

19   what you agreed with me on, negative corpus

20   essentially is the fact that you as a fire

21   investigator didn't find a piece of

22   evidence at a fire scene that's a plausible

23   ignition source doesn't necessarily mean

James Sobota                                          6/28/2023

Page 61

1    that that was not the cause of the fire,

2    right?

3         A.     I'm formulating.

4         Q.     I'm sorry?

5         A.     Remember I said evaluate,

6    formulate, and articulate in the expert

7    witness and testimony class.  So I'm

8    formulating.

9         Q.     Okay.

10        A.     I would say that you have to take

11   everything into account with those type of

12   things.  So like I guess -- you left me.

13        Q.     I'm listening.

14        A.     Okay.  I mean, there's a whole

15   bunch of things that were there that could

16   have been an ignition source.  Okay.

17   Lightning.  Did lightning occur somewhere.

18   Didn't see any signs of it.  The weather

19   didn't indicate it or anything like that.

20   Is that a possibility or a probability.  So

21   the fact that I didn't find something --

22   you know, all things are possible, but

23   whether or not they're probable are two

James Sobota                                            6/28/2023

Page 62

1   different things.

2        Q.      Okay.  I appreciate all of that

3   and I want to move on.  I just want to make

4   sure I have an answer to the question I'm

5   not sure I have yet.  The concept of

6   negative corpus, which is inappropriate

7   under NFPA 921, is that basically the idea

8   that there can be a plausible ignition

9   source, evidence of which, you as a fire

10  investigator do not find and yet that could

11  actually be the cause of the fire, right?

12       A.      That's what the guide says, yes.

13       Q.      And that's the guide that you

14  follow and that you followed in this case;

15  true?

16       A.      As a guide.

17       Q.      Does that mean you can follow it

18  sometimes but not follow it others?

19       A.      Well, there's -- you know,

20  there's different parts in that I don't

21  agree.  You've got to remember that it's a

22  consensus document.

23       Q.      Well, do you -- in your

James Sobota                                          6/28/2023

                                                      Page 63

1    investigation in this case, did you

2    disregard the NFPA 921's guide with respect

3    to negative corpus?

4         A.     Sure.

5         Q.     You disregarded that concept?

6         A.     No.

7         Q.     Okay.  Okay.  So your

8    investigation and your complying with the

9    scientific method, you recognized the

10   concept of negative corpus; fair?

11        A.     Fair.

12        Q.     All right.  How do you define the

13   area of origin in a fire?

14        A.     Defined by basically fire

15   patterns.

16        Q.     Okay.  Anything else?

17        A.     What is there at the scene, what

18   is the ignition source, or the possible

19   ignition sources.

20        Q.     Anything else?

21        A.     Witness statements, arc mapping.

22        Q.     Did you say arc mapping?

23        A.     Yes.

James Sobota                                              6/28/2023

Page 64

```
 1      Q.      Anything else?

 2      A.      None that I can think of right

 3   now.

 4      Q.      Witness statements, including but

 5   not limited to those witnesses who were

 6   present at the scene of the fire?

 7      A.      Yes.

 8      Q.      Which you didn't do in this case,

 9   right?

10      A.      Yes.

11      Q.      Have you told me everything that

12   you consider in defining the area of

13   origin?

14      A.      That's all I can think of right

15   now.

16      Q.      Okay.  In this case and in your

17   opinion --

18      A.      Can I back up?

19      Q.      Go ahead.

20      A.      Yeah.  Basically, you know, I use

21   systematic approach to investigate all

22   fires.  You know, you go from the least

23   damaged to the worst damaged.  Then you go
```

James Sobota                                           6/28/2023

Page 65

1    down there and evaluate the fire patterns,

2    what the ignition sources are, and you get

3    witness information and develop collect

4    data and develop hypothesis.  All of that

5    sort of stuff.

6         Q.    In this case, where is the area

7    of origin in your opinion?

8         A.    I believe you have it marked as

9    shelf number two in the photos.

10        Q.    Which photos?

11        A.    I think there were photos in the

12   Juan Fernandez deposition.  Shelf one, two,

13   three, and four.

14             (Defendant's Exhibit Nos. 2-3 were

15              marked for identification.)

16        Q.    Okay.  I'm going to show you and

17   I'm going to mark as Defendant's Exhibit 2

18   your report and I'm going to mark as

19   Defendant's Exhibit 3 what I'm going to

20   call your notes.  Okay.

21        A.    Yes.

22        Q.    And I'm going to show these to

23   you.  Can you see my screen?

James Sobota                                          6/28/2023

Page 66

1       A.      Yes.

2       Q.      Let me scroll to the top.  This

3    is a 54 page document that I'm calling your

4    notes; is that fair?

5       A.      Yes.

6       Q.      At the top this says no report.

7    What does that mean?

8       A.      That means to -- one, no report

9    was requested; two, it's a note to the

10   people that process the information that I

11   did not write a report for this case.

12      Q.      And this says -- go ahead, I'm

13   sorry.

14      A.      I said at that time I did not

15   write a report at the time that this was

16   uploaded.

17      Q.      So what is date in mean?

18      A.      That was when I was notified of

19   the case.

20      Q.      That's when you were hired,

21   right?

22      A.      Yes.

23      Q.      And the date of loss was the day

James Sobota                                              6/28/2023

                                                        Page 67

1   before, right, May 19, 2020?

2        A.     Yes.

3        Q.     And this says -- this is a little

4   squiggly line that means approximately,

5   right?

6        A.     Yes.

7        Q.     Is that 17:30?

8        A.     Yes.

9        Q.     So that means -- what does that

10  mean?  That the fire occurred at

11  approximately 5:30 p.m.?

12       A.     That was some of the information

13  I got, yes.

14       Q.     And date of inspection, May 21,

15  2020, is that the date that you conducted

16  an inspection of the residence?

17       A.     Yes.

18       Q.     How long were you there on May 21

19  of 2020?

20       A.     If you scroll back up -- can you

21  scroll up?

22       Q.     I can.  Well, I do mine inverse.

23       A.     Yeah.  I'm going to say two to

James Sobota                                           6/28/2023

Page 68

1    three hours maybe.

2         Q.      Before I get to this, do you know

3    Mr. John Crist, C-R-I-S-T?

4         A.      I met him before.

5         Q.      When did you meet him?

6         A.      Training classes.

7         Q.      Did you talk with him in

8    connection with this case?

9         A.      Yes.

10        Q.      What did y'all discuss?

11        A.      I think it's on my notes there if

12   you scroll up.

13        Q.      We will get to it.  I'm just

14   asking if you remember.

15        A.      Yeah.  I remember talking to him.

16   We talked about what he thought the origin

17   of fire was, where it was, what the

18   witnesses told him.

19        Q.      Okay.  You got a page here, page

20   seven of your notes.  I'm going to get you

21   to translate some of them.  I think I can

22   read most of this.  I need translation and

23   help on some of them.  This highlighted

James Sobota                                              6/28/2023

Page 69

1    area here says, "Larry & Sons contractor,

2    new AC and this Christie," C-H-R-I-S-T-I-E.

3    Does that indicate that you called her on

4    May 21, 2020?

5         A.    Yes.

6         Q.    And then you have a note that

7    says, "Will get back to me"?

8         A.    Yes.

9         Q.    Did you ever speak with or

10   interview Christie with Larry & Sons?

11        A.    Not other than that phone call,

12   they didn't get back to me.

13        Q.    Why did you reach out to Christie

14   at Larry & Sons?

15        A.    Just to see what their activities

16   were.

17        Q.    Okay.  All right.  Now, I want to

18   skip forward to -- we were talking about

19   the area of origin.  Bear with me.  I

20   apologize.  Do you see this photograph?

21        A.    Yes.

22        Q.    This is on page 18 of your notes

23   and I want to make sure we're on the same

James Sobota                                             6/28/2023

Page 70

1    page.  Can you see my cursor?

2        A.    Yes.

3        Q.    So we're looking at the shelving

4    in the basement of the Taronji residence,

5    right?

6        A.    Yes.

7        Q.    And I believe you just told me

8    that you defined the area of origin as

9    being at shelf two?

10       A.    Yes.

11       Q.    And the way we numbered them in

12   the deposition and the way I believe

13   Mr. Flaherty designated them, this bottom

14   left shelf is one; is that right?

15       A.    I stand corrected then.  Shelf

16   one.

17       Q.    So you're defining the area of

18   origin as being shelf one?

19       A.    Yes.

20       Q.    We go clockwise, right?  Bottom

21   left shelf is one, top left shelf is two,

22   top right shelf is three, and then I've

23   called the bottom right shelf four?

James Sobota                                                6/28/2023

Page 71

1      A.      Yes.

2      Q.      Are we on the same page?

3      A.      Yes.

4      Q.      And you made a note in your

5   report about when you were there conducting

6   your investigation at the residence, that

7   the fire department had overhauled the

8   scene.  Do you remember that?

9      A.      Yes.

10     Q.      What does that mean?

11     A.      Making sure everything is

12   extinguished.

13     Q.      I'm sorry?

14     A.      Make sure the fire is

15   extinguished.

16     Q.      Of course.  Is there anything

17   else about overhauling the scene other than

18   putting the fire out?

19     A.      It's different for each fire.

20     Q.      How about this one?

21     A.      Well, this one, I believe John

22   Crist's report was that they used a

23   relatively low amount of water and very low

James Sobota                                                    6/28/2023

                                                           Page 72

1    disturbance.

2         Q.    On shelf four, see these stacks

3    of tiles?

4         A.    Yes.

5         Q.    And you have -- we see here on

6    this right stack of tiles a battery

7    charger, right?

8         A.    Yes.

9         Q.    And you understand that that

10   battery charger was actually on the floor

11   farther to the right of the basement,

12   right?

13        A.    Yes.

14        Q.    Who put that battery charger

15   there?

16        A.    Me.

17        Q.    So you put it there where it is

18   depicted in this picture, but then you have

19   a note, you have an arrow over to this left

20   stack of tiles that says most probable

21   location of charger, right?

22        A.    Yes.

23        Q.    What's the basis of that

James Sobota                                                    6/28/2023

                                                              Page 73

1    statement?

2         A.      Well, I believe there were

3    protected patterns of that piece of tile

4    that match the charger I believe at that

5    time.

6         Q.      Okay.  Is that the protected area

7    or is that --

8         A.      No.  At the time I took the

9    picture, I think what I was trying to

10   document was what Mr. Fernandez says where

11   he put the charger.

12        Q.      Okay.  And your notes indicate --

13   and I'm not quoting them verbatim, but your

14   notes indicate that basically Mr. Fernandez

15   had put the battery pack on top of the

16   charger but not connected into the charger.

17   Do you remember that?

18        A.      Yes.

19        Q.      And then last night when you read

20   his deposition, you remember reading his

21   testimony that he testified that he put the

22   battery pack to the left of the charger

23   approximately six inches apart.  Do you

James Sobota                                              6/28/2023

Page 74

1    remember that?

2         A.      I remember that, but I remember

3    you making notations on the photograph but

4    I could not find those notations on the

5    photograph that was in the deposition.

6         Q.      But I'm talking about his

7    testimony.

8         A.      Yes.  I remember that testimony.

9         Q.      So you understand he testified

10   that he placed the unplugged battery

11   approximately six inches to the left of the

12   unplugged charger on the shelf, right?

13        A.      Yes.  Can I elaborate on that as

14   well?

15        Q.      Sure.  Go ahead.

16        A.      Fire Marshal Crist was told that

17   the battery and/or the charger were placed

18   on shelf one.

19        Q.      And that would be incorrect,

20   right?

21        A.      I don't know.

22        Q.      Well, you say here in page 18 of

23   your notes, most probable location of

James Sobota                                              6/28/2023

Page 75

1    charger is on top of a tile that's on shelf

2    four, right?

3        A.    I did say that at that time based

4    on what Mr. Fernandez was saying.

5        Q.    Okay.  Is your opinion now

6    different?

7        A.    Yeah.  Taking in to account what

8    the fire marshal said and even listening

9    and even reading Mr. Fernandez' testimony,

10   he was back and forth on exactly where he

11   put anything in there.  I think one of the

12   words he said was, okay, let's just go with

13   that.  So he wasn't too -- he wasn't too

14   convincing on where he actually put the

15   charger and the battery.

16       Q.    All right.  Well, where does

17   Mr. Sobota place the charger and the

18   battery on the date of the fire?

19       A.    I think the charger was over on

20   tiles and I think that the battery was

21   probably located closer to shelf number

22   one.

23       Q.    You see this photograph I'm

James Sobota                                              6/28/2023

Page 76

1    showing you?

2         A.     Yeah.

3         Q.     I'll represent to you this was

4    one of your photographs as jpeg210068 and

5    I'm going to annotate this.  I want to see

6    where -- and I know we're doing this via

7    Zoom, which makes it a little bit more

8    difficult.  How about this.  See my cursor?

9         A.     Yes.

10        Q.     Stop me where I'm at the point

11   where you think the battery pack was.

12        A.     Right in there.

13        Q.     All right.

14        A.     And I base that on right below it

15   are a good amount of the cell cases.

16        Q.     Okay.  And so you see my blue

17   box?

18        A.     Yes.

19               (Defendant's Exhibit No. 4 was

20               marked for identification.)

21        Q.     And so let's -- we're going to

22   call that blue box that I've put on -- I'm

23   going to mark this as Defendant's 4.  It's

James Sobota                                              6/28/2023

Page 77

1    going to be a collection of -- there are 32

2    photographs within a PowerPoint and these

3    photographs consist of a combination of

4    your scene photographs as well as Mr. Drew

5    Hornick's photographs.  And on slide 11,

6    which is your photograph 210068, is this a

7    fair representation with this blue box

8    where you say the battery pack was located

9    at the time of the fire?

10       A.    It's fair.

11       Q.    Okay.  And you see how these --

12   so the right -- the right stack of tiles

13   are stacked relatively straight, right?

14       A.    The right stacks of the tile?

15       Q.    Yes, sir.  Over here.

16       A.    Yes.

17       Q.    And you then see next to my blue

18   box how four or five -- I don't know how

19   many.  Several of the tiles are sort of

20   spread out to the right?

21       A.    Yes, I see that.

22       Q.    You attribute that to fire

23   suppression efforts?

Page 78

1      A.      Possible.

2      Q.      Well, is it probable?

3      A.      Yeah, I would say it's probable.

4      Q.      All right.  So more likely than

5    not, the arrangement -- the way we see this

6    left stack of tiles arranged and the three

7    or four on top, more likely than not, that

8    arrangement is attributable to fire

9    suppression efforts, fair?  That's what you

10   just told me.  I'm just trying to get you

11   to --

12     A.      Yeah, I know.  I know.  I'm

13   thinking based on one, the lack of water

14   that was in the room.  And I know I was

15   there the day after the fire or two days

16   after the fire.  My other thought about

17   displaced tiles could be from the failure

18   of the lithium-ion batteries as well.

19     Q.      Okay.  So you're saying one

20   possibility for the displacement of several

21   tiles is the failure of a lithium-ion

22   battery pack?

23     A.      Yes.

James Sobota                                        6/28/2023

Page 79

1      Q.    Do you hold that opinion within a

2   reasonable degree of fire science

3   certainty?

4      A.    Based on my training, yes.

5      Q.    You just 35 seconds ago told me

6   that more likely than not, the displaced

7   tiles was from fire suppression efforts.

8   Is that still your testimony or not?

9      A.    I think -- actually I think it's

10  less likely than fire suppression efforts.

11     Q.    What is less likely?

12     A.    That the tiles are from fire

13  suppression efforts.

14     Q.    Okay.  What just changed in the

15  last 35 seconds?  I thought you said it was

16  probable and thus more likely than not that

17  the fire suppression efforts moved those

18  tiles that we see in this picture on

19  Defendant's 4 at slide 11.  What changed?

20     A.    Basically my mind.  After

21  considering looking at the pictures and

22  remembering the scene and the fact that the

23  fire department said that they used very

James Sobota                                                    6/28/2023

Page 80

1    little water.

2         Q.      Okay.  They used a dadgum fire

3    department fire hose, right?

4         A.      Yes.

5         Q.      And so when you say using very

6    little water, you're talking about the

7    amount of time that they had the suppress

8    the fire, not the pressure at which the

9    water is coming out of the hose, right?

10        A.      It depends on what they flowed

11   the nozzle at.  You don't have to open it

12   up full blast.

13        Q.      Well, do you know how open the

14   nozzle was when they put out this fire?

15        A.      No.

16        Q.      Did you ask Mr. Crist?

17        A.      No.

18        Q.      Did you ask anybody?

19        A.      No.

20        Q.      So then what is the basis of your

21   opinion that it is the battery as opposed

22   to a fire department's fire hose that

23   displaced these tiles?

James Sobota                                              6/28/2023

Page 81

 1      A.      Just now looking at the picture

 2   and the way that the tiles are displaced,

 3   it could have been from part of the --

 4   there's a whole bunch of possibilities.  It

 5   could have been from the fire department

 6   moving things to check to see if the fire

 7   was out.  It could have been partially from

 8   the fire stream and could partially be also

 9   from the reaction of the batteries.

10      Q.      Okay.  Did you do any testing --

11   as part of the scientific method, did you

12   do any testing to develop any sort of

13   hypothesis or opinion as to the battery --

14   lithium-ion battery pack displacing these

15   tiles?

16      A.      No.

17      Q.      How many times do you say you've

18   used a fire hose in your career?

19      A.      Many, many, many times.  If I

20   could back up to one of your questions

21   about if I did any testing.  I have

22   observed videos of how lithium-ion

23   batteries fail.

James Sobota                                      6/28/2023

                                                  Page 82

1      Q.     Tell me about those videos.

2      A.     Well, basically when the cells

3  fail, they do so in a catastrophic means.

4  They shoot out flames like a Roman candle.

5  They are propelled from their pack.

6      Q.     What is propelled from their

7  pack?  What is propelled from their pack?

8      A.     What is propelled from their

9  pack?

10     Q.     That's what you just said.  I'm

11 trying to understand what's propelled.

12     A.     They move away from their pack at

13 a very, very high rate of speed.

14     Q.     Whose videos were these?

15     A.     I think that was some of the

16 videos I saw in one class that I just

17 talked about.

18     Q.     I'm sorry, Mr. Sobota, I don't

19 know if it's on my end or not.  I think

20 we're having connection issues.  Can you

21 still hear me?

22     A.     Yes.

23     Q.     You said --

James Sobota                                        6/28/2023

Page 83

1       A.      I think the videos that I last

2    remember were those -- we talked about

3    earlier about that lithium-ion battery

4    class that was taught.  I believe Butta

5    from the ATF.

6       Q.      Butta videos?

7       A.      Butta.  Just other still pictures

8    and documentations that I've read.

9       Q.      Okay.  Let's focus on the videos.

10   How many videos were there?

11      A.      I do not remember.

12      Q.      Were Mr. Butta's videos, were

13   they depicting some sort of test that he

14   set up or was it videos of an actual say

15   security footage or whatever showing an

16   actual event that happened with a

17   lithium-ion battery pack?

18      A.      It could have been with a

19   security video and I don't remember if

20   there were tests or specifically if they

21   were video camera security.

22      Q.      Where were those batteries?  Were

23   there multiple battery packs in the videos?

James Sobota                                      6/28/2023

                                                    Page 84

 1      A.      I don't remember.

 2      Q.      What were the batteries placed

 3   upon or where were they located?

 4      A.      I don't remember.

 5      Q.      What do you remember about the

 6   videos other than Roman candle stuff?

 7      A.      Mainly observing the type of

 8   reaction.

 9      Q.      Okay.  Do you know whether those

10   videos were from showing the lithium-ion

11   battery's reaction when they were subject

12   to external fire or whether it was showing

13   the reaction of a lithium-ion battery pack

14   that experienced an internal cell failure?

15      A.      I don't know.

16      Q.      You don't know either way?

17      A.      No.

18      Q.      It could be that the videos you

19   saw were showing the reaction of a battery

20   pack that had been attacked by fire, true?

21      A.      It could have been.

22      Q.      So after all of that, do we still

23   agree -- do you still agree with what's in

James Sobota                                        6/28/2023

Page 85

1    slide 11 of Defendant's 4 in this blue box

2    as to where the battery pack was located?

3         A.    Yes.

4         Q.    All right.  And I'm going to do

5    -- just so we're not getting confused on

6    our shapes, I'm going to do a circle for

7    the charger and I want you to tell me -- I

8    want you to stop my cursor when I'm where

9    you believe the charger was located at the

10   time of the fire?

11        A.    Right there.

12        Q.    Right here?

13        A.    Yeah.  But actually maybe back up

14   just a little bit to the right.

15        Q.    Is that fair?

16        A.    That's fair.  Maybe on the tile

17   that I had in the picture.  I really don't

18   know.

19        Q.    All right.  So is it your opinion

20   that this is a fair and accurate depiction

21   of -- this blue circle is a fair and

22   accurate depiction of where you believe, in

23   your opinion, the battery charger was

James Sobota                                            6/28/2023

Page 86

1    located?

2        A.    Yes.

3        Q.    I want to talk about shelf one.

4    What all was located on shelf one at the

5    time of the fire?

6        A.    The information I had, there was

7    a plastic bin full of regular alkaline type

8    of batteries.  There was a cup of what I

9    believe Mr. Hernandez described as a

10   purplish liquid, which I interpreted it to

11   be fuel from a recent furnace change-out.

12   There was also a report that there was --

13   that was from John Crist that there was the

14   little girl's craft supplies there.  There

15   were aerosol cans and paint containers.

16       Q.    Are all of those items that you

17   just listed to me combustible?

18       A.    To a varying degree, yes.

19   There's drywall compound on there as well.

20       Q.    Did Mr. Crist describe any detail

21   that you recall of the craft supplies?

22       A.    No.

23       Q.    Do you have any other information

James Sobota                                      6/28/2023

Page 87

1    about the craft supplies?

2        A.     No.

3        Q.     Do you know if they included

4    let's say pens, paint, paper, anything like

5    that?

6        A.     No.  I don't know the makeup of

7    what the craft supplies were.

8        Q.     But nevertheless, all the items

9    you just listed for me are in your opinion

10   combustible items?

11       A.     Yes.

12       Q.     Anything else on shelf one?

13       A.     There was a modem that they said

14   they didn't use.  It was left there by the

15   previous owner.

16       Q.     Anything else?

17       A.     I think there was a soldering

18   iron maybe.

19       Q.     Soldering irons can cause fires,

20   cant' they?

21       A.     Yes.  If on or energized.

22       Q.     Do you know whether the soldering

23   iron that was on shelf one was on or

James Sobota                                              6/28/2023

Page 88

1    energized at the time of the fire?

2        A.     No, I don't.  And I had notes in

3    my -- from the lab inspection that the

4    solder iron was supposed to be X-rays.  I

5    believe C.J. was going to take care of

6    that.  I haven't got the results of that.

7        Q.     So as we sit here today, with you

8    being prepared to offer your full final

9    complete opinions, do you know one way or

10   the other whether that soldering iron was

11   on and energized on shelf one at the time

12   of the fire?

13       A.     No.  But I think if it was and

14   there was anything, I'm sure I would have

15   noted that.

16       Q.     Okay.  So the answer to my

17   question is no, I do not know whether the

18   soldering iron was on or energized on shelf

19   one at the time of the fire; is that

20   correct?

21       A.     No, I do not know.  Not right

22   now.

23       Q.     Okay.  You mentioned a cup of

James Sobota                                          6/28/2023

Page 89

1    purplish liquid that you referred to as

2    fuel oil; is that right?

3         A.    Yes.

4         Q.    I'm going to go back to your

5    notes here.  This is page 17 of your notes.

6    It has a photograph of the shelf, right?

7         A.    Yes.

8         Q.    And you have annotations with

9    yellow ink, blue ink, red ink, right?

10        A.    Yes.

11        Q.    You say here -- do I read

12   correctly in yellow, "Plastic container

13   with batteries."  It points down and it's

14   got a little blue box, right?

15        A.    Yes.

16        Q.    What kind of batteries?

17        A.    Alkaline batteries.

18        Q.    All right.  And then you have a

19   yellow bucket looking thing that says

20   "Tupperware container w/," which means

21   with, right?

22        A.    Yes.

23        Q.    "With fuel oil open container."

James Sobota                                    6/28/2023

Page 90

1    Did I read that right?

2         A.    Yes.

3         Q.    What was the size of the

4    Tupperware container?

5         A.    Roughly about the way it was

6    described to me.  About the size that you

7    see in comparison to the paint cans.

8         Q.    I'm sorry?

9         A.    I said roughly the size that was

10   conveyed to me by Mr. Fernandez.  Maybe a

11   little even smaller than in comparison to

12   the size of the paint cans in the back.

13        Q.    So we're not talking about like a

14   solo cup.  It's a Tupperware container

15   that's not quite as big as a paint can

16   similar to the paint cans we see above your

17   yellow drawing of the Tupperware, right?

18        A.    Yes.

19        Q.    And in your notes, you said that

20   Tupperware container was filled with liquid

21   from oil furnace (removed) near point of

22   origin (fuel oil reddish color).  Do you

23   know the volume of the fuel oil that was in

James Sobota                                          6/28/2023

                                                      Page 91

 1    the Tupperware container that was nearly

 2    the size of the paint can?

 3        A.    I'm not saying that it was the

 4    size of the paint can.  I would say

 5    probably a quarter of a size of a paint

 6    can.  I didn't see that container.

 7        Q.    Because the container was

 8    consumed by the fire; true?

 9        A.    Yes.

10        Q.    Can cigarettes be consumed by a

11    fire?

12        A.    Yes.

13        Q.    And you've experienced this

14    before, haven't you?  There's been a

15    cigarette-induced fire and you investigated

16    it and couldn't find any evidence of

17    cigarettes in the area or point of origin,

18    right?

19        A.    Yes.

20        Q.    All right.  So what was the

21    volume of the fuel oil in the Tupperware

22    container, if you know?

23        A.    I do not know.

James Sobota                                              6/28/2023

Page 92

1        Q.     Did you ask anybody?

2        A.     Mr. Fernandez kind of held his

3   hand in a small circular pattern saying how

4   big the Tupperware container was.  I

5   imagine that's how I got that size.

6        Q.     And when I read your notes and

7   they say filled with liquid from oil

8   furnace, I interpret that as being pretty

9   well full.  Are you saying that it was full

10  or did it simply contain -- the Tupperware

11  container contained the fuel oil?

12       A.     I'm thinking it just contained

13  the fuel oil.

14       Q.     Okay.  Do you have any estimate

15  as to the volume?

16       A.     No.  Estimate?

17       Q.     Yes, sir.

18       A.     Ounces.

19       Q.     Yes, sir.

20       A.     Several ounces.

21       Q.     Okay.  Is that between three and

22  five?

23       A.     Yes.

James Sobota                                    6/28/2023

Page 93

1       Q.      And fuel -- well, let me ask you

2    this:  What was the chemical composition of

3    the fuel, if you know?

4       A.      No.  I don't know the chemical

5    composition.

6       Q.      Was it diesel?

7       A.      Similar to diesel.  I guess it's

8    a different breed of diesel.

9       Q.      Would you agree with me that the

10   flash point of liquid diesel is

11   approximately 105 degrees Fahrenheit at

12   minimum?

13      A.      Yes.

14      Q.      Would you also agree with me --

15   let me back up.  In general, a liquid with

16   a lower flash point is easier to ignite,

17   right?

18      A.      Yes.  Lower the flash.

19      Q.      And you agree with me that liquid

20   diesel, it's flash point is as minimum

21   approximately 105 degrees Fahrenheit,

22   right?

23      A.      Yes.

James Sobota                                                6/28/2023

Page 94

1      Q.      And would you also agree with me

2    that the flash point of liquid gasoline is

3    negative 45 degrees Fahrenheit?

4      A.      Yes.

5      Q.      Would you agree that cigarettes

6    have a burning temperature of 930 and

7    1300 degrees when free burning?

8      A.      Yes.

9      Q.      All right.  I want you to assume

10   for me hypothetically that a battery pack

11   fails and shoots out that -- does the Roman

12   candle thing, shoots out flames, can a jet

13   of flames come out of a battery pack ignite

14   a container containing three to five ounces

15   of fuel?

16     A.      I think eventually -- and what I

17   mean by that is that the plastic container

18   that it was in, another surrounding

19   combustible was burning, would have to melt

20   that container and release the liquid.  In

21   other words, that container initially is

22   protecting that fluid.

23     Q.      Right.  So to be direct -- well,

James Sobota                                                    6/28/2023

Page 95

1    let me ask it this way:  If I took a match

2    and threw it in a Tupperware container of

3    three to five ounces of fuel, it would not

4    light the thing on fire, would it?

5         A.    No, it would not.

6         Q.    Because that fuel would quench

7    it, wouldn't it?

8         A.    Yes.  And the temperature of that

9    time wouldn't be producing a flash point.

10        Q.    What is your opinion in this case

11   as to the first fuel ignited?

12        A.    The gases from the batteries.

13        Q.    What is that based on?

14        A.    Based on my research that when

15   batteries fail, they -- there's reaction

16   within the battery and they fail.

17        Q.    What research?

18        A.    The research that we talked about

19   earlier.  Quintiere's articles, CFI trainer

20   net class I took.

21        Q.    And in those same training

22   materials, you know and you would agree

23   with me or would you agree with me that

James Sobota                                    6/28/2023

Page 96

1    those same gases can be admitted from a

2    lithium-ion battery pack that's attacked

3    externally by a fire, right?

4         A.    Yes.

5         Q.    Okay.  So then what -- is there

6    any other basis for your opinion that --

7    strike that.

8              So based on Dr. Quintiere's

9    articles, some podcast, and your class on

10   lithium-ion battery packs, is it your

11   testimony under oath today that you hold --

12   that you have an opinion within a

13   reasonable degree of fire science certainty

14   the first fuel ignited was the lithium-ion

15   battery cell based on the gases that were

16   admitted?

17        A.    Yes.

18        Q.    Okay.  And is that really

19   reflected in opinion three of your report

20   which says the materials first ignited were

21   the batteries -- I guess that should say

22   battery's combustible liquid electrolyte?

23        A.    Yes.

James Sobota                                              6/28/2023

Page 97

1        Q.      Do you know if the battery cells

2    contained liquid electrolyte?

3        A.      From my research, yes.

4        Q.      Is that what Dr. Quintiere told

5    you in his paper?

6        A.      Yes.

7        Q.      Do you know if there's a liquid

8    electrolyte in Ryobi 40 volt cells?

9        A.      Not specifically, no.

10       Q.      Okay.  So if there's not liquid

11   electrolyte in this -- you already told us

12   you don't know the model of this battery

13   pack.  If the subject Ryobi 40 volt battery

14   pack at issue in this case does not in fact

15   contain liquid electrolyte, can we take a

16   red pen and mark through opinion three?

17       A.      Yes.

18       Q.      You would be dead wrong, wouldn't

19   you?

20       A.      Yes.

21       Q.      All right.  Number four opinion,

22   "The act or omissions that brought the

23   ignition source and the material first

James Sobota                                                    6/28/2023

                                                              Page 98

1    ignited together resulted from a

2    catastrophic failure of lithium-ion battery

3    cells."  Did I read that right?

4         A.    Yes.

5         Q.    What is the basis of that

6    opinion?

7         A.    The basis of that opinion is the

8    degree of damage of the cells that we

9    found.  One cell was expelled all the way

10   across the room on the opposite side.

11   That's it.

12        Q.    And cells -- would you agree with

13   me that based on your podcast, looking up

14   Dr. Quintiere's article, and your

15   lithium-ion training class that you took in

16   2022, that lithium-ion cells can be cast

17   across a room, they can expel their

18   contents, one or more can expel their

19   contents, and that can be caused by

20   external fire?

21        A.    It's possible, yes.

22        Q.    So you would agree with me?

23        A.    I would agree what?

James Sobota                                          6/28/2023

Page 99

1       Q.     You would agree with me that

2    lithium-ion battery packs, that one or more

3    of their cells can expel their contents

4    and/or one or more cells can be cast, you

5    know, lengths across a room as a result of

6    an external fire attack?

7       A.     Yes, and it could also be caused

8    by other things.

9       Q.     Sure.  Sure.  I'm not fussing

10   with you.  I just trying to get a clean

11   answer.  You would agree with me, sir, that

12   cells can be thrown across a room and one

13   or more of them can expel their contents

14   when they are subject to external fire

15   attack?

16      A.     Yes.

17      Q.     All right.  What part of my

18   screen do you see, Mr. Sobota, if any?

19      A.     I see the picture that we're

20   looking at with the Tupperware container

21   and the battery container and the paint

22   cans on shelf one.

23      Q.     While I'm thinking about it, you

James Sobota                                          6/28/2023

Page 100

1    mentioned C.J. Flaherty a couple of times.

2    What is his role in this case?

3         A.    He was the electrical engineer

4    brought out to assist.

5         Q.    Did you and C.J. talk about this

6    case?

7         A.    Yes.

8         Q.    What did y'all discuss?

9         A.    Discussed our findings.

10   Basically discussing when we're at the

11   scene, at the lab exams.

12        Q.    Going back to opinion four --

13   before I leave this, opinion four, "The act

14   or omissions that brought the ignition

15   source and the material first ignited

16   together resulted from a catastrophic

17   failure of lithium-ion battery cells."  Do

18   you hold that opinion within a reasonable

19   degree of fire science certainty?

20        A.    I hold that opinion.

21        Q.    And that is based upon -- I

22   believe you told me the fact that there

23   were one or more cells that expel their

James Sobota                                              6/28/2023

                                                          Page 101

1    contents and at least one cell had been --

2    that was found in another area of the

3    basement?

4        A.      Yes.  And other parts of the

5    battery were displaced about the room as

6    well.

7        Q.      Which can also occur when a

8    lithium-ion battery pack is subject to

9    external fire attack; true?

10       A.      True.

11       Q.      All right.  Is there any other

12   basis that support -- or any other reason,

13   observation, podcast, anything that serves

14   as the basis of opinion four?

15       A.      None that I can think of right

16   now.

17       Q.      And so you would agree with me,

18   sir, that every basis that supports your

19   opinion four are things that can occur when

20   a lithium-ion battery pack is subject to

21   external fire attack; true?

22       A.      Yes.  As well as other things.

23               MR. YEAROUT:  Can we go off the

James Sobota                                                6/28/2023

                                                      Page 102

1    record real quick?

2            (Discussion off the record.)

3    Q.      Mr. Sobota, back from a brief

4    break.  I apologize for the interruption.

5    When you read Ms. Taronji's deposition last

6    night, do you remember her talking about

7    she heard the hissing noises, she smelled

8    what she thought was natural gas, went to

9    the kitchen, heard the smoke detector going

10   off, calls 911, and shortly thereafter

11   observes thick black smoke coming up from

12   the basement?  Do you remember that?

13   A.      I believe the way I read it was

14   she was outside of the house and saw smoke

15   coming out.

16   Q.      Okay.  What is the fact that

17   thick, black smoke -- strike that.  What's

18   your understanding of the amount of time

19   between Ms. Taronji hearing the hissing

20   noises, calling 911, and observing thick

21   black smoke?

22   A.      Can you ask the question one more

23   time?  I'm sorry.

James Sobota                                          6/28/2023

Page 103

1      Q.     I would be happy to.  Do you have

2   an understanding of the amount of time that

3   elapsed between Ms. Taronji hearing the

4   hissing noises and the smoke detectors

5   going off and observing the thick black

6   smoke?

7      A.     No.

8      Q.     Do you know if it's a minute,

9   five minutes, ten minutes?  Do you have a

10  judgment?

11     A.     A judgment would be a couple of

12  minutes.

13     Q.     Okay.  Couple minutes between

14  hearing the hissing, smoke detectors going

15  off, and seeing thick black smoke coming

16  out of the basement and out of the house.

17  What does that tell you about how far this

18  fire had progressed when the smoke was

19  observed?

20     A.     It doesn't tell me anything.

21     Q.     It doesn't?  Does it tell you --

22  what I'm driving at is, she hears the

23  hissing noises, hears the smoke detector go

James Sobota                                              6/28/2023

Page 104

1    off, and give or take two minutes later,

2    there's thick black smoke emanating from

3    the basement and the house.  Does that tell

4    you that this fire had just started or that

5    it was a longer progressing fire?

6        A.    Well, my judgment is a couple of

7    minutes, so I think it's a relatively quick

8    fire.

9        Q.    What's that based on?  Just the

10   smoke?

11       A.    Well, she -- no, not just the

12   smoke.  I mean, the sequence of events that

13   she describes that -- I can't remember if

14   she heard the hissing noises first, then

15   the smoke detector, goes outside and sees

16   the black smoke, so that's relatively

17   quick.

18       Q.    Okay.  Do you understand the

19   phrase ignition scenario?

20       A.    Ignition sequence?

21       Q.    Ignition sequence.  Scenario.

22   Let's use ignition sequence.  Are you

23   familiar with that?

James Sobota                                        6/28/2023

                                                        Page 105

 1      A.      Yes.

 2      Q.      What is your ignition sequence in

 3   this case?

 4      A.      The battery fails, the gases

 5   expel, it's ignited most likely by the hot

 6   casing of the battery.

 7      Q.      Did you say hot casing of the

 8   battery?

 9      A.      Yes.

10      Q.      What is the basis for your

11   opinion that the battery had a hot casing?

12      A.      There's a -- when the battery

13   fails, there's an exothermic reaction that

14   heats up the battery.  As the gas expels,

15   it's ignited by the hot gas or it could

16   also be -- from the research again it could

17   be where it doesn't need oxygen.  It

18   actually produces oxygen and can fail

19   internally.

20      Q.      The same exothermic reaction that

21   can occur from an external fire attack,

22   right?

23      A.      Yes.

James Sobota                                           6/28/2023

                                                    Page 106

1      Q.     So then what happens next in

2   Mr. Sobota's ignition sequence?

3      A.     The nearby combustibles are

4   ignited and goes from a fuel package to

5   fuel package.

6      Q.     And are those fuel packages the

7   items that we discussed earlier as what you

8   believe were contained on shelf one?

9      A.     Yes.

10     Q.     All right.  I apologize, I'm

11  trying to share my screen here.  Do you see

12  my screen?

13     A.     Yes.

14     Q.     This is slide two of Defendant's

15  4 and this is your photograph 210050.  Do

16  you see this big black container,

17  Mr. Sobota?

18     A.     Yes.

19     Q.     What's that?

20     A.     Fuel tank.

21     Q.     Do you see this shelf next to it?

22     A.     Yes.

23     Q.     Do you believe that shelf number

James Sobota                                          6/28/2023

Page 107

1    one could contain contents similar to what

2    we see in this shelf in slide two of

3    Defendant's 4?

4         A.     What are you referring to as

5    shelf number one?

6         Q.     I'm talking about the subject

7    shelf number -- and that's a good

8    clarification.  I'm talking about for the

9    contents on subject shelf number one, could

10   that have contained items similar to what

11   we see in the shelving in this picture that

12   is slide number two of Defendant's 4?

13        A.     Possible.

14        Q.     Okay.  Let's go to page 20 of

15   your notes.  See that?

16        A.     Yes.

17        Q.     Here we are the subject shelving.

18   We've got the two tape measurers.  We see

19   battery cells on the floor nearby the

20   shelving.  Right?

21        A.     Yes.

22        Q.     Who put that pink or what is that

23   pink -- what is that pink stuff?

James Sobota                                          6/28/2023

Page 108

1      A.      It's a surveyor tape.  I put it
2  on there.
3      Q.      What did you put that pink
4  surveyors tape on?
5      A.      I think it was on one of the
6  failed cells.
7      Q.      Why did you pick that one?
8      A.      I'm not sure exactly why.  I just
9  kind of make it recognizable in the
10  picture.
11      Q.      And this photograph was taken
12  when, May 21st of 2020?
13      A.      I believe so.  I take that back.
14  I don't know.  There were three separate
15  inspections on that and I can't remember
16  exactly when I took that picture.
17      Q.      All of the inspection photographs
18  occurred in what, June or July of 2020?
19      A.      I think the last inspection was
20  on June 2, 2020.
21      Q.      And I said June or July.  Your
22  scene inspection photographs and the
23  others, all of those were taken either May

James Sobota                                        6/28/2023

                                                    Page 109

1    or June of 2020, right?

2         A.    Yes.

3         Q.    And so you put this pink tape on

4    this cell because you had already

5    determined that it was a failed cell?

6         A.    It was deformed cell.

7         Q.    Well, you just told me it was a

8    failed cell.

9         A.    Okay.

10        Q.    So you put that pink tape on

11   there in May or June of 2020 because you

12   made the determination that that was a

13   failed cell?

14        A.    One of them.

15        Q.    Okay.  Was that simply based on

16   your gross observations at the scene?

17        A.    Yes.

18        Q.    Without X-ray, right?

19        A.    Without X-ray, correct.

20        Q.    Without CT, right?

21        A.    Yes.

22        Q.    Without any testing or analysis,

23   right?

James Sobota                                        6/28/2023

                                                    Page 110

1        A.      Yes.

2        Q.      What, if anything, did you do to

3    determine, you know what, I've seen

4    these -- well, I don't know if you had seen

5    the podcast at this point.  Based on your

6    training, education, and experience, what

7    did you do to determine I'm not sure if

8    this cell right here expelled its contents

9    because it had been attacked by fire versus

10   internally failed?

11       A.      Brought on by the electrical

12   engineer.

13       Q.      Did he tell you to put the pink

14   tape on there?

15       A.      No.

16       Q.      So C.J. has nothing to do with

17   your decision to put pink tape on that

18   cell, does he?

19       A.      No.

20       Q.      Based upon your training,

21   education, and experience, why did you put

22   the pink tape on there and what, if

23   anything, did you do to determine whether

James Sobota                                              6/28/2023

Page 111

1   that was a cell that expelled its contents

2   because it was attacked by a fire versus

3   your belief in May or June of 2020 that it

4   was a failed internal cell failure?

5        A.    The reason I can think I put the

6   tape on was to note that that was one of

7   the cells that were damaged.  I didn't -- I

8   wasn't trying to infer that that one failed

9   by internal damage.  It was just a marker

10  to aide in my photography.

11       Q.    Here we are, page 19, what do

12  those words in red ink say?

13       A.    Failed cell.

14       Q.    When was that photograph taken

15  and when did you write that?

16       A.    Some time in June and probably

17  right after I took the picture.

18       Q.    This doesn't say damaged cell, it

19  doesn't say deformed cell, it says failed

20  cell; true?

21       A.    True.

22       Q.    What, if anything, did you do to

23  distinguish this cell as being externally

James Sobota                                          6/28/2023

                                                      Page 112

1    attacked by fire versus "being a failed

2    cell"?

3         A.     I guess I used the term failed

4    generically.  Damaged cell may have been a

5    better term.

6         Q.     Yeah.  So would it be fair and

7    consistent with the scientific method NFPA

8    921 for us to add a note here that says,

9    either by external fire attack or internal

10   failure?  Would that be fair?

11        A.     That would be fair.

12        Q.     All right.  Let's write it.

13   Let's do it.  All right.  We're going to

14   put a note.  So I'm going to write failed

15   cell--either by external fire attack or

16   internal failure.

17        A.     Can you put another or in there?

18        Q.     Sure.

19        A.     Or cell affected by other cells

20   next to a failed cell.

21        Q.     So I've got failed cell--either

22   by external fire attack or internal failure

23   or cell affected by other cells.  Is that

James Sobota                                           6/28/2023

                                                        Page 113

1    Mr. Sobota's opinion as we're sitting here

2    today?

3         A.      Yes.

4         Q.      All right.  See here on page 22

5    of your notes?

6         A.      Yes.

7         Q.      You've got -- you write here in

8    yellow "battery pack."  Do you see that?

9         A.      Yes.

10        Q.      Then you write "copper foil

11   electrodes," right?

12        A.      Yes.

13        Q.      How did that battery pack get on

14   the ground, if you know?

15        A.      I don't know.

16        Q.      I mean, do you think it exploded

17   and just blew itself off of the shelf?

18   Could it have gotten there from fire

19   suppression efforts?  Mr. Fernandez threw

20   it on the ground?  Do you have any idea?

21        A.      Other than Mr. Fernandez throwing

22   it on the ground, I think all apply that

23   you mentioned.

James Sobota                                          6/28/2023

                                                     Page 114

1      Q.     Okay.  So could have been fire

2   suppression.  Could have just blown itself

3   off of the shelf.  Those are the

4   possibilities?

5      A.     Yes.

6      Q.     All right.  Bear with me, please.

7   I'm sorry.  And I'm going to find this

8   picture and mark it as an exhibit, but I

9   don't have it handy.  I will represent to

10   you that this was a photograph taken during

11   the lab exam.  Does that appear to be

12   correct?

13      A.     Yes.

14            (Defendant's Exhibit No. 5 was

15            marked for identification.)

16      Q.     You see the paint cans, right?

17      A.     Yes.

18      Q.     And I'll further represent to you

19   that this is shelf one; is that fair to be

20   correct?

21      A.     Yes.

22      Q.     Do you know or have an opinion as

23   to what this white cakey stuff is in the

James Sobota                                              6/28/2023

Page 115

1   center of -- kind of in the center area of

2   shelf one?

3       A.    My best guess is drywall

4   compound.

5       Q.    Is that combustible?

6       A.    I'm sure certain components of it

7   is, which is designed to be a endothermic

8   chemical.  Like I said, I would have to

9   look at the MSDS for that product.

10      Q.    Do you know what the flash point

11  for drywall compound is?

12      A.    No.

13      Q.    All right.  You read

14  Mr. Fernandez' deposition and you recall

15  that he said he used the chain saw with his

16  lithium-ion 40 volt battery pack and then

17  went inside the basement, put the battery

18  on the charger in his basement office desk,

19  correct?

20      A.    Yes.

21      Q.    And about 30 minutes later, the

22  charge is complete and he then takes the

23  battery pack, according to his testimony,

James Sobota                                          6/28/2023

Page 116

1    and the charger, unplugs them, takes them

2    into the utility room, and puts them on the

3    shelf, right?

4        A.    Yes.

5        Q.    And that's at approximately

6    9:30 a.m., right?

7        A.    Yes.

8        Q.    And your notes indicate that at

9    approximately 4:15 p.m., Mr. Fernandez is

10   smoking cigarettes in the basement, right?

11       A.    Yes.

12       Q.    And then he leaves the house at

13   approximately 4:20, correct?

14       A.    Yes.

15       Q.    And the fire is reported at what

16   time?

17       A.    I think it was dispatched at

18   1818 hours, 6:18 p.m.

19       Q.    I'm sorry?

20       A.    At 6:18 p.m.

21       Q.    6:18 p.m.  So what is that,

22   approximately two hours after Mr. Fernandez

23   left the house?

James Sobota                                    6/28/2023

Page 117

1       A.      Yes.

2       Q.      All right.  And you remember

3   seeing the photographs.  In fact, you

4   photographed the cigarette butts that were

5   in the containers, ashtrays, whatever,

6   cans, whatever you want to call them;

7   there's two of them on your desk, right?

8       A.      Yes.

9       Q.      Two hours is within the window --

10  according to peer review published

11  literature, two hours is within the window

12  of time in which a cigarette can cause a

13  fire; true?

14      A.      True.

15      Q.      All right.  How, sir, were you

16  able, in your opinion, to rule out an

17  inadvertent discarded cigarette in the

18  utility room that caused the fire?

19      A.      I believe my notes there it says

20  the last time he was in that utility room

21  was around 10:00 in the morning after he

22  put the battery charger in there.

23      Q.      Okay.  Of course we talked about

James Sobota                                        6/28/2023

                                                   Page 118

1    people's -- whether it's a memory fading or

2    whether it's a misremembering or

3    misstatement or misrepresentation about

4    activities that are reported on the date

5    and time of the fires, right?

6         A.    We talked about that, yes.

7         Q.    Right.  And you agreed with me

8    that that happens and has happened to you

9    relatively often in your career, right?

10        A.    Yes.

11        Q.    We also talked about the fact

12   that cigarettes can be consumed by fire and

13   as such cannot be found as evidence, right?

14        A.    Yes.

15        Q.    All right.  I'll represent to you

16   that you took seven photographs of the

17   aerosol cans that were on shelf one.  Why?

18        A.    Why?  I don't know.  I mean,

19   sometimes I just take pictures of things

20   that I'm seeing.  No particular reason.

21        Q.    No particular reason.  You just

22   took seven photographs of aerosol cans?

23        A.    To see if there's any burn

James Sobota                                          6/28/2023

                                                      Page 119

1    patterns on them.  What they look like.

2        Q.     Okay.  You observed the arcing on

3    the -- strike that.

4               What, if anything, of significance

5    did you observe on the extension cord that

6    was draped across and above the shelving?

7        A.     There was an arc site that we

8    noticed on lab exam.

9        Q.     Arcing indicates what?

10   Electrical activity, right?

11       A.     Electrical activity, correct.

12       Q.     What, if anything, did you do to

13   rule out the electrical cord that shows

14   evidence of arcing and thus electrical

15   activity as the cause of this virus?

16       A.     Ruled it out because it was above

17   the area of origin and it appeared to be

18   more thermal damage than anything else.

19       Q.     Well, if an arced electrical cord

20   causes a fire that then drops down, can it

21   also then get burnt by the fire that it

22   caused?

23       A.     I would suspect to see different

James Sobota                                      6/28/2023

                                              Page 120

1    burn patterns.  If that was the case, I

2    would see more heavily damaged burn

3    patterns above that extension cord rather

4    than below it.

5         Q.    Okay.  I'm going to share again.

6    This is slide 23 of Defendant's 4.  I'm

7    going to come back.  I want to focus on

8    shelf four, okay?

9         A.    Yes.

10        Q.    Is this just a big giant random

11   piece of wood?

12        A.    Yes.

13        Q.    Do you know how it got there?

14        A.    No.

15        Q.    Do you see where my cursor is?

16        A.    Yes.

17        Q.    That black sooty area, what does

18   that indicate to you?

19        A.    That something burned there and

20   I'm not sure what.

21        Q.    You don't know what caused that

22   black sooty area on that tile which is on

23   shelf four?

James Sobota                                                6/28/2023

Page 121

1      A.      No.

2      Q.      And do you see where my cursor is

3   now?

4      A.      Yes.

5      Q.      This tile does not have the same

6   extent for degree of soot or burned char,

7   right?

8      A.      Yes.

9      Q.      Same with the tile below it,

10  right?

11     A.      Yes.

12     Q.      Same with the tile below it,

13  right?

14     A.      Yes.

15     Q.      Same with the tile below it,

16  right?

17     A.      Yes.

18     Q.      What does that indicate to you

19  relative to this top tile with all the

20  black sooty char on it?

21     A.      That they were protected at the

22  time of fire.

23     Q.      Right.  And does that also

James Sobota                                        6/28/2023

Page 122

1    indicate to you that they were stacked on

2    top of each other, thus protecting the

3    tiles beneath this top one with the black

4    sooty char on it?

5        A.    Yes.

6        Q.    Okay.  This is a little bit of a

7    random -- what is this -- I'll represent

8    this is slide 32 of Defendant's 4, this is

9    your photograph 210117.  What is this brown

10   stake thing?

11       A.    I don't know.

12       Q.    And this is one of those -- what

13   is that?  Some sort of candle?

14       A.    No.  It's a shot glass.

15       Q.    It's got cigarettes in it, right?

16       A.    It's got I think one cigarette in

17   it.

18       Q.    And then there was the other can

19   thing containing cigarette butts, right?

20       A.    Yes.

21       Q.    Did you find any evidence of

22   cigarette butts in the utility room in or

23   near the area origin of the shelving?

James Sobota                                                    6/28/2023

                                                              Page 123

 1       A.      No.

 2       Q.      And that, of course, did not mean

 3   that there weren't cigarette butts that

 4   were in the area of origin that were

 5   consumed by the fire, right?

 6       A.      Sure.

 7       Q.      And thus, cigarette smoking

 8   cannot be ruled out as a cause of this

 9   fire; true?

10       A.      I ruled it out.

11       Q.      Consistent with the scientific

12   method?

13       A.      Yes.

14       Q.      I'm almost done, Mr. Sobota.  I'm

15   going to consult with a couple of people

16   who are smarter than me and I'm going to

17   look at my notes and I might be done.  Can

18   we take a five minute break?

19       A.      Sure.

20               (A recess was taken.)

21       Q.      Back on the record after a break.

22   Mr. Sobota, are you familiar with NFPA 921

23   and its discussion of expectation bias?

James Sobota                                      6/28/2023

Page 124

1       A.      Yes.

2       Q.      What is expectation bias?

3       A.      Trying to prove a hypothesis

4    instead of disprove it.

5       Q.      Is that a good or bad thing under

6    the NFPA 921?

7       A.      That's a bad thing.

8       Q.      In fact, investigators are

9    strongly cautioned to avoid expectation

10   bias in proper use of the scientific

11   method, right?

12      A.      Yes.

13      Q.      What's confirmation bias?

14      A.      I'm sorry.  The expectation bias

15   is trying to prove a case without all the

16   facts and data.  Confirmation bias is

17   trying to confirm a hypothesis rather than

18   disprove it.

19      Q.      And we're talking about

20   confirmation bias.  Would you agree with me

21   that a hypothesis can be said to be valid

22   only when rigorous testing has failed to

23   disprove the hypothesis?

James Sobota                                      6/28/2023

Page 125

1      A.    Yes.

2      Q.    Is there anything -- I know we've

3  been going a while and I meant to apologize

4  earlier, but I was not -- I had forgotten

5  y'all were on eastern and I know it's

6  lunchtime.  Everybody is probably getting

7  hungry.  Forgive me for that.

8            Is there anything, any aspect of

9  your testimony that you need to change,

10  clarify, elaborate upon, anything like

11  that?

12      A.    No.

13      Q.    All right.  Have you understood

14  my questions today?

15      A.    Yes.

16      Q.    Have I been courteous and

17  respectful to you in my questioning?

18      A.    Yes, and I hope I have been too.

19      Q.    You have, Mr, Sobota, and I

20  appreciate your time.  If you could send

21  Mr. Fratus a copy of that Dr. Quintiere

22  thing, I would appreciate it.  And for now

23  I will pass the witness.  I have no further

James Sobota                                        6/28/2023

Page 126

1    questions.

2        A.    Okay.  Is that the only thing

3    that you wanted?

4        Q.    Well, I do want -- if you've got

5    materials from that smoking class and the

6    lithium-ion class.

7        A.    Yeah.  Like I said, the only

8    thing I have are my notes.  They don't

9    provide handouts or things like that.

10       Q.    Okay.  I would be interested in

11   those, your notes.

12             MR. BROWN:  And the CV with the

13   two updated depositions.

14             MR. YEAROUT:  Yeah.  I don't see

15   that in my file, Chuck.  It's not a big

16   deal for purposes of today, but if I could

17   get an updated CV, that would be great.

18             And before I pass, I've got

19   Defendant's 1 as the depo notice.

20   Defendant's 2 as Mr. Sobota's report.

21   Defendant's 3 as Mr. Sobota's notes.

22   Defendant's 4 as the PowerPoint collection

23   of scene photographs.  Then I have

James Sobota                                                    6/28/2023

                                                            Page 127

1    Defendant's 5 as that lab exam photograph

2    that we discussed with the drywall

3    compound.  Is that correct, Madam Court

4    Reporter?

5              COURT REPORTER:  Yes.

6              MR. YEAROUT:  I have no further

7    questions right now.  Thank you for your

8    time, Mr. Sobota.

9              MR. FRATUS:  I do not have any

10   questions.  And Mr. Sobota, as you probably

11   remember, you have the right to read and

12   review or you can waive that right assuming

13   that the court reporter is taking

14   everything down.  Typically experts read

15   and review and then are provided with an

16   errata sheet to make any necessary changes,

17   spelling and such.

18             THE WITNESS:  I waive.

19             MR. FRATUS:  Okay.

20      Q.    (BY MR. YEAROUT) And I'm sorry, I

21   have one more.  Famous last words.  Have

22   you told me today the full extent and the

23   entirety of your opinions in this case that

James Sobota                                              6/28/2023

                                                    Page 128

1    you intend to offer at trial in this case?

2         A.    Yes.

3         Q.    All right.  No further questions.

4

5               (The deposition of James A. Sobota

6               was concluded at 11:46 a.m. on

7               July 28, 2023.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

James Sobota                                          6/28/2023

Page 129

1                    C E R T I F I C A T E

2      State of Alabama

3      St. Clair County

4         I hereby certify that the above and

5      foregoing deposition was taken down by me

6      in stenotype and the questions and answers

7      thereto were transcribed by means of

8      computer-aided transcription, and that the

9      foregoing represents a true and correct

10     transcript of the testimony given by said

11     witness upon said hearing.

12        I further certify that I am neither of

13     counsel, nor of kin to the parties to the

14     action, nor am I in any way interested in

15     the result of said cause named in said

16     caption.

17

18                 /s/Danielle Leigh Bowman

19                 DANIELLE LEIGH BOWMAN, CCR

20                 CCR#651, Expires 9/30/23

21                 Commissioner for the State

22                 Of Alabama at Large

23                 My Commission Expires 1/22/2024

James Sobota
6/28/2023

## A

**a.m** 1:20 2:13 6:11 116:6 128:6
**a/s/o** 1:10
**ability** 8:17
**able** 41:2,7 117:16
**Abraham** 39:6 39:19
**AC** 69:2
**account** 61:11 75:7
**accurate** 85:20 85:22
**act** 97:22 100:13
**acting** 6:4
**action** 1:5 129:14
**activities** 69:15 118:4
**activity** 58:14 119:10,11,15
**actual** 83:14,16
**add** 112:8
**addition** 26:15
**additional** 27:3
**additions** 25:21
**address** 9:3
**administration** 30:16
**admitted** 96:1 96:16
**advance** 34:12
**advised** 3:14
**aerosol** 86:15 118:17,22
**affect** 11:6
**AFIC** 43:3
**ago** 7:12 36:3 45:7 49:4 79:5
**agree** 37:3 46:13 59:13,22 60:1 62:21 84:23,23 93:9,14,19

94:1,5 95:22 95:23 98:12,22 98:23 99:1,11 101:17 124:20
**agreed** 2:4,15,22 60:19 118:7
**ahead** 9:20 16:4 64:19 66:12 74:15
**aide** 111:10
**Alabama** 2:11 3:8 5:15 6:3,4 6:6,10 129:2 129:22
**alkaline** 86:7 89:17
**alleged** 29:20
**allegedly** 21:9 21:16 22:7
**Allen** 7:6
**Allstate** 15:23 16:4,6
**alternative** 51:17
**amended** 3:9
**AMERICA** 1:13
**amount** 71:23 76:15 80:7 102:18 103:2
**amounts** 13:6
**analysis** 22:10 53:16 109:22
**analyze** 50:12 51:12
**and/or** 74:17 99:4
**animations** 44:9
**Annapolis** 5:6
**annotate** 76:5
**annotated** 44:7
**annotations** 44:4 89:8
**annual** 46:8
**answer** 8:1,5,16 48:13 62:4 88:16 99:11

**answered** 23:19
**answers** 129:6
**anybody** 80:18 92:1
**apart** 73:23
**apologize** 69:20 102:4 106:10 125:3
**apparently** 18:14
**appear** 114:11
**appeared** 119:17
**appears** 43:12
**Appendix** 26:9
**applicability** 38:1
**apply** 113:22
**appreciate** 60:17 62:2 125:20,22
**approach** 34:16 64:21
**approximately** 2:13 6:11 16:16 32:9 67:4,11 73:23 74:11 93:11,21 116:5,9,13,22
**arc** 63:21,22 119:7
**arced** 119:19
**arcing** 119:2,9 119:14
**area** 59:19 63:13 64:12 65:6 69:1,19 70:8 70:17 73:6 91:17 101:2 115:1 119:17 120:17,22 122:23 123:4
**arranged** 78:6
**arrangement** 78:5,8
**arrow** 72:19

**Arson** 32:23
**article** 29:11 30:2,11 98:14
**articles** 95:19 96:9
**articulate** 33:23 61:6
**ashtrays** 117:5
**asked** 18:3
**asking** 11:17 17:2,9,21,23 18:4 22:15 68:14
**aspect** 11:5 125:8
**assign** 3:3
**assist** 100:4
**Association** 49:12
**assume** 12:11 29:17 94:9
**assuming** 127:12
**ATF** 37:12 39:6 39:19 83:5
**attack** 99:6,15 101:9,21 105:21 112:9 112:15,22
**attacked** 84:20 96:2 110:9 111:2 112:1
**attempt** 56:16
**attendance** 41:9
**attorney** 16:2 28:1,3,4 38:16 39:10
**attributable** 78:8
**attribute** 77:22
**attributed** 53:9
**authoritative** 23:23
**available** 46:4 56:14
**Avenue** 41:15

41:17
**avoid** 124:9

## B

**B** 26:9
**B-U-T-T-A** 37:16,17
**back** 13:19 26:15 31:17 33:11 38:8 39:8 45:5 47:6 47:9 49:4 55:7 59:2,3 64:18 67:20 69:7,12 75:10 81:20 85:13 89:4 90:12 93:15 100:12 102:3 108:13 120:7 123:21
**background** 8:21
**bad** 124:5,7
**Baltimore** 5:6
**banging** 54:4,10
**base** 76:14
**based** 10:15 25:18 60:3 75:3 78:13 79:4 95:13,14 96:8,15 98:13 100:21 104:9 109:15 110:5 110:20
**basement** 70:4 72:11 101:3 102:12 103:16 104:3 115:17 115:18 116:10
**basic** 36:17
**basically** 40:3 53:1 60:6 62:7 63:14 64:20 73:14 79:20 82:2 100:10
**basis** 20:11,18

53:11 72:23
80:20 96:6
98:5,7 101:12
101:14,18
105:10
**batteries** 21:9
21:16 22:1,7
29:13,15 30:2
30:14 38:13
39:5,18,21
40:2,4,5 47:11
49:4 53:10
78:18 81:9,23
83:22 84:2
86:8 89:13,16
89:17 95:12,15
96:21
**battery** 12:16,20
13:10,11 22:13
22:16,22 23:3
23:6,9,14
29:21 30:22
46:14 47:4,16
48:3,6,19
51:18 53:18,22
72:6,10,14
73:15,22 74:10
74:17 75:15,18
75:20 76:11
77:8 78:22
80:21 81:13,14
83:3,17,23
84:13,19 85:2
85:23 94:10,13
95:16 96:2,10
96:15 97:1,12
97:13 98:2
99:2,21 100:17
101:5,8,20
105:4,6,8,11
105:12,14
107:19 113:8
113:13 115:16
115:17,23
117:22
**battery's** 84:11

96:22
**Bear** 69:19
114:6
**beat** 25:16
**beginning** 31:14
**belief** 111:3
**believe** 13:21
14:5 16:12
22:17 24:15
29:14 32:1,15
34:15 35:19
37:9,13 39:14
39:15 43:18
53:6 57:2 65:8
70:7,12 71:21
73:2,4 83:4
85:9,22 86:9
88:5 100:22
102:13 106:8
106:23 108:13
117:19
**believing** 59:16
**Ben** 5:11
**beneath** 122:3
**best** 8:16 17:11
20:1,2 34:11
115:3
**bet** 30:7
**better** 112:5
**bias** 123:23
124:2,10,13,14
124:16,20
**Bible** 24:8
**big** 90:15 92:4
106:16 120:10
126:15
**biggest** 33:7
46:1
**billing** 32:6
**bills** 33:6
**bin** 86:7
**bins** 43:19
**Birmingham**
2:10,11 5:15
6:3,9,10
**bit** 13:19 76:7

85:14 122:6
**black** 102:11,17
102:21 103:5
103:15 104:2
104:16 106:16
120:17,22
121:20 122:3
**blamed** 18:17
**blast** 80:12
**blew** 113:17
**blown** 114:2
**blue** 76:16,22
77:7,17 85:1
85:21 89:9,14
**Blvd** 5:6
**boss** 43:3
**bottom** 70:13,20
70:23
**Bowman** 1:23
2:8 3:10 6:1
129:18,19
**box** 43:14 76:17
76:22 77:7,18
85:1 89:14
**break** 8:6,7,8
32:20 58:22
59:3 102:4
123:18,21
**breed** 93:8
**Bridges** 38:15
39:10
**brief** 59:3 102:3
**broke** 15:21
**brought** 97:22
100:4,14
110:11
**brown** 5:11
122:9 126:12
**bucket** 89:19
**Building** 5:13
**bunch** 16:8
61:15 81:4
**burn** 118:23
120:1,2
**burned** 120:19
121:6

**burning** 94:6,7
94:19
**burnt** 119:21
**Butta** 37:15 83:4
83:6,7
**Butta's** 83:12
**butts** 117:4
122:19,22
123:3

——————————
**C**
**C** 5:1,10 129:1,1
**C-H-R-I-S-T-...**
69:2
**C-I-A-R-A**
57:13
**C-R-I-S-T** 68:3
**C.J** 88:5 100:1,5
110:16
**cakey** 114:23
**call** 8:21 19:6
57:5 65:20
69:11 76:22
117:6
**called** 39:23
41:19,21 42:14
69:3 70:23
**calling** 52:17
66:3 102:20
**calls** 102:10
**camera** 83:21
**candle** 82:4 84:6
94:12 122:13
**cans** 86:15 90:7
90:12,16 99:22
114:16 117:6
118:17,22
**cant'** 87:20
**capacity** 46:19
**caption** 129:16
**care** 24:3,9 88:5
**career** 81:18
118:9
**case** 9:15 10:5
10:12 12:17
13:1,7,20 14:6

14:14,15 19:14
22:10 28:17,20
28:21 30:4
31:13 32:14
33:15 34:18
38:1,6 44:1,11
44:15 47:3,10
47:14,18,21
48:14,17 62:14
63:1 64:8,16
65:6 66:11,19
68:8 95:10
97:14 100:2,6
105:3 120:1
124:15 127:23
128:1
**cases** 16:14,16
17:15 18:10
19:18 20:6,9
20:16 26:20
27:3 34:13
47:7 76:15
**casing** 105:6,7
105:11
**cast** 98:16 99:4
**CASUALTY**
1:9
**CAT** 22:19
**catastrophic**
82:3 98:2
100:16
**category** 50:18
**cause** 6:13 11:11
21:2,7,14,19
22:5 24:2
36:18,21,22
37:4 47:16
48:3 52:2
60:10 61:1
62:11 87:19
117:12 119:15
123:8 129:15
**caused** 21:9,16
22:7 47:4
48:19 51:9
98:19 99:7

117:18 119:22
120:21
**causes** 119:20
**cautioned** 124:9
**CCR** 1:23
129:19
**CCR#651**
129:20
**cell** 76:15 84:14
96:15 98:9
101:1 109:4,5
109:6,8,13
110:8,18 111:1
111:4,13,18,19
111:20,23
112:2,4,19,20
112:23
**cell--either**
112:15,21
**cells** 22:18 23:9
23:15 46:15
82:2 97:1,8
98:3,8,12,16
99:3,4,12
100:17,23
107:19 108:6
111:7 112:19
112:23
**center** 115:1,1
**certain** 36:10
115:6
**certainly** 46:10
**certainty** 49:18
51:23 79:3
96:13 100:19
**Certified** 2:8 6:2
**certify** 6:5 129:4
129:12
**CFI** 29:14 30:19
30:21 35:20
95:19
**chain** 42:7 43:2
115:15
**change** 125:9
**change-out**
86:11

**changed** 79:14
79:19
**changes** 25:3
26:18 27:6,12
127:16
**char** 121:6,20
122:4
**charge** 39:23
40:1,8,11
115:22
**charged** 31:18
31:22 32:1
48:10,10
**charger** 72:7,10
72:14,21 73:4
73:11,16,16,22
74:12,17 75:1
75:15,17,19
85:7,9,23
115:18 116:1
117:22
**Charles** 5:4
**check** 14:6 33:4
33:9 35:15
81:6
**chemical** 12:6
93:2,4 115:8
**chimney** 18:15
18:15
**choosing** 60:15
**Christie** 69:2,10
69:13
**Christopher**
5:10
**Chuck** 16:23
20:9 32:18
126:15
**Ciara** 1:10
10:19 29:4
55:6,8,12
56:22 57:12
**CID** 40:1,8
**cigarette** 117:4
117:12,17
122:16,19,22
123:3,7

**cigarette-indu...**
91:15
**cigarettes** 36:6
36:11,15,18,18
36:22 37:4
38:7 91:10,17
94:5 116:10
118:12 122:15
**circle** 85:6,21
**circular** 92:3
**circumstance**
53:17
**circumstances**
21:3,8,15,19
22:6
**Civil** 1:5 3:8 6:7
**claim** 42:3,11
**Clair** 129:3
**clarification**
107:8
**clarify** 125:10
**Clark** 5:13
**class** 27:21,23
28:14 34:2,9
35:5 36:1
37:20,23 38:12
39:2,9 61:7
82:16 83:4
95:20 96:9
98:15 126:5,6
**classes** 27:12,15
68:6
**clean** 8:1 47:20
99:10
**clockwise** 70:20
**close** 18:14
**closer** 75:21
**collect** 50:9 65:3
**collecting** 55:19
**collection** 43:20
77:1 126:22
**color** 90:22
**combination**
77:3
**combustible**
86:17 87:10

94:19 96:22
115:5
**combustibles**
106:3
**come** 10:14 38:8
94:13 120:7
**comfort** 58:22
**coming** 80:9
102:11,15
103:15
**commencing**
2:12 6:10
**Commission**
129:23
**Commissioner**
6:5 129:21
**companies**
15:11,15,16,18
16:19 17:18
18:1 19:11
32:3
**company** 1:10
15:14 18:17
34:13 43:5,6
**comparison**
90:7,11
**complete** 88:9
115:22
**compliance** 2:18
**complying** 63:8
**components**
115:6
**composition**
93:2,5
**compound**
86:19 115:4,11
127:3
**computer-aided**
129:8
**concept** 59:5
62:5 63:5,10
**concluded** 128:6
**conduct** 55:1
56:21
**conducted** 67:15
**conducting** 71:5

**confirm** 124:17
**confirmation**
124:13,16,20
**confused** 85:5
**connected** 73:16
**connection**
19:10 68:8
82:20
**consensus** 62:22
**consider** 23:23
51:17 64:12
**considering**
79:21
**consist** 77:3
**consistent** 112:7
123:11
**constant** 54:8
**construction**
40:3
**consult** 123:15
**Consultants**
33:1
**consumed** 91:8
91:10 118:12
123:5
**contain** 92:10
97:15 107:1
**contained** 23:9
92:11,12 97:2
106:8 107:10
**container** 89:12
89:20,23 90:4
90:14,20 91:1
91:6,7,22 92:4
92:11 94:14,17
94:20,21 95:2
99:20,21
106:16
**containers**
86:15 117:5
**containing**
94:14 122:19
**contains** 53:13
**contents** 40:4
46:16 98:18,19
99:3,13 101:1

107:1,9 110:8
111:1
**context** 17:19
**continuing**
27:13,16
**contractor** 69:1
**conveyed** 90:10
**convincing**
75:14
**cooking** 58:7
**copper** 113:10
**copy** 14:7 26:8
125:21
**cord** 119:5,13
119:19 120:3
**corpus** 59:5,21
60:12,19 62:6
63:3,10
**correct** 7:14 8:4
25:6 36:16
37:17 41:12
43:5 51:14
56:3 88:20
109:19 114:12
114:20 115:19
116:13 119:11
127:3 129:9
**corrected** 70:15
**correctly** 89:12
**corruption**
39:23 40:1
**counsel** 2:6,23
3:2 6:8 129:13
**count** 31:17
**County** 17:5,7
18:20,21 46:21
47:1 129:3
**couple** 24:19
100:1 103:11
103:13 104:6
123:15
**course** 35:19
37:18 40:13,15
49:8 71:16
117:23 123:2
**courses** 27:13,15

38:23
**court** 1:1,22
2:19 3:15,16
6:20 7:21
127:3,5,13
**courteous**
125:16
**courthouse**
10:14
**covers** 21:11
**craft** 86:14,21
87:1,7
**created** 44:8
**Crist** 68:3 74:16
80:16 86:13,20
**Crist's** 71:22
**cross** 41:2,5
**CT** 109:20
**cup** 86:8 88:23
90:14
**current** 24:4
26:12 40:9
**currently** 8:22
**cursor** 70:1 76:8
85:8 120:15
121:2
**CV** 26:10,12
126:12,17

---

**D**

**D** 4:1
**dadgum** 80:2
**damage** 98:8
111:9 119:18
**damaged** 64:23
64:23 111:7,18
112:4 120:2
**damages** 13:1,3
13:4,5,6
**Danielle** 1:23
2:8 3:10 6:1
129:19
**data** 50:10,12
55:19 60:3,4
65:4 124:16
**date** 6:6 14:1

26:14 66:17,23
67:14,15 75:18
118:4
**dated** 27:2
**David** 38:15
39:9
**day** 14:3,9 58:15
66:23 78:15
**days** 78:15
**dead** 97:18
**deal** 8:15 33:8
126:16
**December** 11:4
25:9 27:2
38:11,22
**decision** 110:17
**deductive** 51:1
**defeat** 30:12
**defect** 29:20
**Defendant's**
4:14 45:2
65:14,17,19
76:19,23 79:19
85:1 106:14
107:3,12
114:14 120:6
122:8 126:19
126:20,21,22
127:1
**Defendant(s)**
1:14 5:9
**defense** 18:5,8
18:10
**deferring** 29:18
**define** 50:6
63:12
**defined** 63:14
70:8
**defining** 64:12
70:17
**deformed** 109:6
111:19
**degree** 79:2
86:18 96:13
98:8 100:19
121:6

**degrees** 93:11
93:21 94:3,7
**delivering** 3:10
**demonstrative**
44:10
**density** 30:14
**department**
17:6 46:20,22
57:19 58:1
71:7 79:23
80:3 81:5
**department's**
80:22
**depends** 80:10
**depicted** 72:18
**depicting** 83:13
**depiction** 85:20
85:22
**depo** 126:19
**deposed** 7:15
**deposition** 1:16
2:1,6,16,17 3:5
4:11 10:23
27:4 29:1 31:2
33:18 34:12
45:5 53:5,6
54:3,8 65:12
70:12 73:20
74:5 102:5
115:14 128:5
129:5
**depositions** 2:20
10:18 11:3
26:16,19 27:18
28:13 29:3
33:12 34:23
35:5,17 126:13
**Depot** 43:19
**describe** 86:20
**described** 86:9
90:6
**describes**
104:13
**DESCRIPTI...**
4:15
**design** 12:16

**designated**
70:13
**designed** 13:10
115:7
**desk** 9:14
115:18 117:7
**detail** 86:20
**detector** 102:9
103:23 104:15
**detectors** 103:4
103:14
**determination**
109:12
**determine** 110:3
110:7,23
**determined**
109:5
**determining**
21:2,7,14,18
22:5
**develop** 50:15
51:8 65:3,4
81:12
**developed** 52:21
**developing**
60:14
**device** 40:1,10
40:12
**devices** 48:8
**diagrams** 44:9
**diesel** 93:6,7,8
93:10,20
**difference** 18:4
**different** 21:12
22:3 36:5
39:22 40:2,5
62:1,20 71:19
75:6 93:8
119:23
**difficult** 76:8
**direct** 8:14,16
94:23
**directly** 33:2
**discarded**
117:17
**discuss** 68:10

100:8
**discussed** 31:3
49:18 51:23
100:9 106:7
127:2
**discussing**
100:10
**discussion** 102:2
123:23
**dispatched**
116:17
**displaced** 78:17
79:6 80:23
81:2 101:5
**displacement**
78:20
**displacing** 81:14
**disprove** 51:13
124:4,18,23
**disregard** 63:2
**disregarded**
63:5
**distinguish**
111:23
**DISTRICT** 1:1
1:2
**disturbance**
72:1
**DIVISION** 1:3
**document** 41:8
41:19,21 42:14
43:11 45:6,8
45:14,16,21
46:2 62:22
66:3 73:10
**documentation**
28:22
**documentations**
83:8
**documents** 9:13
9:17,21
**doing** 7:10 13:18
15:11,13 16:10
17:4 47:1 58:5
76:6
**Dr** 29:12 96:8

97:4 98:14
125:21
**draped** 119:6
**drawing** 90:17
**drawn** 60:3
**Drew** 42:4 77:4
**drill** 14:20
**driving** 103:22
**drops** 119:20
**drywall** 86:19
115:3,11 127:2
**due** 30:13
**dues** 46:8
**duly** 6:18

_____
**E**

**E** 4:1 5:1,1
129:1,1
**e-mail** 41:18
42:2,3,8,17
43:2 46:4,10
**e-mails** 42:18
**earlier** 37:9 83:3
95:19 106:7
125:4
**easier** 35:19
93:16
**eastern** 125:5
**edition** 24:18
25:4,10,18
49:19 52:1
**editions** 25:16
**education** 27:13
27:16 110:6,21
**Edwards** 14:13
**effect** 2:18
**effective** 3:9
**efforts** 77:23
78:9 79:7,10
79:13,17
113:19
**eight** 34:2,8 35:5
**eight-hour**
28:14
**either** 41:3
46:18,23 54:15

57:23 84:16
108:23 112:9
**elaborate** 74:13
125:10
**elapsed** 103:3
**electric** 18:17
**electrical** 12:4
22:17 52:4,12
100:3 110:11
119:10,11,13
119:14,19
**electrodes**
113:11
**electrolyte**
96:22 97:2,8
97:11,15
**electronic** 43:12
**electronically**
46:4
**eliminated**
59:17
**elimination**
59:14
**emanating**
104:2
**endeavor** 45:14
**endothermic**
115:7
**energized** 87:21
88:1,11,18
**energy** 30:14
**engineer** 11:22
12:2,4,6,8
22:17 100:3
110:12
**engineering**
12:12
**entirety** 44:14
127:23
**Erie** 15:20,23
16:4,6
**errata** 127:16
**essentially** 60:20
**estimate** 17:3
92:14,16
**estimating**

57:11
**evaluate** 33:22
61:5 65:1
**event** 83:16
**events** 104:12
**eventually** 94:16
**Everybody**
125:6
**evidence** 3:6
41:17 43:20
59:20 60:8,22
62:9 91:16
118:13 119:14
122:21
**evidences** 59:9
**exactly** 32:8
75:10 108:8,16
**exam** 4:20 41:16
114:11 119:8
127:1
**examination** 4:6
6:13 7:1 49:16
51:22
**examined** 6:18
**example** 58:6
**examples** 36:7
**exams** 22:15
100:11
**exclusively** 19:2
**exemplar** 23:3
**exhibit** 44:20
45:2 65:14,17
65:19 76:19
114:8,14
**exhibits** 3:13 4:9
4:10,14
**exists** 59:20
**exothermic**
105:13,20
**expectation**
123:23 124:2,9
124:14
**expel** 98:17,18
99:3,13 100:23
105:5
**expelled** 46:16

57:11
**expels** 105:14
**experience** 21:1
21:6,11,13,18
22:4 57:16
58:2,12 110:6
110:21
**experienced**
84:14 91:13
**expert** 11:10,12
14:16 15:18
16:11,19 17:16
18:2 19:2,3,11
20:17 22:18
24:2 38:12,16
47:2 57:22
58:1 61:6
**experts** 127:14
**Expires** 129:20
129:23
**exploded** 113:16
**explosion** 53:3
**explosions** 30:13
**extension** 119:5
120:3
**extent** 25:17
121:6 127:22
**external** 46:14
84:12 98:20
99:6,14 101:9
101:21 105:21
112:9,15,22
**externally** 96:3
111:23
**extinguished**
71:12,15

_____
**F**

**F** 129:1
**fact** 60:7,20
61:21 79:22
97:14 100:22
102:16 117:3
118:11 124:8
**facts** 124:16

fading 118:1
Fahrenheit
  93:11,21 94:3
FAIC 31:23
  32:13 33:2
  41:19,22
fail 81:23 82:3
  95:15,16
  105:18
failed 108:6
  109:5,8,13
  110:10 111:4,8
  111:13,19
  112:1,3,14,20
  112:21 124:22
fails 94:11 105:4
  105:13
failure 29:19
  78:17,21 84:14
  98:2 100:17
  111:4 112:10
  112:16,22
fair 12:10 29:17
  32:4 63:10,11
  66:4 77:7,10
  78:9 85:15,16
  85:20,21 112:6
  112:10,11
  114:19
Fairfax 17:5,7
  17:11 18:20,21
  46:21 47:1
familiar 39:1
  49:8 59:4
  104:23 123:22
Famous 127:21
far 10:16 103:17
Farm 1:9 9:5,6
  11:10 14:13,17
  15:17 17:22
  20:17 32:13
  33:3,4 42:2,10
Farm's 13:6
farther 72:11
fatality 18:16
Federal 41:15

Fernandez 11:1
  29:5 55:6,8,11
  56:8,22 57:10
  65:12 73:10,14
  75:4 90:10
  92:2 113:19,21
  116:9,22
Fernandez' 75:9
  115:14
field 23:23
file 14:6 26:3
  28:20 31:10
  32:19 35:11
  40:17,18 41:1
  41:6 42:3
  43:15,22,23
  44:6,14 45:19
  126:15
filed 3:16
files 31:22 35:10
  35:16
filled 90:20 92:7
final 51:5 60:15
  88:8
find 59:8 60:7
  60:21 61:21
  62:10 74:4
  91:16 114:7
  122:21
findings 100:9
finish 38:9
fire 1:9 11:11
  14:1,4,10,16
  17:5,16 18:15
  18:19 19:2
  24:1,4,8,16
  32:23 36:12,13
  36:15 42:10
  46:14,20,21
  47:4,16 48:4
  48:20 49:11
  51:9 52:3,9
  53:2,18 55:13
  55:16 56:3
  57:16,18,23
  58:6,12,15

59:16 60:11,20
  60:22 61:1
  62:9,11 63:13
  63:14 64:6
  65:1 67:10
  68:17 71:7,14
  71:18,19 74:16
  75:8,18 77:9
  77:22 78:8,15
  78:16 79:2,7
  79:10,12,17,23
  80:2,3,8,14,22
  80:22 81:5,6,8
  81:18 84:12,20
  85:10 86:5
  88:1,12,19
  91:8,11,15
  95:4 96:3,13
  98:20 99:6,14
  100:19 101:9
  101:21 103:18
  104:4,5,8
  105:21 110:9
  111:2 112:1,9
  112:15,22
  113:18 114:1
  116:15 117:13
  117:18 118:12
  119:20,21
  121:22 123:5,9
fires 17:12,22
  21:4,8,15,20
  21:22 22:6
  30:13,22 36:7
  36:19,23 37:5
  47:10,13,22
  48:7,15 49:5
  57:23 64:22
  87:19 118:5
firm 28:6,7
first 6:18 30:10
  41:8 49:4
  51:17 95:11
  96:14,20 97:23
  100:15 104:14
five 11:15 15:12

16:11 19:22
  30:10 58:22
  77:18 92:22
  94:14 95:3
  103:9 123:18
Flaherty 22:18
  29:18 70:13
  100:1
flames 82:4
  94:12,13
flash 93:10,16
  93:18,20 94:2
  95:9 115:10
floor 72:10
  107:19
flowed 80:10
fluid 94:22
flute 18:14
FMEA 22:10
focus 83:9 120:7
foil 113:10
follow 49:23
  62:14,17,18
followed 62:14
following 6:14
follows 6:19
footage 83:15
force 2:18
foregoing 6:7
  129:5,9
Forgive 125:7
forgot 54:16
forgotten 125:4
form 3:1 53:13
formulate 33:22
  61:6
formulating
  61:3,8
forth 75:10
forward 42:1,2
  69:18
found 45:22
  59:17 98:9
  101:2 118:13
four 65:13 70:23
  72:2 75:2

77:18 78:7
  97:21 100:12
  100:13 101:14
  101:19 120:8
  120:23
FRANKLIN
  5:12
Fratus 5:4,5
  6:23 19:16
  20:6,18 32:16
  32:21 33:10
  40:19 42:8
  46:5 47:17
  49:2 125:21
  127:9,19
free 94:7
front 13:14,17
fuel 51:18 86:11
  89:2,23 90:22
  90:23 91:21
  92:11,13 93:1
  93:3 94:15
  95:3,6,11
  96:14 106:4,5
  106:6,20
full 2:18 24:13
  80:12 86:7
  88:8 92:9,9
  127:22
furnace 86:11
  90:21 92:8
further 2:14,21
  39:8 114:18
  125:23 127:6
  128:3 129:12
fussing 99:9

_____

G

gas 52:18 53:2,8
  53:9,22 102:8
  105:14,15
gases 53:10,13
  53:14,19 95:12
  96:1,15 105:4
gasoline 94:2
general 93:15

James Sobota

6/28/2023

**generally** 7:19
59:4
**generated** 11:4
25:8 49:15
**generically**
112:4
**gentleman**
37:11 39:17
**getting** 22:2
85:5 125:6
**giant** 120:10
**girl's** 86:14
**gist** 60:11
**give** 7:23 8:16
10:9,14 11:11
16:15 17:3,9
20:1 33:18
34:11,11 40:15
104:1
**given** 27:23 34:9
39:5 129:10
**gives** 32:9
**giving** 12:12
27:18 28:12
33:11 34:22
35:4
**glass** 122:14
**go** 7:19 8:3 9:20
16:4 20:18
26:13,14 31:17
33:2 45:11
47:6,9 50:6,21
51:4 55:7 59:2
64:19,22,23
66:12 70:20
74:15 75:12
89:4 101:23
103:23 107:14
**goes** 104:15
106:4
**going** 12:11,15
12:19,23 22:20
25:23 26:1,3
26:22 29:18
38:8 40:19
44:19,20 45:11

57:6 58:20
65:16,17,18,19
65:22 67:23
68:20 76:5,21
76:23 77:1
85:4,6 88:5
89:4 100:12
102:9 103:5,14
112:13,14
114:7 120:5,7
123:15,16
125:3
**good** 7:2,3 8:1
57:6 76:15
107:7 124:5
**gotcha** 25:15
52:11
**gotten** 113:18
**great** 126:17
**gross** 109:16
**ground** 7:19
113:14,20,22
**grounds** 3:4
**GROUP** 5:5
**guess** 32:11
36:17 61:12
93:7 96:21
112:3 115:3
**guide** 62:12,13
62:16 63:2
**Gwen** 14:13

---

**H**

**H** 5:11
**habit** 7:20
**hair** 21:12 22:3
**half** 57:11
**hand** 92:3
**handouts** 35:3
126:9
**handy** 114:9
**happen** 58:9
**happened** 83:16
118:8
**happens** 58:17
106:1 118:8

**happy** 103:1
**hazards** 30:15
**head** 16:9 28:2
**hear** 9:8 82:21
**heard** 40:11
53:7 54:16,17
102:7,9 104:14
**hearing** 23:19
54:4 102:19
103:3,14
129:11
**hears** 103:22,23
**heat** 53:13
**heats** 105:14
**heavily** 120:2
**heck** 35:8
**held** 92:2
**help** 57:3 68:23
**Hernandez** 86:9
**hesitating** 48:5
**hey** 34:17 57:6
**high** 30:14 37:2
82:13
**highlighted** 27:8
68:23
**hired** 11:10
14:15 15:18
16:1,18 17:16
19:10,14,15
20:17 66:20
**hissing** 54:5,9
102:7,19 103:4
103:14,23
104:14
**hold** 79:1 96:11
100:18,20
**holding** 32:8
**home** 43:19
56:13
**homeowners**
58:3
**hope** 125:18
**Horner** 16:2
**Hornick** 42:4
**Hornick's** 77:5
**hose** 80:3,9,22

81:18
**hot** 105:5,7,11
105:15
**hour** 16:20,22
31:19 32:1,4
34:2,9 35:5
38:12 57:11
58:21
**hours** 29:9
31:16,18 36:2
68:1 116:18,22
117:9,11
**house** 8:23
102:14 103:16
104:3 116:12
116:23
**housekeeping**
44:19
**huh-uhs** 8:3
**hundred** 15:1,2
57:4
**hundreds** 36:22
37:4 40:21
**hungry** 125:7
**hypotheses**
50:15,22 51:8
51:13 52:2,21
**hypothesis** 51:5
60:14,15 65:4
81:13 124:3,17
124:21,23
**hypothetically**
94:10

---

**I**

**IAAI** 46:7
**idea** 62:7 113:20
**identification**
45:3 65:15
76:20 114:15
**identify** 50:4
**identifying**
59:15
**ignite** 93:16
94:13
**ignited** 51:18

95:11 96:14,20
98:1 100:15
105:5,15 106:4
**ignition** 36:3,6
37:10,19 59:16
59:17 60:2,9
60:23 61:16
62:8 63:18,19
65:2 97:23
100:14 104:19
104:20,21,22
105:2 106:2
**III** 5:11
**imagine** 92:5
**impact** 52:20
**important** 23:12
23:13,21 55:21
**inadvertent**
117:17
**inappropriate**
62:6
**inappropriately**
59:15
**incendiary** 52:4
52:5,12 59:10
**inches** 73:23
74:11
**include** 54:4
**included** 87:3
**including** 64:4
**income** 19:9
**incorrect** 74:19
**indicate** 61:19
69:3 73:12,14
116:8 120:18
121:18 122:1
**indicates** 119:9
**inductive** 50:19
**INDUSTRIES**
1:13
**infer** 111:8
**inferences** 60:3
**information**
10:8 52:15
56:9 65:3
66:10 67:12

86:6,23
**initially** 94:21
**ink** 89:9,9,9
  111:12
**inside** 115:17
**inspection** 22:14
  42:18 67:14,16
  88:3 108:17,19
  108:22
**inspections**
  108:15
**installed** 18:13
**installer** 18:13
**instruction**
  35:20
**insulation** 18:13
  18:13
**insurance** 1:9
  15:11,14,14,18
  16:19 17:17
  18:1 19:11
  32:2 34:13
**insured** 41:18
**insurers** 58:2
**intend** 128:1
**intentionally**
  52:9
**interested**
  126:10 129:14
**internal** 84:14
  111:4,9 112:9
  112:16,22
**internally**
  105:19 110:10
**interpret** 92:8
**interpreted**
  86:10
**interrupt** 9:20
**Interrupted**
  40:12
**Interrupter**
  40:9
**interruption**
  102:4
**interview** 55:2
  56:5,11,16

57:8,9,14
  69:10
**interviewed**
  55:8
**interviewing**
  55:20
**interviews** 56:22
**inverse** 67:22
**investigate**
  14:16 64:21
**investigated**
  17:12 47:3,14
  47:22 48:1,16
  48:18 91:15
**investigating**
  47:14 49:5
  57:23
**investigation**
  19:3 24:16
  33:1 55:22
  63:1,8 71:6
**investigations**
  24:4
**investigator**
  17:17 24:1
  43:6 57:17
  58:12 60:21
  62:10
**investigators**
  59:21 124:8
**invoice** 32:12,13
  42:14
**invoices** 32:17
  33:5
**involved** 32:6
  47:10
**iPad** 9:17,21
  41:3
**iron** 87:18,23
  88:4,10,18
**irons** 87:19
**issue** 12:17,21
  97:14
**issues** 82:20
**items** 86:16 87:8
  87:10 106:7

107:10
_____

**J**

**J** 5:4
**James** 1:17 2:7
  4:4 6:12,17 7:6
  128:5
**jet** 94:12
**John** 68:3 71:21
  86:13
**joint** 41:9
**Jonathan** 37:15
**jpeg210068** 76:4
**Juan** 10:23 29:4
  55:5,11 65:12
**judgment** 17:11
  20:1,3 103:10
  103:11 104:6
**July** 36:2 108:18
  108:21 128:7
**June** 1:19 2:12
  3:12 6:12
  108:18,20,21
  109:1,11 111:3
  111:16
_____

**K**

**K-I-R-K-'-S**
  24:11
**keep** 14:18 15:6
**keeping** 19:19
**kidding** 49:5
**kin** 129:13
**kind** 28:6,21
  53:8 89:16
  92:2 108:9
  115:1
**Kirk's** 24:10,16
**kitchen** 58:6
  102:9
**knew** 38:21
**know** 7:18 8:2,6
  8:20 16:7
  19:20 20:9
  22:14,14 23:5
  23:8,13,18,20

31:20,21 35:3
  37:1 39:15
  42:22 43:4,13
  44:4 46:6
  49:19 52:7
  53:4,21 61:22
  62:19 64:20,22
  68:2 74:21
  76:6 77:18
  78:12,12,14
  80:13 82:19
  84:9,15,16
  85:18 87:3,6
  87:22 88:9,17
  88:21 90:23
  91:22,23 93:3
  93:4 95:22
  97:1,7,12 99:5
  103:8 108:14
  110:3,4 113:14
  113:15 114:22
  115:10 118:18
  120:13,21
  122:11 125:2,5
**Knowing** 53:12
**knowledge**
  21:10
**known** 59:18
_____

**L**

**L** 2:3
**L-O-N-G-M-...**
  9:6
**lab** 4:20 22:15
  41:16 88:3
  100:11 114:11
  119:8 127:1
**lack** 18:17 78:13
**Lane** 9:5,6
**Large** 2:10 6:4
  129:22
**Larry** 42:14
  43:9 69:1,10
  69:14
**latching** 43:13
**law** 5:5 28:7

**laws** 2:19
**lawyer** 33:14
  34:10 35:6
  39:13
**lead** 49:14
**leading** 3:2
**learn** 30:4 33:17
  34:8
**learned** 28:14
  33:13,21 37:22
**learning** 38:10
**leave** 8:7 17:7
  100:13
**leaves** 116:12
**left** 18:21 58:7
  61:12 70:14,21
  70:21 72:19
  73:22 74:11
  78:6 87:14
  116:23
**Leigh** 129:18,19
**lengths** 99:5
**let's** 11:14 14:20
  20:18 35:23
  38:15 55:7
  58:5 59:2
  75:12 76:21
  83:9 87:4
  104:22 107:14
  112:12,13
**letter** 41:16
**letters** 30:10
**levels** 49:17
  51:23
**light** 43:8 53:12
  95:4
**lighted** 36:18,21
  37:3
**LIGHTFOOT**
  5:12
**lightning** 61:17
  61:17
**limited** 64:5
**line** 34:17 67:4
**liquid** 86:10
  89:1 90:20

92:7 93:10,15
93:19 94:2,20
96:22 97:2,7
97:10,15
list 33:5
listed 86:17 87:9
listen 31:1 33:21
listening 29:23
61:13 75:8
literature
117:11
lithium 38:13
48:6
lithium-ion
13:10 21:9,16
22:1,7 29:13
29:15 30:1,2
30:13,21 39:5
39:17,21 40:5
46:13 47:11,15
48:3,19 49:3
53:18,22 78:18
78:21 81:14,22
83:3,17 84:10
84:13 96:2,10
96:14 98:2,15
98:16 99:2
100:17 101:8
101:20 115:16
126:6
little 13:19
44:17,18 58:21
67:3 76:7 80:1
80:6 85:14
86:14 89:18
90:11 122:6
LLC 5:5,12
located 8:22 9:1
75:21 77:8
84:3 85:2,9
86:1,4
location 72:21
74:23
log 41:17
logical 60:3
long 29:7 57:9

57:13,18 67:18
longer 104:5
Longmoor 9:5
look 24:15 26:23
28:21 37:14
41:1 46:11
47:7,9 115:9
119:1 123:17
looked 20:10
31:21
looking 14:6
37:8 70:3
79:21 81:1
89:19 98:13
99:20
looks 42:2
loss 66:23
low 71:23,23
lower 93:16,18
lunchtime 125:6

M

M-Y-L-I-K-A
42:23
Madam 7:20
127:3
maintenance
18:18
makeup 87:6
making 71:11
74:3
manual 24:4,16
manufacturer
12:20 23:8
mapping 63:21
63:22
March 27:10,17
30:17
marine 21:4,20
mark 7:23 40:20
40:21 44:19
65:17,18 76:23
97:16 114:8
marked 4:10
45:3 65:8,15
76:20 114:15

marker 111:9
marshal 74:16
75:8
MARYLAND
1:2
match 73:4 95:1
material 97:23
100:15
materials 10:8
26:4 30:15
31:10 32:19
35:2,4,12 36:3
36:8 37:8,10
37:18,19 38:10
38:11 40:14,16
40:18,18 41:6
43:22 44:1,6
44:10,14 45:15
45:19,20 95:22
96:20 126:5
math 32:11
matter 17:20
28:20 30:4
34:14
MD 5:7
mean 8:11 9:19
13:3 33:17
49:19 52:7
54:14 57:5
59:7 60:10,23
61:14 62:17
66:7,17 67:10
71:10 94:17
104:12 113:16
118:18 123:2
means 51:15
52:8 59:8 66:8
67:4,9 82:3
89:20 129:7
meant 125:3
measurers
107:18
mechanical 12:8
meet 57:7 68:5
melt 94:19
member 37:11

37:12
memory 118:1
mentioned 54:2
88:23 100:1
113:23
met 7:10,11,12
68:4
method 38:18
49:23 50:2
51:7,16 55:19
63:9 81:11
112:7 123:12
124:11
methodology
38:17
Michael 31:22
32:22 39:6,19
43:2
Mike 33:4
mind 79:20
mine 67:22
minimum 93:12
93:20
minute 27:2
58:22 103:8
123:18
minutes 7:11
57:15 103:9,9
103:12,13
104:1,7 115:21
misremember
58:14
misremember...
58:4
misremember...
118:2
misrepresent
58:13
misrepresenta...
118:3
misrepresented
58:4
misstate 58:13
misstated 58:3
misstatement
118:3

mode 29:20
model 23:5,14
97:12
modem 87:13
moralization
38:20
morning 7:2,3
117:21
move 35:23 62:3
82:12
moved 79:17
moving 81:6
MSDS 115:9
multiple 83:23
Mylika 42:19

N

N 2:3 4:1 5:1
name 7:4 16:6
28:2,5 30:11
30:18,20 39:16
46:19
named 16:2
129:15
names 16:7
26:20
National 49:11
natural 52:18
102:8
near 90:21
122:23
nearby 106:3
107:19
nearly 91:1
necessarily
40:22 51:15
60:10,23
necessary 2:22
127:16
need 8:5 10:4,9
16:23 34:2
50:4 68:22
105:17 125:9
negative 59:5,21
60:12,19 62:6
63:3,10 94:3

neither 55:11
129:12
net 30:21 35:20
95:20
nevertheless
87:8
new 69:2
NFP 9:19
NFPA 9:16,22
9:23 24:7,19
25:11,19 49:8
49:20 50:3
55:20 59:3
62:7 63:2
112:7 123:22
124:6
NFTA921 52:1
night 29:6 54:7
73:19 102:6
noises 102:7,20
103:4,23
104:14
North 1:13 5:14
NORTHERN
1:3
Nos 65:14
Notary 2:9 6:3
notations 74:3,4
note 53:6 66:9
69:6 71:4
72:19 111:6
112:8,14
noted 88:15
notes 4:18 26:2
28:21 31:8
37:14 40:16
41:4 44:7 47:9
54:3,3 56:18
56:20 65:20
66:4 68:11,20
69:22 73:12,14
74:23 88:2
89:5,5 90:19
92:6 107:15
113:5 116:8
117:19 123:17

126:8,11,21
notice 4:16
24:17 38:19
45:4 126:19
noticed 119:8
notified 66:18
nozzle 80:11,14
number 1:5
17:10 32:8
37:1,2 65:9
75:21 97:21
106:23 107:5,7
107:9,12
numbered 70:11
numbers 14:19
15:9

O

O 2:3
oath 8:9 47:13
48:1,17 54:19
54:22 96:11
objections 2:23
3:3
observation
101:13
observations
109:16
observe 31:1
119:5
observed 52:15
81:22 103:19
119:2
observes 102:11
observing 84:7
102:20 103:5
occur 61:17
101:7,19
105:21
occurred 58:14
67:10 108:18
odor 53:9
offer 88:8 128:1
offered 3:5
offhand 34:7
office 8:23

115:18
offices 2:10 6:9
oil 89:2,23 90:21
90:22,23 91:21
92:7,11,13
okay 9:1,8,8,10
13:18 20:13
22:2,20 23:17
23:22 25:13
27:1,17 30:18
30:23 32:2,7
33:10,11 34:6
35:2,23 38:8
39:2 40:13
41:8 42:13
43:7,21 44:3
46:3,12 49:1,7
52:11 53:15,21
56:11 57:4
61:9,14,16
62:2 63:7,7,16
64:16 65:16,20
68:19 69:17
73:6,12 75:5
75:12 76:16
77:11 78:19
79:14 80:2
81:10 83:9
84:9 88:16,23
92:14,21 96:5
96:18 97:10
102:16 103:13
104:18 107:14
109:9,15 114:1
117:23 119:2
120:5,8 122:6
126:2,10
127:19
omissions 97:22
100:14
open 43:16
80:11,13 89:23
opened 42:21
opening 42:12
opined 48:2,18
opining 12:16

12:19 13:1
opinion 38:3
53:11 64:17
65:7 75:5 79:1
80:21 81:13
85:19,23 87:9
95:10 96:6,12
96:19 97:16,21
98:6,7 100:12
100:13,18,20
101:14,19
105:11 113:1
114:22 117:16
opinions 10:4,10
10:15 11:6,11
11:14,18 12:12
25:18 29:19
38:18 49:14,15
88:9 127:23
opposed 80:21
opposite 98:10
oral 3:12 6:13
order 10:9 17:13
49:22 53:3
origin 11:11
21:2,7,14,18
22:5 24:1
59:19 63:13
64:13 65:7
68:16 69:19
70:8,18 90:22
91:17 119:17
122:23 123:4
original 3:11
ounces 92:18,20
94:14 95:3
outside 45:19
102:14 104:15
overdoing 15:10
overhauled 71:7
overhauling
71:17
owner 31:23
87:15
oxygen 105:17
105:18

P

P 2:3 5:1,1
p.m 67:11 116:9
116:18,20,21
pack 12:16,20
13:10,11 22:13
22:16,23 23:3
23:6,10,14
29:21 51:19
73:15,22 76:11
77:8 78:22
81:14 82:5,7,7
82:9,12 83:17
84:13,20 85:2
94:10,13 96:2
97:13,14 101:8
101:20 113:8
113:13 115:16
115:23
package 106:4,5
packages 106:6
Packaging
30:12
packs 83:23
96:10 99:2
page 4:6,15
13:13 20:23
49:14 66:3
68:19,19 69:22
70:1 71:2
74:22 89:5
107:14 111:11
113:4
pages 11:15
paid 13:7 16:20
16:22 46:7
paint 86:15 87:4
90:7,12,15,16
91:2,4,5 99:21
114:16
paper 8:3 9:14
29:12 87:4
97:5
Park 5:7
part 39:4,8 43:5

43:22 51:1
53:17 55:18,21
81:3,11 99:17
**partially** 81:7,8
**particular** 38:6
118:20,21
**particularly**
56:1
**parties** 2:5 3:3
129:13
**partner** 43:3,4
**parts** 62:20
101:4
**pass** 125:23
126:18
**pattern** 92:3
**patterns** 63:15
65:1 73:3
119:1 120:1,3
**pay** 32:3
**payments** 13:6
**PE** 12:1
**peer** 117:10
**pen** 97:16
**pens** 87:4
**people** 38:19
66:10 123:15
**people's** 118:1
**percent** 18:7,8
18:10 19:5,9
20:14 57:5
**percentage** 20:8
36:11
**person** 56:23
57:2,8
**personal** 13:5
**pertain** 44:1
**pertaining**
44:10
**Philadelphia**
28:8
**phone** 57:1
69:11
**photograph**
69:20 74:3,5
75:23 77:6

89:6 106:15
108:11 111:14
114:10 122:9
127:1
**photographed**
117:4
**photographs**
76:4 77:2,3,4,5
108:17,22
117:3 118:16
118:22 126:23
**photography**
111:10
**photos** 4:19,20
40:22 44:3,5,7
65:9,10,11
**phrase** 104:19
**physical** 22:12
22:22
**pick** 108:7
**picking** 40:9
**picture** 72:18
73:9 79:18
81:1 85:17
99:19 107:11
108:10,16
111:17 114:8
**pictures** 41:15
41:16 79:21
83:7 118:19
**piece** 60:8,21
73:3 120:11
**pieces** 9:14
**pink** 107:22,23
107:23 108:3
109:3,10
110:13,17,22
**Pipeline** 30:15
**place** 58:15
75:17
**placed** 74:10,17
84:2
**plaintiff** 19:7
28:9 33:14
39:12
**plaintiff's** 4:9,10

34:10 35:6
**Plaintiff(s)** 1:11
5:3
**plastic** 86:7
89:12 94:17
**plausible** 60:9
60:22 62:8
**please** 3:14 7:5
114:6
**podcast** 29:15
30:1,19,20
35:21,22 96:9
98:3 101:13
110:5
**point** 34:21,22
40:20 76:10
90:21 91:17
93:10,16,20
94:2 95:9
110:5 115:10
**pointed** 34:16
**points** 89:13
**poles** 18:18
**popping** 54:5,10
**possibilities**
81:4 114:4
**possibility** 61:20
78:20
**possible** 34:12
61:22 63:18
78:1 98:21
107:13
**potentially** 51:9
**PowerPoint**
77:2 126:22
**premise** 36:17
**preparation**
31:2
**prepare** 28:23
**prepared** 10:13
28:17 33:15
88:8
**present** 55:15
56:2 59:18
64:6
**presentation**

27:22 28:15
36:1 38:12
40:14
**presented** 39:9
**presenter** 37:9
**pressure** 80:8
**pretty** 92:8
**previous** 87:15
**previously**
47:22 48:15
**prior** 3:6
**probability**
61:20
**probable** 61:23
72:20 74:23
78:2,3 79:16
**probably** 25:12
75:21 91:5
111:16 125:6
127:10
**problem** 50:4,7
**Procedure** 3:8
6:7
**proceedings**
6:14
**process** 32:6
38:19 59:14
60:13,16 66:10
**produces** 105:18
**producing** 95:9
**product** 115:9
**professional**
12:1 27:10,11
35:1
**progressed**
103:18
**progressing**
104:5
**propelled** 82:5,6
82:7,8,11
**proper** 124:10
**properly** 26:5
**property** 13:5
49:17 51:22
57:7
**protected** 73:3,6

121:21
**protecting** 94:22
122:2
**Protection**
49:11
**prove** 124:3,15
**provide** 45:15
126:9
**provided** 27:4
45:22 127:15
**Public** 2:9 6:3
**published**
117:10
**pull** 13:14,16
26:22 27:1
**Purcellville** 9:2
9:6
**purplish** 86:10
89:1
**purposes** 126:16
**pursuant** 6:6
**pursue** 20:11
**push** 23:17
**put** 7:22 35:8
72:14,17 73:11
73:15,21 75:11
75:14 76:22
80:14 107:22
108:1,3 109:3
109:10 110:13
110:17,21
111:5 112:14
112:17 115:17
117:22
**puts** 116:2
**putting** 38:19
71:18

---

**Q**

**Q-U-I-N-T-E-...**
30:7
**Q-U-I-N-T-I-...**
30:9
**qualifications**
38:17
**qualify** 49:2

James Sobota                                                                    6/28/2023

quarter 91:5
quench 95:6
question 7:22,23
  8:7,15 18:3
  21:12 22:3
  25:6 33:21,22
  48:13,14 57:12
  62:4 88:17
  102:22
questioning
  125:17
questions 3:1,2
  81:20 125:14
  126:1 127:7,10
  128:3 129:6
quick 41:1 102:1
  104:7,17
Quintiere 29:12
  30:6 46:2 97:4
  125:21
Quintiere's
  95:19 96:8
  98:14
quite 14:19,20
  20:12 48:13
  90:15
quoting 73:13

──────── R ────────
R 5:1 129:1
R-E 42:18
random 120:10
  122:7
rate 16:18 17:1
  31:19 82:13
reach 69:13
reaction 81:9
  84:8,11,13,19
  95:15 105:13
  105:20
read 8:4 27:19
  29:3 54:7
  60:18 68:22
  73:19 83:8
  89:11 90:1
  92:6 98:3

102:5,13
  115:13 127:11
  127:14
reading 2:1,16
  30:1 35:3
  73:20 75:9
real 13:4 102:1
really 4:18
  36:12,13,14
  85:17 96:18
reason 42:10
  48:5 54:16
  101:12 111:5
  118:20,21
reasonable 79:2
  96:13 100:18
reasoning 50:19
  51:2
reasons 52:10
recall 47:13,23
  48:9,17 86:21
  115:14
recalled 54:8
receipt 43:8,8
  43:12,18
received 43:22
recess 59:1
  123:20
recognizable
  108:9
recognize 44:23
recognized 63:9
recognizing
  50:3
record 102:1,2
  123:21
red 89:9 97:16
  111:12
reddish 90:22
reference 9:23
  25:10 41:2,5
referenced
  24:18
references 24:19
  25:13 54:4
referred 59:20

89:1
referring 24:20
  107:4
reflected 11:7
  11:15 56:18
  96:19
regular 86:7
related 9:15
  27:10,12 30:14
relating 2:20
relative 121:19
relatively 58:17
  71:23 77:13
  104:7,16 118:9
release 94:20
relevance 37:23
relied 25:12
rely 25:10
relying 24:18
remember
  26:21 34:7
  47:7 52:16
  54:11,15 56:7
  56:15 61:5
  62:21 68:14,15
  71:8 73:17,20
  74:1,2,2,8 83:2
  83:11,19 84:1
  84:4,5 102:6
  102:12 104:13
  108:15 117:2
  127:11
remembering
  79:22
removed 90:21
render 10:4
report 4:17 11:5
  11:7,16 13:13
  20:23 24:17
  25:9,13 26:2,9
  31:6 44:8
  49:13 65:18
  66:6,8,11,15
  71:5,22 86:12
  96:19 126:20
reported 52:17

116:15 118:4
reporter 1:22
  2:9 3:16 6:2,20
  7:21 127:4,5
  127:13
Reporting 2:11
  6:9
represent 76:3
  114:9,18
  118:15 122:7
representation
  77:7
represents
  129:9
request 45:9
requested 66:9
requests 45:14
  45:17,21
require 51:16
requires 51:7,11
Rescue 17:6
  46:21
research 28:19
  95:14,17,18
  97:3 105:16
researched 9:18
residence 55:12
  67:16 70:4
  71:6
residential 21:8
  21:15 22:6
  36:22 37:4
respect 63:2
respectful
  125:17
respective 2:6
response 33:23
  34:1 45:16
responsive
  45:20
result 99:5
  129:15
resulted 98:1
  100:16
results 88:6
retained 3:15

13:20 14:3,8,9
retired 17:8
review 10:9
  28:20,20 29:10
  31:1,6 45:8
  117:10 127:12
  127:15
reviewed 10:7
  10:18 29:11,14
  45:13 56:20
revisions 25:3
right 7:13,18 8:4
  8:9,14,19 9:11
  10:1 11:12,21
  13:9 16:9,20
  16:22 19:7,11
  19:13,21 22:9
  24:6,8 25:2,4
  25:23 26:8,10
  27:19 28:12
  30:11 31:5,12
  32:10 33:15
  35:23 36:19
  37:7,12 40:17
  41:10,14,22
  42:5,9,15,23
  43:9 44:17
  46:12 48:9
  49:8,13,20,23
  50:4,7,10,16
  50:19,22 51:5
  51:13 52:14
  54:5,19 55:9
  55:22 58:11,20
  59:12 60:11,17
  61:2 62:11
  63:12 64:2,9
  64:14 66:21
  67:1,5 69:17
  70:5,14,20,22
  70:23 72:6,7
  72:11,12,21
  74:12,20 75:2
  75:16 76:12,13
  76:14 77:12,12
  77:13,14,20

78:4 80:3,9
85:4,11,12,14
85:19 88:21
89:2,6,9,14,18
89:21 90:1,17
91:18,20 93:17
93:22 94:9,23
96:3 97:21
98:3 99:17
101:11,15
105:22 106:10
107:20 109:1
109:18,20,23
110:8 111:17
112:12,13
113:4,11 114:6
114:16 115:13
116:3,6,10
117:2,7,15
118:5,7,9,13
118:15 119:10
121:7,10,13,16
121:23 122:15
122:19 123:5
124:11 125:13
127:7,11,12
128:3
**rigorous** 124:22
**role** 100:2
**Roman** 82:4
84:6 94:11
**room** 9:11 78:14
98:10,17 99:5
99:12 101:5
116:2 117:18
117:20 122:22
**roster** 41:9
**roughly** 90:5,9
**rule** 3:7 41:16
117:16 119:13
**ruled** 119:16
123:8,10
**rules** 2:19 3:8
6:6 7:19
**ruling** 38:7
**Ryobi** 97:8,13

---

## S

**S** 2:3,3 5:1
**S-C-A-T-L-I-...**
43:1
**S-C-H-A-A-L**
32:23
**S-O-B-O-T-A**
7:8
**s/Danielle**
129:18
**safe** 36:12,13,15
**safely** 40:6
**safety** 29:13
30:15
**saw** 54:17 82:16
84:19 102:14
115:15
**saying** 20:18
34:17 42:22
52:18 60:6
75:4 78:19
91:3 92:3,9
**says** 27:18 43:8
62:12 66:6,12
67:3 69:1,7
72:20 73:10
89:19 96:20
111:19 112:8
117:19
**scan** 22:19
**Scatliffe** 42:19
**scenario** 104:19
104:21
**scene** 4:19 41:9
44:5 56:3
60:22 63:17
64:6 71:8,17
77:4 79:22
100:11 108:22
109:16 126:23
**Schaal** 31:23
32:23 33:4
43:2
**science** 79:2
96:13 100:19

---

**scientific** 38:18
49:17,23 50:2
51:7,16,23
55:18 63:9
81:11 112:7
123:11 124:10
**scooter** 48:8
**scores** 29:13
**screen** 26:6
44:20,21 65:23
99:18 106:11
106:12
**scroll** 66:2 67:20
67:21 68:12
**search** 35:8,9
45:15
**searched** 45:21
**seconds** 79:5,15
**section** 27:9
**security** 83:15
83:19,21
**see** 8:19 11:14
26:5,14 27:8
27:17 33:5
35:16 37:14
38:15 42:10,20
44:2,21 46:11
53:1 59:13
61:18 65:23
69:15,20 70:1
72:2,5 75:23
76:5,8,16
77:11,17,21
78:5 79:18
81:6 90:7,16
91:6 99:18,19
106:11,16,21
107:2,11,15,18
113:4,8 114:16
118:23 119:23
120:2,15 121:2
126:14
**seeing** 103:15
117:3 118:20
**seen** 22:14 32:17
33:8 110:3,4

---

**sees** 104:15
**select** 51:4
**send** 125:20
**Senior** 43:6
**sense** 48:11,12
**sent** 26:15 40:19
44:13
**separate** 108:14
**sequence** 104:12
104:20,21,22
105:2 106:2
**served** 17:16
**serves** 101:13
**set** 10:12 52:9
83:14
**seven** 11:16
16:12,15 20:4
47:2 57:22
68:20 118:16
118:22
**Severna** 5:7
**shaded** 8:20
**shapes** 85:6
**share** 26:5 44:20
106:11 120:5
**Sharon** 16:2
**sheet** 127:16
**shelf** 65:9,12
70:9,14,15,18
70:21,21,22,23
72:2 74:12,18
75:1,21 86:3,4
87:12,23 88:11
88:18 89:6
99:22 106:8,21
106:23 107:2,5
107:7,9 113:17
114:3,19 115:2
116:3 118:17
120:8,23
**shelving** 70:3
107:11,17,20
119:6 122:23
**shoot** 82:4
**shoots** 94:11,12
**Shorthand** 2:8

---

6:2
**shortly** 102:10
**shot** 122:14
**show** 25:23 26:4
65:16,22
**showing** 76:1
83:15 84:10,12
84:19
**shows** 119:13
**shush** 53:7
**shushing** 54:9
**side** 98:10
**signature** 2:15
**significance**
54:13 119:4
**signing** 2:1
**signs** 53:1,4
61:18
**similar** 90:16
93:7 107:1,10
**simply** 54:8
92:10 109:15
**sir** 7:9 9:4 11:19
11:22 20:21
23:15 31:15
77:15 92:17,19
99:11 101:18
117:15
**sit** 47:12 88:7
**site** 119:7
**sitting** 113:1
**six** 11:15 15:12
16:11 36:2
38:11 73:23
74:11
**size** 90:3,6,9,12
91:2,4,5 92:5
**sizes** 40:2
**sketch** 44:5
**skip** 69:18
**skipped** 44:18
**slide** 77:5 79:19
85:1 106:14
107:2,12 120:6
122:8
**slides** 35:3

James Sobota                                                    6/28/2023

small 92:3
smaller 90:11
smarter 123:16
smelled 52:18
  53:7,19 102:7
smells 53:22
smoke 102:9,11
  102:14,17,21
  103:4,6,14,15
  103:18,23
  104:2,10,12,15
  104:16
smoking 36:3,8
  37:10,19 52:4
  52:12 58:14
  116:10 123:7
  126:5
Sobota 1:17 2:7
  4:4 6:12,17 7:2
  7:6,7 22:21
  49:7 59:2
  75:17 82:18
  99:18 102:3
  106:17 123:14
  123:22 125:19
  127:8,10 128:5
Sobota's 106:2
  113:1 126:20
  126:21
solder 88:4
soldering 87:17
  87:19,22 88:10
  88:18
solo 90:14
Sons 42:14 43:9
  69:1,10,14
soot 121:6
sooty 120:17,22
  121:20 122:4
sorry 14:8 15:21
  16:21 24:14
  46:20 47:19
  48:22 55:2
  61:4 66:13
  71:13 82:18
  90:8 102:23

114:7 116:19
124:14 127:20
sort 8:20 46:9
  65:5 77:19
  81:12 83:13
  122:13
sound 53:7 54:9
source 36:4,6
  37:10,20 59:16
  60:2,9,23
  61:16 62:9
  63:18 97:23
  100:15
sources 51:17
  59:17 63:19
  65:2
speak 69:9
specialized 21:1
  21:6,13,17,22
  21:23 22:4
specific 17:10
specifically 22:8
  48:16 59:12
  83:20 97:9
speed 82:13
spell 7:7 30:6
spelling 127:17
spent 31:13
spoke 54:18,21
spread 77:20
squiggly 67:4
St 129:3
stack 72:6,20
  77:12 78:6
stacked 77:13
  122:1
stacks 72:2
  77:14
stake 122:10
stand 49:10
  70:15
standard 24:3,9
start 19:19
started 16:13
  18:19 36:7
  49:5 104:4

starting 19:1
starts 50:3
state 1:9 2:9 6:4
  7:4 11:10 13:5
  14:13,16 15:17
  17:22 20:17
  32:13 33:3,4
  42:2,10 129:2
  129:21
statement 73:1
statements
  63:21 64:4
States 1:1 37:5
stenotype 129:6
step 44:18 50:9
STIPULATED
  2:4,14,21
stipulation 6:8
stipulations
  6:21
stop 76:10 85:8
stove 58:6,7,9
straight 77:13
stream 81:8
street 5:14 41:17
strictly 17:21
strike 12:11
  49:6 55:19
  57:17 96:7
  102:17 119:3
stronger 27:18
  28:12 33:11,18
  34:22 35:4,16
strongly 124:9
structural 21:3
  21:19
structure 21:22
stuff 40:6 46:9
  65:5 84:6
  107:23 114:23
subject 22:13,16
  22:22 23:9
  28:19 29:20
  30:3 34:17,19
  51:18 84:11
  97:13 99:14

101:8,20 107:6
107:9,17
submitted 22:18
  32:12,13,15
subro 33:14
  34:10 35:6
  41:22
subrogation
  17:19,19 18:5
  18:8 19:6
  20:11,19 28:10
  34:13 39:13
subscription
  46:8
sue 20:19
summarize
  60:18
supplies 86:14
  86:21 87:1,7
support 101:12
supporting
  59:19
supports 101:18
supposed 36:11
  88:4
suppress 80:7
suppression
  77:23 78:9
  79:7,10,13,17
  113:19 114:2
sure 18:6 28:9
  34:4 35:18
  37:2 42:11
  46:9 62:4,5
  63:4 69:23
  71:1,14 74:15
  88:14 99:9,9
  108:8 110:7
  112:18 115:6
  120:20 123:6
  123:19
surrounding
  94:18
surveyor 108:1
surveyors 108:4
suspect 119:23

suspected 59:18
sworn 6:18
systematic
  64:21

                T

T 2:3,3 129:1,1
table 8:8
take 8:6,6,8
  26:23 29:7
  32:7 40:23
  46:11 58:21
  61:10 88:5
  97:15 104:1
  108:13 118:19
  123:18
taken 2:7 3:12
  11:3 38:23
  59:1 108:11,23
  111:14 114:10
  123:20 129:5
takes 115:22
  116:1
talk 26:1,3 36:5
  39:20 68:7
  86:3 100:5
talked 36:10
  38:16,17 39:17
  39:22 55:5
  68:16 82:17
  83:2 95:18
  117:23 118:6
  118:11
talking 22:20
  23:14 42:21
  68:15 69:18
  74:6 80:6
  90:13 102:6
  107:6,8 124:19
talks 55:20
tank 106:20
tape 107:18
  108:1,4 109:3
  109:10 110:14
  110:17,22
  111:6

Taronji 1:10
  10:19,21 14:14
  29:4,4 52:17
  54:2 55:9,12
  55:15 56:6,23
  57:12 70:4
  102:19 103:3
Taronji's 102:5
Taronji/Ferna...
  42:11
taught 39:9 83:4
teach 34:10
teaching 38:10
technique 30:12
TECHTRONIC
  1:13
tell 8:12 16:23
  28:13 36:4
  38:13 82:1
  85:7 103:17,20
  103:21 104:3
  110:13
temperature
  94:6 95:8
ten 14:21,22
  103:9
term 43:5 112:3
  112:5
termination
  60:2
terms 13:5
  39:20
test 50:21 51:12
  83:13
testified 6:19
  73:21 74:9
testify 54:10
testimony 1:16
  3:12 11:6 27:5
  27:19 28:13
  33:12,19 34:12
  34:19 35:5,17
  38:13,16 61:7
  73:21 74:7,8
  75:9 79:8
  96:11 115:23

125:9 129:10
testing 22:13,16
  22:22 23:2
  53:16 60:14
  81:10,12,21
  109:22 124:22
tests 83:20
texts 23:22
Thank 7:9 22:9
  46:12 127:7
Theresa 10:21
  29:4 52:17
  54:2 55:15
  56:5,12
thereto 3:6
  129:7
thermal 119:18
thick 102:11,17
  102:20 103:5
  103:15 104:2
thing 53:8 89:19
  94:12 95:4
  122:10,19
  124:5,7 125:22
  126:2,8
things 28:16
  29:16 33:13
  38:22 58:4
  61:12,15,22
  62:1 81:6 99:8
  101:19,22
  118:19 126:9
think 10:8 16:8
  20:10 24:6,22
  26:17 28:1,5
  31:4,22 64:2
  64:14 65:11
  68:11,21 73:9
  75:11,19,20
  76:11 79:9,9
  82:15,19 83:1
  87:17 88:13
  94:16 101:15
  104:7 108:5,19
  111:5 113:16
  113:22 116:17

122:16
thinking 23:16
  78:13 92:12
  99:23
thorough 49:16
  51:21
thought 68:16
  78:16 79:15
  102:8
thousand 20:2
thousands 17:13
  17:14 47:13,21
  48:15
three 13:13
  20:23 29:9
  65:13 68:1
  70:22 78:6
  92:21 94:14
  95:3 96:19
  97:16 108:14
threw 95:2
  113:19
throwing 113:21
thrown 99:12
tile 73:3 75:1
  77:14 85:16
  120:22 121:5,9
  121:12,15,19
tiles 72:3,6,20
  75:20 77:12,19
  78:6,17,21
  79:7,12,18
  80:23 81:2,15
  122:3
time 3:4,5 31:12
  32:3 47:1
  55:13,16 56:8
  57:7 66:14,15
  73:5,8 75:3
  77:9 80:7
  85:10 86:5
  88:1,11,19
  95:9 102:18,23
  103:2 111:16
  116:16 117:12
  117:20 118:5

121:22 125:20
  127:8
times 14:15 32:9
  81:17,19 100:1
tips 33:20 34:11
title 24:13 42:20
today 10:10
  11:10 17:20
  29:1 35:15
  47:12 88:7
  96:11 113:2
  125:14 126:16
  127:22
told 25:14 33:12
  56:9,10,13
  58:8 64:11
  68:18 70:7
  74:16 78:10
  79:5 97:4,11
  100:22 109:7
  127:22
tomorrow 10:13
top 16:9 28:2
  66:2,6 70:21
  70:22 73:15
  75:1 78:7
  121:19 122:2,3
topics 34:5,6
total 29:9
track 14:18 15:6
  19:19
trainer 29:14
  30:19,21 35:20
  95:19
training 21:11
  21:22,23 27:10
  35:10,12 68:6
  79:4 95:21
  98:15 110:6,20
transcribed
  129:7
transcript 3:11
  8:2 129:10
transcription
  129:8
translate 68:21

translation
  68:22
transportation
  30:16
transported
  40:6
treatises 23:22
trial 3:4 10:13
  128:1
true 7:16 21:4
  36:23 47:16
  48:4,20,21,23
  50:13 51:2,3,9
  51:19 54:22
  55:13,16 56:1
  62:15 84:20
  91:8 101:9,10
  101:21 111:20
  111:21 117:13
  117:14 123:9
  129:9
truth 8:12,12,13
try 14:20 46:7
  51:12 56:11
trying 23:17
  25:15 73:9
  78:10 82:11
  99:10 106:11
  111:8 124:3,15
  124:17
TTI 42:4
Tupperware
  89:20 90:4,14
  90:17,20 91:1
  91:21 92:4,10
  95:2 99:20
two 26:16,19
  27:3 45:7
  61:23 65:9,12
  66:9 67:23
  70:9,21 78:15
  104:1 106:14
  107:2,12,18
  116:22 117:7,9
  117:11 126:13
type 53:3,7

61:11 84:7
86:7
**types** 18:10 40:5
**Typically**
127:14
**typo** 24:20

___

**U**

**U** 2:3
**uh-huhs** 8:3
**unable** 56:17
**unavailable**
56:8
**understand** 7:15
8:8 11:9 15:8
34:3 57:3 72:9
74:9 82:11
104:18
**understanding**
32:5 102:18
103:2
**understood**
125:13
**United** 1:1 37:5
**unplugged** 47:5
47:8,15 48:2
48:19 74:10,12
**unplugs** 116:1
**updated** 26:16
126:13,17
**updates** 25:3
**uploaded** 66:16
**use** 64:20 87:14
104:22 124:10
**Usual** 6:20
**utility** 116:2
117:18,20
122:22
**UV** 43:8

___

**V**

**valid** 124:21
**various** 17:17
**varying** 86:18
**vehicle** 21:3,20
**verbatim** 73:13

**Vermont** 41:15
41:17
**versus** 110:9
111:2 112:1
**victim** 46:14
**video** 83:19,21
**videos** 44:8
81:22 82:1,14
82:16 83:1,6,9
83:10,12,14,23
84:6,10,18
**Virginia** 9:2,7
**virus** 119:15
**voicemail** 56:12
**volt** 97:8,13
115:16
**volume** 90:23
91:21 92:15
**vs** 1:12

___

**W**

**w/** 89:20
**waive** 127:12,18
**waived** 2:2,17
**want** 9:3 14:5
26:4 30:4
34:18 37:13
38:9 40:21
43:15 59:13
62:3,3 69:17
69:23 76:5
85:7,8 86:3
94:9 117:6
120:7 126:4
**wanted** 33:8
126:3
**wasn't** 23:18
56:13 60:10
75:13,13 111:8
**watch** 31:1
**water** 71:23
78:13 80:1,6,9
**way** 8:1 21:17
26:13 70:11,12
78:5 81:2
84:16 88:9

90:5 95:1 98:9
102:13 129:14
**ways** 36:6
**we're** 7:10 17:20
22:2 23:14
26:1,2 38:8
69:23 70:3
76:6,21 82:20
85:5 90:13
99:19 100:10
112:13 113:1
124:19
**we've** 24:10 31:3
58:20 107:18
125:2
**weather** 61:18
**week** 45:7
**weeks** 45:7
**went** 39:7 43:19
44:6 56:12
102:8 115:17
**weren't** 123:3
**white** 5:12 28:1
28:4 33:14
34:9 114:23
**Williams** 28:1,5
33:14 34:9
**win** 34:18
**window** 117:9
117:11
**wire** 18:18
**witness** 2:16 4:3
6:12 61:7
63:21 64:4
65:3 125:23
127:18 129:11
**witnesses** 55:21
56:2 64:5
68:18
**wondering**
25:17
**wood** 120:11
**word** 52:8
**words** 34:16
75:12 94:21
111:12 127:21

**work** 10:3,15
15:19 16:11
18:2 19:2,3
28:10 40:4
47:2
**worked** 17:5
19:15
**working** 20:17
46:23
**worst** 64:23
**wouldn't** 95:7,9
97:18
**write** 56:19
66:11,15
111:15 112:12
112:14 113:7
113:10
**wrong** 30:8
52:10 97:18
**wrote** 29:12

___

**X**

**X** 4:1
**X-ray** 109:18,19
**X-rays** 88:4

___

**Y**

**y'all** 68:10 100:8
125:5
**yeah** 18:3 24:22
25:1 27:23
47:20 64:20
67:23 68:15
75:7 76:2 78:3
78:12 85:13
112:6 126:7,14
**year** 13:22 16:16
36:3,23 37:5
**Yearout** 3:11
4:7 5:10 6:22
7:1 32:18 33:7
101:23 126:14
127:6,20
**years** 15:12
16:11,12,15
17:8,10 20:4

47:2 49:4
57:20,21,21,22
58:11
**yellow** 89:9,12
89:19 90:17
113:8

___

**Z**

**Zoom** 2:11 6:10
7:11 76:7

___

**0**

___

**1**

**1** 4:16 18:8,9
44:20 45:2
126:19
**1/22/2024**
129:23
**1:22-CV-01753**
1:6
**10** 20:20,22
**10:00** 117:21
**105** 93:11,21
**11** 77:5 79:19
85:1
**11:46** 128:6
**114** 4:20
**1300** 94:7
**15** 3:9 27:2
57:15
**150** 20:5,6,19
32:1,3,9
**17** 89:5
**17:30** 67:7
**18** 69:22 74:22
**1818** 116:18
**18650s** 40:3
**19** 13:21 14:2
67:1 111:11
**1988** 3:9

___

**2**

**2** 4:17 65:17
108:20 126:20
**2-3** 65:14

**20** 14:8 20:1,20
  20:22 107:14
**20-10622-089**
  41:19
**20132** 9:7
**2015** 16:13 17:4
  18:21,23 19:1
**2017** 24:21,22
  24:23 25:1,14
  25:21 49:19
  52:1
**2018** 24:18 25:3
  25:14 49:18
**2019** 27:11,17
**2020** 13:23 14:2
  14:8 30:17
  42:5,9 67:1,15
  67:19 69:4
  108:12,18,20
  109:1,11 111:3
**2021** 24:23 25:2
  25:10,11,12,18
  25:21
**2022** 11:4 25:9
  27:2 36:2
  38:11,22 98:16
**2023** 1:19 2:12
  3:12 6:12
  128:7
**20th** 5:14
**21** 67:14,18 69:4
**210050** 106:15
**210068** 77:6
**210117** 122:9
**21146** 5:7
**21st** 108:12
**22** 42:4,9 113:4
**23** 120:6
**250** 15:5,10
  16:14 17:15
**26** 41:16 45:12
  45:13 49:14
**28** 1:19 2:12
  3:12 6:12
  128:7

**3**

**3** 4:18 65:19
  126:21
**30** 20:2 115:21
**32** 17:8,10 57:20
  57:21,21 77:1
  122:8
**35** 16:16 49:4
  79:5,15
**35203** 5:15
**37096** 9:5
**39** 57:22 58:11

**4**

**4** 4:19 76:19,23
  79:19 85:1
  106:15 107:3
  107:12 120:6
  122:8 126:22
**4:15** 116:9
**4:20** 116:13
**40** 31:16,18 32:7
  32:8,9 97:8,13
  115:16
**400** 5:14
**412** 41:14,16,17
**45** 4:16 94:3

**5**

**5** 4:20 114:14
  127:1
**5(d)** 3:7
**5:30** 67:11
**50** 20:2,14
**500** 15:3,4
**54** 66:3
**566** 5:6

**6**

**6,000** 32:10
**6:18** 116:18,20
  116:21
**6220** 41:11
**65** 4:17,18

**7**

**7** 4:7
**70** 16:20,22
  31:19
**76** 4:19

**8**

**9**

**9/30/23** 129:20
**9:00** 1:20 2:13
  6:11
**9:30** 116:6
**911** 102:10,20
**921** 9:16,19,22
  9:23 10:1 24:3
  24:7,19 25:19
  49:8,20 50:3
  59:3 62:7
  112:8 123:22
  124:6
**921's** 63:2
**930** 94:6
**99** 18:7 19:5,9