**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | | |
|---|---|---|
| **STATE FARM FIRE & CASUALTY INS. CO. a/s/o CIARA TARONJI,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Civil Action No. 1:22-cv-01753** |
| **TECHTRONIC INDUSTRIES NORTH AMERICA, INC.,** | ) ) ) | |
| **Defendant.** | ) ) | |

---

**DEFENDANT TECHTRONIC INDUSTRIES NORTH AMERICA, INC.'S, MOTION
TO EXCLUDE OPINIONS OF PLAINTIFF'S EXPERT, C.J. FLAHERTY**

---

Defendant Techtronic Industries North America, Inc. ("TTI-NA"), respectfully requests that this Court excludes the defect opinions offered by Plaintiff's designated expert witness, C.J. Flaherty, pursuant to Rules 104, 402, 403, and 702 of the Federal Rules of Evidence.

Flaherty advances a defect theory premised on untested hypotheses that are nothing more than speculation. He has opined that an unidentified manufacturing defect caused an internal short circuit in a Ryobi-brand lithium-ion battery pack, and that this defect led to the battery pack's failure and caused a fire. However, Flaherty cannot say how the alleged short circuit occurred. Flaherty has conducted no independent analysis or sufficient testing in support of that opinion. To be sure, Mr. Flaherty simply conducted so-called "cognitive testing"— that is, he thought about the evidence. When analyzed against the standards for expert testimony established by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Flaherty's opinions are inadmissible, and his testimony should be excluded.

1

## <u>TABLE OF CONTENTS</u>

**BACKGROUND**                                                          **Pg. 3**

   **A.  Subject Fire**                                              **Pg. 3**

   **B.  C.J. Flaherty's Testimony**                                **Pg. 4**

**ARGUMENT**                                                            **Pg. 5**

   **A.  Flaherty is not qualified to testify competently regarding potential**          **Pg. 6**
      **defects in lithium-ion batteries.**

   **B.  Flaherty arrived at his defect opinion without any reliable**                   **Pg. 8**
      **methodology.**

   **C.  Flaherty's defect opinions cannot rely on his "ruling out" other**              **Pg. 14**
      **potential ignition sources, because his methodology was unreliable**
      **there as well.**

   **D.  Flaherty's defect opinions – which are nothing more than an**                  **Pg. 16**
      **impermissible *ipse dixit* – will not assist the trier of fact.**

   **E.  Flaherty's testimony is inadmissible under Rule 403.**                          **Pg. 19**

**CONCLUSION**                                                          **Pg. 19**

## BACKGROUND

**A.**    **<u>Subject Fire.</u>**

On May 19, 2020, a residential fire occurred in the basement utility room at Ciara Taronji's house in Hagerstown, Maryland. State Farm Insurance Company held a homeowners insurance policy for Taronji's home. (Compl. ¶ 7). Plaintiff asserts that "[t]he fire and Plaintiff's insured's damages were proximately caused by the aforementioned defective and unreasonably dangerous conditions" associated with the subject battery. (*Id.* at ¶ 21).   The area of origin of the subject fire was within the utility room in the basement of the residence. (Report of Jim Sobota ("Sobota Report"), p. 6, attached as Exhibit A). Specifically, the area of origin was on a metal shelving unit located within the basement utility room. *Id.* According to Sobota, the area of origin was located on the bottom-left shelf when facing the unit, also referred to as "Shelf 1," as indicated below. (Deposition of Jim Sobota ("Sobota Dep.") at 70:3-19, attached as Exhibit B).



At the time the subject fire started, a Ryobi-brand lithium-ion battery (the "subject battery pack") was located on Shelf 4. (Sobota Dep. at 75:16 - 77:10). The subject battery pack was not

plugged into, or energized by, a battery charger. The subject battery pack had been on Shelf 4, unplugged, for approximately eight hours before the fire occurred.

Mr. Juan Fernandez, one of the tenants at the subject house, utilized the subject battery pack with his Ryobi-brand chainsaw on the morning of May 19, 2020. (Sobota Dep. at 115:13 – 116:6). Following that use, Mr. Fernandez charged the subject battery pack. *Id.* Once fully charged, Mr. Fernandez placed the subject battery pack on Shelf 4 at approximately 9:30 AM. *Id.*; (Sobota Dep. at 75:16 - 77:10). At approximately 4:15 PM, Mr. Fernandez smoked cigarettes in the basement. (Sobota Dep. at p. 116:8-10). Mr. Fernandez left the house at approximately 4:20 PM. (*See id.* at p. 116:12-14). Around two hours later, the subject fire occurred at approximately 6:18 PM. (Sobota Dep. at 116:15-20).

**B.    C.J. Flaherty's Testimony.**

Following the fire, Plaintiff filed this lawsuit in subrogation. Plaintiff alleges that the subject battery was defective and caused the subject fire. (*See generally* Compl.). Plaintiff retained C.J. Flaherty to testify in support of its claims. Flaherty is a licensed electrical engineer who has worked in a consulting role for decades (Deposition of C.J. Flaherty ("Flaherty Dep.") at 11:16-17, attached as Exhibit C; C.J. Flaherty's Curriculum Vitae, attached as Exhibit D).

Flaherty seeks to testify that an alleged manufacturing defect in the subject battery caused the subject fire. (Report of C.J. Flaherty ("Flaherty Report"), attached as Exhibit E.). Flaherty believes that the subject fire "was caused by the thermal runaway of the Ryobi 6 amp-hour 40-volt lithium battery . . . ." (*Id.* at 7). He contends that the thermal runaway "was most likely caused by the development of an internal short circuit in one of the cells due to a manufacturing defect." (*Id.*).

Relying on his "cognitive testing," Flaherty's defect theory is that an internal short circuit formed from either the introduction of an impurity during manufacturing, or by a defect in the

separator during manufacturing. (Flaherty Dep. at 106:1 – 107:4). But Flaherty "**can't tell [the jury] what the specific instance of mechanism of the internal short circuit was** . . . ." (Flaherty Dep. at 99:22 – 100:22) (emphasis added). In essence, Flaherty wants to tell the jury that "it could be *this* or it could be *that*, but I can't really tell you what happened. Just trust me." Rule 702 requires more. This Court should exercise its gatekeeping role and exclude Mr. Flaherty's opinions as unreliable and inadmissible *ipse dixit*.

## ARGUMENT

Testimony by expert witnesses has the potential to "be both powerful and quite misleading." *Daubert*, 509 U.S. at 595 (quotation omitted). Federal Rule of Evidence 702, therefore, "imposes a special obligation upon a trial judge to 'ensure that any and all [expert] testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589). Under *Daubert*'s "exacting standards of reliability," *Weisgram v. Marley*, 528 U.S. 440, 455 (2000), an expert's bald assurance of validity is not enough. Rather, the party presenting the expert must show that the expert's findings are based on sound science, which requires an "objective, independent validation of the expert's methodology." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) (emphasis added).

So, under Rule 702, this Court must determine whether an expert is qualified, and if so, whether the opinions they render are reliable. *Shreve v. Sears, Roebuck & Co.*, 166 F.Supp.2d 378, 391 (D. Md. 2001). When evaluating the reliability of expert testimony, Rule 702 only "permits expert testimony 'if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the jury or other trier of fact to understand or resolve a fact at issue.'" *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F.Supp.2d 334, 340 (D. Md. 2011) (citations omitted). And, "'[t]he party seeking admission of the expert testimony bears the burden of

establishing admissibility by a preponderance of the evidence.'" *Id.* (citing *Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F.Supp.2d 549, 553 (D. Md. 2011)).

Speculation is inadmissible. *See Nease v. Ford Motor Company*, 848 F.3d 219, 231 (4th Cir. 2017) (citing *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)). This Court, not the jury, "must ensure that the proffered expert opinion is 'based on scientific, technical, or other specialized knowledge and not on belief or speculation . . . .'" *Nease*, 848 F.3d at 229 (citing *Oglesby*, 190 F.3d at 250). For product liability claims specifically, speculation is fatal. "[A] plaintiff may not prevail in a products liability case by relying on the opinion of an expert unsupported by any evidence such as test data or relevant literature in the field." *Id.* at 231. When an expert's opinions are unsupported by evidence, this Court must reject them. "The Fourth Circuit does not accept opinions from experts simply because the 'expert says its so.'" *Shreve*, 166 F. Supp. 2d at 400 (citing *Alevromagiros v. Hechinger Co.*, 93 F.2d 417, 421 (4th Cir. 1993)); *see also General Electric v. Joiner*, 522 U.S. 136, 146 (1997) (holding "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected only by the *ipse dixit* of the expert.").

A.    <u>**Flaherty is not qualified to testify competently regarding potential defects in lithium-ion batteries.**</u>

The first determination of whether expert testimony is admissible is whether the expert is qualified to render their opinions. *Shreve*, 166 F.Supp.2d at 391. "[A]n expert's opinion is helpful to the trier of fact, and therefore relevant under Rule 702, 'only to the extent the expert draws on some special skill, knowledge or experience to formulate that opinion; the opinion must be an expert opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert.'" *Id.* at 393 (citing *Ancho v. Pentek Corp.*, 157 F.3d 512, 518 (7th Cir. 1998)).

Sure, Flaherty is a licensed electrical engineer. This, by itself, does not qualify him to render opinions as to an alleged manufacturing defect present within a lithium-ion battery's cell(s). "[A]n expert who is a mechanical engineer is not necessarily qualified to testify as an expert on any issue within the vast field of mechanical engineering." *Id.* at 392. The "engineer must possess 'some special skill, knowledge or experience' concerning the particular issue before the court." *Id.* (citing *Ancho*, 157 F.3d at 517); *see Oglesby,* 190 F.3d at 247 (mechanical engineer's testimony excluded due to lack of specialized experience or expertise in evaluating automobile manufacturing processes or evaluating strengths of plastic automobile component parts).  Here, the particular issue before this Court is an alleged manufacturing defect within a lithium-ion battery pack. Flaherty possesses no specialized skills, knowledge, or experience that renders him qualified to opine on this topic.

Flaherty admitted that he has no specialized training related to lithium-ion battery packs or chargers. (Flaherty Dep. at 12:3-4). He has never designed or developed a lithium-ion battery pack. (Flaherty Dep. at 14:22; 15:3). Flaherty has never taken or taught a course related to lithium-ion battery packs. (Flaherty Dep. at 15:23; 16:16, 20). Prior to his consulting work, none of Flaherty's professional career involved lithium-ion battery packs. (Flaherty Dep. at 16:17). Flaherty's only experience pertaining to alleged failures of lithium-ion batteries (like the theory he advances here) stems from two fires that "involved battery packs used in hoverboards." (Flaherty Dep. 30:11-13). However, the hoverboards' "battery management systems would vary greatly" and ran into issues due to "very cheaply and rapidly produced battery packs that weren't probably subject to stringent quality controls …" (Flaherty Dep. 31:23 – 32:5). Unlike the hoverboards' battery packs, Flaherty acknowledges that the subject battery pack was "not a cheaply or rapidly made and distributed battery pack," as it was subjected to series of tests and had to meet regulated criteria. (Flaherty Dep. 32:7 – 33:14).

With (1) no specialized training on lithium-ion batteries, (2) no experience designing or developing lithium-ion batteries, (3) no education on lithium-ion batteries, and (4) no non-consulting professional work related to lithium-ion batteries, Flaherty is not qualified to render opinions in this case. An electrical engineer is not necessarily qualified to testify as an expert on any issue within the vast field of electrical engineering. *Shreve*, 166 F. Supp. 2d at 392. Like the excluded expert in *Oglesby*, Flaherty lacks the specialized experience and expertise in evaluating alleged manufacturing defects of complex lithium-ion batteries, and his testimony should be excluded accordingly.

**B.**     **Flaherty arrived at his defect opinion without any reliable methodology.**

Even if Flaherty was qualified to offer defect theories here, his opinions are inadmissible because they rest on an unreliable methodology. For reliability, the main inquiry under *Daubert* is whether proffered testimony "can be (and has been) tested." *Daubert*, 509 U.S. at 593. This consideration is described as a "key component" or "the most significant factor" of a *Daubert* analysis, especially in products-liability cases. *Fireman's Fund Ins. Co. v. Tecumseh Products Co.*, 767 F.Supp.2d 549, 554 (4th Cir. 2011); *Cummins v. Lyle Industries*, 93 F.3d 362, 362-68 (7th Cir. 1996); *Watkins v. Telsmith, Indus.*, 121 F.3d 984, 992 (11th Cir. 1997); *Pestel v. Vermeer Mfg., Inc.*, 64 F.3d 382, 383–84 (8th Cir. 1995). Courts routinely exclude expert opinions grounded on insufficient testing.  *See, e.g.*, *Fireman's Fund Ins. Co.*, 767 F.Supp.2d at 556 (expert opinion was "plainly insufficient" because his hypothesis was derived from only observations, with no testing); *Jaurequi v. Carter Mfg. Co., Inc.*, 173 F.3d 1076, 1084 (8th Cir. 1999) (expert opinions unsupported by testing excluded as "unabashed speculation"); *Peitzmeier v. Hennessy Indus., Inc.*, 97 F.3d 293, 297 (8th Cir. 1996).

For fire investigations specifically, the Fourth Circuit has recognized and applied the standards set forth in NFPA 921 to evaluate the reliability of an expert's principles and

methodology. *Fireman's Fund Ins. Co.*, 767 F.Supp.2d at 554. Reliable fire investigations require the investor "to collect data about the fire 'by observation, experiment, or other direct … means,' to analyze the data objectively and without speculation, to develop a hypothesis based solely on the data collected, to test the hypothesis by comparing it to all known facts, and to repeat the process until all feasible hypotheses have been tested." *Id.* (citing NFPA 921 4.3.3 – 4.3.6). "Until all these steps are completed, NFPA 921 unambiguously requires an investigator to list the cause of the fire as undetermined." *Id.* (citing NFPA 921 4.3.6). In *Fireman's Fund Ins. Co.,* the court excluded expert testimony because the expert failed to properly collect data per NFPA 921, formed his hypothesis through speculation, and failed to test that hypothesis. *Id.* at 554-555. That was "plainly insufficient" and did not meet "'the same level of intellectual rigor that characterizes the practice of an expert' in the field of fire investigations." *Id. at 555-556* (citing *Kumho Tire v. Carmichael*, 526 U.S. 137, 152 (1999)).

Again, Flaherty's contends – without any evidence in support – that the introduction of an impurity during manufacturing or a damaged separator caused the subject battery to short circuit. (Flaherty Dep. at 106:1 – 107:4). Flaherty's manufacturing defect theory does not pass muster under Rule 702.

*First,* Flaherty's defect theory hinges completely on "cognitive testing" (i.e. thinking). He performed <u>no</u> physical testing to support or rebut his defect theory.

Q. All right. So one of your hypothesis, of course, and I guess the one you selected as your final hypothesis, is the subject battery pack. What, if anything, did you do to test that hypothesis in an effort to disprove it?

A. That hypothesis is tested, you know, cognitively with comparison to all of the other hypotheses. Could a fire – is there any evidence to support a fire starting externally. That is the primary test against that hypothesis. There being none, based on the analysis, leaves us with that final hypothesis.

Q. Okay. So you tested it cognitively, that is, thinking about it?

A. Right. In comparison, in consideration of all other hypotheses, yes.

Q.    Okay. Any testing as in, you know, any testing of any exemplars, any scientific testing that's outside of cognitive testing to disprove the hypothesis that you performed?

A.    No physical testing of this.

(Flaherty Dep. at 118:17 – 119:17).

Q.    Did you do any testing of any exemplars to try to determine or replicate a short circuit and an internal failure of a battery cell like this one?

A.    No.

(Flaherty Dep. at 99:22 – 100:22).

"Cognitive testing" is not a reliable methodology to arrive at opinion. In fact, it is the antithesis of a reliable fire investigation under NFPA 921. *See e.g., Fireman's Fund Ins. Co.*, 767 F. Supp. 2d 549. It is the exact essence of *ipse dixit* testimony that is explicitly prohibited. *Gen Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Flaherty's defect opinion is supported by no objective, independent validation, only his mental impressions.

*Second*, Flaherty acknowledged that he cannot specifically identify the mechanism of defect that led to the alleged short circuiting that caused this fire.

Q.    All right. How does it begin to fail? What is causing the short circuit? That's what I'm trying to understand.

A.    The result of a manufacturing defect inside the cell that causes an electrical path to develop that is not the normal discharge path from the cell.

Q.    What is the manufacturing defect in your opinion?

A.    **I don't know specifically whether it's the introduction of some foreign material, the damage to a separator that causes a small connection in between different windings. I don't know specifically what it was.**

Q.    So you can't tall the ladies and gentlemen of this jury, within a reasonable degree of scientific certainty, what the short circuit is that you say initiated the thermal runaway that caused this fire; is that right?

A.    **I can't tell them what the specific instance of mechanism of the internal short circuit was, that is correct.**

(Flaherty Dep. at 99:22 – 100:22).

In other words, *"just trust me."* Not only can Flaherty not identify *how* the alleged short circuit occurred, but he also cannot identify a specific battery cell or cells *where* the alleged short circuit occurred. (Flaherty Dep. at 107:12-20).

> Q.    Slide 23, **do any of these cells show me a short circuit or show you a short circuit resulting from an internal manufacturing defect**, which is what you put in your report?
>
> A.    **No, they do not** – they would not be able to at this point in my opinion.

(Flaherty Dep. at 107:12-20).

*Third,* Flaherty cannot show a jury *how* or *where* his alleged defect occurred, because there is <u>no</u> direct physical evidence supporting his defect theory.

> Q.    Mr. Flaherty, are you able to point me to a photograph, a CT image or **are you able to point me to any physical evidence that indicates to you or indicates to anyone a manifestation of a short circuit internal to a battery cell that resulted in thermal runaway?**
>
> A.    **Not directly, no.** That conclusion is based on the consideration of the entirety of the available evidence, fire scene, history of the pack, et cetera.
>
> Q.    Okay. So I'm correct that Mr. Flaherty cannot identify a piece of physical evidence that shows an internal short circuit that resulted in thermal runaway. True?
>
> A.    <u>**There is no remaining evidence of an internal short circuit of the battery pack.**</u>

(Flaherty Dep. at 134:7 – 136:6) (emphasis added).

> Q.    All right. Do any of your CT images show us a pierced or damaged separator?
>
> A.    No.
>
> Q.    Do any of your images – any of the CT images show an impurity present with the cells?
>
> A.    No. Not identifiable as such.

(Flaherty Dep. at 107:5-11).

*Fourth,* the direct evidence associated with the battery is equally characteristic of a battery pack attacked from an external fire. Flaherty acknowledged as much.

> Q.    Can an external fire destroy all the plastic casings of a lithium-ion battery pack?

A.    Yes.

Q.    Can an external fire result in physical attributes and characteristics of all 20 of these cells and the printed circuit board we see in this case?

A.    Yes.

(Flaherty Dep. at 104:6-13).

Q.    So the essence of this paper is that you can have lithium ion 18650 cells that have physical characteristics from an external fire attack, in other words a noncausative external fire attack, and those batteries will have similar, substantially identical, physical features as those cells that might internally fail from a short circuit. Fair?

A.    Yes.

(Flaherty Dep. at 43:5-13).

Q.    Okay. Do you attribute – does the damage you see on this circuit board, is that considered – does that support your opinion of an internal short circuit and cell failure?

A.    I would say it's consistent with it. I would not say that there's anything specific to the damage of that circuit board that would indicate that in particular.

. . .

Q.    Just to make sure I've got a point on it. Would you agree with me that the damage profile we see on slide 20, your photograph 897, of this printed circuit board, that damage profile can occur from an external fire or an internal short-circuit failure, right?

A.    Yes.

(Flaherty Dep. at 87:21 – 88:21).

Flaherty's entire defect opinion was formed in reverse – that is, he identified the subject battery as the source of the fire, then formed a defect theory to support that conclusion. He determined the "physical mechanisms necessary" for the battery to cause this fire and ignored or failed to adequately address evidence to the contrary. This methodology directly contradicts the requirements of *Daubert* and NFPA 921.

Q.    And so then what – what happens?

A.    The electrical energy of the battery pack discharging through the internal short circuit heats up the cell to a point where thermal runaway begins to occur. And then the battery pack enters a self-sustaining heating reaction

> that eventually results in the expulsion, the venting of cells, the expulsion and ignition of the flammable electrolyte material and the fire itself.
>
> Q.   So it is your testimony that energy was being dissipated within the battery pack eight and a half hours after it was off the charger?
>
> A.   Yes.
>
> Q.   Is that based upon your CT imaging?
>
> A.   No.
>
> Q.   Is it based upon your photographs?
>
> A.   No.
>
> Q.   What is it based on?
>
> A.   Based on the physical mechanisms necessary to produce heat inside the battery pack.

(Flaherty Dep. at 103:6 – 104:5).

In short, Flaherty's opinions reduce to mere speculation. Flaherty relied on direct evidence of a battery that is equally indicative of a non-defective battery attacked by an external fire. He, instead, decided it was an internal failure, even though there is no physical evidence he can point to that supports his defect theory. Despite having no direct evidence to support his theory, Flaherty performed no physical testing to validate his theory. He simply thought about what happened and pinned the Ryobi battery as the culprit. If NFPA 921 were a test, Flaherty's circular reasoning would receive an "F." This is the essence of an impermissible *ipse dixit* opinion, and Flaherty's opinions are due to be excluded accordingly.

As this Court has explained, for testimony to be "relevant under *Daubert*, the proposed expert testimony must have 'a valid scientific connection to the pertinent inquiry as a precondition to admissibility.'" *Nease*, 848 F.3d at 229 (citing *Daubert*, 509 U.S. at 597). Untested theories are unreliable. *See Id.* at 232 (the expert's "failure to test his hypothesis renders his opinions on the cause of [the] accident unreliable."). Even though an untested theory could be "plausible and 'may even be right[,] … it is no more than a hypothesis, and thus it is not knowledge, nor is it based upon sufficient facts or data or the product of reliable principles and

methods applied reliably to the facts of the case.'" *Id.* (citing *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010)). Flaherty's defect opinion is nothing more than an untested hypothesis that should be inadmissible.

**C.** **Flaherty's defect opinions cannot rely on his "ruling out" other potential ignition sources, because his methodology was unreliable there as well.**

TTI-NA anticipates Plaintiff arguing that despite performing no testing to validate his defect theory, Flaherty's methodology was reliable, because he effectively ruled out the other potential ignition sources, leaving only the subject battery pack as the ignition source. This argument misses the mark. In reality, Flaherty's methodology in ruling out other ignition sources was just as flawed as his methodology in forming his defect opinion.

For example, improperly discarded smoking materials have been considered as a potential cause of this fire. Flaherty acknowledged that improperly discarded cigarettes can and do cause house fires, possibly thousands, every year. (Flaherty Dep. at 37:21-38:10). Evidence of smoking materials was found in the basement, albeit adjacent to the utility room. Plus, Mr. Fernandez, one of the tenants, was reported to have been smoking in the basement of the home approximately two hours before the fire was reported. (Flaherty Dep. at 36:4-10).

Presumably because of this information, Flaherty claimed that he considered, and eventually ruled out, an improperly discarded cigarette as a cause of this fire. Flaherty ruled out this hypothesis based on two pieces of evidence: (1) no indication of discarded smoking materials in the area of the fire, and (2) no testimony or reports showing that smoking occurred in the area of the fire. (Flaherty Dep. at 117:10 – 118:1).

The bases that Flaherty relied upon to rule out improperly discarded smoking materials as a cause of this fire are not sound, which he conceded. First, Flaherty ruled out improperly discarded smoking materials as a cause of this fire because (1) no evidence of discarded smoking

materials was found in the area of the fire. However, he acknowledged that "it's possible" for a discarded lit cigarette to start a fire, then be consumed within that fire, so that no evidence of that discarded cigarette could be found. (Flaherty Dep. at 64:17-66:6). Despite acknowledging that a discarded cigarette can be consumed by a fire it creates, Flaherty performed no testing to see if that was even a possibility here. Critically, he is not even aware of any testing on this subject. (Flaherty Dep. at 65:21-67:10).

Second, Flaherty ruled out improperly discarded smoking materials as a cause of this fire because no testimony or reports showed that smoking occurred in the fire's area of origin. However, Flaherty acknowledged that witnesses misremember, misstate, or misrepresent their smoking activity around fires.

> Q.  Okay. And in your experience from 2017 prior as a CFEI, would you agree with me that insureds, homeowners, witnesses will often either misremember or misstate or misrepresent their smoking activity and whereabouts of smoking activity?
>
> A.  Yes.

(Flaherty Dep. at 37:6-12).

So, Flaherty relied on testimony about smoking activity, even though he knows and admits that witnesses often misremember, misstate, or misrepresent their smoking activity around fires. Flaherty could have corroborated or confirmed this report by simply interviewing the witness. However, Flaherty did not interview Mr. Fernandez (or any witness for that matter) to evaluate the validity of his testimony. (Flaherty Dep. at 60:5-8).

Flaherty's "methodology" used to rule out improperly discarded smoking materials as a potential cause of this fire rests on circular logic. First, Flaherty based this opinion on the lack of evidence of discarded smoking materials at the area of the fire. Yet, he acknowledged that discarded cigarettes can be consumed by fires they start, destroying the evidence of their presence in the area. Further, he performed no testing, referenced no testing, nor is he even aware

of testing related to this possibility. Second, he based this opinion on witness testimony that there was no smoking activity at the area of the fire. However, he acknowledged that this type of testimony is often unreliable or misstated, and he failed to interview the key witness to evaluate the validity of that testimony. Similar to his defect opinion, this is an impermissible *ipse dixit* opinion. That opinion was not formed using sound methodology, as Flaherty himself admits that both bases upon which he forms that opinion are unreliable, and he performed no testing otherwise.

**D.** **Flaherty's defect opinions – which are nothing more than impermissible *ipse dixit* opinions – will not assist the trier of fact.**

Ultimately, with no testing supporting his defect opinions, Flaherty offers only a bare-boned hypothesis derived solely from his own thinking. Relevant evidence helps the trier of fact understand evidence or determine a factual issue. *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (citing *Daubert*, 509 U.S. at 591). As the Fourth Circuit has explained, "[t]o be relevant under *Daubert*, the proposed expert testimony must have a 'valid scientific connection to the pertinent inquiry as a precondition to admissibility.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (citing *Daubert*, 509 U.S. at 592). And to determine reliability, "the district court must ensure that the proffered expert opinion is 'based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (citing *Oglesby*, 190 F.3d at 250).

To be clear, Flaherty's defect opinion pertains exclusively to a manufacturing defect.

Q. All right. And am I correct that you're not – you do not intend and are not offering opinions regarding the design of the subject battery pack. Is that fair?

A. Correct.

16

Q.      And you're not offering any opinions with respect to warnings or instructions, fair?

A.      Yes.

(Flaherty Dep. at 11:1-9)

To determine relevance, the Court should consider the underlying substantive claims. *See, e.g.*, *Daubert*, 43 F.3d at 1320 ("In assessing whether the proffered expert testimony 'will assist the trier of fact' in resolving this issue, we must look to the governing substantive standard, which in this case is supplied by [state] tort law."). To succeed on any product liability theory, the "[p]laintiff must establish the existence of a defect." *Hartford Cas. Ins. Co. v. Marpac Corp.*, 193 F.Supp.2d 859, 862 (D. Md. 2002) (citing *Watson v. Sunbeam Corp.*, 816 F. Supp. 384, 387 n. 3 (D. Md. 1993)). "Proof of defect must arise above surmise, conjecture or speculation; and one's right to recovery may not rest on any presumption from the happening of an accident." *Id.* at 862-63 (citing *Virgil v. "Kash N' Karry" Serv. Corp.*, 484 A.2d 652, 657 (Md. App. 1984)). Maryland law is clear on what evidence is specifically required for a manufacturing defect claim:

> A manufacturing defect claim, however, involves an examination of the conduct or procedures involved in the manufacturing and construction of the product. Contrary to the [plaintiff's] argument, a manufacturing defect claim **cannot be established by simply presenting evidence that the product is defective at the time it left the manufacturer's control**. To avoid defendants' motion for summary judgment, **plaintiffs must offer evidence of some indication that the product at issue was not manufactured in accordance with the product's design specifications or that during the manufacturing process the [subject product] was assembled improperly or that some other error occurred.**

*Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 411 (4th Cir. 2001) (emphasis added) (citations omitted); *see also Stanley Martin Companies, Inc. v. Universal Forest Products Shoffner LLC*, 396 F. Supp. 2d 606 (D.Md. 2005). The Fourth Circuit has rejected manufacturing defect theories when the plaintiff "did not provide evidence concerning [defendant's] method of manufacturing or its product specifications in order to show that the [subject product] was

defective due to noncomformity with the manufacturer's standards." *Shreve*, 166 F. Supp. 2d at 412 (citing *Koch v. Sports Health Home Care Corp.*, 54 F.3d 773 (4th Cir. 1995)).

Flaherty cannot establish the existence of a defect. He claimed the manufacturing defect was either "the introduction of some foreign material" **or** "damage to a separator" within the subject battery that led to an internal short circuit.  (Flaherty Dep. at 99:22 – 100:22) (emphasis added). He cannot, however, point to any physical evidence that shows or even suggests introduction of foreign material **or** a damaged separator. (Flaherty Dep. at 107:5-11; 134:7 – 136:6). Further, Flaherty cannot identify a single cell that showed signs of short circuiting due to an internal manufacturing defect. (Flaherty Dep. at 107:12-20). Fully distilled, Flaherty's manufacturing defect theory rests solely on his own surmise.

If speculating as to the defect was not already fatal to the reliability and relevance of Flaherty's testimony, he also failed to present any evidence related to TTI-NA's manufacturing methodology or product specifications. In his deposition, Flaherty could not even remember the model number associated with the subject battery pack. (Flaherty Dep. at 83:21-23). He did not know the manufacturer of the cells – the very component he claims failed – within the subject battery pack. (Flaherty Dep. at 84:5-8). Significantly, Flaherty testified that he reviewed the various documents produced by TTI-NA concerning the engineering, design, testing, and manufacture of the subject model battery pack, **<u>but none of those documents supports or forms the basis of any of his opinions</u>**. (Flaherty Dep. p. 120:20-23). "This testimony only supports the conclusion that a product defect may exist; it does not speak to manufacturing processes or product specifications." *Shreve*, 166 F. Supp. 2d at 412. Flaherty presented no evidence as to how he alleges the subject battery pack did not conform to TTI-NA's standards. Instead, "just trust me."

TTI-NA expects Plaintiff to respond that the mere existence of a foreign material or damaged separator is evidence of noncomformity with its manufacturing standards. This argument misses the mark, because Flaherty cannot provide any evidence that shows either of those theories *actually existed* here. There is no physical evidence suggestive of some foreign material introduced during manufacturing. There is no physical evidence suggestive of a damaged separator during manufacturing. Flaherty performed no testing to determine the validity of either of those theories. Instead, those defect theories rest solely on Flaherty's conjecture and speculation; they are not based on scientific testing or analysis. Because there is no evidence that either of Flaherty's alleged defect theories existed in the subject battery pack, he cannot opine as to how the subject battery pack failed to conform with manufacturing standards.

E.     **Flaherty's testimony is inadmissible under Rule 403.**

Flaherty's defect-related opinions, for the reasons outlined above, will confuse the jury. The Court should exclude Flaherty's opinions under Rule 403 because the prejudicial effect of the opinions overwhelms their minimal probative value. FED. R. EVID. 403; *Daubert*, 509 U.S. at 595 ("'Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge is weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.'") (internal citations omitted); *see also Higginbotham v. KCS Int'l, Inc.*, 85 Fed. App'x 911, 014 (4th Cir. 2004) ("[W]here the expert proffer has a greater potential to mislead than to enlighten, that evidence may be properly excluded").

## CONCLUSION

Plaintiff seeks recovery for a fire that it says was caused by alleged manufacturing defects in the subject battery pack. But Flaherty cannot reliably say *what* the alleged defect is, *how* the subject battery pack supposedly caused the fire, or *how* the subject battery pack's

manufacture did not conform to TTI-NA's design standards. Accordingly. Mr. Flaherty's opinions are due to be excluded, and TTI-NA's Motion is due to be granted.

Respectfully submitted this 5th day of December 2023,

> */s/ H. Ben Brown III*
> J. Chandler Bailey (admitted *pro hac vice*)
> cbailey@lightfootlaw.com
> Christopher C. Yearout (admitted *pro hac vice*)
> cyearout@lightfootlaw.com
> H. Ben Brown III (admitted *pro hac vice*)
> bbrown@lightfootlaw.com
> LIGHTFOOT, FRANKLIN & WHITE, LLC
> The Clark Building
> 400 North 20th Street
> Birmingham, Alabama 35203
> (205) 581-0700
> (205) 581-0799 (fax)
>
> Jeffrey J. Hines (Bar No. 03803)
> GOODELL, DEVRIES, LEECH AND DANN LLP
> One South Street, 20th Floor
> Baltimore, MD 21202
> (410) 783-4000
> (410) 783-4040 Facsimile
> jjh@gdldlaw.com
>
> **Attorneys for Defendant Techtronic Industries North America, Inc.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 5th day of December 2023, the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which sends electronic notification of such filing to all CM/ECF participants.

*/s/ H. Ben Brown III*
OF COUNSEL
