**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | | |
|---|---|---|
| STATE FARM FIRE & CASUALTY INS. CO. a/s/o CIARA TARONJI, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 1:22-cv-01753 |
| TECHTRONIC INDUSTRIES NORTH AMERICA, INC., | ) ) ) | |
| Defendant. | ) ) | |

**DEFENDANT TECHTRONIC INDUSTRIES NORTH AMERICA, INC.'S,
REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE
OPINIONS OF PLAINTIFF'S EXPERT, C.J. FLAHERTY**

Defendant Techtronic Industries North America, Inc. ("TTI-NA"), submits the following Reply in further support of its Motion to Exclude the Opinions of Plaintiff's Expert, C.J. Flaherty. Plaintiff's Response in Opposition to Defendant's Motion fails to meaningfully address the glaring deficiencies in Flaherty's manufacturing defect opinions[1] and the methodologies that he used to support those opinions. Plaintiff lacks both direct and circumstantial evidence of a manufacturing defect in the subject battery pack, and Flaherty's opinions thus are unreliable, unhelpful to the jury, and due to be excluded.

**ARGUMENT**

As established in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993), *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999), and *Fireman's Fund Insurance Co. v. Tecumseh Products Company*, 767 F. Supp, 2d 549, 553 (D. Md. 2011),

---

[1] Consistent with Flaherty's deposition testimony, Plaintiff has acknowledged in its Response in Opposition to Defendant's Motion for Summary Judgment that its sole theory of liability in this case is a manufacturing defect in the subject battery pack. (*See* Doc. No. 37, p. 4).

this Court serves as a "gate keeper" to review expert testimony and ensure that it both rests on a reliable foundation and is relevant to the case at hand. As such, the Court must determine whether the expert's opinion is supported by adequate validation to render it trustworthy. *Westberry*, 178 F.3d at 260.

In its role as "gate keeper," the Court must exclude expert testimony that is based on belief or speculation, and any inferences by the expert must be derived using scientific or other valid methods. *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). An expert's proffered testimony is inadmissible when it is based on assumptions that are speculative and not supported by the record. *Tyger Constr. Co. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994).

I.  **Flaherty's opinions are based on unreliable principles and methodologies, and thus are due to be excluded.**

A.  **Flaherty cannot identify any competent evidence of a manufacturing defect in the subject battery pack.**

i.  *Lack of Direct Evidence.*

Flaherty admits that he cannot identify any particular cell from the subject battery pack that he believes experienced a short circuit and caused the subject fire. (*See* Flaherty Dep. at 96:6-10) ("Q. . . . What caused the short circuit? A. The development of an internal fault in one of the cells. Q. Which cell? A. **I don't know**."). And Flaherty testified that he is unable to tell the jury "what the specific mechanism of the internal short circuit was . . . ." (Flaherty Dep. 100:15-22). Put simply, Flaherty just "doesn't know."

Q.    What is the manufacturing defect in your opinion?

A.    I don't know specifically whether it's the introduction of some foreign material, the damage to a separator that causes a small connection in between different windings. **I don't know specifically what it was.**

(Flaherty Dep. at 100:9-14) (emphasis added).

Plaintiff asserts that Flaherty's opinions are supported, in part, by the CT imaging of the subject battery pack's cells. In Flaherty's report, he states that the CT imaging revealed "widespread internal electrode damage due to thermal runaway." (Doc. 39, p. 6). But Flaherty made clear in his deposition that "[t]here is no specific evidence in the CT scan that can be pointed to as an internal short circuit." (Flaherty Dep. at 93:11-13). And Flaherty readily agreed that "there is nothing . . . in any of these [CT] scans about any of these cells that indicates within a reasonable degree of scientific certainty an internal short circuit." (Flaherty Dep. at 94:12-20).

At bottom, Flaherty cannot identify the mechanism of *how* the alleged manufacturing defect occurred. (Flaherty Dep. at 99:22 – 100:22). And he cannot identify *where* the alleged manufacturing defect occurred. (Flaherty Dep. at 107:5-20, 134:7 – 136:6). Rule 702 requires more.

ii.    *Lack of Indirect Evidence.*

Without identifying any direct evidence of a manufacturing defect, Flaherty is left only with indirect evidence with which he attempts to support his opinions. But "[e]ven absent direct evidence, however, a plaintiff's proof must still 'arise above surmise, conjecture, or speculation' because her 'right to recovery may not rest on any presumption from the happening of the accident.'" *Redford v. SC Johnson and Son, Inc.*, 437 F.Supp.2d 391, 395 (D. Md. 2006). Fully distilled, Flaherty's manufacturing defect opinions amount to nothing more than impermissible surmise, conjecture, and speculation – rendering his opinions unreliable, unhelpful to the jury, and inadmissible.

Flaherty agreed that the evidence associated with the subject battery pack is equally consistent with the battery pack being attacked by an external fire, unrelated to any defective condition in the battery pack. (Flaherty Dep. at 43:5-13, 87:21 – 88:21, 104:6-13). More specifically on this point, Flaherty testified as follows:

Q.     Can an external fire result in physical attributes and characteristics of all 20 of these cells and the printed circuit board as we see in this case?

A.     **Yes.**

(Flaherty Dep. at 104:9-13) (emphasis added).

Flaherty further agreed that external fire attack can cause lithium-ion battery cells to go into thermal runaway. (Flaherty Dep. at 39:5-8). Put simply, Flaherty acknowledged that the physical evidence from the subject battery pack can be attributed to either an external fire attack or an internal failure within the battery pack.

Without *any* specific piece of evidence that supports his manufacturing defect opinion, Flaherty attempts to utilize other indirect evidence to support his theory, specifically, his ruling out of an equally plausible cause of this fire – improperly discarded cigarettes. However, Flaherty's "methodology" used to rule out improperly discarded smoking materials as a potential cause of this fire rests on circular logic. Flaherty attempted to rule out smoking materials as the cause based on the fact that no discarded smoking materials were found at the area of the fire. (Flaherty Dep. at 117:10 – 118:1). But Flaherty acknowledged that discarded cigarettes can be consumed by fires they start, destroying the evidence of their presence in the area. (Flaherty Dep. at 64:17 – 66:6). He further based this opinion on witness testimony that there was no smoking activity at the area of the fire. (Flaherty Dep. at 117:10 – 118:1). However, Flaherty acknowledged that this type of testimony is often unreliable or misstated, and he failed to interview the key witness to evaluate the validity of that testimony. (Flaherty Dep. at 37:6-12, 60:5-8). In sum, Flaherty applied the same unreliable, unscientific methodology to rule out improperly discarded cigarettes that he utilized to form his opinion that a manufacturing defect in the subject battery pack cause the fire. Rule 702 is not selectively applied to only some of an expert's opinions. Taken together, Flaherty's opinions are unreliable and inadmissible because he

failed to eliminate a potential cause of the fire – improperly discarded cigarette – that is at least as plausible as the subject battery pack.

### iii. *There is no evidence that the subject battery pack deviated from TTI-NA's design specifications.*

Beyond that, Flaherty's manufacturing defect opinions fail because he offered no opinion that the subject battery pack deviated from TTI-NA's design specifications. Maryland law is clear that a plaintiff must present such evidence to establish a manufacturing defect claim:

> A manufacturing defect claim, however, involves an examination of the conduct or procedures involved in the manufacturing and construction of the product. Contrary to the [plaintiff's] argument, **a manufacturing defect claim cannot be established by simply presenting evidence that the product is defective at the time it left the manufacturer's control. To avoid defendants' motion for summary judgment, plaintiffs must offer evidence of some indication that the product at issue was not manufactured in accordance with the product's design specifications or that during the manufacturing process the [subject product] was assembled improperly or that some other error occurred.**

*Shreve v. Sears, Roebuck & Co.*, 166 F.Supp.2d 378, 411 (4th Cir. 2001) (emphasis added) (citations omitted); *see also Stanley Martin Companies, Inc. v. Universal Forest Products Shoffner LLC*, 396 F. Supp. 2d 606 (D. Md. 2005), *Eaton Corp. v. Wright,* 375 A.2d 1122 (Md. App. 1977).

The Fourth Circuit has rejected a plaintiff's manufacturing defect theory because "[the plaintiff] did not provide evidence concerning [the defendant's] *method of manufacturing* or its *product specifications* in order to show that the heat pack in question was defective due to nonconformity with the manufacturer's standards." *Koch v. Sports Health Home Care Corp.,* 54 F.3d 773, 1995 WL 290409, at *6 (4th Cir. May 15, 1995) (per curiam) (unpublished) (emphasis added).

Flaherty testified that he reviewed the various documents produced by TTI-NA concerning the engineering, design, testing, and manufacture of the subject model battery pack, but none of those documents support or form the basis of any of his opinions. (Flaherty Dep. at

120:20-23). Likewise, Flaherty does not know the manufacturer of the cells within the subject battery pack. (Flaherty Dep. at 84:5-8). As such, Flaherty has no evidence – and thus, no admissible opinion – that the subject battery pack was "defective due to nonconformity with [TTI-NA's] standards." *Koch*, 54 F.3d at *6.

### B. Flaherty performed no physical testing to validate his opinions.

As the Fourth Circuit explained in *Oglesby*, "[a] reliable expert opinion must be based on scientific, technical or other specialized *knowledge* and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (emphasis in original) (*citing Daubert,* 509 U.S. at 592–93, 113 S.Ct. 2786). "[T]o qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known." *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified . . . The statements constituting a scientific explanation must be capable of empirical test." *Id.* at 593, 113 S.Ct. 2786 (citations omitted). To be sure, "a plaintiff may not prevail in a products liability case by relying on the opinion of an expert unsupported by any evidence such as test data or relevant literature in the field." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 290 (4th Cir. 2021) (quoting *Oglesby*, 190 F.3d at 249). This is because, "[w]ithout testing, supporting literature in the pertinent field, peer reviewed publications, or some basis to assess the level of reliability, expert opinion testimony can easily, but improperly, devolve into nothing more than proclaiming an opinion is true 'because I say so.'" *Id.* at 292 (brackets removed) (quoting *Small v. WellDyne, Inc.*, 927 F.3d 169, 177 (4th Cir. 2019)).

Flaherty's defect theory relies solely on "cognitive testing," (i.e. thinking), and he performed <u>no</u> physical testing to validate his theory. (Flaherty Dep. at 99:22 – 100:22, 118:17 –

119:17; *id.* at 119:13-17) ("Q. Okay. Any testing . . . of any exemplars, any scientific testing that's outside of cognitive testing to disprove the hypothesis that you performed? A. **<u>No physical testing of this</u>**."). Indeed, Flaherty made clear that he performed no testing of an exemplar battery pack to support his failure mode opinions. (Flaherty Dep. at 100:23 – 101:4) ("Q. Did you do any testing of any exemplars to try to determine or replicate a short circuit and an internal failure of a battery cell like this one? A. **<u>No</u>**."). Even if Flaherty's hypothesis about an internal short circuit in the subject battery pack was sound, it was never tested.

"Engineering is a field of applied science. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148, 119 S.Ct. 1167 (1999). It relies on the scientific method. That method involves formulating a hypothesis to explain the world based upon what is already known and then subjecting the hypothesis to tests designed to falsify (or confirm) the hypothesis. *See Daubert,* 509 U.S. at 590, 113 S.Ct. 2786. Flaherty's disregard of the scientific method and his utter lack of physical testing leave his opinions unworthy of passing through *Daubert's* gate. Flaherty's opinions are due to be excluded.

C.     **<u>Whether an inference of a defect is proper in this case has no relation to whether Flaherty's methodology was reliable.</u>**

In an attempt to circumvent the gaping hole in Flaherty's methodology, Plaintiff contends it is proceeding under an "indeterminate defect theory," which allows the inference of a product defect under special circumstances. *See generally* Doc. 39. An inference of a defect is allowed in special circumstances, but whether an inference of a defect can be drawn is a question to address based, in part, on *reliable expert testimony*. Under Maryland law, utilizing the *Harrison* factors and establishing an inference of a defect is not an argument that relates to whether an expert's testimony is reliable or admissible. *See Harrison v. Bill Cairns Pontiac of Marlow Heights, Inc.*, 549 A.2d 385 (Md. App. 1988) (holding that a reasonable factfinder could not draw an inference

of a defect, in part, because the plaintiff's relied "only upon the supposition of one of their expert witnesses that such a fire would not normally result in the absence of a product defect." *Id.* at 391); *Shreve*, 166 F.Supp.2d 378 (where the Court still evaluated the *Harrison* factors even though it found the expert was unqualified and the expert's methodology was unreliable), *Redford*, 437 F.Supp.2d 437 (where the Court still evaluated the *Harrison* factors despite the plaintiff's experts being unqualified to testify as to possible defects). It is not the expert's job to utilize the *Harrison* factors to establish an inference of a defect, and *Harrison* does not supplant *Daubert* and this Court's gate-keeping role under Rule 702. Flaherty was required to present reliable, scientifically valid opinions that pass muster under Rule 702 and *Daubert*. He did not, and Flaherty's opinions are due to be excluded.

II.     **Flaherty is not qualified to testify competently regarding alleged defects in lithium-ion batteries.**

Plaintiff argues that Flaherty is adequately qualified to render opinions and testify about alleged manufacturing defects in lithium-ion batteries. (Doc. 39, pp. 2-4). In support, Plaintiff notes that "[n]either Daubert, nor Rule 702, require a person intending to give expert testimony to hold any specific title in order to testify as an expert on that subject." (Doc. 39, p. 3). This misses the point. TTI-NA does not contend there is some special title that automatically renders an expert qualified on any given topic, nor does TTI-NA contend that because some expert does not hold some specific title, they are automatically prohibited from testifying on a given topic. Maryland law is clear that what renders an expert qualified to testify on a given topic: the expert must possess "some special skill, knowledge or experience to formulate that opinion; the opinion must be an expert opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *Shreve.*, 166 F.Supp.2d at 393 (citing *Ancho*

*v. Pentek Corp.*, 157 F.3d 512, 518 (7th Cir. 1998)). Whether Flaherty holds some "specific title" is not of concern.

Plaintiff cites Flaherty's *curriculum vitae* and, as a blanket statement, states that his "formal education and training as an electrical energy (sic) allows him to be well versed in a multitude of electronics, electrical power sources, and electrical systems – include (sic) lithium-ion batteries and their chargers." (Doc. 39, p. 3). The simple fact that Flaherty has education and training as an electrical engineer does not automatically render him qualified to testify about the very specific issue of alleged manufacturing defects in lithium-ion batteries.[2] "[A]n expert who is a mechanical engineer is not necessarily qualified to testify as an expert on any issue within the vast field of mechanical engineering." *Shreve.*, 166 F.Supp.2d at 392. Plaintiff claims that Flaherty "needn't be specific (sic) training (sic) in any one source of electricity or any one electronic to determine thermal runaway and internal failure when there is no evidence of an external source of attack." (Doc. 39, p. 3). Maryland case law is clear that this is wrong. *See Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (excluding a mechanical engineer's testimony due to the engineer's lack of specialized experience or expertise in evaluating automobile manufacturing processes or evaluating strengths of plastic automobile component parts); *Ancho v. Pentek Corp.*, 157 F.3d 512, 515 (7th Cir. 1998) (a mechanical engineer with no specialized experience designing or evaluating factories was not qualified to testify on industrial plant configuration). The "engineer must possess 'some special skill, knowledge or experience' *concerning the particular issue before the court*." (*Shreve*, 166 F.Supp.2d at 392 (citing *Ancho*, 157 F.3d at 517) (emphasis added)).

---

[2] Utilizing Plaintiff's own argument, the fact that Flaherty holds the title of "electrical engineer" (a 'special title') does not automatically render him qualified to testify about manufacturing defects in lithium-ion batteries.

The concern is whether Flaherty possesses the specialized skills, knowledge, or experience that makes him qualified to testify "the particular issues before the court." *Id.* Here, the 'particular issue before the court' is whether the subject battery pack contained a manufacturing defect. (Doc. 37, p. 4). Flaherty must possess some special skill, knowledge, or experience concerning manufacturing defects of lithium-ion batteries for him to be qualified to testify as an expert on the subject. He does not.

Flaherty has no specialized skill concerning manufacturing defects in lithium-ion batteries. He has never designed or developed a lithium-ion battery pack. (Flaherty Dep. at 14:22; 15:3). Flaherty admitted that he has no specialized training related to lithium-ion battery packs or chargers. (Flaherty Dep. at 12:3-4). Likewise, he has no specialized knowledge concerning manufacturing defects in lithium-ion batteries. Flaherty has never taken a course related to lithium-ion battery packs, and he has never taught a course related to lithium-ion battery packs. (Flaherty Dep. at 15:23; 16:16, 20).[3] For the subject battery pack specifically,

---

[3] Plaintiff states that "Defendant's supposition that Mr. Flaherty has no education on lithium-ion batteries does not reflect the testimony given [in his deposition]." (Doc. 39, p. 3). This is in direct conflict with his testimony.

> Q.    Okay. When you were at the U.S. Naval Academy from 2006 to 2012, your CV in this case says there's courses taught. And I don't see anything on here explicitly about lithium-ion batteries but I'll just ask you: Did you teach a course or subject that was related to lithium-ion battery packs?
>
> A.    No.
>
> Q.    Have you ever – outside of the Naval Academy, have you ever taught a course or a subject on lithium-ion battery packs?
>
> A.    No.
>
> Q.    Have you ever taken a course of [sic] subject concerning lithium-ion battery packs?
>
> A.    No.

(Flaherty Dep. at 15:9-23).

Flaherty did not know the model of the subject battery pack. (Flaherty Dep. at 83:21-23). He did

not know the manufacturer of the subject battery's cells – the very component(s) that he claims

failed. (Flaherty Dep. at 84:5-8). In an attempt to establish Flaherty's specialized knowledge on

the subject, Plaintiff points to a list of four referenced sources from Flaherty's report as evidence

that he is in fact educated on manufacturing defects in lithium-ion batteries. (Doc. 39, pp. 3-4).

However, Flaherty admitted that none of those sources directly support his specific failure mode

opinion in this case:

> Q.   Do any of the four references that you've cited in your report, do they
> support the proposition or your opinion that a battery – an 18650 40-volt
> battery pack that's been on the shelf off the charger for eight and a half
> hours, has a short circuit initiated and causes thermal runaway?
>
> A.   I don't think any of them have that degree of specificity regarding
> charging storage time frames.

(Flaherty Dep. at 119:18 – 120:4).

Flaherty has no specialized experience concerning manufacturing defects in lithium-ion

batteries. Prior to his consulting work, none of Flaherty's professional career involved lithium-

ion battery packs. (Flaherty Dep. at 16:17). Even in his consulting work, the only experience

Flaherty has with lithium-ion battery failures relates to two investigations of lithium-ion batteries

in hoverboards. (Flaherty Dep. at 30:11-13). Flaherty, however, admitted that the batteries

utilized in those hoverboards are vastly different than the subject battery pack. (Flaherty Dep. at

30:11-13, 31:23 – 32:5, 32:7 – 33:14).

Just like the mechanical engineering expert in *Oglesby*, Flaherty is an electrical engineer

who is not qualified to testify as an expert on every issue within the vast field of electrical

engineering. Specifically, he is not qualified to testify as an expert on the very specific subset of

the field of electrical engineering related to lithium-ion battery failure modes. Without

specialized skill, knowledge, or experience concerning manufacturing defects in lithium-ion

batteries, Flaherty is not qualified under Maryland case law and *Daubert* to offer his opinions in this case.

**III.    Flaherty's testimony is inadmissible under Rule 403.**

Plaintiff claims that "there is nothing in the record to suggest that the probative value of Mr. Flaherty's testimony is outweighed by any prejudice it would create." (Doc. 39, p. 7). As established above, the opposite is true. Flaherty's untested defect theory rests solely on an unreliable methodology. As his opinions fail to meet the rigorous requirements of *Daubert*, they offer virtually no probative value. *Kumho Tire Co.,* 526 U.S. at 147 (citing *Daubert*, 509 U.S. at 589), *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F.Supp.2d 334, 340 (D. Md. 2011) (citations omitted). Conversely, if Flaherty's opinions are admissible, Plaintiff will be allowed to put forward an expert who, based on unreliable methodology, points the finger at one party – TTI-NA. The prejudicial effect of this would be huge, and it substantially outweighs any probative value.

**CONCLUSION**

Flaherty's methodology utilized to form his defect opinions was unreliable, most significantly because he failed to perform any objective testing or evaluation to validate his hypotheses. Flaherty is not qualified to render opinions concerning defects in lithium-ion batteries, nor is he qualified to render opinions concerning the specific issue of manufacturing defects in lithium-ion batteries. Plaintiff cannot utilize the *Harrison* factors to show that Flaherty's methodology was reliable, or that his opinions are admissible. Flaherty's opinions offer virtually no probative value and would create an enormous prejudicial effect against TTI-NA.

TTI-NA respectfully requests that the Court exclude Flaherty's opinions as outlined above.

Respectfully submitted this 23rd day of January 2024,

/s/ H. Ben Brown III
J. Chandler Bailey (admitted *pro hac vice*)
cbailey@lightfootlaw.com
Christopher C. Yearout (admitted *pro hac vice*)
cyearout@lightfootlaw.com
H. Ben Brown III (admitted *pro hac vice*)
bbrown@lightfootlaw.com
LIGHTFOOT, FRANKLIN & WHITE, LLC
The Clark Building
400 North 20th Street
Birmingham, Alabama 35203
(205) 581-0700
(205) 581-0799 (fax)

Jeffrey J. Hines (Bar No. 03803)
GOODELL, DEVRIES, LEECH AND DANN LLP
One South Street, 20th Floor
Baltimore, MD 21202
(410) 783-4000
(410) 783-4040 Facsimile
jjh@gdldlaw.com

**Attorneys for Defendant Techtronic Industries North America, Inc.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 23rd day of January 2023, the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which sends electronic notification of such filing to all CM/ECF participants.

*/s/ H. Ben Brown III*
OF COUNSEL

14